# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LAURA MULLEN, individually and on behalf of all others similarly situated,<br><br>  *Plaintiff,*<br><br>v.<br><br>GLV, INC., d/b/a SPORTS PERFORMANCE VOLLEYBALL CLUB and GREAT LAKES CENTER, an Illinois corporation, RICKY BUTLER, an individual, and CHERYL BUTLER, an individual,<br><br>  *Defendants.* | Case No. 1:18-cv-1465<br><br>JURY TRIAL DEMANDED |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Laura Mullen, by and through her *pro bono* counsel Edelson PC, brings this Class Action Complaint and Demand for Jury Trial against Defendant GLV, Inc. ("GLV"), Defendant Ricky Butler ("Rick" or "Butler"), and Defendant Cheryl Butler ("Cheryl" or "Cheryl Butler") for deceiving parents and youth volleyball players to become members of the Sports Performance Volleyball Club ("Sports Performance") based upon false information and material omissions of fact regarding Defendant Butler's sexual abuse of underage girls. Plaintiff, for her Complaint, alleges as follows upon personal knowledge as to her and her own acts and experiences, and as to all other matters, upon information and belief, including investigation conducted by her attorneys:

## NATURE OF THE ACTION

1. Sports Performance Volleyball Club, operated by and through Defendants, is one of the most powerful youth sports clubs in the country. And according to ESPN, its owner, Rick Butler, is the most powerful coach in youth volleyball. Simply stated, Butler has the ability to

place the teenage girls he coaches at top college volleyball programs in the Midwest and around the country, and ultimately give them opportunities to pursue the sport beyond college. Unfortunately, for over three decades, Rick has used his position of power to sexually abuse no fewer than six underage teenage girls, and likely many more. USA Volleyball and the Amateur Athletic Union have both banned Butler, and the State of Illinois has made findings regarding his sexual misconduct with minors.[1]

2.      Butler, his wife Cheryl, and GLV (among others) have actively concealed his abuses for years by pressuring his victims—often by threatening to end their futures in the game—to remain silent. Worse, they have persistently intimidated and attempted to discredit the few of his victims brave enough to come forward by exerting emotional and psychological control over them. Such concealment has allowed Defendants to not only to remain in business, but to thrive.

3.      Defendants have misrepresented or intentionally omitted Butler's history of sexual abuse of teenage girls under his training and supervision. At no time have Defendants or any of their employees given parents or players disclosures regarding the true extent of Butler's sexual misconduct.

4.      Plaintiff Laura Mullen is the parent of a former player at Sports Performance who sent her child to the organization without knowledge of Butler's history of sexual abuse. Had she and members of the putative Class known that a child sexual predator would coach their teenage daughters, they never would have given money to Defendants and never would have sent their girls to Sports Performance.

---

[1]      Notably, the transcripts of these hearings and the findings of USA Volleyball and the Illinois Department of Child and Family Services have not been made available to the public and are not searchable online.

5.     As such, Plaintiff Mullen now brings this suit seeking (1) monetary compensation in the form of fees paid to Defendant GLV as well as statutory penalties; (2) injunctive relief requiring Defendants to fully disclose to current and prospective players and parents the true nature of Butler's sexual abuse of underage girls; and (3) attorneys' fees and costs.[2]

## PARTIES

6.     Plaintiff Laura Mullen is a natural person and citizen of the State of Illinois.

7.     Defendant GLV, Inc., d/b/a Sports Performance Volleyball Club and Great Lakes Center, is a corporation organized and existing under the laws of the State of Illinois with its principal place of business located at 579 North Oakhurst Drive, Aurora, Illinois 60502. It does business in this County and across the State of Illinois.

8.     Defendant Ricky Butler is a natural person and citizen of the State of Illinois. Defendant Ricky Butler is a co-owner of GLV Inc. and formerly a Director of the Sports Performance Volleyball Program.

9.     Defendant Cheryl Butler is a natural person and citizen of the State of Illinois. Defendant Cheryl Butler is a co-owner of GLV Inc. and a Director of the Sports Performance Volleyball Club Program.

## JURISDICTION & VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the putative Class is a citizen of a state different from the Defendants, (ii) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) none of the exceptions under the subsection apply to this action.

---

[2]     Plaintiff Mullen's attorneys, Edelson PC, will seek attorneys' fees separate and apart from any monetary recovery achieved for Plaintiff and the putative Class. Edelson PC will donate any such attorneys' fees to an appropriate charity.

11.     This Court has personal jurisdiction over Defendants because they transact significant business in this District, and the unlawful conduct alleged herein was directed to and emanated from this District.

12.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Plaintiff and Defendants reside in this District, and the unlawful conduct alleged herein was directed to and emanated from this District.

## BACKGROUND FACTS

### *Rick Butler and his Role in the Volleyball Community*

13.     Participation in competitive club volleyball is growing across the country. Male and female youths participate in the sport (usually) in addition to their traditional high school teams, many with hopes of playing in college and beyond. The youth volleyball scene is extremely competitive. For the players, it is a nearly 365-day a year commitment, with hours every day dedicated to practicing and training. For many in the youth volleyball world, everything else—school, friends, family, socializing, and other normal teenage activities—comes second.

14.     Rick Butler is a long-time youth volleyball coach based in Aurora, Illinois. Butler is the leader and creator of Sports Performance—a widely known training program that fields numerous youth volleyball teams for national competitions—and Great Lakes Volleyball Center, one of the sports facility centers that hosts Sports Performances programs and camps. Sports Performance has won dozens of national titles and sent hundreds of students on to Division I schools with full scholarships.

15.     Sports Performance is considered a "feeder" club to many of the top volleyball programs in the country, including in the Mid-West.

4

16.     Butler's personal influence with colleges allows him incredible latitude in helping to place players (or keep them from being placed, if he so chooses) at these programs.

17.     Indeed, as one example, Butler has a special relationship with Michigan State University.  The current head coach of the women's volleyball program there was one of Butler's coach's at Sports Performance during the mid 1980's (during which Butler was victimizing girls, as discussed below).  And her current assistant coach for the women's program served as the head coach for the Sports Performance Volleyball Club Summer Camp from 2000-2004.

18.     Not only does Michigan State work with Butler and Sports Performance in identifying potential recruits, at least one Michigan State women's volleyball coach has, as a proxy of Butler and Sports Performance, taken an active role in denying the accusations against Butler and discouraging victims from speaking out.

19.     Due to his far-reaching sphere of influence—one that reaches far beyond Sport Performance's 66,000 square foot training center—parents and their children seek out Butler's and Sports Performance's services hoping they will provide the best opportunities possible. In that regard, over the past three decades, thousands of young girls and boys have participated in clinics and teams at Sports Performance with the hope that, with Butler's training and endorsement, their futures in volleyball will flourish.

20.     Defendants operate, and the Butlers actively participate in, a variety of camps and clinics around the country. Thousands of youth volleyball players (and their parents) from outside the State of Illinois have engaged with Defendants (either at out-of-state camps, or by traveling to Illinois to participate in camps and on teams) all for the "elite coaching" Defendants claim to provide. Outside of their own complex (Great Lakes Volleyball Center), the Butlers and

5

GLV have received substantial monetary fees for various camps nationwide, including but not limited to camps operated in partnership with the following organizations:

- Benedictine University (Illinois);
- Texas State University (Texas);
- Round Rock Sports Center (Texas)
- North Carolina Xcel Sportsplex (North Carolina);
- Louisiana Team Sportsplex (Louisiana);
- Southern Performance Volleyball Academy (Alabama);
- Southwest Oregon Community College (Oregon);
- Schoolcraft College (Michigan);
- University of Central Florida (Florida);
- VC Nebraska (Nebraska);
- Atlanta Performance Volleyball Center (Georgia);
- V. Sue Cleveland High School (New Mexico);
- Alabama Metro Athletic Center (Alabama);
- University of Michigan Dearborn (Michigan); and
- Illini Elite Volleyball Center.

***Rick Butler's Manipulation and Sexual Exploitation of Underage Girls***

21.     Butler has sexually abused, as well as physically and emotionally abused, no fewer than six—and on information belief, numerous more—underage girls in his care.

22.     Each of Butler's victim's stories (with the exception of one young girl who falls outside of Butler's pattern of abuse because she was living with him at the time of the rape), have very similar themes:

a)  The victims were each at the top of their game; rising stars in need of a coach to propel them to the next level and help get them a scholarship to an elite college;

b)  Butler used his position of power as an influential and nationally known volleyball coach to gain leverage over the girls and their parents;

c)  He used abusive emotional, psychological, and physical tactics to shame the girls and put them in vulnerable positions; and

d)  He used abusive emotional, psychological, and physical tactics and intimidation to prevent the girls from stopping the sexual abuse or revealing the abuse to others.

6

23.     Relying on these vulnerabilities and aspirations, Butler set up an environment of dependency and fear with each teenage girl. By repeatedly telling them that they needed to follow his directives "blindly" in order to succeed, combined with threats of blackballing them from the sport and physical intimidation, Butler could mold and pressure each girl to his own ends without fear they would reveal what he was doing.

24.     The best description of this emotional and psychological traps come from one of the victims herself, Christine Tuzi, as she explained it at Butler's closed-door 1995 Ethics and Eligibility Committee Hearing of the United States Volleyball Association:

> The question that seems to plague this
> Committee is <u>why didn't I come forward sooner.</u>
> <u>The answer is very simple: Fear.</u>  When this was
> happening to me, I was 16 years old.
> ....
> MS. TUZI:  Because Butler had a <u>tremendous</u>
> <u>influence over me, I truly believed that I needed</u>
> <u>him, that I would have nothing but a wasted life</u>
> <u>without him.</u>  I believed that he could give me
> everything or he could take everything away from
> me.  I believe that he held my whole future in his
> hands.  All of my dreams and all of my desires to
> be the best.  The fear that he would take
> everything away if I didn't do what he wanted was
> my reality, and I lived with my fear every single
> day and every single practice.

25.     Below are the stories of the five women who have been brave enough to come forward with the horrific details of what Butler did to them.

*Sarah Powers-Barnhard*

26.     In 1981, Sarah Powers-Barnhard was a rising top ranked high school volleyball player and star at Sports Performance. When she first met Rick Butler, she was just 15 years old.

27.     Butler began his campaign of manipulation and improper conduct toward Sarah by gaining leverage over her. He repeatedly told her he could make her a star as long as she did everything he said. But that without him, she would not succeed. These talks would happen in private, away from her parents and teammates under the guise of discussing team-related issues.

28.     Butler then started to touch her at inappropriate times, such as on her 16th birthday when he coaxed her into a back stairwell of a gymnasium and hugged her.

29.     Shortly after she turned 16, Sarah was on a team trip to Syracuse, New York and Canada. Without any parental chaperones, the girls were separated from their family for an extended period of time.

30.     Along the way, the team stopped at Western Michigan University to practice. When Butler found out Sarah had not followed his exact instructions for a drill, he whipped a volleyball forcefully at the wall making a loud noise and startling everyone in the gym. He then screamed "jesus fucking christ you're going home on a bus" and demanded that another coach purchase her a ticket immediately.

31.     Because she did not understand what she had done wrong, Sarah spent that night hysterically crying, believing she was being sent home without participating in her team's tournament. She was so upset that the Western Michigan volleyball players she was sharing an apartment with became concerned about her well-being. The next day, presumably as planned, Butler informed her she could stay but that she had to ride in the equipment van to New York—a 16-hour trip—isolated and alone.

32.     That night, after they arrived and settled into the Syracuse dorms, Butler summoned Sarah to an upstairs private lounge. Once again believing she was being sent home (and this time on a bus all the way back to Illinois), she went to the lounge in a state of panic and terror.

33.     There, Butler told her "you need to follow me blindly. You're not like everyone else. Even when you don't understand what I'm asking. There can be no exceptions." Sarah responded "yes" and agreed she would listen to everything he said.  At that moment, Butler leaned over and kissed her. At the time, Sarah had no sexual experience and didn't realize or understand what was happening. Her only thought, as likely was Butler's exact plan, was relief that he was no longer punishing her and she wasn't going home.

34.     On the Canadian part of the trip, Butler twice served alcohol to the entire team and got them intoxicated. Throughout the entire trip, Butler kissed and fondled her.

35.     Within a week of being back home, Butler invited the team over to his house and served them "tequila sunrises" and again got them intoxicated. Later in the evening, Butler pulled Sarah's head into his lap and stroked her hair while another player looked on.

36.     Just days later, Butler summoned Sarah to his house to discuss a "problem on the team." Expecting his roommate to also be home, Sarah arrived to find Butler home alone.

37.     After they had some food, Butler grabbed her hand and walked her to the bedroom, undressed her, and proceeded to rape her as she lay motionless in a terrified state. It was painful and resulted in her bleeding. After, Butler was very angry that she had not enjoyed it.

38.     Unfortunately, this was only the beginning of the sexual abuse that Sarah would suffer. While the incidents number in the hundreds, a few notable acts of abuse are listed here:

- On a team trip to Germany, Butler raped Sarah in the bathroom of a train car, with her entire team nearby.

- On the same trip to Germany, after an issue with their sleeping arrangements, the entire team and Butler were forced to sleep on the floor in one large room. Butler slept next to Sarah and fondled her throughout the night just feet from the other girls.

- Butler, on several occasions, had Sarah watch pornographic movies so she could "learn."

- Butler regularly used the pretext of talking or meeting about "team issues" to lure Sarah to his car, house, or other secluded locations to sexually abuse her.

- Butler utilized a "secret ring" to avoid detection by Sarah's parents. He would call her house and hang up after the first ring. This was a known instruction for Sarah to call him back.

39. Any time Sarah did something that upset Butler off the court, he would punish her during practice. For example, Butler would make Sarah come to his condo building to swim at his pool, and because of the obvious outward inappropriateness of them being seen together in the pool, Butler instructed Sarah to tell anyone who asked that she was his cousin. However, when the teenage lifeguard at the pool took an interest in Sarah and came to Butler's apartment asking about his "cousin," Butler became furious.

40. The next day, Sarah opened up her front door to find several photos of her, which she knew had been in Butler's possession, ripped into small pieces on her doorstep. Although she was not yet aware that the lifeguard had approached Butler, Sarah knew that something was wrong and she was terrified by the fact that Butler was clearly upset with her.

41. At practice, Butler told her it was her fault, and as punishment, he told her she had to run until she threw up.

42. As Sarah approached her senior year, she was a massive star in the volleyball world. Top schools around the country recruited her heavily. Sarah had already committed to a

top program in California when Butler surprised her with a meeting at Butler's apartment with

Rob Buck, the head coach at Western Michigan University. Butler made clear, as he had for

years, that all of Sarah's success was because of him and that any success she had in the future

would only come from him. Based on that, Butler insisted that Sarah needed to follow his and

Buck's instructions, which was to break her other college commitment and go to Western

Michigan. After years of abuse, Sarah had little ability to say no.

43.     It turned out that Buck happened to be a very close friend of Butler, and

unbeknownst to Sarah, they had already agreed that Butler would come up the following year to

work with the Western Michigan team. To that end, Sarah soon found out that she was placed in

a dorm room with another student-athlete that was having a sexual relationship with Buck. The

purpose of this intentional arrangement, set up by Butler and Buck, was to allow them to see

both girls without raising any suspicion.

44.     However, when first Butler came to see her at Western Michigan, she'd finally

had enough and had gained the strength to try and resist him. She lay on her floor sobbing in

front of him, begging him to leave her alone. Butler was furious with her and left.

45.     Shortly thereafter, Sarah found out that Butler was abusing a new girl at Sports

Performance (a sixth girl not described or identified in this Complaint). Sarah's friends who were

still on the team called her and told her they'd seen Butler kissing this girl. When he found out

they'd been seen, he called a team meeting to tell the girls they had not seen what they thought

and threatened them that there would be "problems" if they said anything.

46.     After hearing of this incident and the other girl, Sarah decided to confront Butler

at his home. She told him he was sick and had a problem and he needed to stop doing this to

young girls. Butler became angry and threw her out of his house.

47.     Still, once back at school, Sarah found out that Butler was coming to coach and the new girl would be coming to join the team.

48.     Sarah went to her coach, Rob Buck, and warned him about Butler coming with a young girl and told him about what Butler had previously done to her. In response, Buck told Sarah to "get the hell out of his office" and said she was "just jealous."

49.     Only years later would Sarah find out that Butler had also been abusing two other women (Christine and Beth, detailed below) around the same time period. With each of these girls, Butler was not only hiding the fact of what he was doing from the others, but that he was having unprotected sex with all of them.

50.     As Sarah was finishing a stellar college career, she was set to fulfill her dreams and play professionally in a newly created league with the heroes she'd watched play her whole life. However, just as soon as the opportunity presented itself, it was ruined. Butler called Sarah and told her he was coaching one of the new teams, the Chicago Breeze, and that he was going to draft her as his "Hometown Draft Pick." While she begged him not to, he of course did. Thus, in order to play professionally, she had no choice but to again endure being around Butler for six months while he was the coach (the structure of the draft forced her to accept or else not play). During the time she played for the Breeze, she lied to Butler that she was still taking classes at Western Michigan in order to have an excuse to leave town (and be away from him) for as much time as possible.

51.     In recent years, Defendant Cheryl Butler has repeatedly attacked Sarah personally on social media and, on information and belief, Rick and Cheryl have directed younger players to reach out to Sarah to tell her to stop telling her story.

12

*Beth Rose*

52.     Beth Rose is the daughter of Butler's former business partner. For a time in the 1980s, Butler lived with Beth and her mother in their apartment.

53.     Beth was not a volleyball player, but lived around the sport everyday. In fact, she generally despised the sport.

54.     Beth's dislike of volleyball was only compounded by Butler's presence in her house. He would either ignore her entirely or, in a similar manner to how Butler treated his players, verbally abuse her. This included body shaming her with comments such as calling her "cottage cheese legs."

55.     Beth witnessed Butler's players coming to her apartment and disappearing into his bedroom for extended periods of time. Sometimes, she never saw the girls come back out. That's because, consistent with Christine's experience, he'd have them leave out his window. In fact, Beth once conveyed this fact to a police officer after their apartment was broken into and the officer asked why there were so many footprints outside Butler's window.

56.     One night in 1983, shortly after turning 16, Beth came home early from a party because she was upset. Beth's mother was out of town, and when she arrived, Butler was sitting in the living room with a bottle of vodka at his feet. Seeing she was upset, Butler offered her a drink.

57.     In a short period of time, Beth consumed a substantial amount of vodka and became very intoxicated. It was then that Butler began to lure her to his bedroom. Beth was so drunk she could barely stand or walk. Because of this, Butler put her feet on his and walked her to the bedroom. There, Butler raped her. Beth was too drunk and too scared to stop him.

58.     The next morning Beth woke up feeling scared, shocked, and confused. She was in the kitchen when Butler appeared from his bedroom. He sped through the living room and left the apartment without acknowledging her presence. Beth was so afraid she was physically shaking and spilled a glass of milk. He continued to ignore Beth for a week after the assault.

59.     One week after Butler's assault, Beth confronted him after having drinks with friends. The situation quickly deteriorated and again Butler raped her. While this was happening, Butler told her about how much Sarah (Powers-Barnhard) supposedly liked having sex with him.

60.     Following this second incident, Beth's home environment became intolerable. Butler became more explosive and demeaning. While he never raped her again, the emotional, verbal, and psychological abuse increased.

61.     Once Beth turned 17, she moved out of her home in order to get away from Butler. A year and a half later, given an opportunity to move back in with her mom, she did, but immediately moved back out when she found out that Butler might be coming back.

62.     Years after this incident, as Beth's abuse became public, Defendant Cheryl Butler posted derogatory comments about her on the Facebook page of Christine Tuzi's husband.

### *Christine Tuzi*

63.     In 1983, Christine Tuzi was in high school and had just been placed on Butler's team at Sports Performance. She was 16 years old.

64.     Butler began his grooming process immediately upon Christine joining his team. He brought her to a Burger King for a private meeting and asked her what her goals were. She told him she wanted to be a great athlete and play in the Olympics. Following the same script he used with Sarah, Butler told Christine what would happen if she followed all of his instructions and did exactly what he said.

14

65.     Once the season was underway, Butler learned that Christine had a history paper to write on the Vietnam War. Butler, presenting himself a history major, offered to assist. He invited her to his apartment to work on the paper and then they went out for pizza. During that dinner, Butler repeatedly told Christine how special she was, how she could be a volleyball star, and how she needed him to achieve her goals. At the same time, Butler told Christine he had "overpowering feelings" for her.

66.     After dinner, Butler brought Christine back to his house. Christine hoped that his roommate would be there by the time they returned, but unfortunately, she was not.

67.     Just after coming into the apartment, Butler grabbed her and forcefully backed her up against the sink in his kitchen, shoved his hand down her pants, and kissed her on the mouth. Christine, shocked and terrified, was too scared to resist or say no.

68.     Soon thereafter, Butler again took Christine back to his apartment under the pretext that he needed to talk to her about the team. Upon arriving, he led her into his bedroom, laid her down on his waterbed, and raped her. At 16, Christine was a virgin. Despite the pain, Christine was paralyzed in fear. Crying, she stared at Butler's brown pleather headboard until he was finished. After it was over, he forced her to climb out his window to avoid being seen.

69.     Following this initial encounter was an endless series of "special practices" and a variety of sexual abuse, assault, and rapes in Butler's car, his apartment, and even the weight room and the gym.

70.     Butler would shove Christine's head into his lap and force her to fellate him. While she often cried in the early incidents, she eventually became detached and distant, simply surviving until it was over.

71.     Butler kept Christine under his control at all times by ensuring she believed her future and career were dependent on remaining in his good graces. He would tell her that college coaches were always calling about her and how she could make the national team under his guidance. But the threat of him taking it all away was always there. Christine did everything she could to please Butler. And if she didn't, there were consequences of either a sexual or physical nature.

72.     Not knowing the truth, Christine's teammates joked that she was Butler's "robot". She was in constant communication with Butler and would respond to his every demand on the court. Little did they know the full extent of his hold over her.

73.     Butler constantly made his sexual abuse present in Christine's life. Before practices, he would shove his hands down her pants so he could "smell her through practice." He told her that any time during practice that he had his hand to his nose, he was thinking of her.

74.     Team trips were a constant source of opportunities for sexual abuse. On a team trip to Rhode Island, Butler had Christine ride in the front seat of the bus with him. He placed a pillow on her lap and proceeded to touch her under the pillow as they drove with nearly forty other people in the bus.

75.     During Christine's junior year, two girls on her team saw Butler kissing a *different girl* on the team (the same story Sarah heard when she was in college). Christine was at the meeting in which Butler told them the girls were lying. Butler lectured Christine and the rest of the team for an hour, calling the girls that allegedly saw him stupid. When he was done, he made them run until they collapsed. Christine was shocked to find out that he was abusing someone else.

76.     Butler's abuse went on for several years. Even when they were physically not in the same place, Butler would emotionally control her through phone calls and letters. Butler put his "overpowering feelings" for Christine down in writing on multiple occasions in "love" letters he wrote her. These letters began in 1983 and continued for several years. They include strongly worded statements of "love," but in fact were the undercurrent of Butler's abuse:



(July 1984 – Christine is 16 years old)



(October 1984 – Christine had just turned 17 years old)



(April 1985 – Christine is 17 years old)

To: christine
From: Rick
Re: My Thoughts - part 2


I'm very sorry that I hurt you

I don't blame you for being mad
It hurts me to know that I've upset you

We're so in love with each other
But we can't have each other!

I'm very mixed up - I'm also
afraid of losing you.

Do you want me to STAY Away?

I hope I never lose your friendship
And I hope I never lose your love

I've spent the last 36 hrs thinking
about you   non-STOP

(April 1985 – Christine is 17 years old)

77.     In one letter, Butler writes that he told Christine "last fall" that "I loved you more than I've ever loved anyone, because you've been so loyal to me." In the time period Butler is referencing, Christine was 16 years old:

> Why do we grow closer together when we are apart?
>
> I respect you more than anyone I have ever known.
>
> Last fall I told you that I loved you more than I've ever loved anyone, because you have been so loyal to me.

(April 1985 – Christine is 17 years old)

78.     Finally, in professing his "love" to Christine, and how he is scared he had lost her, Butler references the 1983 TV movie, *The Thorn Birds*, in which a priest and his teenage "ward" have a "tortured romance."[3]

---

[3] *See "The Thorn Birds:" 30 Years Later*,
https://www.nbcchicago.com/entertainment/entertainment-news/The-Thorn-Birds-Stars-Reunite-and-Remini-189576701.html (last visited on February 27, 2018).

I'm different from you in that respect, Christine, I guess it comes down to the fact that I love you very much and I'm scared to death of losing you. We have the most special relationship that I have ever known and I feel like it's coming to an end. I don't hate you at all, but I am very jealous. I guess you knew that already. It's almost like the THORN BIRDS when RACHEL WARD married someone else because she couldn't have Father Ralph. I don't know if any of this makes any sense to you but I had to write and tell you.

Love ya,
Rick

79. Just like with Sarah, Butler even dictated that Christine go to Western Michigan University for college. At the time he forced her into this decision, Butler was expecting to still be a coach there; however, for reasons unknown, by the time Christine got there Butler had been let go. Christine quickly transferred to University of Southern California in an attempt to get further away from him.

80. It was there that, after hundreds of unprotected sexual encounters, Butler got Christine pregnant. Although Butler initially denied that he was the father, when he finally conceded responsibility, he told Christine that she had to "get rid of it."

81. He then flew out to California and took her to an abortion clinic down the road from school. After the procedure, he brought her back to a hotel. Once there, with her recovering

20

from a physically and emotionally difficult procedure, he demanded that she masturbate him. In her vulnerable state, she submitted to his request. And if that was not demeaning enough, Butler made her pay for half the hotel room (her food money for the week).

82.     That was last time Christine had any contact with Butler.

83.     It wasn't until years later, as Christine and other were coming forward, that Defendant Cheryl Butler called Christine in October of 1994 and threatened to harm her family if she spoke publicly about what happened.

*Julie Bremner*

84.     In 1986, Julie Bremner was star player at Sports Performance and coached by Rick Butler. She was 16 years old at the time.

85.     From the outset of her participation on his team, Rick Butler started testing and grooming Julie. Butler would regularly make inappropriate sexual comments about other players to her, such as "I wonder if she is a virgin?", "she's too tense, she just needs to get fucked", and "I wonder what she is like in bed." After making such inappropriate comments, Butler would laugh.

86.     Starting when she was 16, Butler would make comments directly to Julie, asking her about her sex life, and commenting that he saw her underwear fall out of her gym bag. He would tell her things like he was afraid he would spend the rest of his life by himself, and that no one loves him, followed directly by a request that Julie give him a hug.

87.     As part of the grooming process, Butler mentally and emotionally abused Julie. During practice one day, Butler kicked the rest of Julie's team out of the gym and told another player that she had to go stand out in the snow in her "bun huggers" until he was done with Julie. In response, the other player said, "Julie, you know I love you but I am more afraid of Rick" and

she went out the door into the freezing cold. The rest of the team left. Butler then told Julie to stand still as he suddenly picked up a desk and threw it at her. He instructed her to keep her hands at her sides and not protect herself. Because she was fearful of even worse consequences, she obeyed him. The reason for this terrible treatment: Butler didn't agree with her setting choice.

88.     Butler forbade Julie and the other girls from going to dances and parties and to make close friends. And going against his wishes would be taken out on Julie, or worse yet, her teammates.

89.     He would constantly body shame Julie and other girls, telling them they had to "make weight" at impossible levels. Julie would skip meals and always feel hungry. She regularly heard teammates throwing up in the bathroom before being weighed.

90.     On several occasions, Julie witnessed or was herself subjected to the "pit" drill, in which Butler or another coach would spike balls at a player repeatedly. While this drill is not abnormal in volleyball as defensive training, in Butler's version of it, the girl in pit never gets out. Instead, balls would repeatedly be hit at them until they could no longer get their arms up to defend themselves and would give up in exhaustion.

91.     On one occasion, the girl in the "pit" was so exhausted that she hyperventilated and wet herself on the court.

92.     Julie was also aware of another girl passing out and wetting herself on the court, at which point her teammates carried her off the court and showered her.

93.     Butler first initiated sexual contact with Julie during a team trip to Japan in 1987. There were no parental chaperones. While at the hotel, Butler summoned Julie to his room for

what she thought was a setter's meeting. When she entered she found Butler lying on the ground wearing only a bathrobe.

94.     He asked her to sit down beside him and after a few moments began to kiss and touch her. He shoved his tongue in her mouth and his hand up her shirt. Frozen in fear, Julie asked why he was doing this, to which he replied, "because I can" and "because I know someone might come back in the room soon, so it was now or never." Butler was someone Julie trusted implicitly, and couldn't understand why he was doing this to her. She was disgusted by what was happening, but felt unable to stop him. Butler repeatedly made it clear to Julie that he was very powerful and people would believe him, not her. Julie believed what he said and was too scared to speak up.

95.     Shortly after returning from Japan, while Julie was still 17, Butler called another "meeting." He told her they couldn't be seen together in public because "people would talk" and so they had to meet at a hotel. This made Julie very uncomfortable, but she felt compelled to follow his instructions and he told her they'd only be there to talk.

96.     In the room, Butler forced himself on her. He removed her pants and his own and held down her arms. She tried to resist and insisted she didn't believe in sex before marriage. She pleaded with him to stop, but to no avail. Butler then raped Julie. It was incredibly painful and caused her to bleed significantly.

97.     Butler continued to repeatedly take advantage of Julie sexually for the next one and half years. In the same manner as Christine, he would shove Julie's head and mouth down on his erect penis until she choked, had tears in her eyes, and couldn't breathe. And in the same way as Sarah, he made Julie watch pornographic movies so she could "learn." He made her watch him masturbate while he watched the pornographic movies and forced her to do the same.

98.     During her junior year, on a team trip to Nationals in New Mexico, Butler raped Julie in his hotel room in the morning just before their first game.

99.      Butler would force himself on Julie in his car, at his apartment, and at hotels. On one occasion, he tried to sodomize her, but she was screaming so much that he stopped out of fear of others hearing.

100.     During these unwanted encounters, Butler would tell Julie about his other sexual contact with Sports Performance players, including Christine, Sarah, and others. He told Julie he was telling her these specific and graphic stories (including the story of him raping Sarah on the train in Germany) because he thought it would "turn her on."

101.     To this day, Julie experiences stomachaches, nightmares, sleeplessness, headaches, and unexplained emotional outbursts all as a result of the sexual abuse at the hands of Butler.

102.     Rick and Cheryl Butler threatened Julie to keep her silent about what happened. When Julie first came forward twenty years ago, Butler called her and told her he owned a gun and he knew how to use it.

103.     More recently, Butler had the message conveyed to Julie that if she spoke out against him, his "lawyers would take everything she owned and leave her family with nothing."

*Jane Doe*

104.     Jane Doe was a star volleyball player who played for Butler and Sports Performance in the 1980s.

105.     When Jane was only starting her sophomore year in high school—making her years younger than the other known victims of Butler's abuse—she began training with Butler.

24

Consistent with Butler's pattern of grooming, he targeted Jane as a rising star and told her she was going to be moving up quickly in the program.

106.    The training immediately became very intense and isolating. Butler would repeatedly break Jane down and then build her back up by telling her that only he could make her a star and that she needed to do everything he instructed.

107.    Jane had never been in a training environment like the one Butler created and did not know what was normal. As such, one day after practice when he offered to drive her home, Butler took full advantage of Jane's vulnerability and told her she was too sweaty to go home and she should stop at his apartment and take a shower. Fearful and confused, she did.

108.    She went into his bathroom and began to shower. Shortly thereafter, Butler entered the shower and raped her. Jane was shocked and terrified and did not know what to do.

109.    That was only the first of over 40 incidents of rape and sexual abuse suffered by Jane.

110.    Butler would bring her to his apartment, into the weight room, and tried to get her to hotels such as the Sybaris Suites (a hotel infamous for "romance" and heart shaped hot tubs in the rooms) all for the purpose of sexually abusing her. Each time it was done under the "official" pretext of volleyball, with messages like "we need to talk about training."

111.    On team trips, Butler would summon her to his hotel room for a "meeting," where he would be waiting in a bathrobe or a towel.

112.    During practices, Butler would make lewd comments to her. For example, similar to Christine, during drills Butler would approach Jane to give her a correction and quietly say that he wanted to "taste" her as he walked away. For the longest time, Jane simply didn't even understand what that meant.

113.     Jane was terrified to say no to anything he asked. She feared Butler at a level that made her unable to avert the situation. Not only did Butler hold her future over her head, he physically abused her on the volleyball court. It was after particularly brutal practices that Butler would often choose to sexually abuse and rape Jane. Strategically selecting times when she was physically and mentally destroyed and her fear of Butler was at its peak.

114.     By her junior year, the sexual and mental abuse was happening constantly and she lived in fear of Butler. Butler told her he loved her and wanted to run away together. Butler would write her love letters and make her write letters to him.

115.     Butler threatened Jane her senior year. By that point, she was a high profile player and he told her that if she left the club or told anyone about what he had done, he'd blackball her from the sport.

116.     Soon thereafter, Jane summoned enough bravery to stand up to Butler and got him to stop the abuse. After that, he no longer spoke to her, but treated her brutally on the court in retaliation. While the sexual abuse subsided, the mental and physical abuse only got worse.

117.     Years later, in 1995, as others began to come forward to tell their stories of abuse to USA Volleyball, Defendant Cheryl Butler called Jane and threatened her to keep quiet. Jane was terrified for her safety and therefore did not come forward at that time.

***Rick Butler's Conduct Has Been Confirmed Through Multiple Official Proceedings***

118.     Butler's conduct has been examined through multiple proceedings, including one before the State of Illinois. Each reviewed documents and testimony and concluded,

unequivocally, that Butler sexually abused at least three teenage girls that he was coaching at the time.[5]

*USA Volleyball Ethics and Eligibility Committee of the United States Volleyball Association*

119.    In 1995, Christine, Julie, and Sarah all came forward to share their stories of abuse. This eventually led to a formal hearing before the Ethics and Eligibility Committee of the United States Volleyball Association. This comprehensive hearing included oral and written testimony from all three women, as well as from Butler and a variety of witnesses of his choosing. All of those present were represented by counsel. The hearing was private and closed to the public. The findings and testimony have not been widely made public or available.

120.    Butler took the position throughout the hearing that USA Volleyball did not have the authority to punish him, and for that matter, it was unclear what he'd even done wrong that would require punishment. He argued that USA Volleyball did not have rules that prevented a coach from having sex with a teenager, a minor, or a player.

121.    Despite these arguments, the Committee reached the following conclusions:

---

[5]      In 1995, when the original proceedings before USA Volleyball and the State of Illinois took place, only three women had come forward with their stories.

The Committee reviewed all documents submitted to it and heard all testimony relating to the charges before it. After considering the written and oral evidence, the Committee makes the following findings of fact:

1. Beginning in 1981, Rick Butler had unprotected sexual intercourse and a subsequent physical and emotional relationship with 16 year old Sarah Powers (now Barnhard) while she was a junior volleyball player with a program in which Mr. Butler was a strength coach and at least a substitute volleyball coach. That experience caused Ms. Powers to lose her virginity.

2. Beginning in 1984, Rick Butler had unprotected sexual intercourse and a subsequent physical and emotional relationship with 16 year old Christine Brigman (now Tuzi) while he was coaching her as a junior volleyball player. That experience caused Ms. Brigman to lose her virginity.

3. Beginning in 1987, Rick Butler had unprotected sexual intercourse and a subsequent physical and emotional relationship with 17 year old Julie Bremner while he was coaching her as a junior volleyball player. That experience caused Ms. Bremner to lose her virginity.

4. The act by a coach of having sexual intercourse with a junior volleyball player entrusted to his care constitutes such immorality, lack of judgment, and unacceptable behavior as to cause the United States Volleyball Association, at minimum, public embarrassment and ridicule by its merely having taken place.

122.     As part of this finding, USA Volleyball banned Butler from membership in the organization for life. Five years after this 1995 hearing, USA Volleyball partially lifted its ban.

*Administrative Hearing Before the Illinois Department of Children and Family Services*

123.     At approximately the same time, the Illinois Department of Children and Family Services conducted an investigation of Butler based upon numerous interviews. Based on that investigation, the Department determined that "credible evidence supported an indicated report of abuse."

124.     Thereafter, Butler appealed the Department's finding and sought to expunge the indicated report from the records of the State Central Register on the grounds that it was inaccurate.

125.     In December 1995, a non-public hearing was held before an administrative law judge of the Illinois Department of Children and Family Services (*In The Matter Of Rick Butler*, Docket No. 95-A-152). A variety of evidence and testimony was presented both in support of and against Butler.

126.     Following the hearing, the administrative law judge made the following findings in a 37 page *Recommendation and Opinion of Administrative Law Judge*:

<u>FINDINGS OF FACT AND DISCUSSION</u>

The administrative law judge, after reviewing all of the evidence, makes the following findings of fact:

. . . .

9.   The appellant had sexual relationships with at least three players, Sarah Powers, Julie Bremner, and Christine Tuzzi, in the years when they were sixteen and seventeen when he was their coach.

. . . .

12.  The appellant admits that he had sexual relations with the girls but denies this occurred while they were minors.  His denial is not credible.

. . . .

is a factor to be considered. Having considered that factor, the administrative law judge rejects it as evidence the appellant does not pose a risk to present players. The appellant did not conduct his sexual activities in public places . Additionally the fact that the appellant did not engage in sexual relations with every single player on his team over a period of years is not evidence that he did not do so with a few selected individuals. No one accused of sexual activity has sexual relations with every individual with whom the accused comes into contact.

. . . .

The most compelling evidence is the testimony of Christine Tuzzi who in detail testified as to her sexual relationship with the appellant. His contention that he did not have sexual relations with these girls until they were eighteen and he was no longer their coach is not credible in light of the testimony of Christine Tuzzi, the corroboration by Kay Rogness, and the complaints of the other two players. It is noted that the appellant did not contend that these girls had a motive to conspire and fabricate allegations against him. No evidence would support

. . . .

him as a coach and mentor. He used his authority and ability to make girls "the best" players and award scholarships in order to have sexual relationships with them.

. . . .

30

RECOMMENDATIONS

In applying the law to the facts in this situation, the administrative law judge must render a reasonable decision based upon all of the evidence. In addition, the Department bears the burden of proving the accuracy and consistency of the record in accordance with the provisions of paragraph 5/7.16 of the Abused and Neglected Child Reporting Act. The administrative law judge is convinced that the Department has carried the burden of proof of demonstrating by a preponderance of the evidence that the appellant's actions constitute child abuse. Therefore, it is recommended the appellant's request for expungement from the State Central Register be denied and the case remain indicated.

*2018 Disciplinary Actions*

127.    In January 2018, USA Volleyball reinstated its lifetime ban of Butler:

A hearing panel of the USA Volleyball Ethics and Eligibility Committee today issued a decision finding that Rick Butler had engaged in multiple acts in violation of USA Volleyball's Bylaws, and banned him for life from membership in USA Volleyball. USA Volleyball had received allegations of misconduct and abuse against Mr. Butler from a number of individuals, including several former players, which led USA Volleyball to bring a disciplinary action against Mr. Butler for violation of USA Volleyball's Bylaws and rules. A hearing was held on those allegations on January 8, 2018. Since Mr. Butler is now suspended for life, this means that he is ineligible to participate, and will forever be ineligible to participate, in any activities organized, operated, run or sanctioned by USA Volleyball.

128.    Then, in Febuary 2018, the Amateur Athletic Union ("AAU") also banned Butler for life. In a statement, the AAU said:

When claims of misconduct arise involving our members, the AAU Code provides for a review procedure to ensure due process to all concerned. This procedure recently concluded with regard to claims of misconduct against AAU member, Rick Butler.

As a result of the review, the AAU determined that as of today, February 9, 2018, Mr. Butler is no longer a member of the AAU. His membership has been voided and he is permanently disqualified from participating in any activity involving the AAU.

129.    The AAU ban was immediately followed by an "indefinite suspension" by the Junior Volleyball Association, an organization that Butler helped create.

*Butler Continues to Attend Tournements Even After Ban*

130.    In the weeks following Butler's bans and indefinite suspension, Butler attended a JVA sanctioned tournment at the Great Lakes Center.

131.    He was viewed standing by the court that one of his teams was playing on and was in direct physical proximity to multiple young female volleyball players.

132.    On information and belief, Butler continues to coach youth players

**The Butlers' Attempts to Silence and Intimidate Victims**

133.    The Butlers, both Rick and Cheryl, have taken steps for years to threaten and intimidate the women that have come forward, those that have not yet come forward, and the other girls who had knowledge of what was going on. As described above, Rick Butler made clear to each girl he abused that if they revealed the truth or tried to stop him there would be dire consequences socially, physically, sexually, and for their future. They would be kicked off the team, embarrassed in front of their teammates, viewed as a failure by their parents, lose their scholarships, not go to college, and not play on the national team. They would be punished on

the court physically through torture at practice, and off the court through more and worse sexual abuse.

134.    Once the women left the program and were out from under Butler's control, the message was still made clear. Defendant Cheryl Butler would make phone calls threatening unknown consequences for coming forward and speaking out. Butler also reached out to threaten their livelihoods, their financial stability, and even their physical well-being. Each of these women knew first hand what Rick was capable of, and the unknown nature of his and Cheryl's threats terrified them. To this day, each still fears the Butlers.

### The Butlers' "Our Story" Document

135.    On February 13, 2018, Cheryl Butler published a document online at https://our-story.online. For unknown reasons, it was publically available online for approximately 10 hours and, at the time of filing, is inaccessible. However, during that time, Cheryl distributed it via email to numerous people and shared the link online.

136.    Cheryl's document sets forth many arguments she and Rick have relied on for decades: (1) the allegations against Butler are the creation of his former business partner; (2) that because the victims supposedly had contact with Butler after the abuse, they must be lying about what Butler did to them; and (3) Butler and Cheryl have both passed numerous polygraph tests that prove his innocence.

137.    Amazingly, among all the assertions made in the document, Cheryl and Butler never clearly and unequivocally deny that Butler had sex with minor players under in his care. In

fact, to the contrary, both Cheryl and Butler acknowledge that *something* improper happened in the 1980s. But, as is Butler's custom, he simply points to the fact that it was a "different time"[6]:

> In 1994 some very serious allegations were made against me from the 1980's. While the 1980's were a completely different time and era in the sport of volleyball and life in general, with very different laws in place and virtually no rules or guidelines regarding the coaching profession, there is no question I could have used better judgment in my early years of coaching. Since
>
> . . . .
>
> merely on allegations that are 30 years old. We are quickly becoming a society of "guilty before proven innocent". Rick will be the first to admit that he made some poor decisions when he was much younger. He was very open and honest with me when we first started a serious relationship in 1991. Since the time we have been together he has been a loving husband and

*Cheryl's Statements Regarding Official Proceedings*

138.    In the "Our Story" document, Cheryl grossly misrepresents the officials proceedings that reviewed Butler's conduct in 1995:

> the abuse in the Sports Performance program. In 1995, USA Volleyball didn't spend any time investigating or challenging the allegations. They just took the statements from the accusers, scheduled and held a hearing and then suspended Rick. The adoption investigation was much more thorough and was overseen by a judge. In his report to the judge, the investigator who
>
> . . . .
>
> It should be noted that after the allegations were made against Rick in 1994, the Illinois DCFS conducted an investigation of the Sports Performance program and spoke with the players that Rick was training at the time. That investigation found nothing at all regarding any type of inappropriate behavior. The DCFS investigator told Rick that they were not going to make

139.    The USA Volleyball hearing was several hours long, allowed Butler, who was represented by a lawyer, to speak for over 90 minutes, present witnesses in support of his position, submit documentation, and cross-examine the victims at length.

---

[6]    Notably, Defendant Cheryl Butler began dating Butler at the same time he was abusing more than one girl. On information and belief, in the late 1980s, Cheryl arrived at a friend's apartment crying and very upset because Butler had asked Cheryl if he could call her by one of those girl's names while they were having sex.

140.     Regarding the Illinois DCFS proceedings, Cheryl's statement above is simply false. As noted above, the Illinois DCFS administrative law judge found conclusive and credible evidence that Butler had sex with Christine, Julie, and Sarah when they were minors, that his actions constituted child abuse, and that he posed a present threat to other minors:

```
9.   The appellant had sexual relationships with at least
     three players, Sarah Powers, Julie Bremner, and Christine
     Tuzzi, in the years when they were sixteen and seventeen
     when he was their coach.
```

*The Butlers' Deceptive Polygraphs*

141.     For years, and throughout the Our Story document, Cheryl claims she and Butler have taken six polygraphs that disprove the victims' claims. Prior to her posting this document, no underlying questions for these tests were publically known. Now, the content of three of those tests are known, while three remain a mystery (even though Cheryl makes specific representations based on those unknown tests).

142.     For those that were briefly made public, the questions make clear that the tests do not demonstrate any amount of innocence for the Butlers.

143.     For example, in December 7, 1999, Butler took a polygraph in which he was asked questions about his personal and business relationship with his former partner. None of the questions pertain to Butler sexually abusing underage girls on his team.

144.     Also in December 1999, Butler took a polygraph regarding Christine. Only two questions pertained to sexual contact:

1. In 1984 when Christine Brigman came to you apartment for assistance on a term paper about Vietnam, did you have sexual intercourse with her as she claims?

Answered (No)

5. Did you continue to have a physical relationship with Christine Brigman in 1989 & 1990?

Answered (Yes)

145.    While the first question appears to address the issue of Butler have sex with Christine as a minor, it is qualified with the phrase "as she claims," allowing Butler to dispute her exact narrative and answer "no." The second question only addresses his sexual contact with Christine after she was 18 and is irrelevant. The question, "did you have sex with Christine when she was 16 years old?" is simply not asked.

146.    The only other polygraph questions Cheryl revealed pertained to Julie. Like the questions above, almost all the questions have nothing to do with Butler's sexual contact with Julie when she was minor. Only one question addresses the real issue:

6. Did you ever rape, physically force or intimidate Julie Bremner into having sexual intercourse with you?

Answered (No)

147.    Again, because Butler's believes he was in a consensual relationship with Julie and the terms used in this question can be viewed as subjective, he can answer "no" to this question as well. As before, the question "did you have sex with Julie when she was 17 years old?" is simply not asked.

36

148.     Relying on these polygraphs, and making public statements about their legitimacy and meaning, as the Butlers have heavily done for years, is deceptive and misleading.[7]

*Other False Claims in the "Our Story" Document*

149.     Cheryl made several unequivocally false statements in her document. They include, but are not limited to:

a.   Cheryl claimed that Christine spent time with, and implied Butler had sex with Christine, in 1990 when she was 23. As proof, Cheryl put forth a faded credit card bill with a handwritten note "spent the afternoon with Brigman at Sybaris in Northbrook." While Butler did take Christine to a Sybaris when she was a teenager, the events described in the document *did not happen*. On information and belief, Butler was actually with a different underage girl, not Christine, at the Sybaris in 1990.

b.   Cheryl accuses Christine of two separate things: (1) forging her signature on multiple documents; and (2) fabricating "love" letters from Butler to her. Each claim has no basis in fact. Christine is in possession of sixteen total letters from Butler, most of which include their original stamped envelopes.

c.   Sarah did not willingly join the Chicago Breeze. Instead, as described, she was drafted by Butler without her consent. Likewise, she did not willingly come back to play at a Sports Performance alumni game. Instead, Butler and her coach Rob Buck forced her to return from Western Michigan to play.

### ***Other Threats and Intimidation Carried Out by the Butlers***

*Intimidation of Julie's Family*

150.     At times, the threats were subtler and made indirectly. For example, when Julie came forward, her sister was still playing at Sports Performance. A series of letters between Butler and Julie's mom sets forth clear threats of how Julie's sister would be punished (kicked off the team, not play in college, etc.) if Julie's keeps on the same path. Below are excerpts from Butler's letters:

---

[7]     Of course, polygraph tests are viewed as unreliable and generally excluded as evidence in court. *See* https://www.justice.gov/usam/criminal-resource-manual-262-polygraphs-introduction-trial

made to the Chicago Tribune in an effort to break the story to the press. The has been done to try to hurt me and bring down the Sports Performance program. The purpose of this letter is to address Bonnie's future involvement in the program. I know in the past both of you have been very positive about Bonnie's continued involvement in the program and her playing for me on the 18-1 team in 1995. In light of what is happening now I am not sure that is such a good idea. We would love to have Bonnie in the program and I feel she has the potential to be an outstanding setter. She has grown up a great deal in the past year and I hear she is having a great High School season and also looked terrific in Puerto Rico with the USA Youth National Team. I also feel that with Bonnie setting the 18-1 team this year we have a legitimate shot at the National Championship. I just do not know if it is a smart move on anyones part to have Bonnie playing on the same team I am coaching while her sister is part of an effort attempting to have me thrown out of the sport. I know Bonnie has her heart set on being on the 18-1 team this coming season, but at this time Cheryl and I are in the process of possibly losing everything we have worked for and we have been told to be very careful about any involvement that might make the situation worse. I feel we need to talk before we go any further. Tryouts are in 1 month and I would like to get this taken care of long before that time. I apologize for not calling, but at

I have a little trouble understanding how you think the last letter I wrote to you could in any way be considered blackmail. I think I clearly stated that this whole situation has gone much further than we thought it would last spring and at this point and time if it blows up Bonnie will be standing in the middle of it. If that is something you and Bob are comfortable with and you are fully aware of the pros and cons of the situation then that is fine. I do not think you really understand the big picture and how it will affect Bonnie. I have discussed some of my concerns below.

In closing I would like to state that I did not insinuate that you or Julie had called the Chicago Tribune. If you remember the letter was to both you and Bob and I was merely stating that the whole situation was starting to get messy. You said you do not read well between the lines but you certainly seem to jump to conclusions when none are present. I think we have bent over backwards to give Bonnie a fair shot even though Julie has stated to a former player that she "will not rest until Rick is out of coaching" (this certainly goes against everything you told me last spring when you said that she just needed to talk to someone and she was not trying to hurt the program or my business ). I wonder how many other coaches would still have Bonnie in their program if they were in my position? I need to hear from you and Bob before we have tryouts or start practice.

38

*Cheryl's Attempts to Intimidate and Spread False Information Online*

151.    More recently, with the help of social media platforms like Facebook, Defendant

Cheryl Butler has had ample opportunity to lash out at the victims, their spouses, as well as

anyone who speaks out against Rick. She repeatedly threatens those speaking out against her and

Butler and attempts to discredit the victims (including attacking them directly). For example**:**

- Posting on Christine's husband's Facebook page "Your wife is a liar...I am sorry", followed by pictures of Christine with Butler's family and a statement "That would Rick's mom she is happily and lovingly sitting with, along with his sister in this picture. Ask her about the name Frankie..."

- Attacking Sarah for "putting on lipstick before an interview" and told her "I don't owe you a f...thing";

- Calling Sarah a "disgrace to true victims" and telling her that "because of you and others one real victim will not be believed because you have tainted the water with all the lies"

- Falsely accusing Sarah of being able to play for a different team after Butler drafted her onto the Chicago Breeze;

- Accusing Emily Swanson, an individual who was posting information about Defendant's on Facebook (where many of Cheryl's comments appeared), that she was "orchestrating a campaign of libelous and slanderous complaints" and falsely accused her of the unlicensed practice of law in Illinios;

- Making threats to Emily Swanson such as "see who has the last laugh..." and "wonder what your firm thinks?"

- Making false statements about the USA Volleyball hearing the Illinois DCFS hearing, including about opportunities she and Butler were provided with to defendant themselves;

- Accusing Christine of lying about her pregnancy and abortion and incorrectly stating that Butler was not the father;

- Claimed that "death threats" were made against her and Butler, and implied Sarah was involved;

- Accusing Sarah of "stalking" them and their teams to try and "hurt our kids."

- Accusing Kay Rogness of conspiring to fabricate the sexual abuse complaints;

- Accusing Sarah of lying about her story and falsely stating she was not a minor when Butler had sex with her;

- Accusing Sarah of fabricating allegations in her lawsuit against AAU;

- Accusing Christine and Julie of lying about Butler sexually abusing them;

- Accusing Sarah of brining a frivolously and vindictive lawsuit against AAU for purely monetary gains;

- Accusing Christine of forging signatures on documents submitted to USA Volleyball; and

- Claiming, without any proof, that she and Butler passed six polygraph tests.

152.    Even other coaches at Sports Performance, including the coach that recruited Plaintiff Mullen to join the club, have injected themselves into online conversations about Butler and attempted to push inaccurate information about his past conduct. Below, Sports Performance coach Erik Vogt incorrectly asserts that the findings of the Illinois DCFS are no longer applicable (the same document and statement asserted by Defendant Cheryl Butler in her "Our Story" document):





*Butler's Non-Public Admissions*

153.    During the closed-door USA Volleyball Ethics hearings, Butler made a variety of admissions and acknowledged his improper sexual conduct.

154.    Butler's attorney set the tone in addressing Butler's position, that having sex with minors and/or players, was not clearly prohibited by anyone:

So then we have to ask is part of the
charge of the USVBA intercourse with minors, and if
it is that, then that varies from year to year in
the state of Illinois and it also varies from state
to state across this country because that's a
matter of the state law. You may find some states
with an age of consent of fourteen. Do you have
different rules for different coaches across this
country? And if it's only sex with any players,
I ask you respectfully, where is the rule that
prohibits that?

....

I would also add that I don't think the
conduct, even if true, has necessarily been a crime
in the state of Illinois. What is being passed
down along the Committee table there is a Xerox
from the 1985 Illinois Revised Statutes. Look at
Section 12-15. The age of consent in 1985 in
Illinois was age 17. It's 16 or over was the age
of consent in 1985.

155. Following that, Butler admitted, unequivocally, that he had sex with Christine,
Julie, and Sarah when they were 18 years old:

MS. HOWARD: Have you ever had sexual

relationship --

MR. BUTLER: As a player.

MS. HOWARD: No, that's not my question.

That's why I am asking --

MR. BUTLER: Yes, I have had sexual relations

with Christine Brigman.

MS. HOWARD: Have you had with Sarah?

MR. BUTLER: Yes.

MS. HOWARD: And have you had sexual relations

with Laura?

MS. BREMNER: Julie.

MS. HOWARD: I am sorry. Julie.

MR. BUTLER: Yes.

156.    However, under subsequent questioning, it becomes clear that Butler cannot

identify when he first had sexual contact with any of the girls (*i.e.*, he has no basis to say the girls

were 18 at the time or that they were no longer players under his supervision).

MR. BUTLER: I know when the last time with --

my relationship with Christine Brigman ended. I

know the day and I know where it was, and I don't

recall the start or the beginning of Julie and I

don't recall the start or the end of Sarah, only

because I haven't thought about it. I haven't

thought about this day or this time.

there.  There are long-term relationships.  I had a
very long relationship with Christine.  It was --
    MR. LOCKWOOD:  Forgive me.  What I am trying
to do is solicit facts to the best of your
recollection.
    MR. BUTLER:  I can't recall.
    MR. LOCKWOOD:  Thank you.

157.   Butler's statements later on echo those of his lawyer, in that he twice asserts that the ethical, moral and legal standards were different in the 1980s (presumably as it applies to having sex with minors and/or players), and that it is *unfair* to apply a 1995 standard to him:

I think the game has changed
drastically, and I think any allegations or
accusations that are eight to fourteen years old
that you set today's standards with and you judge
by today's standards are wrong, and first of all, I
don't think I am going to get a fair hearing here.

. . . .

our program, and I still have to wake up every day
to the fact that I am going through something that
doesn't even resemble justice and I am being judged
on 1995 standards for allegations from 1981, 1984
and 1987.  Now, I don't think anybody can say
that's fair.

158.    Equally disturbing, Butler attempts to justify his own conduct by pointing to many people in the volleyball community "doing the same thing I am doing":

```
long enough.  You know that the rumors about me can
be applied to a hundred different people.  You know
that if you want to go find a hundred different
people, you can do that.  You know that.  You know
there are coaches married to players, and you don't
know if they were 17 or 18, and I don't think you
are going to sit here and tell me that if they were
17 you are going to go after them.
```

. . . .

```
it.  So I would like to have the cards on the table
and be honest about that.  That's not going to
happen, and if I have to bring you 25 people
accused of doing the same thing I am doing, I don't
think you are going to prosecute them and I don't
think you will, because then you become a police
force, and I think I said in the letter to you it's
a gestapo situation.  You literally have to hunt
for people all the time, and knowing how the sport
of volleyball has changed over the past 10 or 15
years, knowing where it was in the '80s, knowing
what it's gone to now, knowing that it went from a
social environment to where you are gone a couple
days a week, you are in charge of driving people
everywhere, where people are running businesses and
lives depend on it.
```

. . . .

```
          So what I am hearing here is I am on

trial in an organization that had no rules

concerning coaches' conduct.  I am on trial in an

organization that's telling me that there is no

statute of limitations.  I am on trial in an

organization saying you can have sex with your

players but they better not be a minor.  Legal age

isn't an issue.
```

159.    Finally, Butler revealed his real view about the extensive claims against him. It

was him—and not the girls he preyed on—who is the *real victim*:

```
that I just buried my mother.  I am glad she is not

here, and I have heard allegations of sexual abuse,

rape, all kinds of things in these documents, and I

thought this morning that if there is ever a case

of rape, it was in front of two or three million

people.  I felt like that this morning.
```

. . . .

```
all that stuff.  There won't be any more me.  It

will never happen.  It will never happen, and talk

about being raped.  I said it earlier today.  I was

raped in front of two million people, and I am

going to walk out there door, have TV cameras on

me.  Like I said, thank God my son is three months
```

***Defendants' Misrepresentations and Omissions to Plaintiff and the Class***

160.     Parents rely on the accuracy and truthfulness of the information they receive from coaches and club management when they are choosing a club volleyball program, camp, or clinic for their children. Of paramount importance in that choice are the quality of the coaching and the safety of their children. Defendants' misrepresentations and omissions are material to both concerns. Had parents and players been aware of the true state of the facts regarding Butler's sexual abuse, including that Butler raped a sophomore girl who played on his team, they would not have participated in any GLV associated volleyball programs and would not have paid substantial money to Defendants.

161.     Defendants misrepresented and omitted material facts in their interactions with parents and players regarding the quality of the services provided through the GLV's volleyball club, camps, and clinics.

162.     Through their website, promotional materials, and in-person meetings, Defendants represented to Plaintiff and members of the Class that their volleyball services:

   a)   have the highest quality coaches;

   b)   will "give you the finest coaching, teaching and training"[8];

   c)   have "extremely qualified staff"[9];

   d)   are a safe environment for underage girls to play volleyball;

   e)   are superior to their competitors;

   f)   have a "commitment to Excellence"[10];

---

[8]      *Id.*

[9]      GLV Sports Performance Volleyball, https://greatlakescenter.com/player-development/lessons/# (last visited Feb. 15, 2018)

[10]      GLV Sports Performance Volleyball, https://greatlakescenter.com/about-glv/about-spvb/ (last visited Feb. 15, 2018)

g) include camps that are "head and shoulders above the competition"[11];

h) include camps that "provide elite, high quality training" [12];

i) will give its "best effort to make sure that you feel that the experience was well worth the time, efforts and expense" [13];

j) "will continue to strive for excellence" [14];

k) have had "37 years of excellence"[15];

l) are "specialists in training youth and junior volleyball athletes"[16]; and that

m) "Only by having "Elite Level" Master Coaches can any program guarantee that all athletes regardless of the team they are playing on will receive the same high quality instruction. Otherwise, each player is at the mercy of the level of their individual team coach who may or may not have the ability to teach at the highest levels and bring out the best in each athlete."[17]

163.    Defendants have also represented that their volleyball services provide a safe environment for youth players to participate in, including by stating, "The #1 priority is the safety of the athletes, coaches, officials and our staff.  We ask that you help us keep our facility a safe and a fun environment for all of us to enjoy the game of volleyball."[18]

164.    Additionally, Defendants omitted material facts about their coaching staff and vital facts about the safety of their programs. Specifically, Defendants failed to inform prospective parents and players of the following facts through their website, promotional materials, and/or in-person meetings:

---

[11]    GLV Sports Performance Volleyball, https://greatlakescenter.com/camps/ (last visited Feb. 15, 2018)
[12]    *Id.*
[13]    *Id.*
[14]    *Id.*
[15]    GLV Sports Performance Volleyball, https://greatlakescenter.com/wp-content/uploads/coaches-clinic-2.pdf (last visited Feb. 15, 2018)
[16]    Best Volleyball Videos, https://bestvolleyballvideos.com (last visited Feb. 15, 2018)
[17]    FAQ, https://greatlakescenter.com/spvb-boys-program/faqs/.
[18]    Great Lakes Center Rules, https://greatlakescenter.com/wp-content/uploads/2015-GLC-Rules.docx.

a) That Butler has sexually abused at least six underage girls, including four girls that were players for Sports Performance at the time of the abuse (and one was only a sophomore at the time);

b) That in 1995, USA Volleyball found, after an extensive hearing and receiving written and oral testimony, that Butler had in fact had sex with three underage Sports Performance players;

c) That in 1995, the Illinois DCFS found, after an extensive hearing and receiving written and oral testimony, that Butler had in fact had sex with three underage Sports Performance players in the past and posed a present threat to players currently under his control;

d) That Butler verbally, emotionally, and physically abused girls on his team; and

e) That Butler has *admitted* to having sex with three women who played on his team when they were 18 years old, but actually cannot recall when he started having sex with them.

165.    Defendants have further acted deceptively by claiming that the Butlers have passed six polygraph tests in which they deny all claims made by Sarah, Julie, Christine, and Beth. As noted above, the questions made public for three of those tests are irrelevant to whether Butler sexually abused teenage players on his team, and for the remaining three tests the questions remain a complete mystery. These public statements falsely and deceptively support Defendants' narrative that Butler has not engaged in any inappropriate behavior.

**FACTS SPECIFIC TO PLAINTIFF LAURA MULLEN**

166.    Plaintiff Laura Mullen is the parent of two daughters who played club volleyball. Plaintiff's oldest daughter began playing volleyball in 7th grade and eventually joined Club Fusion in Batavia, Illinois on their regional team. However, Laura and her daughter were not happy with the training provided at Club Fusion and began looking elsewhere.

167.    Laura heard positive reviews of the clinics at GLV and allowed her daughter to attend several clinics with Coach Erik Vogt in July 2012. During that same time period, Vogt

49

pushed Laura to let her daughter join Sports Performance and repeatedly told her that it had the best coaches and training programs.

168.    Based on the representations by Vogt, representations from Defendants' website, as well as an email exchange with Rick Butler directly in August 2012 in which he represented how much personalized and focused individual training her daughter would receive, Laura's daughter joined Sports Performance in October 2012. That same month, at the outset of the season, Laura attended a parents meeting in which Butler and other coaches laid out various advantages of Sports Performance and expectations for parents in the year ahead. This meeting included an introduction to the coaching staff and information about why the GLV coaches are better than their counterparts at other clubs, and why the Sports Performance program was superior. Butler and others discussed the number players that have been recruited to Division I schools, how many AAU and JVA championships they've won, and who went on to Olympic teams. Laura attended these parents meeting each year in November between 2011 and 2017, with the exception of the 2014 season.

169.    Laura's daughter played at GLV for two years before briefly returning to Club Fusion in 2014, and then came back to GLV her junior year.

170.    Laura's daughter became heavily recruited after she was put onto Butler's team in November of 2016. However, from there, everything got worse.

171.    Butler verbally and emotionally abused Laura's daughter and other teammates. He regularly made comments about her weight and appearance. He attempted to force her to come back early from an injury. Laura's daughter began to lose weight and to develop self-esteem issues as a result of Butler's coaching techniques, which caused her to see a therapist. At

one point, Butler commented that Laura's daughter was "losing her butt" and looked like an "Ethiopia distance runner."

172.     Prior to Laura's daughter joining Butler's team, her husband was diagnosed with prostate cancer in 2015 and his health began to quickly deteriorate.  Once on the team, when they were set to play in a tournament in China, Laura was concerned about her daughter going instead of staying home with her father. When Butler found out about Laura's concerns, he began to pressure and guilt her to make sure her daughter came. Butler created a narrative that an absence at the tournament would disrupt the two teams going on the trip, forcing him to combine them into one team, thereby resulting in many girls not playing. Butler made clear that Laura would have to go and explain to the parents of those girls why they were not getting vital playing time.

173.     Additionally, even though Laura's daughter already signed her national letter of intent, she feared Butler could have a negative impact on her scholarship and chance to succeed. Under this mounting pressure and shaming, Laura's daughter went on the trip. While she was in China, her father passed away. At that point, Laura removed her daughters from GLV.

174.     During her enrollment process in Sports Performance, Defendants and other GLV employees did not disclose to Laura anything about the allegations of sexual abuse against Butler. They did not disclose the findings of USA Volleyball, or anything related to the USA Volleyball ban. They did not disclose the findings of the Illinois DCFS. They did not disclose the stories of the five women in this Complaint. Instead, they repeatedly told Laura that they had the best coaching staff in the country and that her daughter would be safe under their watchful eye.

175.     Laura eventually found links in June of 2017 on the internet that lead her to substantial details of Butler's sexual abuse. However, at that point, Laura was already pulling her daughters from the program based upon the physical and emotional abuse.

176.     Plaintiff paid Defendants substantial amounts of money in the form of annual

enrollment fees and fees for other related services. Had Plaintiff known the full truth and depth

of Butler's sexual, emotional, and physical abuse, she would not have allowed her daughters to

attend Sports Performance and she would not have paid fees to Defendants.

## CLASS ALLEGATIONS

177.     **Class Definition**: Plaintiff Laura Mullen brings this action pursuant to Federal

Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and a class defined as

follows:

> All persons in the United States who: (1) paid money to Defendant
> GLV, Inc.; (2) for any volleyball related services provided by or
> through Defendant GLV, Inc., including but not limited club
> teams, camps, youth academies, and clinics.

The following people are excluded from the Class: (1) any Judge or Magistrate presiding over

this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents,

successors, predecessors, and any entity in which Defendants or their parents have a controlling

interest and their current or former employees, officers and directors; (3) Defendants' insurers its

subsidiaries, parents, successors, predecessors, and any entity in which Defendants' insurers or

its parents have a controlling interest and their current or former employees, officers and

directors; (4) persons who properly execute and file a timely request for exclusion from the

Class; (5) persons whose claims in this matter have been finally adjudicated on the merits or

otherwise released; (6) Plaintiff's counsel and Defendants' counsel; and (7) the legal

representatives, successors, and assigns of any such excluded persons.

178.     **Numerosity**: The exact number of members in the Class is unknown and not

available to Plaintiff, but it is clear that individual joinder is impracticable. On information and

belief, thousands of consumers fall into the definition of the Class. Members of the Class can be identified through Defendants' records.

179. **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class, and has retained counsel competent and experienced in complex class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

180. **Policies Generally Applicable to the Class**: This class action is appropriate for certification because Defendants have acted or refused to act on grounds generally applicable to the Class as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct towards the Class's members, and making final injunctive relief appropriate with respect to the Class as a whole. Defendants' practices challenged herein apply to and affect the Class's members uniformly, and Plaintiff's challenge of those practices hinges on Defendants' conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

181. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

> (a) Whether Defendants and/or their agents accepted payment for volleyball activities or instruction from GLV, pursuant to a contract, that either did not include all provisions required by law or did not include all relevant material facts regarding Rick Butler's past sexual misconduct;

> (b) Whether Defendants' conduct violated the Illinois Physical Fitness Services Act;

> (c) Whether Plaintiff and members of the Class are entitled to statutory damages based on Defendants' violations of the Illinois Physical Fitness Services Act;

(d) Whether Defendants' conduct violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

(e) Whether Plaintiff and members of the Class are entitled to actual damages based on Defendants' violations of the Illinois Consumer Fraud and Deceptive Business Practices Act;

(f) Whether Defendants made material misrepresentation of facts in connection with receiving payment for volleyball activities;

(g) Whether Defendants made material omissions of fact in connection with receiving payment for volleyball activities;

(h) Whether Defendants Rick and Cheryl Butler were unjustly enriched.

182. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class, in that Plaintiff and the members of the Class sustained damages arising out of Defendants' uniform wrongful conduct.

183. **Superiority:** This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and

comprehensive supervision by a single Court. Economies of time, effort and expense will be

fostered and uniformity of decisions ensured.

## FIRST CAUSE OF ACTION
### Violation of the Illinois Physical Fitness Services Act 815 ILCS 645/1 *et seq.*
### (On Behalf of Plaintiff and the Class as Against Defendant GLV, Inc.)

184.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth

herein.

185.    The Illinois Physical Fitness Services Act ("IPFSA") (815 ILCS 645/1, *et seq.*)

protects customers of physical fitness centers by requiring private businesses to include certain

provisions in their contracts and prohibiting unlawful and deceptive conduct in the formation of

that contract.

186.    The IPFSA expressly prohibits, among other things:

   a)  Engaging in unfair or deceptive acts and practices, including inducing a
       customer to enter into a contract in reliance upon any false, fraudulent, or
       misleading information, representation, notice, or advertisement regarding the
       physical fitness center (815 ILCS 645/10).

187.    Under the IPFSA, any contract failing to comply with the applicable provisions of

the statute is deemed void and unenforceable. 815 ILCS 645/9(c). A customer injured by a

violation of the IPFSA may bring an action to recover damages, which may be entered for three

times the amount of actual damages, plus costs and reasonable attorneys' fees. 815 ILCS 645/11.

188.    Here, Defendant GLV is a "physical fitness center" or "center" as defined under

Section 645/2(a) of the IPFSA. Defendant GLV provides "physical fitness services" or

"services" as defined under Section 645/2(b) of the IPFSA because it engages in physical

instruction and training, as well as provides the use of its facilities for such activities. Plaintiff

and each member of the Class are "customers" of Defendant GLV as contemplated by the

IPFSA.

189.    Defendant GLV engages in unfair or deceptive acts and practices, including but not limited to misrepresentations about the quality of its physical fitness services as described in detail above in paragraphs 160-165. Specifically, Defendant GLV induced Plaintiff and the Class to enter into contracts for physical fitness services based on the following misrepresentations made on their website, in promotional materials, and in-person meetings:

a)  That Sports Performance and GLV have the highest quality coaches;

b)  That Sports Performance and GLV ire a safe environment for underage girls to play volleyball; and

c)  That Sports Performance and GLV are superior to their competitors.

190.    Defendant GLV induced Plaintiff and the Class to enter into contracts for physical fitness services while omitting and failing to disclose the following material facts:

a)  That Butler has sexually abused at least six underage girls, including five girls that were players at GLV at the time of the abuse (and one who was only a sophomore at the time);

b)  That in 1995, USA Volleyball found, after an extensive hearing and receiving written and oral testimony, that Butler had in fact had sex with three underage GLV players;

c)  That in 1995, the Illinois DCFS found, after an extensive hearing and receiving written and oral testimony, that Butler had in fact had sex with three underage GLV players and posed a present threat to players currently under his supervision;

d)  That Butler verbally, emotionally, and physically abused girls on his team; and

e)  That Butler has admitted to having sex with three women who played on his team when they were 18 years old, but actually cannot recall when he started having sex with them.

191.    Based upon the foregoing allegations and pursuant to the IPFSA, the contract between Plaintiff (and each member of the Class) and Defendant GLV is void and unenforceable. 815 ILCS 645/9(c) & 10(b).

192.    Plaintiff and each member of the Class have been injured as a direct and proximate result of Defendant GLV's conduct described above in the form of money paid to Defendant GLV.

193.    Under the IPFSA, Plaintiff and each member of the Class are entitled to recover three times the amount of actual damages, plus costs and reasonable attorneys' fees. 815 ILCS 645/11.

**SECOND CAUSE OF ACTION**
**Violation of the Illinois Physical Fitness Services Act 815 ILCS 645/1, *et seq.***
**(On Behalf of Plaintiff and the Class as Against Defendant GLV, Inc.)**

194.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

195.    The Illinois Physical Fitness Services Act ("IPFSA") (815 ILCS 645/1, *et seq.*) protects customers of physical fitness centers by requiring private businesses to include certain provisions in their contracts and prohibiting unlawful and deceptive conduct in the formation of that contract.

196.    Under the IPFSA, any contract failing to comply with the applicable provisions of the statute is deemed void and unenforceable. 815 ILCS 645/9(c). A customer injured by a violation of the IPFSA may bring an action to recover damages, which may be entered for three times the amount of actual damages, plus costs and reasonable attorneys' fees. 815 ILCS 645/11.

197.    Here, Defendant GLV is a "physical fitness center" or "center" as defined under Section 645/2(a) of the IPFSA. Defendant GLV provides "physical fitness services" or "services" as defined under Section 645/2(b) of the IPFSA because it engages in physical instruction and training, as well as provides the use of its facilities for such activities. Plaintiff

and each member of the Class are "customers" of Defendant GLV as contemplated by the IPFSA.

198.    Under the IPFSA, any contract for physical fitness services must:

   a) Be in writing and given to the customer at the time the customer signs the contract;

   b) Contain all mandated provisions, requirements, and prohibitions of the IPFSA in the contract before its signed;

   c) Be maintained by the physical fitness center for 3 years thereafter;

   d) Set forth the customer's total payment obligation for services to be received under the contract; and

   e) Provide that the customer may cancel, with a full refund, the contract within 3 business days after the customer signs.

199.    On information and belief, Defendant GLV violated the following provisions of the IPFSA:

   a) 815 ILCS 645/4; and
   b) 815 ILCS 645/6

200.    Based upon the foregoing allegations and pursuant to the IPFSA, the contract between Plaintiff (and each member of the Class) and Defendant GLV is void and unenforceable. 815 ILCS 645/9(c) & 10(b).

201.    Under the IPFSA, Plaintiff and each member of the Class are entitled to recover three times the amount of actual damages, plus costs and reasonable attorneys' fees. 815 ILCS 645/11.

## THIRD CAUSE OF ACTION
### Violations of Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 ILCS § 505/1, *et seq.*
### (On Behalf of Plaintiff and the Class as Against Defendant GLV)

202.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

203.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA") (815 ILCS § 505/1 *et seq.*) protects both consumers and competitors by promoting fair competition in commercial markets for goods and services.

204.    The ICFA prohibits any unlawful, unfair, or fraudulent business acts or practices, including the employment of any deception, fraud, false pretense, false promise, false advertising, misrepresentation, or the concealment, suppression, or omission of any material fact.

205.    The ICFA applies to Defendant GLV's actions and conduct described herein because the ICFA protects consumers in transactions that are intended to result, or which have resulted, in the sale of goods or services.

206.    Defendant GLV's volleyball services—both the direct provision of volleyball instruction services and indirect corporate sponsorship of tournaments or other organizing activities—are "merchandise" within the meaning of Section 505/1(b) of the ICFA.

207.    Defendant GLV is a "person" as defined under Section 505/1(c) of the ICFA.

208.    Defendant GLV's volleyball activities—both direct provision of volleyball instruction, camps, clinics, training, teams, organization, other services or other organized activities—constitute a "sale" within the meaning of Section 505/1(d) of the ICFA.

209.    Plaintiff and each member of the Class are "consumers" as defined under Section 505/1(e) of the ICFA.

210. The sale of Defendant GLV's volleyball service is considered "trade" or "commerce" under Section 505/1(f) of the ICFA.

211. As described herein, Defendant GLV engaged in unfair or deceptive acts or practices and unfair methods of competition as defined by Section 505/2 of the ICFA to the detriment of Plaintiff and the Class.

212. Specifically, Defendant GLV violated Section 505/2 of the ICFA through Defendant GLV's use or employment of deception, fraud, false pretense, false promise, misrepresentation or concealment, suppression, and/or omission of material facts with the intent that Plaintiff and the Class rely upon the concealment, suppression or omission of such material facts.

213. Defendant GLV also violated Section 505/2 of the ICFA by employing deceptive acts or practices to induce customers to enter into contracts with Defendant GLV for volleyball services that were void from the outset pursuant to Sections 9(c) and 10(b) of the IPFSA.

214. Defendant GLV engages in unfair or deceptive acts and practices, including but not limited to misrepresentations about the quality of its physical fitness services as described in detail above in paragraphs 160-165. Specifically, Defendant GLV induced Plaintiff and the Class to enter into contracts for volleyball services based on the following misrepresentations made on their website, in promotional materials, and in-person meetings:

    a) That Sports Performance and GLV have the highest quality coaches;

    b) That Sports Performance and GLV are a safe environment for underage girls to play volleyball; and

    c) That Sports Performance and GLV are superior to their competitors.

215. With the intent to induce reliance, Defendant GLV purposefully concealed, suppressed, and/or omitted material facts concerning Butler's past misconduct with teenage

players, including but not limited to Butler's sexual, emotional, physical, and psychological abuse.

216.    Defendant GLV's purposeful concealment, suppression, and/or omissions of fact were material because it likely influenced consumers' decisions of whether or not to enroll in Defendant GLV's teams, camps, clinics, or other services.

217.    With the intent to induce reliance, Defendant GLV's purposefully employed the use of deception, fraud, concealment, and/or omission of material facts.

218.    Defendant GLV engaged in unfair and deceptive acts or practices by failing to disclose in clear and unambiguous language the following material facts:

    a)  That Butler has sexually abused at least six underage girls, including five girls that were players at GLV at the time of the abuse (and one who was only a sophomore at the time);

    b)  That in 1995, USA Volleyball found, after an extensive hearing and receiving written and oral testimony, that Butler had in fact had sex with three underage GLV players;

    c)  That in 1995, the Illinois DCFS found, after an extensive hearing and receiving written and oral testimony, that Butler had in fact had sex with three underage GLV players and posed a present threat to players currently under his supervision;

    d)  That Butler verbally, emotionally, and physically abused girls on his team;

    e)  That Butler has admitted to having sex with three women who played on his team when they were 18 years old, but actually cannot recall when he started having sex with them; and

    f)  Employing deceptive acts or practices to induce customers to enter into contracts with Defendant GLV that were void from the outset under Illinois law.

219.    Defendant GLV intended that Plaintiff and Class members would rely on their deceptive conduct to secure enrollment and participation on Defendant GLV's volleyball services.

220. Plaintiff and members of the Class relied upon Defendant GLV's deceptive conduct, were deceived and/or misled by Defendant GLV's deception, fraud, and omission of material facts, and suffered harm in the form of paying for Defendant GLV's volleyball services.

221. Defendant GLV's conduct is also unfair, offends public policy, and is immoral, unethical, oppressive, and unscrupulous. Defendant GLV knew, reasonably should have known, or actively participated in the following unfair acts:

    a) Butler's misconduct—both past and present;

    b) Enabling Butler to exert dominion over volleyball participants to facilitate his physical, emotional and sexual misconduct imposed upon Defendants' volleyball services;

    c) Concealing, obscuring, or suppressing facts concerning Butler's misconduct—past and present—from being publicly exposed;

    d) Allowing Defendants Rick and Cheryl Butler to use the corporate structure of Defendant GLV to conceal the truth about Rick Butler's sexual abuse and propagate false information to Plaintiff and members of the Class for personal profit;

    e) Creating a network that insulated Butler from criminal prosecution, accountability, or other liability based on his misconduct; and

    f) Offering continued support and resources that provided Butler with an ongoing opportunity to engage in his misconduct.

222. Defendant GLV's deceptive and unfair actions in violation of the ICFA were committed during the course of conduct involving trade or commerce.

223. As a direct and proximate result of Defendant GLV's unfair, immoral, unethical, oppressive, and unscrupulous conduct, Plaintiff and the Class members suffered substantial injuries.

224.     As a direct and proximate result of Defendant GLV's actions in violation of the ICFA, Plaintiff and the Class members suffered damages by paying for Defendant GLV's volleyball services and by exposing youth volleyball players to Butler's misconduct.

225.     Defendant GLV's violation of the IPFSA also constitutes an unlawful practice under the ICFA. 815 ILCS 505/2Z.

226.     Under 815 ILCS 505/10a, Plaintiff and the Class members seek an order: (1) requiring Defendant GLV to prevent Defendants Rick and Cheryl Butler from having further involvement in any of its youth volleyball programs; (2) require Defendant GLV to cease the unfair and deceptive practices described herein; (3) require Defendant GLV to restore to Plaintiff and each Class member any money acquired by means of unfair and deceptive practices; and, (3) awarding reasonable costs and attorneys' fees pursuant to 815 ILCS 505/10a.

## FOURTH CAUSE OF ACTION
## Fraud
### (On Behalf of Plaintiff and the Class as Against All Defendants)

227.     Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

228.     Defendants Rick Butler and Cheryl Butler have consistently maintained control and responsibility for Defendant GLV's marketing materials, publications, and statements about the company's volleyball programs.

229.     For example, Defendants Rick Butler and Cheryl Butler are responsible for the content on Defendant GLV's website and social media presence. Additionally, Defendants Rick Butler and Cheryl Butler are responsible for Defendant GLV's published promotional materials, including those materials that are embedded within the company's website and social media pages.

230.    Defendants Rick and Cheryl Butler are also responsible for the statements—both oral and written—proffered on behalf of Defendant GLV regarding its volleyball programs.

231.    Through its website, social media, promotional materials, and in-person meetings, Defendants Rick Butler and Cheryl Butler caused Defendant GLV to represent to Plaintiff and members of the Class that its volleyball services:

    a)  have the highest quality coaches;

    b)  will "give you the finest coaching, teaching and training" [19];

    c)  have "extremely qualified staff" [20];

    d)  are a safe environment for underage girls to play volleyball;

    e)  are superior to their competitors;

    f)  have a "Commitment to Excellence" [21];

    g)  include camps that are "head and shoulders above the competition" [22];

    h)  include camps that "provide elite, high quality training" [23];

    i)  will give its "best effort to make sure that you feel that the experience was well worth the time, efforts and expense" [24];

    j)  "will continue to strive for excellence" [25];

    k)  have had "37 years of excellence" [26]; and

---

[19]    *Id.*

[20]    GLV Sports Performance Volleyball, https://greatlakescenter.com/player-development/lessons/# (last visited Feb. 15, 2018)

[21]    GLV Sports Performance Volleyball, https://greatlakescenter.com/about-glv/about-spvb/ (last visited Feb. 15, 2018)

[22]    GLV Sports Performance Volleyball, https://greatlakescenter.com/camps/ (last visited Feb. 15, 2018)

[23]    *Id.*

[24]    *Id.*

[25]    *Id.*

[26]    GLV Sports Performance Volleyball, https://greatlakescenter.com/wp-content/uploads/coaches-clinic-2.pdf (last visited Feb. 15, 2018)

l)  are "specialists in training youth and junior volleyball athletes"[27]

m)  "Only by having "Elite Level" Master Coaches can any program guarantee that all athletes regardless of the team they are playing on will receive the same high quality instruction. Otherwise, each player is at the mercy of the level of their individual team coach who may or may not have the ability to teach at the highest levels and bring out the best in each athlete."[28]

232.  Defendants have also represented that their volleyball services provide a safe environment for youth players to participate in, including by stating, "The #1 priority is the safety of the athletes, coaches, officials and our staff.  We ask that you help us keep our facility a safe and a fun environment for all of us to enjoy the game of volleyball."[29]

233.  Based on the extensive pattern of sexual misconduct carried out by Defendant Rick Butler described herein, and the coordinated systematic concealment of that conduct by all Defendants, the above-referenced representations were false statements of material fact made to Plaintiff and members of the Class.

234.  When making the statements, Defendant GLV knew the statements were false, believed the statements to be false, and/or made the statements in reckless disregard of whether they were true or false.

235.  Defendants Rick Butler and Cheryl Butler, as the owners of Defendant GLV, acted in concert to use the corporate structure of Defendant GLV to conceal the truth about Rick Butler's sexual abuse and propagate false information to Plaintiff and members of the Class for personal profit. As described in detail herein, Defendant GLV acted in a fraudulent manner at the direction of and under the control of Defendants Rick Butler and Cheryl Butler to ensure Defendant Rick Butler's conduct stayed concealed.

---

[27]  Best Volleyball Videos, https://bestvolleyballvideos.com (last visited Feb. 15, 2018)
[28] FAQ, https://greatlakescenter.com/spvb-boys-program/faqs/.
[29] Great Lakes Center Rules, https://greatlakescenter.com/wp-content/uploads/2015-GLC-Rules.docx.

236.    Defendants Rick Butler and Cheryl Butler knowingly directed Defendant GLV to act in a fraudulent manner for the purpose of their own financial gain. Adherence to the fiction of Defendant GLV's separate corporate existence would promote injustice and inequitable consequences. It is inequitable to allow Defendants Rick Butler and Cheryl Butler to retain the monetary benefit Defendant GLV received.

237.    Plaintiff and members of the Class reasonably believed the above-referenced statements were true, and agreed to participate in Defendant GLV's volleyball programs, including enrolling players in Defendant GLV's volleyball teams, camps, and clinics, and paid requisite fees, in justifiable reliance on the truth of those statements.

238.    Plaintiff and members of the Class were injured and sustained damages based upon their justifiable reliance on Defendants above-referenced statements in the form of fees paid to Defendant GLV.

239.    Defendants' conduct was malicious, willful and wanton, and violated the trust and confidence Plaintiff and Class members put in Defendants. As a result, Plaintiff and Class members sustained damages. Justice and the public good require the imposition of additional damages to serve as punishment for Defendants and to deter Defendants and others from engaging in similar conduct.

### FIFTH CAUSE OF ACTION
### Fraudulent Concealment
**(On Behalf of Plaintiff and the Class as Against all Defendants)**

240.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

241.    Defendants Rick Butler and Cheryl Butler have consistently maintained control and responsibility for Defendant GLV's marketing materials, publications, and statements about the company's volleyball programs.

242.    For example, Defendants Rick Butler and Cheryl Butler are responsible for the content on Defendant GLV's website and social media presence. Additionally, Defendants Rick Butler and Cheryl Butler are responsible for Defendant GLV's published promotional materials, including those materials that are embedded within the company's website and social media pages.

243.    Defendants Rick and Cheryl Butler are also responsible for the statements—both oral and written—proffered on behalf of Defendant GLV regarding its volleyball programs.

244.    Defendants had an affirmative duty to truthfully and accurately apprise Plaintiff and the Class of all material facts relevant to Defendant GLV's volleyball programs.

245.    During the course of involvement in Defendant GLV's volleyball programs, Defendants had an opportunity to speak to Plaintiff and Class members regarding truthful and accurate representations of facts concerning Defendant GLV's volleyball programs and Defendant Rick Butler's history of sexually abusing minors.

246.    During the course of involvement in Defendant GLV's volleyball programs, Defendants knowingly concealed and/or withheld from Plaintiff and Class members the following facts:

> a)  That Butler has sexually abused at least six underage girls, including five girls that were players at GLV at the time of the abuse (and one who was only a sophomore at the time);
>
> b)  That in 1995, USA Volleyball found, after an extensive hearing and receiving written and oral testimony, that Butler had in fact had sex with three underage GLV players;

c) That in 1995, the Illinois DCFS found, after an extensive hearing and receiving written and oral testimony, that Butler had in fact had sex with three underage GLV players and posed a present threat to players currently under his supervision;

d) That Butler verbally, emotionally, and physically abused girls on his team; and

e) That Butler has admitted to having sex with three women who played on his team when they were 18 years old, but actually cannot recall when he started having sex with them.

247. Defendants concealed and/or withheld the above-referenced facts from Plaintiff and the Class, which were material facts. The information withheld by Defendants related directly to the safety of the youth volleyball players under Defendants direct care and control.

248. Defendants concealed and/or withheld the above-referenced facts with the intent to deceive Plaintiff and the Class and to induce Plaintiff and the Class to agree to participate in Defendant GLV's volleyball programs, including enrolling players in Defendant GLV's volleyball teams, camps, and clinics, and paying the requisite fees.

249. Defendants used the concealed and/or withheld facts to device and mislead Plaintiff and Class members.

250. Defendants Rick Butler and Cheryl Butler, as the owners of Defendant GLV, acted in concert to use the corporate structure of Defendant GLV to conceal the truth about Rick Butler's sexual abuse and propagate false information to Plaintiff and members of the Class for personal profit. As described in detail herein, Defendant GLV acted in a fraudulent manner at the direction of and under the control of Defendants Rick Butler and Cheryl Butler to ensure Defendant Rick Butler's conduct stayed concealed.

251. Defendants Rick Butler and Cheryl Butler knowingly directed Defendant GLV to act in a fraudulent manner for the purpose of their own financial gain. Adherence to the fiction of

Defendant GLV's separate corporate existence would promote injustice and inequitable consequences. It is inequitable to allow Defendants Rick Butler and Cheryl Butler to retain the monetary benefit Defendant GLV received.

252.    In the absence of Defendants' deceptive conduct and suppression of materials facts, Plaintiff and members of the Class would have acted differently in that they would not have allowed their children to participate in Defendant GLV's volleyball programs and would not have paid substantial fees for those programs.

253.    Based upon Defendants' duty and opportunity to speak regarding truthful and accurate representations of material facts, Defendants  silence regarding the above-referenced facts proximately caused Plaintiff and the Class to incur damages.

254.    Plaintiff and the Class sustained damages as a result of Defendants' concealment and/or withholding of the above-referenced material facts.

255.    Defendants are liable to Plaintiff and members of the Class for damages caused by their silence, concealment and/or withholding of facts.

**SIXTH CAUSE OF ACTION**
**<u>Unjust Enrichment</u>**
**(On Behalf of Plaintiff and the Class as Against**
**Defendant Rick Butler and Defendant Cheryl Butler)**

256.    Plaintiff incorporates by reference the foregoing allegations as if fully set forth herein.

257.    Plaintiff and the Class have a contract implied at law with Defendants Rick Butler and Cheryl Butler.

258.    Defendants Rick Butler and Cheryl Butler, as the owners of Defendant GLV, used the corporate structure of that company to conceal the truth about Rick Butler's sexual abuse and propagate false information to Plaintiff and members of the Class for personal profit. Defendants

Rick Butler and Cheryl Butler failed to maintain a formal legal separation between GLV and their personal affairs and ignored the legal formalities that GLV must follow in terms of preventing the propagation of fraudulent information. As described in detail herein, Defendant GLV acted in a fraudulent manner at the direction of and under the control of Defendants Rick Butler and Cheryl Butler.

259.    Defendants Rick Butler and Cheryl Butler received money from Plaintiff and members of the Class in the form of substantial fees paid to Defendant GLV.

260.    Defendant Rick Butler engaged in the improper conduct detailed above toward minors under his care and control, including but not limited to sexual, emotional, psychosocial, and physical abuse. Defendant Cheryl Butler actively facilitated the concealment of Defendant Rick Butler's sexual misconduct with teenage youth volleyball players, as well as orchestrated a campaign of intimidation and suppression of victims and those that speak out against Rick, all in the name of Defendant GLV.

261.    Based upon Defendants Rick Butler and Cheryl Butler's misconduct, Defendants Rick Butler and Cheryl Butler have unjustly retained a benefit in the form of the money paid by Plaintiff and Class members to Defendant GLV.

262.    Defendants Rick Butler and Cheryl Butler's continued retention of that monetary benefit violates the fundamental principles of justice, equity, and good conscience.

263.    Defendants Rick Butler and Cheryl Butler voluntarily accepted the benefit of money paid by Plaintiff and Class members knowing that it was obtained through misrepresentations and omissions of material facts about the services provided through Defendant GLV and the Butler's own coaching. Defendants Rick Butler and Cheryl Butler knowingly directed Defendant GLV to act in a fraudulent manner for the purpose of their own

financial gain. Adherence to the fiction of Defendant GLV's separate corporate existence would promote injustice and inequitable consequences. It is inequitable to allow Defendants Rick Butler and Cheryl Butler to retain that monetary benefit.

264.    As such, Plaintiff and the Class seek the complete disgorgement of all monies obtained by Defendants Rick Butler and Cheryl Butler that sourced from monies paid to Defendant GLV by Plaintiff and members of the Class for GLV's volleyball programs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Laura Mullen, on behalf of herself and a Class or similarly situated individuals, respectfully requests that this Court issue an order:

A.      Certifying this case as a class action on behalf of the Class defined above, appointing Laura Mullen as Class Representative, and appointing her counsel as Class Counsel;

B.      Declaring that Defendant GLV's actions, as set out above, constitute a violation of the Illinois Physical Fitness Services Act 815 ILCS 645/1 and a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS § 505/1, et seq.,

C.      Declaring that Defendants actions, as set out above, constitute Fraud and Fraudulent Concealment; and that Defendants Rick and Cheryl Butler's actions, as set out above, constitute Unjust Enrichment;

D.      Awarding damages, including actual, statutory, and punitive damages where applicable, to Plaintiff and the Class;

E.      Awarding injunctive and other equitable relief as necessary to protect the interests of the Class;

F.      Awarding Plaintiff and the Class their reasonable litigation expenses and attorneys' fees;

G.      Awarding Plaintiff and the Class pre- and post-judgment interest;

H.      Providing such other injunctive and/or declaratory relief as necessary to protect

the interest of Plaintiff and the Class; and

**I.**      Awarding such other and further relief as equity and justice may require.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

Dated: February 27, 2018          **LAURA MULLEN**, individually and on
behalf of all other similarly situated,


By: _/s/ Jay Edelson_____
       One of Plaintiff's Attorneys


JAY EDELSON
jedelson@edelson.com
EVE-LYNN J. RAPP
erapp@edelson.com
CHRISTOPHER L. DORE
cdore@edelson.com
ALFRED K. MURRAY II
amurray@edelson.com
SYDNEY JANZEN
sjanzen@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, IL 60654
Tel: 312.589.6370
Fax: 312.589.6378

*Counsel for Plaintiff and the Putative Class*