```
 1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                     EASTERN DIVISION

 3  LAURA MULLEN, Individually and on    )
    behalf of all others similarly       )
 4  situated,                            )
                                         )
 5              Plaintiffs,              )
                                         )
 6              v.                       )  No. 18 CV 01465
                                         )
 7  GLV, INC., an Illinois corporation   )
    d/b/a Sports Performance Volleyball  )
 8  Club and Great Lakes Center, et al., )  Chicago, Illinois
                                         )  July 3, 2018
 9              Defendants.              )  9:52 a.m.

10                  TRANSCRIPT OF PROCEEDINGS

11          BEFORE THE HONORABLE MATTHEW F. KENNELLY

12  APPEARANCES:

13  For the Plaintiffs:        EDELSON, PC
                               BY:  MR. JAY EDELSON
14                                  MS. SYDNEY M. JANZEN
                                    MR. ALFRED K. MURRAY, II
15                             350 North LaSalle Street, Suite 1400
                               Chicago, Illinois 60654
16                             (312) 589-6375

17
    For the Defendants:        ANGELINI & ORI, LLC
18                             BY:  MS. DANIELLE C. D'AMBROSE
                               155 North Michigan Avenue
19                             Suite 400
                               Chicago, Illinois 60601
20                             (312) 621-0000

21  Court Reporter:            Judith A. Walsh, CSR, RDR, F/CRR
                               Official Court Reporter
22                             219 South Dearborn Street, Room 1944
                               Chicago, Illinois 60604
23                             (312) 702-8865
                               judith_walsh@ilnd.uscourts.gov
24

25
```

1     (Proceedings heard in open court:)

2          THE CLERK:  Case No. 18 C 1465, Mullen versus GLV,

3     Inc.

4          THE COURT:  Good morning.

5          MS. D'AMBROSE:  Good morning, your Honor.  Danielle

6     D'Ambrose for the defendants.

7          MR. EDELSON:  Good morning, your Honor.  Jay Edelson

8     for the plaintiff and putative class.

9          MR. MURRAY:  Good morning, your Honor.  Alfred Murray

10    for the plaintiff and putative class.

11         MS. JANZEN:  Good morning.  Sydney Janzen for

12    plaintiff and putative class.

13         THE COURT:  So has a motion for class certification

14    been filed yet?

15         MR. EDELSON:  No, your Honor.

16         THE COURT:  When are you planning to file it?

17         MR. EDELSON:  We need discovery first.

18         THE COURT:  What discovery do you need to file -- to

19    file the motion for class certification, what discovery do you

20    need?

21         MR. EDELSON:  We -- so the contracts would be the

22    most important thing.

23         THE COURT:  When you say "the contracts," you don't

24    mean just your clients, you mean all types of contracts?

25         MR. EDELSON:  Yes.  Just, we may end up having to --

1   to define the class --

2          THE COURT:  To break it down.

3          MR. EDELSON:  Correct.  That would be the major thing

4   that I can think of, and also the marketing material to make

5   sure that there's consistency.

6          THE COURT:  Okay.  And -- and as you stand there --

7   and I'm not asking you this to hold you to something.  I just

8   want to get a sense of it.  As you stand there, do you think

9   it's likely that you're going to move for class certification

10  on all six of the claims or just some of them, or what?

11         MR. EDELSON:  It's our intent to move on all of the

12  claims right now.

13         THE COURT:  So both -- so there's -- I kind of group

14  them, and there's the deception claims and there's the

15  contract claims, and then the unjust enrichment kind of floats

16  around all of them.  So both, you're intending to move -- as

17  you stand there, you're intending to move for class cert both

18  on the deception claims and on the contract claims?

19         MR. EDELSON:  We are, but it really is dependent on

20  if there's a type of consistency which --

21         THE COURT:  And that's why you're looking for the

22  marketing materials.

23         MR. EDELSON:  Yes, and the contracts.

24         THE COURT:  All right.  And so the discovery that you

25  would need to do that sounds like it's document discovery.

1    MR. EDELSON:  The -- for the contracts, yes.  For the

2  marketing, a lot of the statements were made in their parental

3  meetings where they go and they hype up the club.  And those

4  are very consistent over the years.  So I don't know if they

5  have scripts.  We may have to depose one or two people.

6    THE COURT:  Okay.  All right.  So on the motion that

7  I set over to today, which is the motion to compel and for

8  issuance of corrective notice, so I'm just going to make this

9  comment to both sides.

10    So, I mean, I understand that some of the underlying

11  allegations in this case are pretty highly charged.  It really

12  doesn't justify the level of sniping that is going on between

13  the lawyers on both sides of this case.  It's just -- and I

14  mean, I don't understand -- I've been doing this a long time.

15  And I practiced law for 18 years.  I've been a judge for 19.

16    I really do not understand what it is that makes

17  lawyers think that basically using apocalyptic language and

18  saying that the other side has deliberately done this or that

19  and talking about the other side, I mean, lawyers, what makes

20  lawyers think that that's beneficial to them because it's the

21  opposite of beneficial.  It's -- it distracts from the

22  presentation that you're making.  And that's been going on on

23  both sides of this case.

24    And I don't really care who started it and who

25  finished it because as my mom used to say, it takes two to

1   make a fight, and you're both doing it.  And it's not helping

2   on either side.  It's time to cut it out.  And I hope I don't

3   have to repeat myself about that.  I mean, it was just kind of

4   hard to sort of sort through all of that in dealing with

5   the -- this motion to compel, which is unfortunate, not just

6   because I'm going to have to spend extra time on it but

7   because, you know, it's possible you missed something because

8   you get distracted by the invective.

9          So I have to -- I have to ask this question.  Let me

10  just find -- I dog-eared some pages here.  So this whole thing

11  about whether there's going to be a counterclaim filed or not,

12  so now you're going to have to answer the complaint.  You've

13  got 21 days.  Your counterclaim, if you're going to file one,

14  has to be filed with the answer.

15         I assume you have some idea as you stand there right

16  now whether there's going to be a counterclaim.  So is there

17  or isn't there?

18         MS. D'AMBROSE:  As I stand here right now, we have --

19  we have some -- I'm leaning towards not filing one but again,

20  I can't say definitively one way or another.

21         THE COURT:  Okay.  I'm just sort of mystified by one

22  statement in the reply, Page 9, the plaintiff's reply:

23  "Nevertheless, this is a civil lawsuit.  Defendants are, in

24  fact, required to inform plaintiff whether they're seeking

25  damages in their initial disclosures, but they haven't done

1  so."

2           Well, they didn't have a counterclaim on file yet.

3  You're not really actually contending that somebody has to put

4  something in a 26(a) disclosure and anticipate something they

5  might not even have to file because the complaint might get

6  dismissed, comma, are you, question mark?

7           MR. EDELSON:  I believe the rules require it but --

8           THE COURT:  Well, you're wrong.  So that means that

9  you shouldn't be able to amend your complaint at any point

10  because you would have had to already disclose all of that

11  now, right?  They didn't -- they're not under any obligation

12  to file a counterclaim until they have to answer the

13  complaint.  You agree with that, right?

14           MR. EDELSON:  Of course.

15           THE COURT:  Okay.  So -- so are you saying that your

16  26(a)(1) disclosures, if the judge just happens to require

17  them before a motion to dismiss gets ruled on, lock you in?

18           MR. EDELSON:  No, they don't.

19           THE COURT:  Well, then why would they lock the

20  plaintiff in because that's what you're basically claiming.

21  You're claiming, well, they didn't say in their 26(a)

22  disclosures that they're claiming any damages and, therefore,

23  they can't possibly be filing a counterclaim.  That's the

24  equivalent of saying they've been locked in, which you just

25  said they're not.  And you were right, by the way, just now.

1      MR. EDELSON:  That's fine.  If -- if your Honor reads

2  the rule as saying that it only applies to the plaintiff, why

3  else would it --

4      THE COURT:  No, no.  It doesn't only apply to the

5  plaintiff.  That's not what I said.  And that's the kind of

6  thing I'm talking about.  You take something somebody says and

7  then you just sort of flip it on its head.

8      MR. EDELSON:  Well, you didn't let me finish, your

9  Honor.

10      THE COURT:  Excuse me.  I'm going to quote you back

11  to yourself:  "If your Honor reads the rule as saying that it

12  only applies to the plaintiff."  Did I cut you off in the

13  middle of that?  I'm not saying that the rule only applies to

14  the plaintiff, and I didn't say that.  I'm saying it applies

15  to claims that you've made.  It doesn't lock you in.  It

16  doesn't -- there's nothing in Rule 26 that says you can't

17  amend a Rule 26 disclosure.

18      MR. EDELSON:  Correct, your Honor.

19      THE COURT:  All right.  Because if there was, you

20  wouldn't be able to amend yours either.

21      MR. EDELSON:  Correct, your Honor.

22      THE COURT:  Okay.  So, I mean, don't clutter this

23  stuff up with bogus arguments.  That was a bogus argument.

24      The second thing I have a question about is when

25  the -- when the -- now I've got to find it.  I've got to say,

1    I spent a lot of time reading the complaint because I had to

2    in order to rule on the motion to dismiss.  So here it is.

3    When the defendant -- so when you're talking about the

4    misleading disclosures or the misleading statements that you

5    think that you're contending that the defendants made so --

6    give me just a second.  Here we go.

7            Page 8 of the motion:  Plaintiff is claiming that

8    what we have on our website is fraud, top coaches, elite level

9    training, master coaches, best summer camps.  Defendant's

10   counsel -- or that was a statement that was made, I guess,

11   from Cheryl Butler.  And then right after that, there's a

12   reference to a statement that defense counsel made saying the

13   recent lawsuit against Rick Butler filed by a disgruntled

14   parent concerns alleged misrepresentations related to

15   contracts and business practices.

16           So let me focus on the second part of that, that

17   second statement there:  "The recent lawsuit against Rick

18   Butler filed by a disgruntled parent concerns alleged

19   misrepresentations related to contracts and business

20   practices."

21           That kind of seems like it's right on the money to

22   me.  What's false about it?

23           MR. EDELSON:  The statement itself isn't false.  It's

24   omitting what the larger issues of the suit are about.

25           THE COURT:  Well, the statement -- the full sentence

1    in your motion says, "Defendant's counsel issued a statement

2    to the press falsely claiming that," quote, "the recent

3    lawsuit against Rick Butler filed by a disgruntled parent

4    concerns alleged misrepresentations related to contracts and

5    business practices," closed quote.

6            So what's false about that?

7            MR. EDELSON:  It -- right.  It's false by -- by -- it

8    creates the impression that --

9            THE COURT:  So each one of your claims is about

10   either misrepresentations or contract problems.

11           MR. EDELSON:  Correct.

12           THE COURT:  Each one of them.  The statement is

13   absolutely true that you quote here.  It's not false at all.

14   It's not misleading at all.  It is.  I mean, each one of your

15   claims is a claim for deception.  You have a claim for

16   deception under the IPFSA.  You have a claim for deception

17   under ICFA.  You have a common law fraud claim.  You have a

18   common law misrepresentation claim.  You have an unfair

19   practices claim under ICFA.  You have a contract deficiency

20   claim under the IPFSA, and you've got an unjust enrichment

21   claim.  All of those concern misrepresentations related to

22   contracts and business practices.  So that statement is true.

23           And, I mean, one of the -- going back to the other

24   thing that I read off of Page 8, this quote from the email,

25   February 28th email from Cheryl Butler to somebody named

1    Jaworski, "Plaintiff is claiming that what we have on our

2    website is fraud, top coaches, elite level training, master

3    coaches."  I mean, that's kind of one of the things I relied

4    on in denying the motion to dismiss.  So that is part of what

5    they're claiming.  It may not be the entire claim.

6         MR. EDELSON:  Correct.

7         THE COURT:  So how does that, quote, misrepresent the

8    fundamental nature of the lawsuit, closed quote?

9         MR. EDELSON:  What I think -- I think what a

10   reasonable person reading this would think is that we're

11   complaining about the fact that the setting skills that they

12   teach aren't top notch, as your Honor understood our theory is

13   different than that in denying the motion to dismiss, which is

14   that they don't have a safe environment for kids based on our

15   allegations about Mr. Butler.  They're leaving out --

16        THE COURT:  Okay.  I guess I get that.  Well, I'm

17   really -- I'm really concerned or loath, I guess would be the

18   word, to get in and start micromanaging what people said

19   because you've made statements to the press, too, right?

20        MR. EDELSON:  Correct, your Honor.

21        THE COURT:  I mean, I read them.

22        MR. EDELSON:  Yes.

23        THE COURT:  I have access to the internet just like

24   everybody else, so I looked them up and so -- I mean, I can, I

25   suppose, impose a gag order on everybody including you.

1    That's not what you're asking me to do.  You're asking,

2    actually me, Exhibit 2 is the thing that you're wanting me to

3    send, and that's -- that's something that you want me to say,

4    and I'm -- I don't agree with a good deal of it.

5         And, I mean, basically, it's basically asking me to

6    make findings about why the lawsuit was filed.  It's asking me

7    to make findings on, you know, what the defendants intend to

8    do.  It's asking me to summarize -- I don't know how long your

9    complaint was but it's, you know, probably 50 pages.  It's

10   actually, it's asking me to summarize a 50-page complaint in

11   basically a paragraph.  It's, I just -- I'm not comfortable

12   with it.

13        And I mean, I guess I -- I guess I do have some

14   concern about, you know, if class members are told something

15   misleading, but I don't even have a motion for class

16   certification yet.  So when you say I'm supposed to send this

17   notice to the class, I don't have a clue who it is.  I mean,

18   is it everybody who's ever entered into a contract with the

19   defendants, or what?

20        MR. EDELSON:  These notices get sent to the putative

21   class as defined in the complaint.

22        THE COURT:  So which is what?  Is that everybody

23   who's ever had a contract with the defendants?

24        MR. EDELSON:  There's a -- there's a timeframe there.

25        THE COURT:  So it goes back a certain number of

1    years.

2            MR. EDELSON:  Correct.

3            MS. JANZEN:  I think it's five years.

4            THE COURT:  Four, five years, whatever the ICFA

5    statute of limitations is probably.  How many people would

6    that be, ballpark?

7            MR. EDELSON:  A few thousand.  I could be wrong.

8            THE COURT:  So currently, what --

9            MS. D'AMBROSE:  Based off of -- based on just the

10   definition of the class, it could potentially include anyone

11   who -- any player who plays -- pays a tournament entry fee

12   that doesn't play for Sports Performance.  It could include

13   any parents who come to watch their kids who paid --

14           THE COURT:  Let's just talk about people who have

15   contracts.  How many is that?  Currently, what would it be, a

16   ballpark figure?  More than a thousand?

17           MS. D'AMBROSE:  Including summer camps, yes.

18           THE COURT:  Yes.  And by definition there, you have

19   people kind of aging out and coming in.  So over the years,

20   that's multiple thousands of people.  So I have some problems

21   with what you filed, too.  And plaintiff didn't raise this,

22   and I don't know why not, but this -- your response is all

23   filed in the public record, right?

24           MS. D'AMBROSE:  Yes.

25           THE COURT:  Yes.  It is a big problem there.  So I'll

1   just give you one example.  It's just one.  Docket No. 64-8,

2   Page 5 of 7.  So the CM/ECF ID number at the top of the page

3   is 820.  It has the date of birth of a minor, the full date of

4   birth of a minor.  It has other identifying information

5   including phone numbers, street addresses, insurance policy

6   numbers, insurance carrier names.  I mean, all of that is a

7   violation of Rule 5.2 of the Rules of Civil Procedure, and so

8   the Clerk is directed to put document No. 64 under seal.  And

9   you're directed to file a redacted version in the public

10  record where you redact out everything that -- I mean, even

11  the minor's name isn't supposed to be in there.  5.2 is the

12  rule of civil procedure.  And that needs to be done by the

13  close of business today.

14          MS. D'AMBROSE:  Will do.

15          THE COURT:  And it's not just that one document.  I

16  thought it was just kind of the most obvious example.  I mean,

17  if I were in your shoes, there's a lot of references in here

18  to, I'm just going to refer to her as the minor, some, we'll

19  just say, medical issues that she had.  That shouldn't be in

20  the public record, period, end of discussion.  So fix that

21  very quickly, like first thing you do when you get back to

22  your office.

23          So, look, I'm -- I'm -- on this question of

24  corrective notices, I'm not there yet.  On the question of

25  making sure that there's a complete response to the

1    interrogatory so that the plaintiffs have all of the

2    communications, I want to make sure that I'm understanding the

3    parameters.

4         So there's no -- nobody's disputing that whatever

5    communications the two Butlers made or that the two Butlers

6    made or that the company as a company made, whether it's

7    emails, texts, announcements, smoke signals, something posted

8    on the website, whatever, nobody is disputing that that all

9    has to be produced, right?

10        MS. D'AMBROSE:  Correct.

11        THE COURT:  And have you produced all of that?  Now,

12   be very careful about your answer because this one, I am

13   holding you to.

14        MS. D'AMBROSE:  To the best of my knowledge, we have

15   done a comprehensive search of --

16        THE COURT:  Okay.  So what does "comprehensive

17   search" mean?  Who did you talk to?

18        MS. D'AMBROSE:  I spoke with Rick and Cheryl,

19   obviously.  Then I spoke with Luke Stapleton who is --

20        THE COURT:  Who is that?

21        MS. D'AMBROSE:  He's one of -- he's the only other

22   employee there who has sent out anything on behalf of -- it

23   was on behalf of Rick and Cheryl, signed by Rick and Cheryl

24   just to ensure that all -- all correspondence that came back

25   from that email was directed to Rick and Cheryl, which I

1    received.

2         And then I've spoken to Rick and Cheryl as far as

3    whether anyone else had sent out information.  I've spoken to

4    Luke about whether anyone else has sent out information that

5    could somehow be a communication between the club itself or

6    construed as a communication between the club itself.

7         THE COURT:  So this Luke fellow, what's his title or

8    what's his job?  What does he do?

9         MS. D'AMBROSE:  He's one of the coaches there.  He's

10   also just more tech savvy so he -- the way the --

11        THE COURT:  He's not like the office manager or

12   something like that.

13        MS. D'AMBROSE:  No.

14        THE COURT:  He's a coach.

15        MS. D'AMBROSE:  He's one of the coaches, and he's

16   just -- the way their email works, I guess, is that they can't

17   send out --

18        THE COURT:  How many coaches does this place have --

19        MS. D'AMBROSE:  I would say --

20        THE COURT:  -- approximately?  More than a dozen?

21        MS. D'AMBROSE:  Somewhere between around 30 to 50.

22        THE COURT:  Okay.  Quite a few.  All right.  So here

23   is my question for you:  So how broad in terms of the scope of

24   production, so who's got to produce what -- nobody disagrees

25   that it's Rick Butler or Cheryl Butler or the company as a

1    company that's got to be produced.

2            Who else?  So let's say -- let's say the coach of

3    the -- I don't know if this is how it is in volleyball because

4    my kids weren't volleyball people.  Let's say the under-14

5    girls volleyball team texts something to parents on the team

6    that responds to something about the lawsuit.  Is that

7    something that you're contending has to be produced?

8            MR. EDELSON:  Yes.  If it's on behalf of --

9            THE COURT:  So what's the theory?  In other words,

10   they just use their own phone and they text something out, and

11   for whatever reason they've got a group text set up where they

12   can text all the parents or the people on their particular

13   team.

14           MR. EDELSON:  Right.  I guess it would depend on how

15   the group texts out, but the group texts are usually set up to

16   communicate on behalf of the club with the team.  So if

17   they're acting --

18           THE COURT:  Right.  That's what I would assume.  I

19   mean, in other words, if I am the coach and I want to -- if I

20   want to let all the parents know, "Oh, the practice today

21   isn't going to be at 4:30, it's going to be at 5:00 o'clock,"

22   I need to have a way to do that, so I have some sort of a

23   group thing set up.

24           So if what happens is that there's an article in the

25   paper about the lawsuit, a parent asks about it, and the coach

1    thinks, "I'm worried about my people, I've got to say

2    something to them about this," and he or she does that, is

3    that something you consider to be a communication on behalf of

4    the company?

5              MR. EDELSON:  Yes, your Honor.

6              THE COURT:  Okay.  Do you think it isn't?

7              MS. D'AMBROSE:  I would say -- I would say in that

8    particular scenario, it would lean more to me that -- I guess

9    the way you put it, if the coach took it upon themselves to

10   say, "I need to send something out on behalf" -- almost on

11   behalf of the club is kind of where that -- where that almost

12   leads me to --

13             THE COURT:  This is a longwinded "yes," right?

14             MS. D'AMBROSE:  If the coach said, "I'm going to take

15   it upon myself to inform all of these people of information" --

16             THE COURT:  Right.

17             MS. D'AMBROSE:  -- as opposed to one parent coming up

18   and saying, "Listen, you know, this is what I read and, you

19   know, what is your experience here," I think those are very

20   different answers.

21             THE COURT:  Okay.  So you haven't given me the answer

22   to either one of them, though.  So what's your answer on group

23   one?  In other words, the coach decides, "I'm going to let

24   everybody on the team know what I think about this lawsuit."

25             MS. D'AMBROSE:  I would say the coach was still

1     acting as -- as an individual.  As to --

2          THE COURT:  So there's a dispute -- so we have a

3     dispute about the scope of this.  That's one thing I was not

4     entirely clear of from reading the response.

5          So my question, though, is, in order to have stuff

6     produced, it has to be preserved.  Okay.  And so one of the

7     things that's referenced somewhere in this material is that

8     you had -- that there was some sort of communication made to

9     somebody, it wasn't clear who, it wasn't clear what, saying

10    something has to be produced.  And I don't know anything -- I

11    couldn't figure out exactly what it was.

12         So in terms of -- in terms of telling people about

13    their obligations to preserve material, what have you done,

14    you or anybody on your behalf, in other words?

15         MS. D'AMBROSE:  I went -- Don Angelini was in the

16    case as well.  We met with the club within the week of us

17    being retained --

18         THE COURT:  You say you met with the club.  What does

19    that mean?

20         MS. D'AMBROSE:  With all the employees of the club.

21         THE COURT:  Okay.

22         MS. D'AMBROSE:  And we informed them that we were not

23    their attorneys, that they have just as much of a right to

24    speak to both parties, and they that should be saving anything

25    that has anything to do with the lawsuit, that we should --

```
 1    you know, if you have emails, we said you may want to create a
 2    separate folder, that you have a duty.  And it was after, I
 3    believe, Mr. Edelson had sent out a document preservation as
 4    well.
 5            THE COURT:  That's what I was going to ask.  So you
 6    guys sent out -- you guys had some way of knowing who the
 7    various people were, and you sent letters to people basically
 8    telling them, among other things, "Preserve whatever material
 9    you've got"?
10            MR. EDELSON:  Some of them, not all.
11            THE COURT:  All right.  Did you -- were there some
12    that you knew about and you didn't send things to, or you just
13    sent them to the people that you knew who you knew where to
14    find them?
15            MR. EDELSON:  We sent them to the people who we --
16            MS. JANZEN:  It was people who were identified on
17    defendant's website as coaches.
18            THE COURT:  As coaches.  Okay.  So if there was
19    somebody that's not on the website as a coach, you didn't send
20    it to them, but there might be people like that.
21            MS. JANZEN:  Correct.
22            THE COURT:  Okay.  And have you heard anything back
23    from any of these people after you -- after you sent out these
24    letters?
25            MS. JANZEN:  Not from any coaches at defendant's
```

1    facility.  We also sent preservation --

2         THE COURT:  When I get something other than a "yes"

3    or a "no," my assumption is that there's a hedge somewhere.

4         MR. EDELSON:  No.

5         THE COURT:  Did you hear anything back from any of

6    these people that you sent letters to?  That's a yes or no

7    question.  Whether they're coaches, not --

8         MR. EDELSON:  From third parties, we also sent

9    letters to some third parties.

10        THE COURT:  Okay.

11        MR. EDELSON:  And the --

12        THE COURT:  I'm not talking about the third parties.

13        MR. EDELSON:  Other than that, nobody associated with

14   the club --

15        THE COURT:  All right.  So my first concern is making

16   sure that whatever ought to get produced under interrogatory

17   No. 1 and the associated document request gets produced.  And

18   it sounds like to me -- it doesn't sound like to me, it's

19   pretty obvious that the plaintiff's contention is that the

20   defendants have not done an adequate job of due diligence in

21   investigating and ferreting out what material might be out

22   there, number one.  And number two, you may also be arguing

23   that there hasn't been enough done to make sure that the -- on

24   the defendant's side to make sure that people preserve stuff.

25   Am I pretty much right about that or not?

1          MR. EDELSON:  The first argument is the one we're

2    making.

3          THE COURT:  It's the first one.  Okay.  All right.

4    So what's the standard for whether something, a person who is

5    employed -- and I understand what you argued about control

6    group, but I'm going to use that term.  Okay.  So let's say a

7    coach isn't part of a control group of GLV, Inc.  It's pretty

8    obvious that are because there are not 30 people that are part

9    of the control group.

10         What's the standard under which a judge is supposed

11   to determine whether communications that that person has made

12   with third parties, let's just say, on a non-company device or

13   using a non-company account, are considered the company's

14   communications for purposes of a discovery request?  I

15   honestly do not know the answer to that question.  Is it just

16   plain old agency?

17         MR. EDELSON:  I believe so.  I think the easy

18   pickings are first, any time they're communicating with the

19   club in kind of a normal manner, so any emails that they are

20   sending on behalf of the club or if it's group text messages.

21   We are not trying to -- if they ran into somebody on the

22   street and the person said, "What do you think of this suit,"

23   and they said, "Oh, we think it's bogus," that's fine.  We're

24   not worried about it.

25         It's really just stuff that they're sending out where

1   the people would understand it is being -- it is being

2   communicated on behalf of the club, so group text messages,

3   emails, parent meetings, that type of thing.

4           THE COURT:  And give me -- give me your argument for

5   why, if a coach, as coach -- and maybe there's an argument

6   about what that means, coach as coach, so let's take it as a

7   given for the moment.  If a coach as coach sends something to

8   his or her players or their parents saying something that

9   relates to the lawsuit, the allegations in the lawsuit, the

10  press about the lawsuit, whatever, what's your argument for

11  why that shouldn't be considered to be something that the

12  company has to produce in discovery or at least has to gather

13  and produce in discovery?

14          MS. D'AMBROSE:  Well, first, I would say that it's --

15  it's likely -- I would say extremely likely that the coach is

16  speaking as to their own personal knowledge and their own

17  personal belief.  These allegations have obviously been around

18  for almost 40 -- it's 30 years that they've been public.  A

19  lot of these coaches were either players at the time or have

20  been coaching there for, you know, 10-plus years.  They have

21  their own opinions as to -- they were here when plaintiff --

22  they coached when plaintiff was at the club.

23          So I think that the biggest issue is that they're

24  expressing their own opinions and their own -- you know, their

25  own opinions on the club, their own opinions on Rick and

1   Cheryl, their own opinions on the allegations.  And I don't

2   think that you can attribute someone's personal experience and

3   personal --

4          THE COURT:  I'm not sure you can go that far.  So

5   I'll play law professor for a second and give you a

6   hypothetical.  So let's say that I was a friend and I -- this

7   is purely hypothetical.  Let's say that I was a friend of the

8   44th president of the United States when we were both in

9   college.  Okay.  And now I work in the White House for the

10  44th president of the United States.  And there is a report

11  out there that says that the 44th president of the United

12  States is a Muslim, and I say to, you know, people, "No, he's

13  not.  I've known him since college or high school" or

14  whatever.  "He's not a Muslim."

15         I mean, I'm not sure that you would necessarily say

16  that that's not a communication made in some sort of at least

17  quasi-agency capacity because I now work for the person.  So

18  the fact that I acquired knowledge of something in capacity A

19  doesn't mean that when I communicate that knowledge at some

20  later point in time that I'm acting in that same capacity.

21  That's my point.

22         MS. D'AMBROSE:  No, I completely understand that

23  point.  And I think as far as what plaintiff is representing

24  is, there is -- I was told that I was supposed to be going

25  through their text messages, their social media accounts,

1  their -- all of these.  We've got -- I mean, if you just take

2  part-time coaches and camp coaches --

3         THE COURT:  You know what, that is the world we live

4  in, folks.  It's -- I mean, you know, every now and then I

5  have to act, as other judges do, as the acting chief judge who

6  deals with stuff that the government is subpoenaing for

7  criminal investigations.  Half to two-thirds of it is Facebook

8  accounts, Twitter accounts, and everything else.  That's the

9  world we live in.  So, I mean, yeah, I get that it's a lot of

10  crap to go through, but that's a function of the kind of

11  communications that people are making.

12         So look, here's what I think you need to do on this.

13  So there's basically two things we're going -- I'm going to

14  direct you to do.  I think that the production obligation is

15  broader than what has been done so far.  I'm not going to

16  say -- I'm not going to sit here today and try to draw exactly

17  where the line is, but it does seem to me that if coaches are

18  making communications, not necessarily one-on-one

19  communications but communications in groups or -- I don't know

20  if they have company email accounts or not, but if they're

21  doing things to groups that consist of the people that they're

22  dealing with on behalf of the company, it seems to me pretty

23  likely that those are within the company's obligation to

24  produce.

25         And it's not a control group question.  I mean, it's

1    just like, you know, for example, if you had kind of a

2    standard employment discrimination case and there was some

3    coworker or even an immediate supervisor who was alleged to

4    have made some nasty comment to the plaintiff that suggests

5    some sort of bias of some kind, that person wouldn't be in

6    the, quote, unquote, control group for attorney-client

7    privilege purposes, but the company would still have to

8    produce that communication.  I don't think it's a lot

9    different here.

10          So I need you to sit down in pretty short order and

11   confer and try to come up with an agreement as to how much

12   broader the search has to be, kind of what has to be done and

13   when it has to be done by.  That's number one.

14          I'm going to circle back to this whole corrective

15   disclosure thing in a second.  Item No. 2 is, I would like you

16   to sit down and confer about what discovery is needed by each

17   side on the question of class certification, and I'd like you

18   to come back in with a status report that basically lays it

19   out, plaintiff saying, "This is what we think we need."  If

20   the defendant is saying, "No, no, no, that goes too far," I

21   want that in the status report, and I want the plaintiff to

22   explain why it's relevant.

23          And the same thing on the other side.  The defendant

24   is going to say, "This is the discovery we think we need to

25   attempt to refute the anticipated motion for class

1  certification."  If you think it goes too broad, tell me why,

2  and then you respond to it.  So I'm going to give you a couple

3  weeks to do that.

4          Then on this question of corrective disclosure, I'm

5  just going to be blunt about this.  It's too much of a mess

6  for me to go wading into it at this point.  I -- I do think

7  it's -- I do think it's unwise -- I understand -- let me put

8  it this way.

9          I understand where people are coming from on the

10  defense side that you don't want to remain mute in the face of

11  pretty serious accusations.  And I'm not talking about the

12  fraud accusations that are in this case.  I'm talking about

13  the underlying accusations, that you don't want to remain

14  silent and you want to try to defend yourself and so on.

15          On the other hand, I'm just going to say you don't

16  want to be in a position where I find -- and I'm not making

17  this finding right now, I'm not making a finding one way or

18  another, in fact -- where I find that somebody has made some

19  sort of a misleading disclosure, and not misleading because it

20  gives your position but misleading because it's misleading.

21  Because once that happens, there's all sorts of bad things

22  that can very easily happen under *Gulf Oil v. Bernard* and all

23  the cases that come after that.  And it's not a position that

24  people want to be in.

25          And so I'm not going to rule on that motion one way

1  or another.  I'm just going to take it under advisement at

2  this point because I want to advance the ball in this case, no

3  puns intended.  I want to advance them.  I'm not going to say

4  anything about spiking or anything like that.  I want to

5  advance the ball in the case and get -- try to get to the next

6  step and try to work towards where we're going to be in class

7  certification.  I mean, I'm confident there's going to be some

8  pretty significant issues on both sides about whether a class

9  ought to be certified, and I want to try to kind of get that

10  all out on the table and get it going.

11         So the ruling is going to say that the motion to

12  compel discovery is granted in part to the extent stated in

13  open court.  And you're to confer to try to come up with the

14  parameters on what additional searches and production have to

15  be done.  And then the motion for entry of a protective order

16  and issuance of corrective notices, continued and taken under

17  advisement.

18         And so then I want a status report by two weeks from

19  now.  That's the -- what is that?  That's the 17th.  And so

20  include this stuff on class certification discovery, and also

21  include what you've discussed up to that point regarding the

22  production of additional communication.  Okay.

23         And then the last thing I'll say and just kind of

24  picking up on what I said before, so going back to what I said

25  about understanding why people want to respond to things, so

1    the -- one of the concerns that any reasonable attorney in

2    defense counsel's position would have to have in this

3    situation is what I'll just call uncontrolled communications

4    that are made in -- either by a person who is named as a

5    defendant or by a person who is -- you know, might be

6    considered to be acting on behalf of the corporate defendant.

7    That's -- because uncontrolled is bad for lawyers.  Okay.

8    It's just bad for lawyers.

9         And it would be wise, I think, to think about

10   whether, if you're going to say something at all, you just

11   come up with a statement, you put it on the web page or

12   something like that, and so that's where it is and so that we

13   don't have -- I don't have to get in and start rummaging

14   around and figuring out, you know, who said what, when and

15   whether it's true or not or whether it's misleading or whether

16   it's going to be considered intimidating and so on.  It's all

17   there, and we don't have to be running around hunting for

18   things.  And so coaches can say, "Go look at the website," and

19   assistant coaches can say, "Go look at the website."  So there

20   you go.

21        So I'm going to have you come back.  So the status

22   report is due on the 17th.  I'm going to have you come back on

23   the -- I think I want to say the 19th, but give me a minute

24   here.  Sorry.

25        So could you come in on the 20th actually at

```
 1   something like 8:30 in chambers for a status, the 20th of
 2   July.  Does that work okay?
 3             MS. D'AMBROSE:  Yes.
 4             MR. EDELSON:  Yes, your Honor.
 5             THE COURT:  See you then.  Anything else we need to
 6   talk about?
 7             MS. D'AMBROSE:  I do.  We just have one outstanding,
 8   Don Angelini's motion to withdraw.
 9             THE COURT:  I thought I ruled on that.  It's granted.
10             MS. D'AMBROSE:  Thank you.
11             THE COURT:  Okay.  I thought I dealt with it.
12             MS. JANZEN:  Your Honor, and just to clarify, on the
13   motion for rule to show cause, that's what you want us to meet
14   and confer about and just narrow it to --
15             THE COURT:  Which one is the motion for rule to show
16   cause?
17             MS. JANZEN:  So we -- that was for the rest of the
18   discovery --
19             THE COURT:  Yes.
20             MS. JANZEN:  -- issues aside from --
21             THE COURT:  Yes.  I want to really focus on class
22   discovery now.  And obviously, and Mr. Edelson has heard me
23   say this before.  There is no neat dividing line between class
24   discovery and everything else, but I want people to focus on,
25   for the time being, what it is you need in order to prosecute
```

1    and defend the class certification motion.

2            MR. EDELSON:  Are we still allowed to get merit

3    discovery or --

4            THE COURT:  Well, I want to talk about that, and

5    we'll talk about that more when you come in on the 20th.  So

6    if you want to do more than that, then pop that in the status

7    report, too, so that it's kind of all in one place, and we can

8    have a discussion about it on the 20th.

9            MR. EDELSON:  Okay, your Honor.

10           THE COURT:  So nothing between now and then, in other

11   words, is what I'm saying.  All right.  Thanks.

12           MS. D'AMBROSE:  Thank you.

13           MR. EDELSON:  Thank you.

14       (Proceedings adjourned at 10:30 a.m.)

15                      * * * * * * *

16                  C E R T I F I C A T E

17       I, Judith A. Walsh, do hereby certify that the

18   foregoing is a complete, true, and accurate transcript of the

19   proceedings had in the above-entitled case before the

20   Honorable MATTHEW F. KENNELLY, one of the judges of said

21   court, at Chicago, Illinois, on July 3, 2018.

22   /s/ *Judith A. Walsh, CSR, RDR, F/CRR*_____      July 15, 2018

23   Official Court Reporter

24   United States District Court

25   Northern District of Illinois, Eastern Division