# Exhibit A

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 2 of 116 PageID #:1313

# Statement by Cheryl Butler

**(February, 2018)**

**Note**: For the past almost 25 years Rick and I have tried be professional regarding the issues I am about to discuss in this statement. Our goal was to move on from 1994 and the allegations from the 1980's, to provide the absolute best service we could to our customers and our employees. I have been involved with the Sports Performance program for over 30 years, Rick and I have been together for the past 27 years. I never wanted to go public with the things that I have written in this statement, but the ongoing smear campaign in the press and on social media has made "taking the high road" virtually impossible.

I am writing this statement to address the ongoing smear campaign against my husband Rick Butler that is taking place on social media and in the press. The number of lies and false statements I have seen printed over the past couple years has brought me to this point. This statement will address allegations that date back to the early and mid 1980's as well as the recent ruling by USA Volleyball to ban Rick for life. The most serious allegations were made in 1994 against Rick by his former partner who he asked to leave the organization in 1989, Kay Rogness and three former players Sarah Powers, Christine Brigman and Julie Bremner. Powers, Brigman and Bremner have alleged that they were victims of sexual abuse when they played for teams coached by Rick in the early and mid-1980's and have remained traumatized for the past three decades. Kay Rogness, also claimed that she was aware of the abuse. Everything included in this statement has been seen or read with my own eyes, heard with my own ears or was addressed in the six total polygraph tests that Rick and I have voluntarily taken.

**THEODORE POLYGRAPH SERVICE**
4415 HARRISON • HILLSIDE, IL 60162 • 708/449-5020

January 20, 2000

Mr. Rick Butler
2413 Glenford Drive
Aurora, IL 60504

Dear Mr. Butler:

Please accept this letter as a summary of the findings I have made as a result of four separate interviews and polygraph testing I have made of you and the one interview and polygraph testing performed on Cheryl Butler. Your dates of interview were the following: December 7, 1999, December 14, 1999, December 22, 1999, and January 4, 2000. Ms. Butler's appointment was on April 29, 1999. During the course of these five testings, it was my evaluation that there were no deception indication by either you or Ms. Butler. Further, my opinion in each instance of the separate testings was that you and Ms. Butler were truthful. The area tested concerned allegations made against you with respect to your sexual involvement with certain females. As indicated, the testing of you and Ms. Butler indicated that you were both truthful about this matter.

I thank you for the opportunity to have been of service to you.

Very truly yours,

Steve Theodore
Polygraph Examiner

**THEODORE POLYGRAPH SERVICE INC.**
4415 WEST HARRISON SUITE 206
HILLSIDE, ILLINOIS 60162
708-449-[illegible]

January 28, 2017

Mr. Rick Butler
2433 Glenford Drive
Aurora, Illinois 60502

Dear Mr. Butler,

Please accept this letter as a summary of the findings I have made as a result of your polygraph interview and examination. Your examination was on January 24, 2017, at 4415 West Harrison, Hillside, Illinois, 60162. Polygraph examination was administered and my opinion is that you are telling the truth to all relevant test questions. The areas tested were concerning allegations made against you with respect to your sexual involvement, as well as, inappropriate and/or abusive conduct with certain females. As stated above my findings are that you told the truth about those matters.

Sincerely,

Deanne Theodore
Polygraph Examiner

Page 1 / 1 Zoom 100%

One of the misconceptions regarding the Sports Performance Volleyball program is that the parents in our program are "idiots" for allowing their daughters to participate in the program and only care about "the scholarship". Nothing could be further from the truth. We have a very large number of former players who now have their daughters and sons involved in the Sports Performance program. Those parents experienced the program for themselves firsthand in the 1980's and 1990's and now have chosen to have their children participate.

Last month (January, 2018) we sent out a mass e-mail to over 600 families in the Sports Performance and Great Lakes Center Youth Academy programs. We offered to meet with any family who had any concerns regarding all the negative publicity that Rick has been getting in the press over the past few months. Out of those 600+ families, one family requested a meeting. Rick and I met with that family who was in their first year with the program. At the end of the meeting they made it clear that their daughter would continue to be a part of the program and she loved her first year playing in the program. I'm not sure there could be a stronger testimonial for the program than the examples that I have just mentioned. The parents in our program are police officers, judges, ministers, attorneys and come from all walks of life. They are certainly not brainwashed into having their children participate in the Sports Performance program. They are closer to us and our program and have more direct knowledge than anyone else. They have made a well researched and thoughtful choice to have their daughters and sons participate in the Sports Performance program. One out of 600! That should give people pause to think that maybe there is a lot more to this story than what they read in the press or on social media. Also, if people look a little deeper they will see that this issue has its own hidden agenda.

In 1992 a young lady was placed in our home by the Illinois Department of Children and Family Services (DCFS) and she lived with us for the entire 1992-1993 school year. She's actually one of several players who have lived with us over the past 25 years. She was a player on Rick's team and after personal issues and a family tragedy created a very bad situation in her home she was placed in our home. Four years later this young lady would invite Rick and me to attend her Senior Night match and stand with her in the pregame introductions as she ended her college career.

6/30/93

Rick,

First I just want to thank you for everything you've provided me with. Without you I'd never be where I'm headed for. You & Cheryl have given me so much I don't know how I can ever repay you. This year has been the worst year of my life and also my most successful year. Right now I don't know what kind of relationship we have. At the beginning I felt great about everything, now it's like I've screwed up so bad that I feel I mean nothing to you. I don't want it to end this way. I feel so bad that I've broken every rule we've had whether you believe me or not. Some times I get so frustrated that acting out of place makes me feel good at that time, but now look at me, I feel guilty as all hell. You've given me so much slack and so much pain but out of all the times I told my self I'm never gonna miss him it is Now, I'm gonna miss him.

I love you & Cheryl very much and have become so adapted to living here I don't want to leave. Now it's like this is my home and once again I'm leaving a place where I feel comfortable in. It's time I moved on and I know what I have to do to be successful. I'm glad I stuck this year through and went through all the experiences. You've taught me alot. Thank you for being here for me, but most of all for saving my life. Good Luck for the rest of this year & I'll see you when I get back.

Love always,

[redacted]

# 21 SPVB.

## KEEP READING

PAGE 2: BACKGROUND →
(HTTPS://OUR-STORY.ONLINE/PAGE-2-BACKGROUND/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 9 of 116 PageID #:1320

# Page 2: Background

I first met Rick Butler in the summer of 1980 before my senior year of high school. Along with some of my high school teammates we attended a volleyball conditioning program that Rick was running at the Sports Fitness Institute in Glen Ellyn, Illinois. I didn't see Rick again until the fall of 1986 after I had graduated from college and gone back to my high school to assist with coaching the volleyball team. We were playing a match at St. Francis high school in Wheaton when Rick approached me following the match and asked me if I would have an interest in coaching with the Sports Performance Volleyball club. I had just started teaching elementary school at a Catholic grammar school and was recently married. My lifelong goal was to be a teacher and a coach so I was very excited to have the chance to coach with a program as strong as Sports Performance. I talked it over with my husband and my former high school head coach, both agreed it would be a great opportunity and would provide great experience to my development as a coach. I joined Sports Performance Volleyball as a coach for the 1987 club season coaching one of the 18's teams made up of juniors and seniors. During that first season Kay Rogness was the club director along with Rick. Julie Bremner was a junior in high school and was playing on Rick's team at the time. Sarah Powers was in the gym on an almost daily basis since she had taken off the second semester of her senior year in college to come back to Chicago and play for the Chicago Breeze, which was a new professional team in the newly formed "Major League Volleyball". Rick was the head coach of the Breeze that year and Kay Rogness was the general manager. During the summer of 1987 Rick asked me if I would be interested in being his assistant coach for the 1988 season with his 18 Elite team. 1988 would be my last year of teaching grammar school. In the summer of 1988 I would join the Sports Performance program as a full-time employee where I have remained for the past 30 years.

**KEEP READING**

PAGE 3: 1995 ADOPTION INVESTIGATION →
(HTTPS://OUR-STORY.ONLINE/PAGE-3-1995-ADOPTION-INVESTIGATION/)

Or revisit a previous page

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 11 of 116 PageID #:1322

# Page 3: 1995 Adoption Investigation

My first marriage ended in 1989. Rick and I began dating in 1991 and were married on January 2, 1994. We both very much wanted to have children since Rick had lost a young son to a drowning in the 1970's and I had lost a baby to a miscarriage in 1988. I was later told that I would never be able to have children. Late in 1994 we had the opportunity to adopt a baby that was due to be born in the spring of 1995. The allegations against Rick in 1994 had caused a Department of Children and Family Services (DCFS) investigation in the spring of 1994. Following that was the USA Volleyball hearing which was held in late July, 1995 in Chicago which created a great deal of media publicity. Our baby was born in late April, 1995 and that triggered an eight month investigation, after the presiding judge overseeing the adoption issued a court order to unseal and review all the documentation regarding the DCFS investigation and the allegations against Rick. Rick and I were also interviewed on multiple occasions. This was the only time that an investigation took place that would look at all the facts regarding the allegations against Rick. In 1994 the DCFS had only spoken by phone to four different people, Kay Rogness, Rick's former partner and former players Sarah Powers, Christine Brigman and Julie Bremner. Rogness failed to tell the DCFS that she had been asked to leave the Sports Performance program in 1989 and that she had a 10 year sexual relationship with Rick during the entire time she had told the DCFS that she was witnessing the abuse in the Sports Performance program. In 1995, USA Volleyball didn't spend any time investigating or challenging the allegations. They just took the statements from the accusers, scheduled and held a hearing and then suspended Rick. The adoption investigation was much more thorough and was overseen by a judge. In his report to the judge, the investigator who was charged with recommending if the adoption should be approved stated that he had spoken to DCFS investigators who had admitted that no laws were broken and he did not find the allegations against Rick "believable".

A year and a half after the DCFS investigation and five months after the USAV hearing in July of 1995, the eight month court ordered investigation was concluded with the approval of the adoption of our baby in December of 1995.

STATE OF ILLINOIS )
) SS
COUNTY OF DU PAGE )

IN THE CIRCUIT COURT OF THE EIGHTEENTH JUDICIAL CIRCUIT
DU PAGE COUNTY, WHEATON, ILLINOIS

In the Matter of

RICKY A. BUTLER and
CHERYL MARTINO BUTLER

to adopt [redacted]

95 F 630

**DECREE OF ADOPTION**

This matter coming on to be heard upon the Petition to Adopt, the Court being fully informed, finds that:

1. The Court has jurisdiction over the subject matter in the parties.

2. The Guardian ad Litem, [redacted], has filed an Answer on behalf of the child.

3. The report of DuPage County Probation Department, as investigating agency, has been presented to and examined by the Court and the Court is satisfied from the report that the adoption of the child by Petitioners is for the welfare of the child.

4. The Guardian ad Litem and the investigative agency have received notice of the application by Petitioners for the entry of a judgment.

5. The Petitioner and the child appeared in person in this court.

6. The Petitioners are husband and wife, of legal age, and under no legal disability; reside in Warrenville, DuPage, County, Illinois, and they have resided in the State of Illinois continuously for a period of at least six months immediately

preceding the filing of their Petition.

7. The Petitioners desire to adopt [redacted], a male minor child who was born on the [redacted] day of [redacted], in Winfield, DuPage County, Illinois; and they are not related to said child.

8. The Petitioners acquired the child pursuant to an interim order of this Court on June 2, 1995.

9. That an Order of Termination of parent-child legal relationship with respect to the child's father has heretofore been entered.

10. That the mother of the child has executed her consent to this adoption, which was properly executed and acknowledged and is valid. Accordingly, upon entry of this Decree of Adoption, the parental rights of the mother are finally and irrevocably terminated.

11. The Petitioners are reputable persons with character, ability and means to rear, nurture and educate the child in a suitable and proper manner.

12. The allegations of the Petition of the Petitioners are true and proven as therein alleged and it is for the best interests of the child that the prayer for adoption be granted.

IT IS THEREFORE ORDERED that from this date, [redacted] [redacted] shall be to all legal intents and purposes, the child of the Petitioners, RICKY A. BUTLER and CHERYL MARTINO BUTLER, husband and wife; and for purposes of inheritance and other legal incidents and consequences, it shall be the same as if the child had been born to

the Petitioners in lawful wedlock.

IT IS FURTHER ORDERED that the name of the child is changed to [redacted].

Dated in Wheaton, Illinois this 12th day of December, 1995.

Enter:

Judge

Richard F. Hudzik
Hultquist, Wiedel, Hudzik & Russ
4915 Main Street
Downers Grove, IL 60515
(708) 969-2300
Atty. #37600

It should be noted that after the allegations were made against Rick in 1994, the Illinois DCFS conducted an investigation of the Sports Performance program and spoke with the players that Rick was training at the time. That investigation found nothing at all regarding any type of inappropriate behavior. The DCFS investigator told Rick that they were not going to make any recommendations to restrict his coaching of junior athletes. Also, Rick's case file with the DCFS was expunged and destroyed in 1999 after five years, which was the minimum length of time that the DCFS had to keep any report on file.

STATE OF ILLINOIS
GEORGE H. RYAN, GOVERNOR
JESS MCDONALD, DIRECTOR

DEPARTMENT OF
CHILDREN AND FAMILY SERVICES

406 EAST MONROE STREET
SPRINGFIELD, ILLINOIS 62701-1498

217-785-2509
217-524-3715/TTY

June 3, 1999

Richard F. Hudzik
Weidel, Hudzik & Russ
Attorneys & Counselors
4915 Main Street
Post Office Box 578
Downers Grove, Illinois 60515

Re: SCR# 0579378A
Butler, Rick

Dear Mr. Hudzik:

Pursuant to your request, please find this as confirmation that all information regarding the above referenced case has been removed from the State Central Register and destroyed.

I hope that this answers your questions and fulfills your requests. If you have further questions, please contact me at the address listed above.

Sincerely,

Linda Everette-Williams
Administrator
State Central Register

## KEEP READING

PAGE 4: KAY ROGNESS →
(HTTPS://OUR-STORY.ONLINE/PAGE-4-KAY-ROGNESS/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 16 of 116 PageID #:1327

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 4: Kay Rogness

For the past 25 years Kay Rogness, Rick's former business partner has been claiming that she left the Sports Performance Program in 1988 because of Rick's inappropriate behavior with his players. In 1994 she told the Illinois Department of Children and Family Services (DCFS) the same story and the DCFS investigator termed Kay, "the key witness" in their investigation of Rick.

In her statement to the Illinois DCFS, Rogness stated that she had left the program in 1988 because of Rick's behavior: "**Since I believed that Butler was pursuing yet another player, I decided to leave Sports Performance.**"

After reading this statement and the attached documents, you will see that Kay's version of her departure from the Sports Performance volleyball program is different from the actual facts.

I was approached in the spring of 1988 about becoming a full-time employee for Training & Publications, which was the company that managed the Sports Performance Volleyball program and also ran all the other business interest such as camps, clinics, events, etc.... I was first asked by Rick and then later had a conversation with Kay. She told me that she felt at some point Rick would move on to coach at a higher level and that she did not want to be left alone running the club. She needed a job that would provide a steady income if Rick moved on. She was 14 years older than Rick and said she needed financial security. She had decided to go to law school and had applied to Loyola-Chicago so she could remain with Sports Performance on a full-time basis. When she did not get admitted to Loyola, she started to look at law schools out of state and eventually settled on Denver, since her daughter was there in school. Regardless of what Kay has been saying over the past 25 years, in 1988 she made it clear to me she would be back to work at the club during the summers and back for good once she got out of law school. She said the same thing in the Sports Performance board of directors meeting in August, 1988 that I attended.

The first year I was working full-time (1988-89), Kay was still running the financial side of the business from Colorado. She told both Rick and I that it had been recommended by our accountant that each week I should mail her all the checks that had come in and she would

prepare and make every deposit. It was clear that this system was very inefficient and when Rick approached our accountant in the spring of 1989, he was told he had not made any recommendation to Kay and that the whole process we were using was ridiculous. It was at that point that Rick decided that a long distance partnership with Kay was not going to work. She wanted to be treated like a day to day partner who was gone most of the year. Kay came back to work for the summer of 1989, but it was obvious that there was tension between her and Rick.

On August 1, 1989 Rick was leaving to visit his mother in Oregon and Kay was out of town as well so he left her a long letter offering to buy her out of the company. He left his mother's phone number and asked Kay to give him a call if she wanted to discuss the letter.

Aug 1, 1989

Dear KAY,

Being at the Olympic festival and the coaches school has given me a chance to do a lot of thinking about what I'm going to do with the next 10-15 years of my life. I've come to the following conclusions and I've decided to take the necessary steps.

I. More than anything in the world I want to be a great coach. Not just a great coach but the very best coach I can be. We don't have the same dreams anymore, that's why we have such a hard time getting along.

The past 2 years I've spent more and more

## KEEP READING

PAGE 5: KAY'S ANGRY LETTER →
(HTTPS://OUR-STORY.ONLINE/PAGE-5-KAYS-ANGRY-LETTER/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 21 of 116 PageID #:1332
Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 5: Kay's Angry Letter

No call came, but when he got back to Illinois, Kay had left Rick a letter dated August 7, 1989. In that letter Kay was very angry and upset about being asked to leave the company. She also confirmed in the same letter that she had been having a sexual relationship with Rick as recently as March of 1989.

August 7, 1989

Rick,

My, my, my - it certainly is interesting how things do change. In March we had a long and, I thought, sincere conversation. So you can imagine how surprised I was when I returned to Illinois in June to find out that after you fucked me in March, you turned right around and fucked me over in May. And now, in August, comes the ultimate fuck-over - the letter whose bottom line is "I don't care what you did to help establish this business - now that it's starting to roll, I want it all for myself."

I can understand what you mean when you say you are very tired. I am very tired also - tired of being screwed over by people who say things like, "I'm not trying to get rid of you." "I want you to be involved." "I'm going to work much harder at communicating with you." "I'll never forget all you've done for me." "You don't have to worry, Kay - I'll never screw you over the way Denny did." Etc., etc., etc., etc..........It is really enlightening to see how someone like you, who places such value on the Old West ideals of being a man of your word and being loyal to your friends, puts those ideals into practice. Somehow I had the crazy idea that the goal was to have to ideal and the practice be as much alike as possible - I didn't know they were supposed to be as different as possible.

I guess you are right that we don't share the same dreams anymore because I know I don't spend weeks at a time thinking about how to build myself and my reputation up at the expense of anyone and everyone around me. But I guess I'm just not competitive enough.

Your comment about not wanting to "fight and argue with you about how the operation functions" is really curious. I don't recall having more than one short conversation with you about Training & Publications functions all summer, or even during the past year, for that matter. You also state that you don't want to feel guilty for not doing more with T&P. I don't understand this reference at all, as I don't even recall a conversation on this subject, let alone a disagreement. As for wanting the freedom to come and go as you please, when have you ever done anything but? While no one can argue that your reputation and the reputation of Sports Performance Volleyball has been a major factor in the growth of T&P, that is not at all the same thing as saying that you alone are responsible for the growth of the company - you did have some help along the way, you know. And it's certainly not just your reputation that has created a positive image for Sports Performance - I had a little something to do with that, too.

"More than anything in the world" you want to be a great coach. I can honestly say I have tried to be a great friend because that was one of my foremost goals. You say you have worked hard for the last two years to develop T&P. I worked hard for eight years, six of those without pay, to help you establish both T&P and SPVB - to help you see your dreams become reality. You got the great reputation and I got a slap in the face. I really think I deserve something a bit more positive.

Page 1 / 1 Zoom 100%

## KEEP READING

PAGE 6: KAY'S NEGOTIATION LETTERS →

(HTTPS://OUR-STORY.ONLINE/PAGE-6-KAYS-NEGOTIATION-LETTERS/)

---

Or revisit a previous page ▼

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 6: Kay's Negotiation Letters

Over the next almost 13 months, numerous letters of negotiation would go back and forth between Rick and Kay, finally ending on August 23, 1990 when Kay resigned from the company as well as her position on the Sports Performance Board of Director's.

850 Lafayette Street
Denver, CO 80218
December 19, 1987

Rick,

Thank you for sending the first quarter check early. I really appreciate it.

I thoroughly enjoyed reading the enclosed clippings about the kids on the All State teams. You've done a great job with all of them.

I have sent the records you asked for under separate cover. I presume that I will receive the copies of the records I asked Cheryl for by return mail.

We need to settle one point regarding the stock sales contract. It has to do with Jerry Wolowicki's suggestion that you not sign a promissory note to guarentee the contract. There are three reasons why I think this suggestion would not be a good thing for me to do. First, it would leave me with what is known as a "naked contract," which is essentially a contract without anything backing it up. As Bob Hultquist noted in his letter to you on November 9, it is typical for a contract like this to be supported by a promissory note. Hultquist said he had anticipated us doing this all along, whether T&F or you were the purchaser.

The second point is that when you came out to Denver in August, we talked about price and settled on the $40,000.00 figure because you told me you didn't want to commit to any higher figure than you personally could afford to pay off if T&F didn't make it. I took this to be a personal guarentee, and it was the main reason I agreed to the price you wanted. Now Jerry is suggesting that you not make a personal guarentee, which is entirely different than what we agreed upon.

Third, the first version of the sales contract was a personal contract from you, pretty much the same thing as a personal guarentee. I suggested looking at making T&F the purchaser because I thought it might save you some money in taxes. I had no intention of changing our agreement about your guarenteeing the purchase. Then Jerry comes back with this twist, which is a whole new ball game.

I would be happy to talk to you about this whole matter. I haven't called because of the turmoil with Laurie's mother and not being able to afford to call in the daytime when you are available in the office. So, if you would like to talk about it, just give me a call.

Hope you have a nice Christmas, too.

Kay

P.S. Congratulations on your selection in Volleyball Monthly as one of the notables in volleyball in the 80's.

850 Lafayette Street
Denver, Colorado 80218
May 25, 1990

Dear Rick,

I just received your letter of May 18. At this point, I am really confused. About 10 days ago, I got a letter from Bob Hultquist, which was copied to you, saying you said you were willing to accept all the terms and conditions of the March, 1990 version of our agreement except the interest provision. Now you are saying that you are not willing to accept any of the agreement - you want to start from scratch and work a new agreement. I don't get it.

There is no doubt in my mind that you are sincere in wanting to get this taken care of. But that is not quite the same thing as actually negotiating in good faith. Right now I feel like I am really getting jerked around.

When you came out here last August, we agreed to a $40,000.00 payout over five years and a "bonus" payment scheme based on gross receipts. The $40,000.00 figure was a significant drop from what I had asked for and the five years was considerably longer than I wanted. I agreed to these terms because you said you wanted the $40,000 figure over the longer period so that you were not committing to more than you yourself could pay off each year if T&P went belly up. You offered the bonus arrangement as a way to compensate for the difference between what I thought was a reasonable price and what you were comfortable being committed to as an absolute figure. That was the substance of our agreement. You never said anything about basing the "bonus" on a profit figure. From day one you offered to pay the bonus based on income, not profit.

When the first draft of the agreement arrived, I saw that the "special project" provision had been added. I do not have any recollection that we ever talked about that provision in August. In fact, you specifically said you did not want to make any more tapes at all. The first I heard about a "special project" provision was when I received the draft. I was really shocked, because you had been so adamant about not wanting to do any more tapes. I called Bob Hultquist, saying this. He suggested I submit revisions in writing, reflecting what I understood our agreement to be. I did this in early November. The interest provision was in that revision and the "special project" provision was not.

The interest provision was inserted, even though we had not specifically talked about it, because it is a standard business practice to pay interest on installment purchases. (I don't know of anyplace a person can go and borrow $40,000.00 without

O: Rick Butler

ROM: Kay Rogness

ATE: June 27, 1990

E: 1. T&P Stock Buyout Agreement

2. Proposed building project

1. I am not going to sign the T&P Stock Buyout at this time because I have ome concerns relating to the financial situation of Training & Publications.

As a Director of and Secretary-Treasurer of T&P, I would like to see ll the financial date for T&P, including tax returns, cancelled checks, cash isbursement sheets, cash receeipts sheets and any financial statements from he last two years as soon as possible.

2. I am concerned about the financing presentation for the new building roject, especially as it regards the participation or involvement of Sports erformance Volleyball. As a Director of Sports Performance and the Secretary-reasurer, I would like to see all the financial records of Sports Performance, ncluding audit reports, tax returns, cash receipts sheets, cash disbursement heets, cancelled checks and any other financial data from the last two years s soon as possible.

Kay Rogness
6/27/90

July 6, 1990

Rick:

Since you do not want to be in business with me and I do not want to be in business with you, and since I am convinced that the building project is a legitimate part of Training & Publications, Inc. and you refuse to be involved if it is, I propose to buy you out of T&P for terms similar to the best offer you made to me. Specifically, I propose the following:

1. I will buy you out of T&P for $60,000.00, payable quarterly in even installments over a five year period, with no interest on the unpaid balance.

2. You will resign from all T&P, SPVB, Great Lakes Power League and Great Lakes Region USVBA directorships and offices immediately.

3. You will complete all the advertised camps you are presently scheduled to do.

4. You will agree to a three year non-compete agreement encompassing Wisconsin, Illinois, Indiana, Iowa, Michigan and Kentucky.

5. I will agree to a personal guarentee.

6. From today on, neither party will discuss the terms and conditions of this agreement with anyone outside the agreement, including, but not limited to present and former players of SPVB, families and friends of present or former players of SPVB, present and former coaches of SPVB, members of the volleyball community or the community at large, present and former clients of T&P, present and former employees of T&P, or present and former independent contractors with T&P except to the extent necessary for adequate legal counsel or as required for financial backing or unless he/she receives express, written consent from the other party.

7. From today on, you, as the seller, will not say or do anything intended or calculated to harm the present or future prospects of SPVB or T&P.

8. All stock will be transfered with full rights and privileges at the time of signing.

9. You will do everything necessary to provide for the orderly transfer of operations of T&P and SPVB, including relinguishing all records, financial projections, pending contracts and plans for future operations of T&P and SPVB.

DATE: August 23, 1990

TO: Rick A. Butler, Director and Ted Albrecht, Director of Sports Performance Volleyball, Inc.

FROM: Kathleen K. Rogness

RE: Resignation of KKR from Directorship and Offices in Sports Performance Volleyball, Inc.

As of this date, and contemporaneous with the signing of a Stock Purchase Agreement between Training & Publications, Inc., and me, Kathleen K. Rogness, I am resigning from all offices and the directorship held by me in Sports Performance Volleyball, Inc. This resignation is final and effective immediately.

Kathleen K. Rogness

Kathleen K. Rogness

8/23/90

Date

## KEEP READING

PAGE 7: KAY'S RENTAL AGREEMENT →
(HTTPS://OUR-STORY.ONLINE/PAGE-7-KAYS-RENTAL-AGREEMENT/)

---

Or revisit a previous page ▼

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 31 of 116 PageID #:1342

# Page 7: Kay's Rental Agreement

She was to be paid a total of $55,000 over a 3-4 year period of time. It should be noted that throughout the entire period of negotiations and the numerous documents between Rick and Kay, not a single mention was made of any type of inappropriate behavior between Rick and his players. Also, during the summer of 1990, Rick and Kay entered into an agreement for Rick to lease her Illinois townhome through July of 1991 while she was finishing law school in Colorado. This is the same person who in 1994 & 1995 told the Illinois DCFS and USA Volleyball that she was a witness to Rick's predatory behavior throughout the entire 1980's. Yet as late as 1991 she had no problem renting her house to the same man who she now says she is trying to protect young females from! That didn't seem to be an issue for 12 years from 1979-1991.

RESIDENCE LEASE [illegible] No. 14 [illegible] [illegible]

# RESIDENCE LEASE

[illegible]

| DATE OF LEASE | TERM OF LEASE BEGINNING | TERM OF LEASE ENDING | RENT | SECURITY DEPOSIT |
|---|---|---|---|---|
| 8/1/90 | 8/1/90 | 7/31/91 | $465.00 per month, with possible increase to cover [illegible] assessment | None $0.00 |

*(IF NONE, WRITE "NONE". Paragraph 2 of this Lease then INAPPLICABLE.)*

| LESSEE | | LESSOR | |
|---|---|---|---|
| NAME | Rick A. Ruffer | NAME | Kathleen K. Angness |
| ADDRESS OF PREMISES | 0 N 667 Essex Lane | ADDRESS | 870 [illegible] Street |
| CITY | Winfield, IL 60190 | CITY | [illegible], CO [illegible] |

In consideration of the mutual covenants and agreements herein stated, Lessor hereby leases to Lessee and Lessee hereby rents from Lessor for a private dwelling the Premises designated above (the "Premises"), together with the appurtenances thereto, for the above term.

**RENT** 1. Lessee shall pay Lessor or Lessor's agent as rent for the Premises the sum stated above, monthly in advance, until termination of this lease, at Lessor's address stated above or such other address as Lessor may designate in writing. [illegible]

**SECURITY DEPOSIT** [illegible] 2. Lessee has deposited with Lessor the security deposit stated above for the performance of all covenants and agreements of Lessee hereunder. Lessor may at any time or times apply all or any portion thereof in payment of any amounts due Lessor hereunder, [illegible] performance of all of Lessee's obligations hereunder, [illegible] shall be returned to Lessee. [illegible]

**CONDITION OF PREMISES** 3. Lessee has examined and knows that the Premises are in good repair, except as [illegible] specified, and that no representations as to the condition or repair thereof have been made by the Lessor, or Lessor's agent, prior to, or at the execution of this lease, that are not herein expressed. [illegible]

**REPAIR** 4. The Lessee covenants and agrees with Lessor to take good care of and keep in a clean and healthy condition the Premises and their fixtures, and to commit no waste thereof; that no changes or alterations of the Premises shall be made [illegible] without the consent in writing of Lessor; that Lessee will make all repairs required to [illegible], windows, glass, ceilings, paint, plastering, plumbing work, pipes, and fixtures [illegible] the Premises, [illegible] the same shall have resulted from misuse or neglect, [illegible] and all repairs that shall be necessary to put the Premises in the same condition as [illegible] [illegible] the expense of such repairs [illegible] [illegible] and any judgment for possession entered thereafter.

**LIMITATION OF LIABILITY** 5. Except as provided by Illinois statute, the Lessor shall not be liable for any damage occasioned by failure to keep the Premises in repair, and shall not be liable for any damage done or occasioned by or from plumbing, gas, water, steam or other pipes, or sewerage, or the bursting, leaking or running of any cistern, tank, [illegible] in, above, upon or about the Premises, nor for damage occasioned by water, snow or ice being upon or coming through the roof, [illegible], nor for any damage arising from acts or neglect of [illegible] or [illegible] property.

**USE; SUBLET; ASSIGNMENT** 6. Lessee will not allow the Premises to be used for any purpose that will increase the rate of insurance thereon, nor for any purpose other than that hereinbefore specified, nor to be occupied in whole or in part by any other persons, and will not sublet the same, or any part thereof, nor assign this lease, without in each case the Lessor's written consent [illegible], and will not permit [illegible] by operation of law, of the interest of the Premises [illegible]. [illegible] Premises to be used for any unlawful purpose or purpose that will injure the reputation [illegible] of the neighborhood, will keep no dogs, cats or other animals or pets in or about the Premises; will not permit the Premises to remain vacant or unoccupied [illegible]; will not permit any alteration of or upon any part of the Premises, nor allow any signs or placards posted or placed thereon, without the written consent of the Lessor; all alterations and additions to the Premises shall remain for the benefit of the Lessor unless [illegible] in said consent.

**RIGHT TO RELET**

7. If Lessee shall abandon or vacate the Premises, the same shall be relet by the Lessor for such rent, and upon such terms as Lessor may see fit; and if a sufficient sum shall not be thus realized, after paying the expenses of such reletting and collecting, to satisfy the rent hereby reserved, the Lessee agrees to satisfy and pay all deficiency.

**HOLDING OVER**

8. If the Lessee retains possession of the Premises or any part thereof after the termination of the term by lapse of time or otherwise, then the Lessor may at Lessor's option within thirty days after the termination of the term serve written notice upon Lessee [illegible] of this lease for one year, and from year to year thereafter, [illegible] for such tenancy [illegible] the monthly rental [illegible]

$ [illegible] dollars per day for the time Lessee remains in possession. If no such written notice is [illegible] Lessee shall also pay to Lessor all damages sustained by Lessor resulting from retention of possession by Lessee.

**FLAMMABLES**

9. [illegible] shall not be allowed or used on the Premises without the written permission of the Lessor.

**TAXES AND UTILITIES**

10. Lessee shall pay (in addition to the rent above specified) all water rates and all gas, electricity and power bills [illegible] charged on or in respect of the Premises, for and during the term of this lease, and in case the water taxes are levied [illegible] in respect of the Premises, to pay the [illegible] part of all water taxes levied or charged in such respect of the building [illegible] and in case said water taxes and gas, electricity and power bills shall not be paid when due, Lessor shall have the right to pay the same, which amount so paid, together with any sums paid by Lessor to keep the Premises and their appurtenances in good condition as hereinbefore specified, shall be due and payable with the next installment of rent [illegible] under this lease.

**SIGNS**

11. Lessor reserves the right to put up a "To Rent" sign sixty days prior to the expiration of this lease and a "For Sale" sign at any time during the term of this lease.

**COMPLIANCE**

12. Lessee will in every respect comply with the ordinances of the municipality aforesaid, with the rules and orders of the health department, with the orders and requirements of the police department, with the requirements of any underwriters association so as not to increase the rate of insurance upon the building and contents thereof, and with the rules and orders of the fire department in respect to any matters [illegible] within their jurisdiction.

**DEFAULT**

13. If default [illegible] in the payment of the above rent or any part thereof, or in any of the covenants [illegible] Lessee, it shall be lawful for Lessor at any time, at his election, [illegible] and to re-enter the Premises, or any part thereof, with or without [illegible] and to remove Lessee or any persons occupying the same, without prejudice to any [illegible] for arrears of rent, and Lessor shall have at all times the right to distrain for rent due and shall have a valid and first lien upon all personal property which Lessee owns or [illegible] interest in, whether exempt by law or not, as security for payment of the rent [illegible]

[illegible]

**CONFESSION** — 34. [illegible] hereby irrevocably constitutes any attorney of any court of record in this state [illegible] default by Lessee of any of the covenants herein, and upon complaint [illegible] Lessee's appearance in any [illegible] waive process and service thereof, and confess judgment, from time to time, for any rent which [illegible] for the term of this lease, with costs and a reasonable sum [illegible], and to waive all errors and all right of appeal from said judgment, and to consent in writing [illegible].

**[illegible] NOT [illegible] OF SUIT** — 35. [illegible] the payment of rent [illegible] final judgment for possession [illegible] and the payment of said rent shall not waive [illegible] said judgment.

**[illegible] AND CAPACITY** — 36. [illegible] the Premises shall be [illegible] by fire or other casualty, Lessor may at its option [illegible] the Premises within thirty days, and failing so to do, or upon the [illegible] the term hereby created shall cease and determine.

**PAYMENT OF [illegible] OF COSTS** — 37. [illegible] covenants and agrees to pay and discharge all reasonable costs, attorney's fees and expenses that shall be made and incurred by Lessor in enforcing the covenants and agreements of this lease.

**[illegible], SUCCESSORS** — 38. [illegible] "Lessor" and "Lessee" wherever herein occurring and used shall be construed to mean "Lessors" and "Lessees" in case more than one person constitutes either party to this lease, and all the covenants and agreements herein contained shall be binding upon, and inure to, their respective successors, heirs, executors, administrators and assigns and be exercised by his or their attorney or agent.

**[illegible] ABILITY** — 39. If any clause, phrase, provision or portion of this lease or the application thereof to any person or circumstance shall be invalid or unenforceable under applicable law, such event shall not affect, impair or render invalid or unenforceable the remainder of this lease nor any other clause, phrase, provision or portion hereof, nor shall it affect the application of any clause, phrase, provision or portion hereof to other persons or circumstances.

WITNESS the hands and seals of the parties hereto, as of the Date of Lease stated above.

[illegible signatures]

[illegible] the performance of the covenants by the Lessee in the within Lease contained [illegible] said Lease provided.

WITNESS ________ hand and seal this ______ day of __________, 19___.

____________________________ (SEAL)

____________________________ (SEAL)

ASSIGNMENT BY LESSEE

In consideration of One Dollar, to the Lessee in hand paid, the Lessee hereby transfers, assigns and sets over to __________________________________________________________________ of __________ [illegible] interest in the within Lease, and the rent thereby reserved ______________________________________________________________________

WITNESS ________ hand and seal this ______ day of __________, 19___.

____________________________ (SEAL)

____________________________ (SEAL)

NOTE: Use Form Number 12-1 for Assignment by Tenant.

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 36 of 116 PageID #:1347

Kay's last "buyout" payment was made in 1993. Rick and I were married on January 2, 1994 and less than 90 days later Kay would write a statement to the Illinois DCFS against Rick, along with 3 former players who have admitted they were contacted by Kay. The investigation against Rick by the Illinois DCFS was made without a single in-person interview. Only phone conversations to the four individuals (Kay Rogness, Sarah Powers, Christine Brigman, Julie Bremner).

Kay Rogness has been saying for over two decades that her actions are only about "protecting" young females. The fact that she has completely falsified her past history with Rick as well as why and when she left the Sports Performance program paints a completely different picture. Also, the fact that for four years after being asked to leave the Sports Performance program, she didn't say or do anything to "protect" the players Rick was coaching, speaks volumes to what her true motives have been all along.

## KEEP READING

PAGE 8: KAY'S ADOPTION INTERFERENCE →
(HTTPS://OUR-STORY.ONLINE/PAGE-8-KAYS-ATTEMPT-TO-BLOCK-OUR-ADOPTION/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 8: Kay's Attempt to Block Our Adoption

The defining moment came in 1995 when Rick and I were in the middle of adopting a new born baby. The baby had come home with us 24 hours after being born in April of 1995. On the day the adoption was finalized, we found out from the attorneys involved in the adoption that Kay had made multiple attempts to contact the judge overseeing the adoption to offer "evidence against Rick Butler." Kay was aware that Rick had lost a young son to a drowning in the mid 1970's. Kay also knew that I had a miscarriage in my first marriage in 1988 and found out I was not able to have children. Kay had even sent me flowers following the miscarriage. Kay's attempt to interfere with the adoption of our son in 1995 is exactly what this issue has really been about from the very beginning. It has never been about "protecting" anybody! She wanted to hurt Rick and me in the most personal way possible and going after our newborn baby was her way of doing it. She wanted Rick to suffer like he had in 1975 when he lost his son and with me having had a miscarriage in 1988 and not being able to have children after that, we would have lost all chances of having a family together.





**Rick and his son**

# Attentive sleuthing spurs arrest in old case

■ **Murder:** A man is charged in the 1975 death of his young stepson.

By JOE BARWOOD
The Register-Guard

A chance glimpse of a 21-year-old death investigation report by an alert records clerk last May and solid gumshoe detective work by investigators led to the arrest Friday of a man suspected of drowning his 2½-year-old stepson in a bathtub in west Eugene in 1975.

Police arrested Stephen Miles Hinkle, 40, shortly after noon at a south Eugene homeless shelter and charged him with murdering Christopher Alan Butler on Jan. 7, 1975.

**Stephen Hinkle**
*Boy's stepfather*

A Lane County grand jury indicted Hinkle on the murder charge Wednesday.

The child died sometime between 7 p.m. and 7:50 p.m. Jan. 7, 1975, said Eugene police detective Les Rainey, who worked the case along with Joe Kosydak of the Lane County district attorney's office.

Hinkle told police more than 20 years ago that he put the boy in the bathtub shortly after 7 p.m. at the family's home on Dove Lane and left him alone for about 15 minutes. When he returned, Christopher was under water, according to police reports reported in The Register-Guard at the time.

The boy's mother, Jaylene Rae Hinkle, was attending a class when the incident occurred, Rainey said.

Hinkle said he tried mouth-to-mouth resuscitation but couldn't revive the boy. When the child didn't respond, Hinkle ran to a neighbor's house and called his mother-in-law, Darlene Hamlin, Rainey said.

"He called the mother-in-law to report that he allegedly found his stepson in the tub," Rainey said.

It was Hamlin who called the ambulance. When the medics arrived shortly before 8 p.m., her grandson was dead.

"He called from the neighbor's house because (he and his wife) were behind on their telephone bill and

Turn to MURDER, Page 4A

Page 1 / 1 Zoom 100%

## KEEP READING

PAGE 9: PREPVOLLEYBALL MESSAGE BOARD →
(HTTPS://OUR-STORY.ONLINE/PAGE-9-PREPVOLLEYBALL-COM-MESSAGE-BOARD/)

Or revisit a previous page ▼

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

# Page 9: PrepVolleyball.com Message Board

Kay Rogness and her lies are symbolic of this entire issue. She has made so many false statements and lied so many times that she can no longer separate fact from fiction. In 2005 Kay and I had pretty intense back and forth on the "prepvolleyball.com" message board. She came right out on the message board and denied that she had ever been involved in a sexual relationship with Rick. When in fact in 1995, she had admitted under oath, that a physical relationship between her and Rick had started in 1979 and lasted 10 years.

**Reposted from PrepVolleyball.com message board thread**

**Cheryl Butler**
Unregistered User(11/10/05 12:49 pm)
Reply Kay Rogness
"From 1979-1989 Rogness carried on a 10 year sexual relationship with Rick Butler. Yes, this is the same period of time that she says all the sexual abuse was taking place in the Sports Performance program. And, Rogness did admit to her relationship with Rick under oath in 1995!"

**kay rogness**
Unregistered User(11/10/05 5:05 pm)
Response to Mrs. Butler
**"I did not carry on a 10 year sexual relationship with Butler"**

Rogness Testimony Oct. 1995

A. No.

Q. Did you ever discuss marriage?

A. No.

Q. Did you harbor romantic feelings for Mr. Butler?

A. Other than friendship, no.

✓ Q. And when was the first time you were physically involved with Mr. Butler?

✓ A. 1979.

✓ Q. And when was the last time?

✓ A. 1989. So I misspoke. I said nine years. It's actually ten years.

Q. Do you recall what month the last time was?

A. Do I recall what month? It was in the spring of 1989, March or April.

Q. Since you have left the business, have you run into Mr. Butler again?

A. On occasion I see him at tournaments and occasions like this.

Q. When you run into him do you go out with him?

A. No.

Q. Do you date him now?

A. No.

Q. Do you have any business interactions with him?

Page 1 / 1 Zoom 100%

Rogness 1995 Testimony to IL. DCFS

## KEEP READING

PAGE 10: RICK'S POLYGRAPH ABOUT KAY →

(HTTPS://OUR-STORY.ONLINE/PAGE-10-RICKS-POLYGRAPH-ABOUT-KAY/)

---

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 10: Rick's Polygraph About Kay

It's interesting that during the entire decade of the 1980's, when Kay Rogness, a key witness for both the Illinois DCFS and USA Volleyball now says she was a witness to Rick abusing his players, she was actually involved in a physical relationship with him that entire time. Then in 1989 when she was asked to leave the Sports Performance program, does she welcome the chance to leave? Absolutely not, she was extremely angry and did not actually leave the organization for another year. You won't read that in the press or on social media!

**THEODORE POLYGRAPH SERVICE**
4415 HARRISON • HILLSIDE, IL 60162 • 708/449-5020

MR. RICHARD HUDZIK
ATTORNEY AT LAW
4915 MAIN STREET
PO BOX 578
DOWNERS GROVE, ILLINOIS 60515

SUBJECT: RICK BUTLER
DOB: 11-24-54
SS#: [redacted]

On December 07, 1999, Rick Butler voluntarily submitted to a polygraph examination.

The main issue under consideration was whether or not Subject was telling the truth when he stated that he had a relationship with Kay Rogness.

A standardized GMQT test was administered utilizing relevant, irrelevant, and control questions were designed and administered to Rick Butler. Noted below are the relevant issue questions asked and the Subject's answered during the examination.

RELEVANT Q1: Did you have a sexual relationship with Kay Rogness from the fall of 1979 to March, 1989?
**Subject answered: YES**

RELEVANT Q2: During the summer of 1989, did you ask Kay (Rogness) to resign from Training and Publications, Incorporated, a business in which you both were shareholders?
**Subject answered: YES**

RELEVANT Q3: Between 1989 and 1993, did you pay Kay (Rogness) $55,000 for her share of the business?
**Subject answered: YES**

RELEVANT Q4: Were you told by your attorney (Hudzik) and [redacted] [redacted] ([redacted] grandfather) that Kay had attempted to offer evidence in the adoption case of your son [redacted]?
**Subject answered: YES**

**CONTINUED ON PAGE TWO**

**TEST EVALUATION AND RESULTS:**
The examination chart data analyzed consistent with nationally standardized scoring. The evaluation was confirmed by using The John Hopkins University Applied Physics Laboratory **POLYSCORE** and the Axciton Chart Analysis. This procedure resulted in a finding of: **NO DECEPTION INDICATED**

**EXAMINER'S PROFESSIONAL OPINION:**
Mr. Rick Butler answers to the above test questions during the computerized polygraph are considered to be: **TRUTHFUL**.

Sincerely,

Steve Theodore
Polygraph Examiner
Lic #:  094-000176

## KEEP READING

PAGE 11: SARAH POWERS-BARNHARD → (HTTPS://OUR-STORY.ONLINE/PAGE-11-SARAH-POWERS-BARNHARD/)

---

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 49 of 116 PageID #:1360

# Page 11: Sarah Powers-Barnhard

**(allegations from 1981-1983)**

There is no question that Sarah Powers played for the Sports Performance Volleyball program for the 1981-82-83 club seasons before graduating and going on to play at Western Michigan University from 1983-1986. In 1994 she told the Illinois DCFS that she had been sexually abused by her coach, Rick Butler in 1981, even though Rick's first year of coaching club volleyball was the 1982 club season. He did not coach Sarah's club team or any team during the 1981 club season.

Then, on June 23, 2016, Powers filed a lawsuit against AAU claiming that she was sexually abused by Rick from 1982-1984, including in a dormitory at UCLA at the 1983 AAU Jr. National Championships in Los Angeles while she was a minor.

## (False Claims from Sarah Powers' lawsuit against AAU, June 23, 2016)

- From 1982 through 1984, Rick Butler ("Butler"), a volleyball coach with the Sports Performance Rehabilitation Institute Inc. and Sports Performance Volleyball Club, sexually molested Plaintiff while he was her coach and she was a star volleyball player and member of the Sports Performance Rehabilitation Institute Inc. and Sports Performance Volleyball Club teams. Butler sexually molested Plaintiff while practicing for and participating in volleyball competitions that were sponsored and sanctioned by the AAU.
**Fact**: Sarah Powers had left the Sports Performance program in June of 1983.

- Athletes participating in the National Junior Olympics are required to use the housing provided by the host of the National Junior Olympics. AAU selects the host of the National Junior Olympics.
**Fact**: AAU has NEVER had a policy requiring teams to stay in AAU selected housing.

- In 1983, the Volleyball Junior Olympics finals were held m Los Angeles, California, at the University of California, Los Angeles ("UCLA").
**Fact**: The AAU Junior Olympic volleyball championships were held in Lisle, Illinois in

1983 and have never been held in Los Angeles or UCLA.

- As a member of the Sports Performance Volleyball Club Team and a member of the AAU, Plaintiff participated in the 1983 Junior Olympics at UCLA. As part of the 1983 Junior Olympics at UCLA, Plaintiff spent the nights during the tournament in the UCLA dormitories.
  **Fact**: Sarah Powers Sports Performance team NEVER stayed in a dormitory at UCLA or anywhere else while participating in the AAU Jr. Olympic volleyball championships.

- As the sponsor of the 1983 Junior Olympics at UCLA, the AAU was responsible for the supervision of Plaintiff, who was a minor.
  **Fact**: Besides the fact that the AAU tournament was not held at UCLA, Sarah Powers was not a minor during the time of the 1983 AAU Jr. Olympic volleyball championships which has been held every June for the past 40+ years. Powers had turned 18 in February several months previously.

- During the 1983 Junior Olympics at UCLA, Butler had sexual contact with Plaintiff, who was a minor.

It would seem that before filing her lawsuit, Sarah Powers would have actually confirmed the facts regarding the allegations contained in that lawsuit. Especially, since she has been claiming how traumatized she was by what happened to her over 35 years ago. Sarah's lawsuit against AAU was dismissed. When she filed her second lawsuit against AAU, her allegations against Rick completely changed.

- From 1981 through 1983, Rick Butler ("Butler"), a volleyball coach with the Sports Performance Rehabilitation Institute Inc. and Sports Performance Volleyball Club, sexually molested Plaintiff while he was her coach and she was a star volleyball player and member of the Sports Performance Rehabilitation Institute Inc. and Sports Performance Volleyball Club teams. Butler sexually molested Plaintiff while practicing for and participating in volleyball competitions that were sponsored and sanctioned by the AAU.
  **Fact:** Rick was not even the coach of Sarah's team or any team at the 1981 AAU Jr. Olympic Volleyball Championship. She also failed to mention that since the tournament was held each June in Lisle, Illinois, a western suburb of Chicago, the Sports Performance players stayed in their own homes, never in a hotel or a dormitory, so being sexually abused while at the tournament would have been impossible.

The Sarah Powers story is intriguing on many levels because it seems to be constantly evolving. She has filed multiple complaints against AAU and signed her name to each lawsuit that she is telling the truth. Yet, that truth is constantly changing and no one seems to even bother to ask her, why? Such as the actual years that she played in the Sports Performance program or where the alleged abuse took place while she was an AAU member and not

knowing when she actually turned 18. In a recent article Sarah says she was just too afraid to leave the Sports Performance program, yet after graduating from high school and moving to Michigan, she was regularly returning to Sports Performance. In the summer of 1984 she came back as a 19 year old and played in the AAU 19 & under Collegiate Division for a Sports Performance team.

**1984 AAU 19 Under National Championships all-tournament team.**

Also, let's not forget that Sarah played for Rick the first two years that he ever coached volleyball during the 1982 and 1983 club seasons. He knew virtually nothing about the sport at that point and had zero standing within the volleyball community or with college coaches. Sarah has forgotten to mention in the press that in 1987 she took the spring semester of her senior year at Western Michigan off to move back to Chicago and play for the Chicago Breeze, a professional volleyball team. This was at the age of 22, four years after last playing for Rick and six years after she said that she was allegedly abused. The head coach of that team was Rick Butler and the general manager was Kay Rogness. We still have the scrap book of the 1987 Chicago Breeze team in our office with numerous newspaper articles where Sarah is quoted about returning to play for Rick. She mentions that prior to the league draft, Rick had called her and asked her if she wanted to return to Chicago to play for the Breeze.

The Glen Ellyn News, February 18, 1987

**"I was still in my (college) season" Powers said. "Rick called me one night right after my season ended, and I said I didn't want to think about it right away because we just finished, and he said, "Well you have till tomorrow morning. I said OK"..........We have a few people who know what Rick's philosophies are," Powers said. "It's good because they're real intense and do things a certain way and we know what to look at and say, O.K., we're going to do it this way."**

This is six years after she had supposedly suffered all the horrendous abuse that she now claims happened to her when she was playing on Rick's team. Yet, she voluntarily chose to leave college to return and play for the team that Rick was coaching. Here's a quote from a 1995 letter written in support of Rick by one of Sarah's teammates on the 1987 Chicago Breeze team.

January 4, 1995

**"During my time with the Breeze, Sarah never gave the impression that she had been abused by Rick, and if she had, I find it hard to believe that she would choose to play for him again......However, I can attest to each of their characters during my time with the Breeze. Rick never led me to believe that he was interested in anything else except for putting the best prepared team on the floor to compete in the Pro League. Sarah, on the other hand, was just as interested in where the parties were and who she could meet after we played, especially on road trips."**

We have had several attorneys look at the Sarah Powers lawsuit against AAU and they all say the same thing, it's about money! After Powers filed her lawsuit against AAU, her attorneys were on the internet looking for anyone who had ever been sexually abused as an AAU member to come forward and contact them. Sarah has done the same thing saying that if people come forward "the truth will set you free". Getting a number of people to come forward against AAU could trigger the threat of a class action lawsuit against AAU. Sarah Powers as the lead plaintiff in any class action lawsuit against AAU would receive the majority of any financial settlement. She talks about the trauma of having to attend the AAU Jr. National Championships each year with Rick in attendance as the reason that she filed the lawsuit against AAU. That didn't seem to be a problem in 2013, 2014 or 2015 when she was bringing her teams to the AAU tournament, with her own daughter playing in the event. This past summer she talked to the press about her team having to play a match against a Sports Performance team and having to be "on the same court with her abuser." The fact is that her team was actually playing one of the Sports Performance 15's teams and Rick was in Aurora, Illinois practicing with his 18's

team [illegible] than the 1995 USAV hearing, Rick has not seen Sarah Powers since the late 1980's. False information seems to be a theme throughout this entire issue!

## KEEP READING

PAGE 12: CHRISTINE BRIGMAN (TUZI) → (HTTPS://OUR-STORY.ONLINE/PAGE-12-CHRISTINE-BRIGMAN-TUZI/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 12: Christine Brigman (Tuzi)

**(allegations from 1984)**

Christine Brigman was last coached by Rick in June of 1984. In 1994 Brigman told the Illinois DCFS that Rick had been her coach in 1984 & 1985 and in 1995 she told USA Volleyball the same thing. Over the past year, letters that were alleged to have been written to Christine from Rick in 1985 when he was her coach have been posted on the internet and in the press. The people posting those letters don't mention or possibly don't even know that at that point, Rick had not been Christine's coach for almost a year. In fact they weren't even living in the same state when those letters were supposed to have been written. After the 1984 club season, Rick would leave Sports Performance to coach the 1984 collegiate season at Western Michigan. He lived in Michigan until the summer of 1985 before moving to Los Angeles for the 1985 collegiate season where he served as a volunteer assistant coach for the University of Southern California. He would return to the Sports Performance program for the 1986 club season and has remained with the club since that time. In fact, in the winter and spring of 1986, while Christine was away at college, Rick was invited by Christine to live with her parent's when he first moved back to Illinois. At no time did he ever live in Christine's parent's house when she lived there, regardless of the false information that is now being spread on the internet.

During the summer of 1987 (three years after Rick had last coached Brigman) Christine asked Rick if he would pay for her apartment rent in Los Angeles while she was in college at USC.

18

Payment for Christine Brigman's apartment in Los Angeles, CA.

B-4

205

RICK A. BUTLER
0 N 662 ESSEX RD. 965-9644
WINFIELD, ILL. 60190

Aug 13 1987

70-462/713

PAY TO THE ORDER OF Treyan Properties $ 325.00

Three Hundred twenty five 00/100 DOLLARS

Gary-Wheaton Bank

Visa 4460 179 679 956

Rick Butler

⑆071904821⑆ 2526310 15⑈ 0205

B-4

206

RICK A. BUTLER
0 N 662 ESSEX RD. 965-9644
WINFIELD, ILL. 60190

Aug 13 1987

70-462/711

PAY TO THE ORDER OF Sunshine Management $ 400.00

Four Hundred and 00/100 DOLLARS

Gary-Wheaton Bank

VISA 4460-174-674-956

Rick Butler

⑆071904821⑆ 2526310 15⑈ 0206

Payment for Christine Brigman's apartment in Los Angeles, CA.

21
GARY WHEATON BANKS
PAID M1

AG '87 17
SPNB-LA-GOC
122000043
PAY ANY BANK P.E.G.

21
GARY WHEATON BANKS
PAID M1

AG '87 17
SPNB-LA-GOC
122000043
PAY ANY BANK P.E.G.





## KEEP READING

PAGE 13: CHRISTINE BRIGMAN (CONTINUED) →
(HTTPS://OUR-STORY.ONLINE/PAGE-13-CHRISTINE-BRIGMAN-CONTINUED/)

---

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 13: Christine Brigman (continued)

Later in 1987 Rick was invited to Los Angeles to spend Thanksgiving with Christine where Rick would introduce Christine to his sister Jody who lived in Los Angeles.

June 4, 1995

To Whom It May Concern,

    I am writing this letter on behalf of my brother Rick Butler regarding his relationship with his former girlfriend Christine Brigman. I first met Christine when she was playing Volleyball at USC in Los Angeles. Rick brought her over to our house and we went over to USC to see her play Volleyball on more than one occasion. In January of 1988 ( Super Bowl Sunday ) my mother was visiting from Oregon and she had wanted to meet Christine since she knew Rick and her had been very serious at one time. I called her on the phone and asked her if she wanted to come over and meet my mother. She said yes, so I drove over to USC and picked her up at her apartment. She spent the afternoon with me and my mother and was very pleasant. She even gave my mother a picture of her and Rick for my mother to keep. At no time during the several times that I met her did she ever say anything negative about my brother. I also know from talking to Rick that the relationship was very serious and they had even discussed getting married after Christine was out of school.

    I am currently traveling, but if you need to contact me please contact my brother and he will be able to get a hold of me.

Respectfully,

Jody Butler

Jody Butler

I would see Christine around the gym from time to time and I knew she was working camps each summer during the 1988-1989 camp seasons. I specifically remember in 1989 her and Rick meeting at the office to drive to Michigan to work a camp together. Kay Rogness was in charge of scheduling all the camp coaches that year, so if what is now being said is true, it seems very strange that Kay had assigned Rick and Christine to work the same camp together. This was five years after Rick had last coached Christine and she was in her 20's at this time.

TRAINING & PUBLICATIONS, INC.
P.O. BOX 210
WINFIELD, ILLINOIS 60190

| EXPLANATION | AMOUNT |
| --- | --- |
| | |
| | |
| | |
| | |

70-482/719

1744

PAY AMOUNT OF Five hundred seventy no/100 DOLLARS

CHECK AMOUNT

| DATE | TO THE ORDER OF | DESCRIPTION | CHECK NUMBER | |
| --- | --- | --- | --- | --- |
| 7/2/88 | Christine Brigman | Camp - Lakewood | 1744 | $ 570.00 |

TRAINING & PUBLICATIONS, INC.

Kathleen K Rogness
AUTHORIZED SIGNATURE

Gary-Wheaton Bank
WHEATON, ILLINOIS 60187
CAROL STREAM, ILLINOIS 60187
312 665 1500

⑈001744⑈ ⑆071904821⑆ 109301028⑈ ⑈0000057000⑈

TRAINING & PUBLICATIONS, INC.
P.O. BOX 210
WHEELING, ILLINOIS 60090

| EXPLANATION | AMOUNT |
|---|---|
| | |
| | |
| | |

1745

PAY AMOUNT OF Five hundred eighty & 50/100 DOLLARS

| DATE | TO THE ORDER OF | DESCRIPTION | CHECK NUMBER | CHECK AMOUNT |
|---|---|---|---|---|
| 1/17/88 | Christine Bergmann | Centerville | 1745 | $ 580.5 |

TRAINING & PUBLICATIONS, INC.

Kathleen K. [illegible]
AUTHORIZED SIGNATURE

⑈001745⑈ ⑆071904821⑆ 1093010280⑈ ⑈0000058050

TRAINING & PUBLICATIONS, INC.
P.O. BOX 210
WINFIELD, ILLINOIS 60190

| EXPLANATION | AMOUNT |
| --- | --- |
| | |
| | |
| | |

1774

PAY AMOUNT OF Seven hundred eighty four + 25/100 — DOLLARS

| DATE | TO THE ORDER OF | DESCRIPTION | CHECK NUMBER | CHECK AMOUNT |
| --- | --- | --- | --- | --- |
| 7/30/88 | Christine Brizman | Gettysburg Camp | 1774 | $ 784.25 |

TRAINING & PUBLICATIONS, INC.

Kathleen K Rogers
AUTHORIZED SIGNATURE

Gary-Wheaton Bank
WHEATON, ILLINOIS 60187
CAROL STREAM, ILLINOIS 60187

⑈001774⑈ ⑆071904821⑆ 1093010280⑈ ⑈0000078425

TRAINING & PUBLICATIONS, INC.
P.O. BOX 210
WINFIELD, ILLINOIS 60190

70-487/719

1759

| EXPLANATION | AMOUNT |
| --- | --- |
| | |
| | |
| | |
| | |

PAY AMOUNT OF: Three hundred fifty + no/100 DOLLARS

| DATE | TO THE ORDER OF | DESCRIPTION | CHECK NUMBER | CHECK AMOUNT |
| --- | --- | --- | --- | --- |
| 7/24/88 | Christine Bugman | Setters Camp | 1759 | $ 350.0 |

[illegible] Bank
[illegible]
Carol Stream, Illinois [illegible]
312 [illegible]

TRAINING & PUBLICATIONS INC

Kathleen K Rogne
AUTHORIZED SIGNATURE

⑈001759⑈ ⑆071904821⑆ 109301028⑈ ⑈000003500

19

TRAINING & PUBLICATIONS, INC.
P.O. BOX 210
WINFIELD, ILLINOIS 60190

| EXPLANATION | AMOUNT |
|---|---|
| | |

70-482/719

1991

PAY AMOUNT OF Five hundred and no/100 DOLLARS

| DATE | TO THE ORDER OF | DESCRIPTION | CHECK NUMBER | CHECK AMOUNT |
|---|---|---|---|---|
| 7/30/89 | Christine Brigman | Training Camp | 1996 | $ 500.0 |

TRAINING & PUBLICATIONS, INC.

Kathleen K Rogers
AUTHORIZED SIGNATURE

⑈001996⑈ ⑆071904821⑆ 1043010 28⑈ ⑈0000050000

TRAINING & PUBLICATIONS, INC.
P.O. BOX 210
WINFIELD, ILLINOIS 60190

| EXPLANATION | AMOUNT |
|---|---|
| | |

70-482/719

200

PAY AMOUNT OF Three hundred and no/100 DOLLARS

| DATE | TO THE ORDER OF | DESCRIPTION | CHECK NUMBER | CHECK AMOUNT |
|---|---|---|---|---|
| 7/5/89 | Christine Brigman | Rochester Camp | 2001 | $ 300.- |

TRAINING & PUBLICATIONS, INC.

Kathleen K Rogers
AUTHORIZED SIGNATURE

⑈002001⑈ ⑆071904821⑆ 1043010 28⑈ ⑈000003000

## KEEP READING

PAGE 14: CHRISTINE & RICK'S RELATIONSHIP →
(HTTPS://OUR-STORY.ONLINE/PAGE-14-CHRISTINE-AND-RICKS-RELATIONSHIP/)

---

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

# Page 14: Christine & Rick's Relationship

After I started working full-time in the office, I would take calls from Christine when she would call to ask Rick out to lunch or to see if he could meet her. The last call I remember taking from Christine was in the spring of 1990 when she called Rick and shortly thereafter he left the office for the rest of the afternoon. He later told me they had met for lunch and Christine had told him that she had recently found out that her older sister had been fathered by a different man than Christine's father, which came as a complete shock to Christine. In light of all the allegations now being thrown around, it's very strange that she would call Rick and ask him to lunch to share that news with him, some six years after he had last coached her. It seems that type of information would be shared with someone who a person is very close to and has a great deal of trust in.

On December 28, 1990 at the age of 23, six and a half years after having last played for Rick and living 2,000 miles away from him for five of those years, Rick and Christine Brigman spent the entire day together touring the new facility that Sports Performance was building in West Chicago and then having lunch and spending the afternoon and evening together.

Warning: Graphic language is used on this site.

# Page 15: Christine's Gifts to Rick

In the spring of 1991 when Rick and I started dating, we sat down and had a very long talk about past relationships that he had. He was very forthcoming in detail regarding everything from the past, including the information that I have included in this statement. This was long before there were allegations of any kind. He showed me a drawer full of letters, cards and gifts that had been given to him over the years. There were dozens and dozens of cards and letters as well as gifts from Julie Bremner, but also gifts and letters from Christine Brigman as well as cards and thank you notes from many other former players. In 1987 for Christmas, Christine had given Rick a very nice book about Japan with a loving inscription on the inside jacket cover.

Christmas present to
Rick 1987



Christine Brigman
Christmas present to
Rick, 1987



A Day in the Life of
Japan

There was also a letter from Christine that was written a few years after Rick had last reached her. In the letter she had written down the names of six children, three boys and three girls that she planned to have after her and Rick were married. I remember one of the girl's names was "Charley" and Christine had signed the letter "**Christine Jean Butler**". The letter was written while Christine was living in California and going to college at USC. The letters from Christine portrayed a completely different picture of her relationship with Rick than what she is saying now or what is being portrayed to the press.

## KEEP READING

PAGE 16: CHRISTINE AND RICK'S FAMILY →
(HTTPS://OUR-STORY.ONLINE/PAGE-16-CHRISTINE-AND-RICKS-FAMILY/)

Or revisit a previous page

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 16: Christine and Rick's Family

If you look at the pictures of Christine with Rick's mother and sister at a family party in 1988 where Rick was not even in attendance, **it seems clear that there is a completely different side to this story**!

Christine Brigman with Rick's Mother
Los Angeles, CA, 1988
Page 1 / 1
Zoom 100%

# Christine Brigman with Rick's Sister, 1988

Page 1 / 1 Zoom 100%



Christine Brigman, 1988

Page 1 / 1 Zoom 100%



August 27, 1995

To Whom it May Concern.

Re: Rick Butler

I have recently heard of the complaints against Rick Butler which involves Christine Brigman.

I am surprised, confused and distressed of this alleged sex abuse complaint since I have met and spent many quality hours with Christine and Rick while they were going together.

I welcomed her in my home in Los Angeles. She came with Rick and we would sometimes watch videos or just visit. We attended a movie together over one Thanksgiving week-end.

While attending U.S.C. Christine invited me along with Rick's sister to attend one of her volleyball games at a time when Rick was not even in town.

In January 1988 Christine was invited over to my house on Super Bowl Sunday while Rick's mother was visiting from Oregon. She spent the day with us and sat on the couch with Mrs. Butler holding her hand and showing her a great deal of affection.

The reason for these comments is to state that during the times I was in the company of Christine and Rick, she never gave any indication of being forced into any of these situations. She only gave the appearance of being very happy to be with Rick.

I have taken the time to write this now because I think this should be known in the defense of Rick Butler.

I am signing my name to the fact that the comments made herewith are true.

Joanne Vaiana

Joanne Vaiana

STATE OF CALIFORNIA
COUNTY OF LOS ANGELES

On AUGUST 28, 1995 **************** before me, JEN C. LIU **************** ********************************************************** Notary Public,

personally appeared JOANNE VAIANA ******************************************
**************************************************************************
**************************************************************************

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) ...

JEN C. LIU
COMM. ...

December 14, 1999

Rick Butler Polygraph Examination

Re: Brigman (1984)

1. In 1984 when Christine Brigman came to you apartment for assistance on a term paper about Vietnam, did you have sexual intercourse with her as she claims?

Answered (No)

2. In 1986, did Christine Brigman ask you to move in with her parents while she was going to college in Michigan?

Answered (Yes)

3. In 1987 did Christine Brigman ask you to come to California to give her financial & emotional assistance after she became pregnant by someone other than you?

Answered (Yes)

4. Did Christine Brigman invite you to come to California to spend Thanksgiving with her in November of 1987?

Answered (Yes)

5. Did you continue to have a physical relationship with Christine Brigman in 1989 & 1990?

Answered (Yes)

20

September 21, 1994

To whom it may concern:

I have known Rick Butler for eight years on a professional and personal basis. Rick has always been an individual whom I have had the utmost respect for.

It is my understanding that one of Rick's former athletes, Christine Brigman is accusing him of improprieties. I was a teammate of Christine for three years at the University of Southern California. While I was not close to Christine she, on several occasions, discused her personal relationship with Rick. Her comments were always positive. She told me she loved Rick and dreamed of starting a family with him. If she was ever mistreated by Rick, she never communicated those feelings to me.



## KEEP READING

PAGE 17: CHRISTINE'S HANDWRITING SAMPLES →
(HTTPS://OUR-STORY.ONLINE/PAGE-17-CHRISTINES-HANDWRITING-SAMPLES/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

# Page 17: Christine's Handwriting Samples

To find out how corrupt this process has been since the beginning, all you have to do is look at the signature on the 1995 statement that Christine submitted to USA Volleyball. Put that signature side by side with the signature from the Christmas present to Rick in 1987 and I defy anyone to tell me those two signatures are from the same person.

***Handwriting Expert, LLC***
***Curt Baggett***
Expert Document Examiner
[illegible] Road, Suite [illegible]
Richardson, Texas 75081
Phone: 972.644.[illegible]
Fax: 972.644.[illegible]
[illegible]
[illegible]

**Questioned Document Examiner Letter**

Subject: **Christine Brigman-Tuzi**
Date: July 28, 201?

I have examined one (1) document with the known handwriting and signature of Christine Brigman-Tuzi. For the purpose of this examination I have labeled this exhibit "K".

Today I have compared the handwriting and signature of Christine Brigman-Tuzi on the "K" document to the signatures on the questioned documents, identified herein as "Q1" through "Q3", to determine if the author of the handwriting and signature on the "K" document was the same person who authored the name of Christine Brigman and Christine Tuzi on the questioned documents: Three (3) typed notes/letters purportedly signed by Christine Brigman and Christine Tuzi.

An examination of handwriting includes establishing patterns of writing habits to help identify the author. Handwriting is formed by repeated habits of writing by the author, which are created by neuro-pathways established in the brain. These neuro-pathways control muscular and nerve movement for writing, whether the writing done is by the hand, foot or mouth.

In support of my opinion, I have included an excerpt from *Handwriting Identification: Facts and Fundamentals* by Roy A. Huber and A.M. Headrick (CRC Press LLC, 1999, pp 50-51) wherein the leading forefathers of document examination in the USA agree that one significant difference in the fundamental structure of a writing compared to another is enough to preclude common authorship:

> [Ordway] Hilton stated: "It is basic axiom of identification in document problems that a limited number of basic differences, even in the face of numerous strong similarities, are controlling and accurately establish nonidentity."

> [Wilson R.] Harrison made similar comments: "...the fundamental rule which admits of no exception when handwritings are being compared...is simple – whatever features two specimens of handwriting may have in common, they cannot be considered to be of common authorship if they display but a single consistent dissimilarity in any feature which is fundamental to the structure of the handwriting, and whose presence is not capable of reasonable explanation."

***Handwriting Expert, LLC***
***Curt Baggett***
Expert Document Examiner
908 Audelia Road, Suite 200-245
Richardson, Texas 75081
Phone: 972.644.0285
Fax: 972.644.5233
*cbhandwriting@gmail.com*
*www.ExpertDocumentExaminer.com*

---

**Questioned Document Examiner Letter**

Subject: **Christine Brigman-Tuzi**
Date: July 28, 2017

I have examined one (1) document with the known handwriting and signature of Christine Brigman-Tuzi. For the purpose of this examination I have labeled this exhibit 'K1'.

Today I have compared the handwriting and signature of Christine Brigman-Tuzi on the 'K' document to the signatures on the questioned documents, identified herein as 'Q1' through 'Q3', to determine if the author of the handwriting and signature on the 'K' document was the same person who authored the name of Christine Brigman and Christine Tuzi on the questioned documents: Three (3) typed notes/letters purportedly signed by Christine Brigman and Christine Tuzi.

An examination of handwriting includes establishing patterns of writing habits to help identify the author. Handwriting is formed by repeated habits of writing by the author, which are created by neuro-pathways established in the brain. These neuro-pathways control muscular and nerve movement for writing, whether the writing done is by the hand, foot or mouth.

In support of my opinion, I have included an excerpt from *Handwriting Identification, Facts and Fundamentals* by Roy A. Huber and A.M. Headrick (CRC Press LLC, 1999, pp 50-51) wherein the leading forefathers of document examination in the USA agree that one significant difference in the fundamental structure of a writing compared to another is enough to preclude common authorship:

> [Ordway] Hilton stated: "It is basic axiom of identification in document problems that a limited number of basic differences, even in the face of numerous strong similarities, are controlling and accurately establish nonidentity."

> [Wilson R.] Harrison made similar comments: "...the fundamental rule which admits of no exception when handwritings are being compared...is simple – whatever features two specimens of handwriting may have in common, they cannot be considered to be of common authorship if they display but a single consistent dissimilarity in any feature which is fundamental to the structure of the handwriting, and whose presence is not capable of reasonable explanation."

> [James V.P.] Conway expressed the same theme when he wrote: "A series of fundamental agreements in identifying individualities is requisite to the conclusion that two writings were authored by the same person, whereas a single fundamental difference in an identifying individuality between two writings precludes the conclusion that they were executed by the same person."

and finally,

> [Albert S.] Osborn and others have generally agreed that despite numerous similarities in two sets of writings, a conclusion of identify cannot be made if there is one or more differences in fundamental features of the writings.

Based upon thorough analysis of these items, and from an application of accepted forensic document examination tools, principles and techniques, it is my professional expert opinion that a different person or persons authored the name of Christine Brigman and Christine Tuzi on the questioned documents. Someone did indeed forge the signature of Christine Brigman-Tuzi on the questioned documents 'Q1', 'Q2' and 'Q3'.

I am willing to testify to this fact in a court of law and I will provide exhibits to the Court showing that I had sufficient data and that my opinion is correct. My Curriculum Vitae is attached and incorporated herein by reference.

Respectfully submitted,

Curt Baggett

The above Letter of Opinion was sworn and subscribed before me by Curt Baggett this 25th day of July, 2017.

State of Texas §
§
§
County of Dallas §

Patricia J. Hale
Notary Public – State of Texas



Christine Brigman
Christmas present to
Rick, 1987

Rick,
You have touched my
life in such a way
as no one has ever touched
it before.
Love Always.
Christine

Christine Brigman's Christmas
Present to Rick, 1987

Curt Baggett <cbhandwriting@gmail.com>

**1st**

1 message

R B [redacted] Sat, Jul 22, 2017 at 9:42 AM
To: Curt Baggett <cbhandwriting@gmail.com>

sex with us when ...
outright lies. It would take pages and pages

In October, 1994, Butlers wife called me up
family if I spoke out about what he did, and
rotten shame that the only way we can speal
things just to hurt people that aren't even im
to come forward?

Sincerely,



Sent from my iPhone

Q1

https://mail.google.com/mail/u/0/?ui=2&ik=[illegible]&view=pt&search=all&th=[illegible]

Curt Baggett <cbhandwriting@gmail.com>

**2nd**

1 message

R B [redacted]
To: Curt Baggett <cbhandwriting@gmail.com>

Sat, Jul 22, 2017 at 9:43 AM

I hope that I have not taken up too much of
in the manner that she did I felt I had no oth
unnecessary and could have been avoided if
absolutely nothing to do with the facts of thi
power when he had a physical and emotion
team. Those actions were illegal and immor
you can make certain that no other girls suf

Sincerely,

Christine Brigman



Sent from my iPhone

Q2

> [James V.P.] Conway expressed the same theme when he wrote: "A series of fundamental agreements in identifying individualities is requisite to the conclusion that two writings were authored by the same person, whereas a single fundamental difference in an identifying individuality between two writings precludes the conclusion that they were executed by the same person."

and finally,

> [Albert S.] Osborn and others have generally agreed that despite numerous similarities in two sets of writings, a conclusion of identity cannot be made if there is one or more differences in fundamental features of the writings.

Based upon thorough analysis of these items, and from an application of accepted forensic document examination tools, principles and techniques, it is my professional expert opinion that a different person or persons authored the name of Christine Brigman and Christine Tazi on the questioned documents. Someone did indeed forge the signature of Christine Brigman-Tazi on the questioned documents 'Q1', 'Q2' and 'Q3'

Page 1 / 5 Zoom 70%

## KEEP READING

PAGE 18: JULIE BREMNER-ROMIUS →

(HTTPS://OUR-STORY.ONLINE/PAGE-18-JULIE-BREMNER-ROMIUS/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 18: Julie Bremner-Romius

**(allegation from 1987)**

Julie Bremner claims that she was sexually abused by Rick Butler in 1987 when she was 17 years old and has detailed how traumatized she was by the entire experience. Of the players who have made allegations against Rick, Julie is the player who I spent the most time with when she was a player in the Sports Performance program. She is also the player that I know without a doubt is not being honest about the details of her relationship with Rick. I was the assistant coach for Julie's team her senior year starting in December of 1987 through June of 1988. Julie was the oldest player on the team and was also the captain. I was with her on an almost daily basis and she was by far the most outgoing of all the players on the team. We were training and playing 5-6 days per week so I got to know Julie very well.

- On weekends when we didn't have tournaments the team would sometimes have a double session practice at York high school in Elmhurst, IL. Julie always brought a lunch for Rick to eat between sessions.
- I remember that year regularly Julie would ask Rick right in front of me if he could give her a ride home after practice.
- I also remember Julie having to have knee surgery her senior year and she specifically asked Rick if he would go with her to the hospital on the day she had the surgery.
- When Julie went out to train with the U.S. National Team in November of 1987, Rick even sent money to the National team assistant coach to cover the cost of Julie's food for the time she was out there staying with the other players. Julie's parents were going through a separation or something at that time and Rick felt like they were having a rough time so he sent his own money to cover her cost of food while she was in San Diego.

13124177

230

RICK A. BUTLER
0 N 662 ESSEX RD. 985-9644
WINFIELD, ILL. 60190

Nov 11 1987

70-482/719

PAY TO THE ORDER OF Jim Fann $ 60.00

Sixty and 00/100 DOLLARS

Gary-Wheaton Bank
312-665-2600
Wesley & Cross Streets Wheaton, ILL. 60187
Schmale Rd. & Thornhill Dr. Carol Stream, ILL. 60187

MEMO Julie Bremner

Rick Butler

⑆071904821⑆ 2526310151⑈ 0230 ⑈0000006000

DELUXE CHECK PRINTERS



## KEEP READING

PAGE 19: JULIE'S SEXUAL ASSAULT CLAIM →
(HTTPS://OUR-STORY.ONLINE/PAGE-19-JULIES-SEXUAL-ASSAULT-CLAIM/)

---

Or revisit a previous page ▼

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 19: Julie's Sexual Assault Claim

All of this was going on in 1988 when Julie now claims that Rick had sexually assaulted her a year earlier. During that entire 1988 season, there was never a time that Julie seemed uncomfortable in any way around Rick. In fact, it was just the opposite; she spent more time around and talking with Rick than any of the other players by far.

After Julie graduated from the Sports Performance program she went to college at Notre Dame, but came home on an almost weekly basis to have Rick work with her on Sunday's. She is even quoted in an article in the Chicago Sun-Times from September of 1990. This is over two years after she has left the Sports Performance program.

## (Chicago Sun Times, September 5, 1990)

**Former Chicago Sun-Times Players of the Year Julie Bremner and Mary Eggers advanced to the U.S. Women's National Team after playing for Sports Performance. Sarah Powers went on to Major League Volleyball's Chicago Breeze and Nancy Reno plays professionally in Turkey. After graduating from Stanford, Reno chose to train with Butler to prepare for National Team tryouts. Bremner commuted two hours each way on Sundays, her only day off as a freshman at Notre Dame, to practice with Sports Performance. "Practice was as physically demanding as it was on the National Team," Bremner said. "The reason I'm a good setter is Rick. He's an incredible motivator. I've always been very competitive inside and he found the proper way to channel it. He demands perfection. "Obviously you'll never reach it, but you'll get as close as possible. Putting bags in order, being punctual, diet and putting in more hours all adds up. He does it in such a way that you want to do it. You really respect him because he's in it with you. He even ran the sprints with us."**

One day in the fall of 1988 after Julie was already at Notre Dame her mother came into our office and told Rick that Julie was in love with him. Later that fall, Rick and I along with Gordon Mayforth who was also a coach in the Sports Performance program drove down to South Bend to watch a Notre Dame volleyball match to see Julie play. Julie met the three of us

on the quad and looked at us all and said "Rick, do you want to come and see my room?" Clearly, Gordon and I were not invited so we ended up going to the Notre Dame bookstore while Rick went with Julie to see her room.

- Also in the fall of 1988, Julie invited Rick to attend a Notre Dame Football game with her father.

- Julie left Notre Dame after one semester to join the USA National team in San Diego, California. In the spring of 1989 Julie called the office one day when Rick was out to lunch. She asked me if I would ask Rick if he would come to Canada to watch her play, since she thought she was going to get to start in a match against Cuba. Rick left later that day with a couple of other coaches to go to Canada to watch Julie play.

- During the summer of 1989 Julie invited Rick out to San Diego to watch her train with the USA National team. While he was there she invited him over to her apartment. She also cashed a check for him during that time period.

RICK A. BUTLER
0 N 562 ESSEX RD. 985-0644
WINFIELD, ILL. 60190

432

8/25 1989

70-480/719

AUG31-89 20.00 CHK000-218-8796 0514

PAY TO THE ORDER OF Julie Brennan $ 20.00

Twenty and 00/100 DOLLARS

Gary-Wheaton Bank

MEMO

Rick Butler

⑆071904821⑆ 2526310151⑈ 0432 ⑈0000002000⑈

(14)

Julie Brennan

AUG-89

Page 1 / 1 Zoom 100%

- In December of 1989, a Christmas card came to the office from Julie with her name and California address on the front and the words "**I miss you**" written on the back of the

- In December of 1989, Julie returned from California and attended the Sports Performance Christmas party and brought her boyfriend from California whose name was Kevin. She was telling the girls at the party that she thought he was going to propose to her in the near future. I found that strange since she spent almost the entire time at the party talking to Rick and gave him a note asking if they could see each other while she was home.

- On Christmas day, 1989 I was at Rick's house and the phone rang. It was Julie calling to ask Rick if he would meet her at the gym for training. It seemed a little strange that she wanted to practice volleyball on Christmas day. Remember, she's calling the guy who she now says had sexually abused her two and a half years earlier and she's asking him to meet her alone to train on Christmas day.

- Later after Rick and I started seeing each other on a more serious basis, Julie, who was living in California at the time, would still call Rick late at night.

All the instances above clearly helped shape my opinion regarding Julie's allegations since I was there at the time and witnessed her behavior firsthand. But, by far the most important thing to me was when in 1991 Rick showed me the drawer full letters, cards and gifts. Julie had written dozens of notes, cards and letters to him over the years. Many were postmarked from Notre Dame and later San Diego after Julie went on to play for the National team. Some of the letters were 10-15 pages long. She talked about everything in those letters. How much she cared about Rick, her dreams for volleyball, even her sexual fantasies! Not once in the 60-70 notes, cards and letters was there any mention that she had ever been mistreated by Rick in any way or that she had anything but the greatest amount of respect for him.

KEEP READING

PAGE 20: BONNIE, JULIE'S YOUNGER SISTER → (HTTPS://OUR-STORY.ONLINE/PAGE-20-BONNIE-JULIES-YOUNGER-SISTER/)

Or revisit a previous page

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 20: Bonnie, Julie's Younger Sister

Most people don't know that Julie Bremner's younger sister Bonnie, played for Rick in 1995 and 1996, AFTER Julie had made the allegations in 1994. In the spring of 1994 after Julie had started making allegations, Rick and I met with Bonnie's (and Julie's) mother & father in our home. They were both adamant about the fact that they wanted Bonnie to stay in the program and they trusted Rick 100% to be her coach. To this day Rick and Bonnie have a great relationship and she has been extremely supportive of him throughout this entire time period.

"Bonnie [redacted]" [redacted]
Wed 7/29/2015 12:03 PM

Leading me to my next statement:
Please know I STAND STRONG IN MY BELIEF IN YOU AND YOUR PROGRAM....... I of course have been bombarded with questions and copies of the article (which I have not even read through).

I remember people that are anti-spri (for various reasons) telling me that when "I got out" and had distance and wisdom I would look back and see how wrong I was and I have to tell you: I am almost 40, a mother of 4, a business woman and a spiritual person that sees it so clear. I don't agree with all your "previous girlfriends" BUT I am absolutely strong in my position you and your program are better than ever. I am excited my daughter may have the chance to play for you and hope you FIGHT THIS WITH THE SAME MENTALITY YOUR PLAYERS DO AT PRACTICE EVERY DAY.

I hope someone writes an article about how you changed their life for the better - I can think of 100 easily. If there is anything I can do just let me know. in Las Vegas right now for basketball - crazy fun!

Talk to you soon. My best to Cheryl and [redacted].

From: Bonnie [redacted]>
Sent: Wednesday, January 24, 2018 10:32 AM
To: R B

Hope you are well! Will the drama EVER end? I have to say your poise and class are remarkable. Your ability to continue to thrive is amazing - I continue to be in awe of this entire scandal but am so glad you just keep going - hope you can hang on until my daughter gets into the program (she is a lefty with hands almost as big as mine :)

## KEEP READING

PAGE 21: RICK'S POLYGRAPH RE: JULIE →
(HTTPS://OUR-STORY.ONLINE/PAGE-21-RICKS-POLYGRAPH-ABOUT-JULIE-BREMNER/)

---

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

# Our Story (https://our-story.online/)

## Page 21: Rick's Polygraph About Julie Bremner

# Bremner polygraph test January 4, 2000

Re: Bremner (1987)

1. In June of 1987 after Julie Bremner says she was raped by you, did she and Lonise Norfleet come to where you were living and place toilet paper all over your room and leave candy and a card on your bed when you were not at home?

Answered (Yes)

2. When Julie Bremner was a student at Notre Dame, did her Mother come to your office and tell you that Julie was in love with you and that she approved of the relationship?

Answered (Yes)

3. In the summer of 1989 while visiting San Diego to observe the USA Women's team in training, did Julie Bremner invite you over to her apartment to watch videos and at that time were you alone with each other?

Answered (Yes)

4. Did Julie Bremner call you house on Christmas day of 1989 and ask you to meet her at Monroe Jr. high which was closed at the time as a school?

Answered (Yes)

5. Did Julie Bremner's mother come to your volleyball practice at York high school in December of 1990 and ask for your help in getting Julie out of a religious cult that she was in at UCLA?

Answered (Yes)

6. Did you ever rape, physically force or intimidate Julie Bremner into having sexual intercourse with you?

Answered (No)

**KEEP READING**

**PAGE 22: NANCY RENO →**

**(HTTPS://OUR-STORY.ONLINE/PAGE-22-NANCY-RENO/)**

---

Or revisit a previous page ▼

© 2018 Rick & Cheryl Butler · All Rights Reserved · **Sitemap (https://our-story.online/sitemap/)**

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 102 of 116 PageID #:1413

# Page 22: Nancy Reno

The one crystal clear fact regarding this issue is how much people's stories have changed over the past 30 years. I am amazed at the way people have twisted the actual facts from the 1980's. Over the past couple years Nancy Reno, Sports Performance alum (1984) has come out in the media and blasted Rick. She makes no claims of ever being abused, just what a horrible person Rick was, etc..... Of course she doesn't mention in the press that after graduating from Stanford, she moved back to Illinois and asked Rick if he would train her to prepare for her tryout with the U.S. National Team. Here's a letter written by Nancy Reno 5-6 years after leaving the Sports Performance program and after she graduated from Stanford.



SPORTS
PERFORMANCE
VOLLEYBALL

INC. 1855 MANCHESTER ROAD • WHEATON, IL 60187 • (312) 690-2074

BOARD OF DIRECTORS

Ted Albrecht
Rick Butler
Kay Rogness

BOARD OF ADVISORS

Jerry Angle, Head Coach
Northwestern Women's Volleyball Team

Doug Beal, Head Coach
1984 USA Men's Olympic Volleyball Team

Stephen J. Block, President
SPRI Products, Inc.

Jim Coleman, Former Coach
USA Men's National Volleyball Team

Chuck Erbe, Head Coach
USC Women's Volleyball Team

Gary Fencik, Former Defensive Back
Chicago Bears

Robert C. Hultquist, Attorney-at-Law
Hultquist & Hudzik, P.C.

Art Lambert, Head Coach
Notre Dame Women's Volleyball Team

Thomas Petley, President
Glenbard Graphics

Stanley Schuham
Schuham Hardware

Sports Performance is unlike any other volleyball program I have seen in this country. It is a program not meant for everybody, nor is it meant just for anybody. The primary prerequisites for being a Sports Performance player are possessing a good work ethic and a strong desire to become a great volleyball player, realizing the latter cannot be obtained without the former. My three years playing for Sports Performance (1981-1984) were filled with countless ups and downs, tears and laughter, failures and successes. Although the details of specific matches or trips escape me, there is one thing I will never forget about those days - - that is, the feeling of wearing a Sports Performance jersey. It is an incredible feeling of pride standing on the endline before a match with your teammates, knowing you have worked harder than any opponent you will face... knowing you have reached higher, and with more persistance, towards obtaining your potential as a player, than most will ever do. To me, there is no better feeling.

In retrospect I have never regretted all the hours in the gym, gallons of sweat, or times of frustration that went along with being a Sports Performance athlete. These were just a part of the package, far outweighed by my development as a player and a person. "What you put into it is what you'll get out of it," is a cliche, but I have found it to be quite true. Again, it isn't the medals or specific techniques that I remember most from the program, but rather what it means to work hard for something, and the satisfaction of knowing without a doubt, "I have done my best" ----- All fame, honors, or titles lie in the shadow of that statement.

I am very proud to be a product of Sports Performance Volleyball. As a consequence, I have never looked back in time and wondered "What if?" Sports Performance was a tremendous learning experience accompanied by a plethora of great times. Thank you Kay Rogness and Rick Butler!

Nancy Reno
Glenbard West High School - "84"
Stanford- "88"
NCAA All American
Major League Volleyball
U.S. National Team

## KEEP READING

PAGE 23: USAV COMPLAINT AGAINST RICK →
(HTTPS://OUR-STORY.ONLINE/PAGE-23-USA-VOLLEYBALLS-COMPLAINT-AGAINST-RICK/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Page 23: USA Volleyball's Complaint Against Rick

(2016-2017)

**On December 11, 2017, Rick was banned for life by USA Volleyball for violating a "protective order".**

In late December of 2016 Rick received a certified letter from USA Volleyball. Inside was a complaint against Rick that USAV was going to immediately suspend him and start proceedings to ban him. All the allegations contained in the complaint were from the 1980's, for harsh coaching, inappropriate language, having the players weigh-in before practice (a pretty common occurrence in the 1980's) and then an allegation from 1983, from the daughter of Rick's former partner Kay Rogness who was never a volleyball player. Not only was USA Volleyball going back 30+ years, they were completely going against the terms that they had agreed to when Rick was reinstated in December of 2000.

ATTACHMENT C

Rick A. Butler

December 6, 2000

Dr. Kerry Klostermann
USA Volleyball
715 South Circle Drive
Colorado Springs, CO 80910

Re: Membership in Great Lakes Volleyball Regional Association

Dear Dr. Klostermann:

I send this letter in satisfaction of the two conditions attached to my membership as was recited in the July 31, 1995 United States Volleyball Association Ethics and Eligibility Committee decision signed by Ms. Rebecca Howard, Chair of that committee. Specifically, I provide you the following information:

1. Misconduct such as was alleged to have occurred in the said July 31, 1995 decision has not occurred since the date of that decision.

2. The undersigned will not coach "junior girls" as such term is defined by Article VIII of the Operating Code of the USA Volleyball Association in any activity which is exclusively a USA Volleyball Association activity. The foregoing representation is not deemed to include any activity or conduct arising out of or relating to (1) AAU activities, practices or events and (2) any volleyball camps or clinics or private or group lessons which are not sponsored or organized by USA Volleyball Association or any of its regional organizations.

In view of your conversations with my attorney, I understand that you will be forwarding this letter to the president of the USAV. His review will indicate that this letter is in satisfaction of the conditions attached to the Ethics and Eligibility Committee decision of July 31, 1995. Thereafter, there will be no impediment to my application for membership in the Great Lakes Regional Volleyball Association for the 2000/2001 year, which membership is understood to be subject to the conditions set forth herein.

Very truly yours,

Rick A. Butler

Rick A. Butler

UNITED STATES ... 12/19/00 RECEIVED JAN - 2 2001

Page 1 / 1 Zoom 100%



December 20, 2000

Mr. Rick Butler

Dear Mr. Butler:

Your letter dated December 6, 2000 to USA Volleyball satisfactorily fulfills the conditions attached to the USAV Ethics and Eligibility Committee decision of July 31, 1995.

Therefore, USA Volleyball grants is approval for you to apply for conditional membership to a USAV Regional Volleyball Association subject to the conditions rendered in the above Ethics and Eligibility Committee decision.

Sincerely,

Kerry J.W. Klostermann

Kerry J.W. Klostermann
Executive Director

cc: Mr. Al Monaco, President USAV
Mr. Kevin Twohig, Chair, USAV Ethics and Eligibility Committee
Mrs. Lea Wagner, Commissioner, USAV Great Lakes Region

USA VOLLEYBALL

NATIONAL OFFICE:
715 S. Circle Drive, Colorado Springs, CO 80910-2368
TEL: (719) 228-6800 • FAX: (719) 228-6899
www.usavolleyball.org

  

## KEEP READING

PAGE 24: USAV REINSTATEMENT LETTERS →

(HTTPS://OUR-STORY.ONLINE/PAGE-24-USA-VOLLEYBALL-REINSTATEMENT-LETTERS/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

# Page 24: USA Volleyball's Reinstatement Letters

Here is what USAV Board President Lori Okimura had said to the New York Daily News as recently as 2016.

**New York Daily News**
Tuesday, July 5, 2016, 11:35 PM

**"USA Volleyball members renew their memberships through one of 40 regions every fall", Okimura says, and applications are renewed as long as there have been no serious complaints about a coach or administrator the previous year. Membership, she said, "would not be denied based on allegations made in the 1980s or 1990s."**

- Rick immediately took and passed a polygraph tests regarding the allegations.
- On the advice of our attorney's, he filed suit against USA Volleyball for injunctive relief to prevent them from immediately suspending and then banning him. It should be noted that the Sports Performance girl's teams have not been to a USA Volleyball event since 2007. The only reason Rick continued each year to renew his USAV membership was to be available to assist any of our boy's teams who might need a coach at a tournament at the last minute. That had happened exactly once over the past 10 years.
- In January Rick filed suit against USA Volleyball. USA Volleyball requested that the complaint be "impounded" so the public wouldn't see it and the identities of the complainants would be kept private. Rick's attorneys did not object, so it was assumed that the complaint was hidden from public view. Over the next 10 months the USAV Complaint would be amended several times from the original complaint with several allegations from the first complaint being removed.
- By the fall of 2017 there was still no hearing date set and USA Volleyball refused to give Rick's attorneys anything they were asking for in regards to how the allegations had been investigated.
- Individuals who were unaware that they were referred to in the USAV complaint, were actually scheduled to appear as witnesses for Rick at the hearing which was to be held in

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 110 of 116 PageID #:1421

the Chicagoland area. In the fall of [illegible] witness list of about 40 people that were going to be called once a hearing date was established. Many of the witnesses were former players of Rick's who were actually in the gym during the 1980's. Once he submitted his witness list, the hearing was moved to Denver, Colorado. This meant that those 40 witnesses would not be appearing at the hearing in his defense. Having all those former players testify would have been a key for Rick, since so much of the complaint centered on how abusive he was as a coach in the 1980's and many of those former players had been on Rick's team during that time period.

- Then in early November, everything changed. A Chicago newspaper reporter had been working on a story since late summer and had seemed to be tipped off about the lawsuit between Rick and USA Volleyball. Somehow the reporter got a copy of the original complaint from USA Volleyball, although it had been amended a number of times by the time the reporter called. It appears that the DuPage County circuit court clerk had failed to impound the entire complaint. The reporter interviewed at least one of the accusers in the complaint, who went on the record in the story, even though her name was supposed to be anonymous and she was supposed to be "protected" from any publicity.

- The reporter called Rick's attorney and asked him if Rick had any comment regarding the allegations from the accuser, who had already given an interview for the story. Since the accuser had already gone public for the story, Rick issued a written denial regarding allegations by the accuser.

- Once the story was published, USA Volleyball moved almost immediately to ban Rick for violating the protective order, even though it had been one of the accusers who had talked to the press about this issue in the first place. This is the same week that a DuPage County circuit court judge had stated that it was no fault of Ricks that the entire complaint had not been impounded.

- On Friday, December 8th, USA Volleyball held a telephonic hearing before the Ethics and Eligibility Committee regarding Rick's alleged violation of the protective order. I went to be a witness for Rick since I knew that the people who had made the allegations against Rick had been on social media for months and years prior to any complaint being filed by USA Volleyball. Saying that Rick had "outed" these individuals to the public was an absolute false statement. USA Volleyball put a time limit on the hearing and I was never allowed to testify on Rick's behalf. Imagine a hearing being held by phone, where the subject of the hearing was banning someone for life and then one of the two witnesses for the defendant was not allowed to testify because the hearing panel ran out of time. On Monday, December 11th, Rick was informed that he had been banned for life from USA Volleyball for violating the "protective order" attached to the complaint.

- Following the December 11th decision, we were informed that USA Volleyball still intended to hold the January 8th hearing in Colorado regarding the 2016 complaint. After meeting with our attorney's Rick and I decided that there was absolutely no reason to

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 111 of 116 PageID #:1422

spend thousands of dollars to fly our attorney and key witnesses to Colorado for the second hearing when that hearing meant nothing since Rick had already been banned for life for violating the protective order.

- Following all of this, our attorney, who has pretty much seen it all stated that in his 44 years of practicing law, he had never dealt with anyone or anything like USA Volleyball. I think that statement pretty much says it all.

Between December 2016 and January 2018, USA Volleyball spent tens of thousands of dollars on legal fees and other expenses to ban Rick for life, twice, when he had not attended a USAV event since 2007 and was not even a member of USA Volleyball when he was banned. Recently one official said it best....."**USA Volleyball got their payback with Rick for the success of the JVA (Junior Volleyball Association) and the growth of the AAU Jr. Championships into the largest junior volleyball tournament in the world.**" For the past 10 years USA Volleyball has blamed Rick for the founding and the growth of the JVA, even thought there were over 30 other clubs involved at each of the first two meetings held in Chicago in 2006. Then when the JVA and AAU partnered together in 2010, the AAU Jr. National championship exploded into an event which annually has over 2,000 teams in attendance.

## AAU / JVA Expulsions & Suspensions

On February 8th AAU moved to ban Rick from coaching. The next day the JVA did the same thing by suspending him indefinitely. Rick will appeal the AAU ban. The JVA had said earlier that they would do whatever AAU did in regards to Rick's participation, even though the JVA is not a membership organization and has no by-laws for disciplining or suspending the people who take part in events insured by the organization.

**KEEP READING**

CONCLUSION →

(HTTPS://OUR-STORY.ONLINE/CONCLUSION/)

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Warning: Graphic language is used on this site.

Our Story (https://our-story.online/)

# Conclusion

Kay and Sarah say they are just trying to protect the players who play in our program. A program they have not been involved with in close to 30 years or more. I have been with Sports Performance for over 30 years and other than the allegations against Rick that go back to the 1980, there has not been a single complaint for any type of sexual misconduct filed against any of our coaches or staff. We have extremely comprehensive and protective policies and guidelines in place for practice as well as when teams are on the road at tournaments.

This issue is really about the total destruction of another person as well as an attempt to destroy his business and force him out of the sport that he has given almost 40 years of his life to. These individuals know exactly what they are doing. We carry a $4.2 mil mortgage on our facility. We have 15 full-time and close to 100 part-time employees. Many of those employees have families and small children they are supporting with the salaries and the insurance we provide them along with the 401K retirement plans that we also have in place for our full-time staff members. Kay's goal is to destroy everything that Rick and I have built over the past three decades. It has absolutely nothing to do with protecting anyone! It's pretty clear that the families in the Sports Performance program don't feel the need to be protected by Kay Rogness or anyone else. They are perfectly capable of making up their own minds about the programs that their children participate in.

- Kay Rogness was a 10 year partner and also involved in a physical relationship with Rick the entire time she now says she was witnessing the abuse. She lied to the DCFS about her reason for leaving the Sports Performance program. In the late 1980's, even after moving to Colorado to attend law school, she was assigning Rick and 21 year old Christine Brigman to work at the same volleyball camps. Even though now she now claims that she knew that Rick had sexually abused Christine back in 1984. After that she didn't seem to see Rick as a threat to anyone since she rented her home to him through the summer of 1991, all the time knowing that he was coaching junior girls. Then in 1995 Rogness attempted to interfere with the adoption of our new born baby, which revealed everything about what her motives have been all along.

- Rick directly addressed the allegation by Kay's daughter in his January, 2017 polygraph tests in which he was determined to be truthful in all his answers.

- The documents from 1989 make it clear that Rogness was asked to leave the Sports Performance program and was clearly not happy when that happened. Then Kay leased her house to Rick following the end of the partnership. I'm not sure how anyone finds Kay Rogness believable. Does Rogness running a national qualifier, which makes her a business partner of USA Volleyball, make it OK to ignore the facts that have been presented in this statement?

- When I was first hired full-time at Sports Performance, Kay was training me and she made it clear to me that she was the brains behind the success of Sports Performance and that Rick was primarily just a good coach in the gym. I found out pretty quickly that Rick was far more than just a good volleyball coach. For the past 25 years I've watched Kay Rogness and her agenda bully people. This issue for Rogness has never been about protecting anyone; it's about revenge and trying to destroy Rick and me. Look at all the years that she was with Rick and look at how she reacted when she was asked to leave and the depths that she sunk to in her attempt to damage us.

- Sarah Powers left the Sports Performance program for four years and then in 1987, as a 22 year old woman she voluntarily took a semester off of college to move back to Chicago to play for the same man that she now says traumatized her in 1981 to the point that she is not able to be at the same tournament with him. Yet, that didn't seem to be an issue before she filed the lawsuit against AAU.

- Christine Brigman last played for Rick in 1984 and then didn't even live in the same state for another five to six years. Yet several years later she was writing letters to him picking out the names of their children and signing her last name "Butler". She was asking him for money to pay for her college apartment and also inviting him to come to Los Angeles and spend holidays with her. She was also attending Rick's family parties, when Rick wasn't even in attendance. Six years after she had last played for him, I was personally taking calls from her at the office, asking him to lunch.

- Julie Bremner made allegations against Rick in 1994 and then her younger sister stayed in the Sports Performance program and played for Rick in 1995 & 1996 and still remains in contact with him today. Julie alleges that she was sexually abused in 1987, but two years later when she was in college, she was writing Rick letters that I read with my own eyes, discussing her own sexual fantasies! After that the calls and letters kept coming, even after Rick and I had started a relationship.

I have known Rick for over 30 years. He is a very good man who has helped literally thousands of young females pursue their dreams and grow into talented and strong young women. In all the years I have known Rick; I have never once seen him turn down a request to help someone. He has mentored hundreds of coaches and given of himself selflessly. We have had a number of players live in our home and those people today look at Rick as their second father. It's a shame and very sad that our society has gotten to the point where personal destruction of

another person has become sport for some people. Social media and the internet provide an avenue for the total destruction of another human being, merely based on allegations that are oftentimes not remotely as they are portrayed. People are banned from organizations based merely on allegations that are 30 years old. We are quickly becoming a society of "guilty before proven innocent". Rick will be the first to admit that he made some poor decisions when he was much younger. He was very open and honest with me when we first started a serious relationship in 1991. Since the time we have been together he has been a loving husband and father, as well as a great business partner and an even better friend. His legacy will be the thousands of young people whose lives were positively impacted through their experience and time spent with him.

KEEP READING

RICK BUTLER'S STATEMENT →
(HTTPS://OUR-STORY.ONLINE/RICK-BUTLERS-STATEMENT/)

Or revisit a previous page ▼

© 2018 Rick & Cheryl Butler · All Rights Reserved · Sitemap (https://our-story.online/sitemap/)

Our Story (https://our-story.online/)

# Rick Butler's Statement

Over my past 35 years of coaching, I have tried my hardest to give every player that I coached the absolute best chance to reach his or her potential. Looking back I know that my passion and my pursuit of excellence was not always easy for my players because of the high standards that were always in place. When I first started coaching in 1982 I approached the task just as I did when I was a collegiate football player. My work ethic was very strong and I took great pride in my own daily training regimen and the ability to work long hours at the highest level possible. To me that was normal. I had never coached volleyball before, much less coached girls, but I was determined that I was going to treat my players like athletes first and never make excuses because they were females. In the early 1980's that was indeed a strange concept.

There was never a time when I wouldn't have done anything to give each and every player the best opportunity to succeed. Over the past three decades I have had countless players tell me that as adults, their lives are guided daily by the lessons and values they learned playing at Sports Performance. To me, hearing those words is far better than any championship I've ever won. I've had the pleasure to coach and train well over 20,000 players in my career and I take great pride in the success that so many of those players have had after they left the Sports Performance program.

In 1994 some very serious allegations were made against me from the 1980's. While the 1980's were a completely different time and era in the sport of volleyball and life in general, with no rules or guidelines regarding the coaching profession, there is no question that I could have used better judgment in my early years of coaching. Since 1994 these allegations have been twisted and the truth distorted with a great deal of false information. The motive behind the false information and lies that have been spread must be questioned.

My wife Cheryl and I have been together 27 years and married for 24 of those years. During that time our greatest accomplishment is raising a wonderful child who has grown into an even better adult. During the past 25 years we have had numerous players live in our home and we treated each one of them as if they were our own daughters. We have always tried to be as helpful as possible to any player, coach, club director or parent who asked for our guidance. We have mentored hundreds of young coaches and dozens of club directors along the way. We take

Case: 1:18-cv-01465 Document #: 79-1 Filed: 08/03/18 Page 116 of 116 PageID #:1427

pride in the success of our alumni as if they were our own children. Anyone who has ever played for Sports Performance will tell you that first and foremost, we are a family and as a family we will continue to chase perfection on a daily basis and along the way handle any challenges that come our way with resolve and a clear sense of purpose.

Or revisit a previous page ▾

© 2018 Rick & Cheryl Butler · All Rights Reserved · **Sitemap (https://our-story.online/sitemap/)**