# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LAURA MULLEN, individually and on behalf of all others similarly situated, | Case No. 18 C 1465 |
| *Plaintiff*, | Honorable Matthew F. Kennelly |
| v. | |
| GLV, INC., d/b/a SPORTS PERFORMANCE VOLLEYBALL CLUB and GREAT LAKES CENTER, an Illinois corporation, RICKY BUTLER, an individual, and CHERYL BUTLER, an individual, | |
| *Defendants*. | |

## PLAINTIFF'S MOTION AND INCORPORATED MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

ANALYSIS ........................................................................................................... 6

   I.      **The proposed class is ascertainable** ............................................. 6

   II.     **The proposed class is sufficiently numerous** ................................ 7

   III.   **Common questions will predominate at a trial of the proposed class's claims** ........................................................... 8

        A.     **Common questions on the merits** .......................................... 8

            i.    *Was Defendants' conduct fraudulent or deceptive?* ............... 10

            ii.   *Were Defendants' acts committed in the course of trade or commerce?* .. 13

            iii.  *Did Defendants intend for class members to rely on the absence of information about Butler's past?* ........................... 13

            iv.   *Did Defendants' conduct proximately cause class members' injuries?* .... 14

            v.    *Did Defendants otherwise violate the IPFSA?* ....................... 18

            vi.   *Did Defendants knowingly violate the IPFSA?* ....................... 18

            vii.  *Was Defendants' conduct unfair?* ......................................... 19

            viii. *Did Defendants' contracts comply with the IPFSA?* ............... 20

        B.     **Mullen's damages theory satisfies *Comcast*** ......................... 21

   IV.   **Mullen is typical of the proposed class** ......................................... 22

   V.    **Mullen and her counsel will adequately represent the class** ........... 23

   VI.   **A class action is the best method for resolving this controversy** ................... 25

   **CONCLUSION** ............................................................................. 26

# TABLE OF AUTHORITIES

**United States Supreme Court Cases:**

*Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*,
 568 U.S. 455 (2013) ............................................................................. 6, 11, 12

*Comcast Corp. v. Behrend*,
 569 U.S. 27 (2013) ................................................................................... 21, 22

*Gen. Tel. Co. of Sw. v. Falcon*,
 457 U.S. 147 (1982) ........................................................................................ 23

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
 559 U.S. 393 (2010) .......................................................................................... 6

*Wal-Mart Stores, Inc. v. Dukes*,
 564 U.S. 350 (2011) ..................................................................................... 6, 8

**United States Court of Appeals Cases:**

*AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*,
 896 F.2d 1035 (7th Cir. 1990) ...................................................................... 16, 17

*Bell v. PNC Bank, N.A.*,
 800 F.3d 360 (7th Cir. 2015) ........................................................................... 8

*Cleary v. Philip Morris, Inc.*,
 656 F.3d 511 (7th Cir. 2011) ........................................................................... 9

*Davis v. G.N. Mortg. Corp.*,
 396 F.3d 869 (7th Cir. 2005) ........................................................................... 9

*De La Fuente v. Stokely-Van Camp, Inc.*,
 713 F.2d 225 (7th Cir. 1983) .......................................................................... 23

*In re Bridgestone/Firestone, Inc.*,
 288 F.3d 1012 (7th Cir. 2002) ........................................................................ 26

*In re First All. Mortg. Co.*,
 471 F.3d 977 (9th Cir. 2006) ...................................................................... 15, 16

*In re IKO Roofing Shingle Prods. Liab. Litig.*,
 757 F.3d 599 (7th Cir. 2014) .......................................................................... 21

*Keele v. Wexler*,
    149 F.3d 589 (7th Cir. 1998) ........................................................................21

*Klay v. Humana, Inc.*,
    382 F.3d 1241 (11th Cir. 2004)....................................................................15

*McCann v. Hy-Vee, Inc.*,
    663 F.3d 926 (7th Cir. 2011) ........................................................................17

*Messner v. Northshore Univ. HealthSys.*,
    669 F.3d 802 (7th Cir. 2012) ......................................................................8, 9

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002)......................................................................15

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ....................................................................6, 26

*Spano v. The Boeing Co.*,
    633 F.3d 574 (7th Cir. 2011) ........................................................................23

*Suchanek v. Sturm Foods, Inc.*,
    764 F.3d 750 (7th Cir. 2014) ..........................................................8, 11, 17, 22

*Torres v. SGE Mgmt., LLC*,
    838 F.3d 629 (5th Cir. 2016) ...................................................................15, 16

*Wigod v. Wells Fargo Bank, N.A.*,
    673 F.3d 547 (7th Cir. 2012) ........................................................................12

**United States District Court Cases:**

*Aliano v. Louisville Distilling Co., LLC*,
    115 F. Supp. 3d 921 (N.D. Ill. 2015)............................................................14

*Applied Sols., Inc. v. Plews/Edelmann*,
    No. 02-cv-50088, 2003 WL 21800410 (N.D. Ill. July 21, 2003) ...................13

*Barnes v. Air Line Pilots Ass'n, Int'l*,
    310 F.R.D. 551 (N.D. Ill. 2015)......................................................................7

*Birchmeier v. Caribbean Cruise Line, Inc.*,
    302 F.R.D. 240 (N.D. Ill. 2014).........................................................24, 25, 26

*Boyd v. U.S. Bank, N.A. ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*,
    787 F. Supp. 2d 747 (N.D. Ill. 2011).........................................................9, 18

*Coulter-Owens v. Time, Inc.*,
    308 F.R.D. 524 (E.D. Mich. 2015)..............................................................................24

*Greene v. Mizuho Bank, Ltd.*,
    206 F. Supp. 3d 1362 (N.D. Ill. 2016).........................................................................13

*Greene v. Sears Prot. Co.*,
    No. 15-cv-2546, 2018 WL 3104300 (N.D. Ill. June 25, 2018)......................................18

*Harman v. LyphoMed, Inc.*,
    122 F.R.D. 522 (N.D. Ill. 1988)...................................................................................14

*Harris v. comScore, Inc.*,
    292 F.R.D. 579 (N.D. Ill. 2013)...................................................................................24

*Heffron v. Green Tree Servicing, LLC*,
    No. 15-cv-996, 2016 WL 47915 (N.D. Ill. Jan. 5, 2016) .............................................19

*In re ConAgra Foods, Inc.*,
    90 F. Supp. 3d 919 (C.D. Cal. 2015)...........................................................................14

*Jackson v. Nat'l Action Fin. Servs., Inc.*,
    227 F.R.D. 284 (N.D. Ill. 2005)...................................................................................24

*Lewis v. First Am. Title Ins. Co.*,
    265 F.R.D. 536 (D. Idaho 2010) ..................................................................................22

*Minter v. Wells Fargo Bank, N.A.*,
    274 F.R.D. 525 (D. Md. 2011)......................................................................................16

*Mednick v. Precor, Inc.*,
    320 F.R.D. 140 (N.D. Ill. 2017)..............................................................................12, 22

*O'Brien v. Landers*,
    No. 10-cv-2765, 2011 WL 221865 (N.D. Ill. Jan. 24, 2011)........................................20

*Oshana v. Coca-Cola Bottling Co.*,
    225 F.R.D. 575 (N.D. Ill. 2008).....................................................................................9

*Schmidt v. Smith & Wollensky, LLC*,
    268 F.R.D. 323 (N.D. Ill. 2010).....................................................................................7

*Schulken v. Wash. Mut. Bank*,
    No. 09-cv-02708, 2012 WL 28099 (N.D. Cal. Jan. 5, 2012)........................................24

*Streeter v. Sheriff of Cook Cty.*,
    256 F.R.D. 609 (N.D. Ill. 2009) ................................................................ 24

*Taylor v. Halsted Fin. Servs., LLC*,
    No. 99-cv-2466, 2000 WL 33201925 (N.D. Ill. Jan. 13, 2000) ................ 19, 20

*Tedesco v. Mishkin*,
    689 F. Supp. 1327 (S.D.N.Y. 1988) ........................................................... 25

*Toney v. Quality Res., Inc.*,
    323 F.R.D. 567 (N.D. Ill. 2018) ................................................................. 25

*Wright v. Nationstar Mortg. LLC*,
    No. 14-cv-10457, 2016 WL 4505169 (N.D. Ill. Aug. 29, 2016) ................... 24

**State Cases:**

*Connick v. Suzuki Motor Co., Ltd.*,
    675 N.E.2d 584 (Ill. 1996) ......................................................... 9, 11, 12, 14

*Hagney v. Lopeman*,
    590 N.E.2d 466 (Ill. 1992) ........................................................................ 12

*JPMorgan Chase Bank, N.A. v. East-West Logistics, LLC*,
    9 N.E.3d 104 (Ill. App. Ct. 2014) ......................................................... 12, 15

*Landwer v. Scitex Am. Corp.*,
    606 N.E.2d 485 (Ill. App. Ct. 1992) ........................................................... 19

*Miller v. William Chevrolet/GEO, Inc.*,
    761 N.E.2d 1 (Ill. App. Ct. 2001) ........................................................ 13, 16

*People ex rel. Hartigan v. Stianos*,
    475 N.E.2d 1024 (Ill. App. Ct. 1985) ......................................................... 20

*Robinson v. Toyota Motor Credit Corp.*,
    775 N.E.2d 951 (Ill. 2002) ................................................................ 9, 10, 19

*Starkweather v. Benjamin*,
    32 Mich. 305 (1875) ................................................................................. 17

*Wendorf v. Landers*,
    755 F. Supp. 2d 972 (N.D. Ill. 2010) ......................................................... 10

**Rules and Statutory Authorities:**

815 ILCS 505 .................................................................................................................*passim*

815 ILCS 645 .................................................................................................................*passim*

Fed. R. Civ. P. 23 ..........................................................................................................*passim*

**Miscellaneous Authorities:**

2 Newberg on Class Actions
   § 4:69 (5th ed. 2018).............................................................................................25

2 Newberg on Class Actions
   § 4:72 (5th ed. 2018).............................................................................................26

19A Ill. Law & Prac. *Fraud* § 16..............................................................................12

Bryan Armen Graham, "Rachael Denhollander: 'Predators know where they're
going to be safe,'"
   The Guardian, July 24, 2018, 7:06 a.m., https://bit.ly/2NFRGHs.........................4

**INTRODUCTION**

GLV Inc., owned and operated by Cheryl and Rick Butler, runs a renowned volleyball training center, Great Lakes Center, in suburban Chicago. Through Great Lakes Center, GLV offers several types of volleyball instruction, including training camps, youth programs, and a high-level club program called Sports Performance Volleyball. GLV's recruiting pitch is simple: We have the best coaches and get the best results.

One of those coaches is Rick Butler, who is practically synonymous with GLV and Sports Performance. These days, though he continues to coach, one finds no mention of Rick Butler on GLV's website. The reason: In January 2018, USA Volleyball, the sport's governing body, determined that credible evidence existed that Butler sexually abused girls that he was coaching. Four women had stepped forward to accuse Butler of sexual abuse, and, at a closed hearing, an ethics panel found their stories credible. On that basis, USA Volleyball banned Butler from further participation in the sport, preventing him from coaching at USA Volleyball-sponsored tournaments. A similar sanction from the Amateur Athletic Union soon followed.

Prior to these bans, Butler's scandalous past was covered up by GLV. Rick and Cheryl Butler shamed and intimidated victims into silence and the relevant information was kept from parents who wanted to enroll their children in GLV or Sports Performance programs. As those of Butler's victims who have come forward aver in their attached declarations, the Butlers regularly engaged in a pattern of intimidation and slander in an attempt to keep stories of abuse buried. And, of course, no parents were ever told by Defendants that Rick Butler was a sexual predator. Instead, all relevant statements from the Butlers or on behalf of GLV carried a radically different message.

Plaintiff Laura Mullen has two daughters, each of whom participated in GLV clinics and clubs. Parents, like Mullen, are naturally concerned about the safety and well-being of their children. Butler's behavior raises serious questions about whether children in GLV's care were truly safe. To put it bluntly, no parent would entrust his or her children to a sexual predator. As Mullen sees it, the failure to disclose the nature and extent of Butler's behavior, and indeed the Butler's extensive actions to keep that behavior secret, violates Illinois's Physical Fitness Services Act ("IPFSA"), 815 ILCS 645, and Consumer Fraud Act ("ICFA"), 815 ILCS 505, amounts to common-law fraud, and resulted in GLV and the Butlers being unjustly enriched. Mullen claims that she and similarly situated parents would not have sent their children to GLV had they known about Butler's conduct. As a result, she and other parents are entitled to a return of money paid to GLV. She also asserts that the process of enrolling in GLV camps or other volleyball instruction flunks basic requirements imposed by the IPFSA. Mullen seeks to represent a class of: All individuals who (1) paid money to Defendants (2) for youth volleyball instruction provided by or through GLV Inc. in the State of Illinois (3) between February 27, 2013 and January 10, 2018 (when USA Volleyball publicly announced its sanction).[1]

Butler, of course, strongly disputes whether his conduct ever was legally or morally problematic. Earlier in the litigation, for instance, he called these allegations "inexcusably false." (Dkt. 45, at 1.) Whether or not Butler has preyed on young girls in his volleyball programs is, of course, *the* key merits question here (*see* dkt. 79, ¶ 36), but its resolution waits for another day. Instead, the critical question here is simply whether that question, along with others about

---

[1]     Excluded from the class are (1) Defendants, Defendants' agents, subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest, and those entities' current and former employees, officers, and directors, (2) the Judge to whom this case is assigned and the Judge's immediate family, (3) persons who execute and file a timely request for exclusion from the class, (4) persons who have had their claims in this matter finally adjudicated and/or otherwise released, and (5) the legal representatives, successors, and assigns of any such excluded person.

whether this information was available to parents and whether the Butlers and GLV were obliged to disclose Butler's past, can be answered on a classwide basis.

They can. As explained in more detail below, Mullen seeks to represent a class of parents who paid to send their children to GLV programs in Illinois. This means that only a single state's law—Illinois's—will apply to Mullen's representative claims, and so questions of intent and reliance can be measured against a consistent standard. Further, because every class member stands in the same relationship to GLV and the Butlers, the question of duty to disclose will be answered the same way for all members. And because Mullen's claims revolve around whether parents should be fully apprised of the same information—Butler's history of sexual abuse—answering the question whether that information is material to the decision to entrust a child to GLV will resolve an issue central to Mullen's fraud, ICFA, and IPFSA claims.

The Court should therefore certify the proposed class, appoint Mullen as class representative, and appoint Mullen's attorneys as class counsel.

## BACKGROUND

Defendants' volleyball club, which is owned and operated by Rick Butler and his wife Cheryl, is one of the most influential youth sports clubs in the country. (*See* Defs' Ans., dkt. 76, at 2.) According to ESPN, Rick Butler is the most powerful coach in youth volleyball as he has considerable influence in placing players at top-tier college programs around the country. (*Id.*) Butler's position gives him considerable sway over impressionable youngsters, and, as the attached declarations demonstrate, he has used that position to sexually, physically, and emotionally abuse underage girls. (*See* Declarations of Sarah Powers-Barnhard, Christine Tuzi, Julie Romias, Beth Rose, and Jane Doe, attached as Exhibit 1-A.) Several women have come forward to tell their stories and provide testimony in this specific case. (*Id.*) Each of these stories

has its own troubling details, but a theme emerges from them: Butler used his position to identify promising young volleyball players, groomed them to rely on him for their future success, and, finally, exploited that reliance to isolate the girls and sexually abuse them.

As if that weren't enough, most of these women have attempted to tell their stories before, but were intimidated or threatened by the Butlers into keeping silent. (*See* Ex. 1-A.) The Butlers used an array of tools, from threats of gun violence to victim blaming, to silence these women. (*See, e.g.*, Ex. 1-A (Powers-Barnhard Decl. ¶ 18; Romias Decl. ¶¶ 11-12; Tuzi Decl. ¶¶ 17-18; Rose Decl. ¶ 10; Doe Decl. ¶ 9).) And, of course, these women also experienced the same instinct to keep quiet that recent experience makes clear many victims of sexual abuse experience. *See, e.g.*, Bryan Armen Graham, "Rachael Denhollander: 'Predators know where they're going to be safe,'" The Guardian, July 24, 2018, 7:06 a.m., https://bit.ly/2NFRGHs (last visited Sept. 28, 2018) (Denhollander: "Predators know where they're going to be safe, how survivors are responded to when they speak up and the message that is given from the top down as to how seriously abuse will be taken").) Many of these efforts took place before Butler's victims left GLV programs, but even after his victims leave the program, Defendants' efforts to silence them continue—by way of harassing phone calls to the victims, threats to their livelihoods, financial stability, and even their physical well-being. (*See* Ex. 1-A.) After some of Butler's victims were brave enough to come forward, Defendants took extreme measures to discredit them in a document entitled "Our Story," an online posting riddled with misleading and false information. (*See* dkt. 79-1.) Defendants continue to rely on and distribute the story, working to hide the truth and prevent criticism of Rick's conduct from ever being discovered. (*Id.*)

By keeping Butler's sexually predatory behavior under wraps, Defendants were able to operate a thriving and profitable business providing youth volleyball instruction. Every year, Defendants operate Sports Performance club teams for girls and boys, training camps and clinics, group lessons, middle school programs, and the Great Lakes Center Youth Academy ("GLCYA"), where volleyball players enroll in to take advantage of Defendants' prowess as a preeminent volleyball training facility. (*See* GLV's Supp. Resp. to Pl.'s 2d Set of Interrog., No. 11, attached as Exhibit 1-B.) Thousands of young girls and boys take part in these programs every year. (*Id.*)[2]

Laura Mullen is the parent of two daughters who are volleyball players. (*See* Mullen Decl., attached as Exhibit 1-C, at ¶¶ 2-5.) In an attempt to facilitate her daughters' success, Mullen enrolled both of her daughters in GLV instructional programs, and one of her daughters earned a spot on a club team coached by Rick Butler. (*Id.*) When her eldest daughter earned that spot, Mullen signed a "Sports Performance Parent/Player Contract," which contained general guidelines for the conduct of parents and players associated with the Sports Performance club team. (*Id.* ¶ 4; *see also* Sports Performance Parent / Player Contract, attached as Exhibit 1-D.)[3] Mullen's daughters received volleyball instruction through GLV for years until the spring of 2017. (Ex. 1-C, Mullen Decl. ¶ 9.) In that time, Mullen estimates that she spent over $25,000 on

---

[2]     Defendants also provide adult volleyball instruction, but, as described above, Mullen's proposed class is limited to individuals who paid Defendants for youth volleyball instruction.

[3]     Defendants have only produced the form contract for Sports Performance club teams from 2017-2018, (Ex. 1-D), and do not appear to have retained (or at least have not produced) a signed copy of Mullen's contract. Regardless, Defendants have represented that the "Sports Performance Parent / Player Contract" was substantially the same throughout the entire Class Period, with the exception of some changes to dates or years. (*See* GLV's Ans. to Pl's 2d Set of Interrog., Nos. 11, 13, 14, attached as Exhibit 1-E; GLV's Resp. to Pl's 2d Set of Requests to Produce, No. 4, attached as Exhibit 1-F.) Defendants have not produced any other purported "contracts" for any other form of youth volleyball instruction that they provide to class members. As such, it is clear that all class members received materially identical contracts.

volleyball instruction. (*Id.* ¶ 6.) Yet had she known about Butler's past abusive behavior, she would not have sent her daughters to GLV at all. (*Id.* ¶ 10.)

**ANALYSIS**

Mullen proposes to represent the following class against GLV and the Butlers:

> All individuals who, between February 27, 2013, and January 20, 2018, paid money to Defendants for youth volleyball instruction provided by or through GLV in the State of Illinois.

To merit certification, the proposed class must meet the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy. *See* Fed. R. Civ. P. 23(a). Because Mullen seeks money damages on behalf of the class, she seeks certification under Rule 23(b)(3). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 350, 362 (2011). She must therefore demonstrate that the proposed class meets Rule 23(b)(3)'s requirements of predominance and superiority. A Rule 23(b)(3) class also must be ascertainable, that is, defined by objective criteria. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 659 (7th Cir. 2015). "The office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." *Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 460 (2013). Nevertheless, "by its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010).

## I. The proposed class is ascertainable.

Before diving into Rule 23(a) and (b)'s textual requirements, Mullen must demonstrate that the proposed class meets the narrow "ascertainability" requirement implied in Rule 23. *See Mullins*, 795 F.3d at 657, 672. An ascertainable class, *Mullins* holds, is clearly defined by reference to objective criteria and not defined in terms of success on the merits. *Id.* at 660. That

is the case here. First, the definition identifies a particular group of people who paid money to Defendants for programs in Illinois during a particular time. *See id.* ("To avoid vagueness, class definitions generally need to identify a particular group, harmed during a particular time frame, in a particular location, in a particular way."). Second, the definition incorporates no subjective criteria, such as state of mind. *See id.* Finally, the definition does not include any element of any applicable claim for relief. *Id.* at 660-61 (noting prohibition on "fail-safe" class definitions). The class is therefore ascertainable.

## II. The proposed class is sufficiently numerous.

Rule 23(a)(1) requires that a proposed class contain so many members that "joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "No magic number exists for satisfying the numerosity requirement," but a class of 40 members is generally sufficient. *Barnes v. Air Line Pilots Ass'n, Int'l*, 310 F.R.D. 551, 557 (N.D. Ill. 2015). Mullen's proposed class easily satisfies this requirement. In Illinois in 2018 alone, approximately:

- 2,500-3,000 players participated in GLV's summer camps;

- 500-700 players participated in GLV clinics and group lessons that typically take place on weekends between September and May;

- 600 players participated in the Sports Performance club team program;

- 200-250 players participated in the boy's middle school program; and

- 500-700 players participated in a GLCYA co-ed program.

(*See* Ex. 1-B, GLV's Supp. Ans. Interrog., No. 11.) Even assuming that there is some overlap between these groups, it is clear that Defendants provided volleyball instruction to thousands of children each year. This suffices to show that the class satisfied Rule 23(a)(1). *See Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 326 & n.3 (N.D. Ill. 2010) (extrapolating from six months of data to determine that proposed class covering 4 years had at least 40 members).

**III.    Common questions will predominate at a trial of the class's claims.**

Next, Rule 23(a)(2) requires that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question is one that can be resolved "in one stroke" for the class on the basis of common evidence. *Dukes*, 564 U.S. at 350. Insofar as Rule 23(a)(2) is concerned, "even a single common question will do." *Id.* at 359. Courts typically conclude that commonality is satisfied when "the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members[.]" *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014).

Relatedly, Rule 23(b)(3) requires that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). "Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case." *Messner v. Northshore Univ. HealthSys.*, 669 F.3d 802, 815 (7th Cir. 2012) (quotations and citation omitted). "Individual questions need not be absent. The text of Rule 23(b)(3) itself contemplates that such individual questions will be present. The rule requires only that those questions not predominate over the common questions affecting the class as a whole." *Id.* "In this case," as in many others, "the question of commonality and predominance overlap in ways that make them difficult to analyze separately." *See Bell v. PNC Bank, N.A.*, 800 F.3d 360, 374 (7th Cir. 2015). As such, we analyze them together here.

**A.    Common questions on the merits.**

The Supreme Court has explained that the Rule 23(b)(3) "inquiry trains on the legal or factual questions that qualify each class member's case as a genuine controversy[.]" *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). Thus, "analysis of predominance under Rule 23(b)(3) begins, of course, with the elements of the underlying cause[s] of action." *Messner*, 669

F.3d at 815 (quotations omitted). Here, Mullen's proposed class claims call for overlapping proof.

Start with the ICFA. An ICFA claim may be predicated on either a deceptive, unlawful, or unfair practice. *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). To prove an ICFA claim through a deceptive practice, Mullen must show that "(1) the defendant undertook a deceptive act or practice; (2) the defendant intended that the plaintiff rely on the deception; (3) the deception occurred in the course of trade and commerce; (4) actual damage to the plaintiff occurred; and (5) the damage complained of was proximately caused by the deception." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 883 (7th Cir. 2005). Similarly, a common law fraud claim requires proof "that the defendant concealed a material fact when he was under a duty to disclose that fact." *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 593 (Ill. 1996). These two claims are analyzed similarly. *See id.* at 591-95. Further, when a unjust enrichment claim is based on the same conduct as an ICFA claim, the same predominance analysis applies, *see Oshana v. Coca-Cola Bottling Co.*, 225 F.R.D. 575, 586 (N.D. Ill. 2008) (concluding that "the same analysis applies" to both an unjust enrichment claim and an ICFA claim), and the unjust enrichment claim generally will stand or fall with the ICFA claim, *see Cleary v. Philip Morris, Inc.*, 656 F.3d 511, 517 (7th Cir. 2011).

An unlawful-practices ICFA claim is parasitic of a violation of another enumerated statute. *See* 815 ILCS 505/2Z. Section 2Z of the law "creates a *per se* rule, providing that a defendant's *knowing* violation of any of the enumerated statutes *automatically* constitutes an unlawful practice under the ICFA." *Boyd v. U.S. Bank, N.A. ex rel. Sasco Aames Mortg. Loan Trust, Series 2003-1*, 787 F. Supp. 2d 747, 755 (N.D. Ill. 2011). One of those enumerated statutes is the IPFSA. *See* 815 ILCS 505/2Z. As relevant here, § 10(a) of the IPFSA prohibits

"deceptive acts or practices" in the course of entering into contracts for physical fitness services. Section 10(b) makes clear that "deceptive acts" include the use of "false, fraudulent, or misleading information" about any physical fitness center's "employees or agents." Proof of a violation of this provision entitles a customer to treble damages, *id.* § 11, and proof of a knowing violation entitles a plaintiff to relief under the ICFA. 815 ILCS 505/2Z.

Finally, an unfair-practices ICFA claim fits into a "factor-based framework." *Wendorf v. Landers*, 755 F. Supp. 2d 972, 979 (N.D. Ill. 2010). Courts use three factors to evaluate whether conduct is unfair: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers." *Id.* A plaintiff need not satisfy all three factors. *See Robinson*, 775 N.E.2d at 961.

These claims give rise to a number of questions that are susceptible to common proof.

### i. *Was Defendants' conduct fraudulent or deceptive?*

Mullen alleges that the Butlers, in order to further their business, GLV, fraudulently suppressed information about Rick's predatory past, and failed to disclose that same information to new customers. As Mullen avers, she never was told the truth about Butler's behavior. (Ex. 1-C, Mullen Decl. ¶¶ 7-8.) The record as it stands contains no evidence that any class member was provided that information, and the Butlers' vigorous denials of any wrongdoing make it clear that nobody was ever given the relevant information. (*See, e.g.*, Ex. 1-E, GLV's Ans. to Interrog., Nos. 12, 14 (indicating that communications to class members were limited to marketing materials (which did not provide information about Butler's misconduct) and the "Parent / Player Contract".) Further, five women have attested to the lengths the Butlers went to in order to prevent the story of Rick's behavior from becoming public knowledge. (*See* Ex. 1-A.) Determining whether this conduct was fraudulent or deceptive is central to Mullen's claims

under the ICFA, the IPFSA, for unjust enrichment, and for common-law fraud. And because each proposed class member was exposed to the same conduct (i.e., no class member was told about Butler's behavior and Defendants' actions to suppress the information were directed towards the entire world), this question is common to the class. *See Suchanek*, 764 F.3d at 756 ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question.").

This inquiry involves several subsidiary questions, each of which can be answered with classwide proof. First, any claim of fraud requires a showing of falsity. *See Connick*, 675 N.E.2d at 591. Thus, a jury will be confronted first with the question of whether to believe Butler's accusers or Butler himself. Indeed, whether or not Butler is in fact a sexual predator underpins each of Mullen's proposed class claims. What matters at this stage is that this core part of this case can be determined through the same evidence and victim testimony. If the Butlers were at all times telling the truth about Rick's past, then there could be no deceptive conduct (as prohibited by the ICFA and IPFSA) or any fraudulent conduct. And whether the Butlers were being truthful will be true or false for all class members. Further, because this is an essential part of Mullen's case, "the failure of proof on th[is element] would end the case for one and for all." *Amgen*, 568 U.S. at 468. Indeed, Defendants seem to recognize as much, as their Affirmative Defenses concede that "[u]ntil this Court decides whether the allegations are true, there is nothing for Defendants could [sic] have disclosed." (Dkt. 79, ¶ 36.)

Assuming a jury believes Mullen's witnesses regarding Butler's abusive behavior, it will next need to decide whether the concealed or omitted information about Rick Butler is material. "A material fact exists where a buyer would have acted differently knowing the information, or if it concerned the type of information upon which a buyer would be expected to rely in make a

decision whether to purchase." *Connick*, 675 N.E.2d at 595. For both the statutory and common-law claims, the test for materiality is objective. *See* 19A Ill. Law & Prac. *Fraud* § 16 (stating that the common-law test is "whether a reasonable and prudent investor would attach importance to those facts"); *Mednick v. Precor, Inc.*, 320 F.R.D. 140, 148 (N.D. Ill. 2017) (noting that whether conduct was deceptive is "established by applying a reasonable person standard"). Because the test is objective, whether the suppressed or withheld information is material is a common question. *See Amgen*, 568 U.S. at 467 ("because the question of materiality… is an objective one … materiality can be proved through evidence common to the class").

A jury would next need to decide whether the Butlers' actions to suppress any rumors about Rick's behavior amounted to suppression of a material fact. "Intentional concealment of a material fact is the equivalent of a false statement of material fact." *JPMorgan Chase Bank, N.A. v. East-West Logistics, LLC*, 9 N.E.3d 104, 120 (Ill. App. Ct. 2014). Whether the factual predicate for this theory—that the Butlers actually suppressed anything—is true is a question for the finder of fact. And the factfinder's answer will apply classwide because the Butler's directed their suppression efforts at everyone.

If the jury disbelieves Mullen's evidence about suppression or concealment, it would then need to assess Mullen's omission theory. A defendant is obligated to affirmatively disclose information only in certain circumstances, and absent a duty to disclose the failure to do so cannot be fraudulent. *See Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 571 (7th Cir. 2012). But a duty to disclose arises when the defendant is in a fiduciary relationship, or a relationship of trust and confidence, with the plaintiff. *See Hagney v. Lopeman*, 590 N.E.2d 466, 468-69 (Ill. 1992). Whether such a relationship existed is a question of fact, *see id.* at 469-70, but that question of fact is common to the class because every class member stood in the same

relationship to Defendants: they each paid money to GLV and trusted their children to the care of GLV agents and employees. Whether that sufficed to create a duty to disclose is common to the class. Moreover, a duty to disclose may arise if the plaintiff and defendant are in a transactional relationship, and the disclosure obligation relates to facts material to the transaction. *See Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1374 (N.D. Ill. 2016); Restatement (Second) of Torts § 551(2)(e). As already discussed, materiality presents a common question, so whether the class's common transactional relationship with Defendants gives rise to a duty to disclose is another common question.

### ii. <u>Were Defendants' acts committed in the course of trade or commerce?</u>

Next, while a defendant's conduct might be deceptive, it is actionable under the ICFA only if the "deception occurred in [a] course of conduct involving trade or commerce." *JP Morgan Chase*, 9 N.E.3d at 121. "The [ICFA] defines 'consumer' as any person who purchases merchandise not for resale in the ordinary course of his business . . . . 'Merchandise' includes services." *Applied Sols., Inc. v. Plews/Edelmann*, No. 02-cv-50088, 2003 WL 21800410, at *2 (N.D. Ill. July 21, 2003). Mullen will present evidence that the class, as defined, includes only individuals who paid money to Defendants in exchange for a service, youth volleyball instruction. Whether those services fit the ICFA's definition of "merchandise" will resolve for each class member the question whether Defendants' allegedly deceptive conduct is actionable under the ICFA.

### iii. <u>Did Defendants intend for class members to rely on the absence of information about Butler's past?</u>

A common-law fraudulent concealment claim also requires a showing that the defendant intended people to "rely on the suppression in making their choice," *Miller v. William Chevrolet/GEO, Inc.*, 761 N.E.2d 1, 14-15 (Ill. App. Ct. 2001). But courts have held that this

issue, which may be thought of as intent or scienter, raises common questions in cases involving uniform misrepresentations, because the class's claims will turn on evidence regarding the defendant's state of mind with respect to a single piece of information misrepresented to all class members. *See Harman v. LyphoMed, Inc.*, 122 F.R.D. 522, 526 (N.D. Ill. 1988). So, too, here: A jury's determination about whether the Butlers intended for potential customers to rely on the absence of evidence about Rick's predatory past will apply classwide, rendering this issue common as well.

iv.   <u>Did Defendants' conduct proximately cause class members' injuries?</u>

All claims sounding in tort require a showing of proximate causation, though the showings here differ slightly between the statutory and common law claims. Under the ICFA, any showing of proximate cause will do; reliance is unnecessary. *See Connick*, 675 N.E.2d at 593. Instead, proximate causation is synonymous with deception and may be inferred when there are no events that break the causal chain between the omission and payment. *Aliano v. Louisville Distilling Co., LLC*, 115 F. Supp. 3d 921, 932 (N.D. Ill. 2015). And, "in cases like this one where the representations and omissions being challenged were made to all putative class members, Illinois courts have concluded that causation is susceptible to class wide proof and that individualized inquiries concerning causation do not predominate if plaintiffs are able to adduce sufficient evidence that the representation was material." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 997-98 (C.D. Cal. 2015) (collecting Illinois cases finding commonality as to proximate cause present when all class members were subjected to the same course of conduct). Each member of the class was plainly subject to a common course of conduct here. Any attempt by victims to discuss publicly their treatment at Butler's hands was suppressed, and no class member ever was informed about the truth of Butler's past. (*See, e.g.*, Ex. 1-A; Ex. 1-C.)

Common evidence about this behavior, in the form of testimony from victims, admissions from Defendants, and documentary evidence of interactions between Defendants and customers, will establish this common course of conduct and thus will render proximate cause a common question for Mullen's statutory claims.

As to the claim for common-law fraud, the class will need to demonstrate that they relied on Defendants' fraudulent concealment or omission of material facts. *See JPMorgan Chase*, 9 N.E.3d at 120. The drafters of Rule 23 have observed that "a fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action." Advisory Committee Notes to Rule 23—1966 Amendments, 39 F.R.D. 69, 103 (1966). Courts therefore separate fraud actions "into two categories: fraud claims based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (Sotomayor, J.). This case falls into the former category and so is an "appropriate subject[] for class certification." *Id.*

This is so because, in a case like this, a classwide inference of reliance is proper. In appropriate cases, courts have recognized that "legitimate inferences based on the nature of the alleged misrepresentations at issue" "could lead a reasonable factfinder to conclude beyond a preponderance of the evidence that each individual plaintiff relied on the defendants' representations." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259 (11th Cir. 2004). Putative representative plaintiffs are typically permitted to attempt to persuade a jury to accept a classwide inference of reliance "when it follows logically from the nature of the scheme, and there is common, circumstantial evidence that class members relied on the fraud." *Torres v. SGE Mgmt., LLC*, 838 F.3d 629, 641 (5th Cir. 2016) (en banc); *see also In re First All. Mortg. Co.*,

471 F.3d 977, 990-92 (9th Cir. 2006) (explaining that fraud claim involving standardized misrepresentations may be suitable for class treatment, and reiterating that "it is the underlying scheme which demands attention").

The Butlers' own actions demonstrate why such an inference is appropriate here. The Butlers understood that if parents knew about Rick's behavior, they would not send their children to GLV-sponsored or run camps, lessons, or clubs, and GLV's revenue would dry up. No rational parent would willingly entrust his or her child to a sexual predator. The Butlers, on GLV's behalf, sought to hide this information from prospective customers precisely for that reason. In other words, inferential proof of reliance is provided by the "nature of the scheme" alleged. *See Torres*, 838 F.3d at 641. Using "legitimate inferences based on the nature of the alleged misrepresentation [at issue]," a jury could conclude that most class members relied on Defendants' misrepresentations and omissions. *See Minter v. Wells Fargo Bank, N.A.*, 274 F.R.D. 525, 546 & n.23 (D. Md. 2011) (noting that "it is reasonable to infer that plaintiff class members would not have transacted with [defendant] had they known [defendant] was not a legitimate lender[,]" with legitimacy being the principal dispute in the class action).

Illinois also requires reliance to be justified, *see Miller*, 762 N.E.2d at 9, but this question, too, is common.[4] Defendants' earlier briefing suggests that Defendants will flag the various rumors about Butler as evidence that any reliance is unjustified. And it is true that knowledge of a fraud breaks the causal chain. *See Torres*, 838 F.3d at 643. But, as the Seventh Circuit has said, in applying Illinois law, this means only that the victim of a deliberate fraud

---

[4]     This analysis is relevant only to Mullen's common-law fraud claim. "[T]he [ICFA] eliminates any requirement of plaintiff diligence in ascertaining the accuracy or misrepresentations." *Miller*, 761 N.E.2d at 13.

"need only avoid *deliberate* or *reckless* risk taking." *AMPAT/Midwest, Inc. v. Ill. Tool Works, Inc.*, 896 F.2d 1035, 1041-42 (7th Cir. 1990). Defendants' argument that class members recklessly assumed the risks of entrusting their children to a sexual predator depends on information in the public domain that was equally available to all class members. It is, in effect, an argument about inquiry notice, which is assessed against an objective, reasonable person standard. *See McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 930 (7th Cir. 2011). So do the existence of unconfirmed rumors, which are denied at every opportunity by the relevant actors, break the causal chain, and render any reliance unjustified? *Cf. Starkweather v. Benjamin*, 32 Mich. 305, 307 (1875) ("It would be absurd to allow street talk . . . to rebut the conclusions of fraud arising out of positive untruths. It is certainly not presumable that others will know better than the parties interested; and even if such rumors had been multiplied and brought home to [plaintiff], he would be justified in believing [defendant's] statements based on better knowledge."). A jury will need to decide. But because the appropriate inquiry is objective, whether existing rumors should have put a reasonably prudent person on notice is a question that can be resolved in a single merits proceeding. The parties will present evidence about how much or how little was known about Butler in the public domain, and about the Butlers' efforts to suppress and deny these rumors. A jury will simply need to decide if this information sufficed to put a reasonable person on notice—a conclusion that will apply to each class member. If the jury finds that a reasonable person would investigate further, no class member will be able to show that his or her reliance was justified.

Finally, even if reliance does not present a common question, a class action is still appropriate. As the Seventh Circuit has made clear, "neither Rule 23 nor any gloss that decided cases have added to it requires that *every* question be common." *Suchanek*, 764 F.3d at 756.

"Where, as here, the purported fraud is based on alleged conduct that was uniform as to all class members, it is well established that individual issues of reliance do not thwart class actions." *Greene v. Sears Prot. Co.*, No. 15-cv-2546, 2018 WL 3104300, at *6 (N.D. Ill. June 25, 2018).

v. <u><em>Did Defendants otherwise violate the IPFSA?</em></u>

Mullen also pursues a claim under § 10 of the IPFSA on behalf of her proposed class. That section prohibits the use of deception or misrepresentation in the formation of a physical fitness services contract. *See* 815 ILCS 645/10. The discussion above about whether Defendants' conduct was fraudulent applies equally to this claim. But other questions raised by the statutory language that are common to the class's claim also exist.

For example, the act only applies to "physical fitness centers," which are defined as "business entit[ies] offering physical fitness services to the public." *See* 815 ILCS 645/2(a). Whether GLV fits that bill, and thus whether the act applies here, is an issue that must be resolved for each class member. But the capacity in which Defendants offered its volleyball instruction to class members—e.g., as a club providing training to youth athletes—did not change from class member to class member, so the common evidence about the Defendants' operation will help resolve this issue for each class member.

vi. <u><em>Did Defendants knowingly violate the IPFSA?</em></u>

Mullen's ICFA claim premised on unlawful activity under § 2Z of the Act, requires proof of a knowing violation of the IPFSA. *See Boyd*, 787 F. Supp. 2d at 755. Assuming a jury credits Mullen's evidence and finds both that the IPFSA applies to GLV and that Defendants violated the IPFSA, the next step is determining whether that violation was knowing. In part, this requires a legal determination about what knowledge is sufficient: Whether it is sufficient that the conduct is intentional or whether Mullen must show that Defendants knew they were violating

the IPFSA specifically. *See Landwer v. Scitex Am. Corp.*, 606 N.E.2d 485, 489 (Ill. App. Ct.

1992) (noting that willful violations require proof that the violator knew their conduct was

prohibited by law). The Court's resolution of that issue will determine the burden Mullen

shoulders on behalf of every class member. *See* Fed. R. Civ. P. 23(a)(2) (requiring common

questions of fact *or law*); *Burns v. First American Bank*, No. 04-cv-7682, 2006 WL 3754820, at

*9 (N.D. Ill. Dec. 19, 2006) (finding whether defendant intended to violate the statute was

common issue that predominated over individual questions and thus suitable for class-wide

treatment).

Once the appropriate standard is established, the jury will need to decide whether the

evidence meets that standard. And again, because a common course of conduct is at issue that

can be shown through evidence adduced from Defendants and third-party witnesses and not any

individual class member, the jury's answer will apply to the claims of every class member.

### vii.     *Was Defendants' conduct unfair?*

Mullen also raises a claim under the ICFA by asserting that Defendants' conduct was

unfair. *See* 815 ILCS 505/2. As noted, Mullen must show that Defendants' misconduct (i)

offended public policy, (ii) was immoral and oppressive, and (iii) caused her and the class

substantial injury. *Robinson*, 775 N.E.2d at 960-61. These elements need not all be shown;

instead, they constitute a multi-factor test. *Id.* But in any event, all can be shown on a classwide

basis. The first two elements are objectively provable and do not raise any individualized issues

as they have little bearing on Defendants' relationship with class members themselves. *See, e.g.*,

*Heffron v. Green Tree Servicing, LLC*, No. 15-cv-996, 2016 WL 47915, at *5 (N.D. Ill. Jan. 5,

2016) ("A practice can offend public policy . . . if it violates a standard of conduct contained in

an existing statute or common law doctrine that typically applies to such a situation."); *Taylor v.*

*Halsted Fin. Servs., LLC*, No. 99-cv-2466, 2000 WL 33201925, at *8 (N.D. Ill. Jan. 13, 2000) (commonality and predominance satisfied with respect to unfair practices ICFA claim because "[t]he focus of an ICFA liability inquiry in the context of a class action is on the defendants' behavior, not the circumstances of [proposed class members]"). As to substantial injury, Illinois courts have noted that even very small losses can be aggregated to determine whether a practice causes substantial injury. *People ex rel. Hartigan v. Stianos*, 475 N.E.2d 1024, 1029 (Ill. App. Ct. 1985). Because this factor can be measured in the aggregate, it too can be measured on a classwide basis.

> viii.     *Did Defendants' contracts comply with the IPFSA?*

Finally, Mullen asserts that the "Parent / Player Contract" she signed for her daughter in the Sports Performance program fails to contain several contractual provisions required by the IPFSA, and that for other GLV programs no required contract was provided at all. Under the IPFSA, physical fitness centers in Illinois must follow certain procedures when enrolling new members, including reducing all membership contracts to writing, binding the center to specific obligations in those contracts (e.g., disclosing that the contract may be cancelled within 3 days of signing for a full refund, that a customer may cancel the contract after relocating somewhere further than 25 miles from the physical fitness center, or after death or disability, and informing customers of cancellation procedures), providing copies of the contract to customers at the time they're signed, and maintaining original copies of the contracts. *See* 815 ILCS 645/4, 645/6; *O'Brien v. Landers*, No. 10-cv-2765, 2011 WL 221865, at *3 (N.D. Ill. Jan. 24, 2011). Mullen alleges that GLV failed to meet these standards.

As discussed above, in the context of Mullen's IPFSA § 10 claim, a threshold issue is whether the IPFSA applies to GLV, specifically whether Defendants' volleyball facilities are

"physical fitness centers" under the IPFSA. *See* 815 ILCS 645/2(a). That issue aside, these claims turn on the existence or absence of a contract, or for the Sports Performance club, and on the language of any contract between GLV and class members. Defendants have produced a document titled "Sports Performance Parent / Player Contract," which they represent is the only written "contract" entered into between Defendants and certain proposed class members (those who participated on Sports Performance club teams), and that the contract remained substantially the same year-to-year. (*See* Ex. 1-D ("Parent / Player Contract"); Ex. 1-E, GLV's Ans. Interrog., Nos. 11, 13, 14; Ex. 1-F., GLV's Resp. Req. Prod., No. 4.) Courts routinely recognize that common questions are presented by the interpretation of standardized contracts. *See, e.g.*, *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998). The same is true here.

As for the all other GLV programs, Defendants' own discovery responses also represent that "parents generally sign up their children for a specific camp, clinic or program online by submitting payment through the GLV, Inc. website," as Mullen did when registering her daughters in other GLV programs. (*See* Ex. 1-B., GLV's Supp. Ans. Interrog., No. 11.) No other contracts were produced in discovery and the factfinder's determination about whether the on-line sign-up process generates a contract (let alone one that complies with the IPFSA) will resolve an issue relevant to the claims of all class members.

### B. Mullen's damages theory satisfies *Comcast*.

Additionally, Rule 23(b)(3) requires a plaintiff to show that her theory of damages is linked to her theory of liability. *See Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). Damages need not be common across the class, but they must "match[] the theory of liability." *In re IKO Roofing Shingle Prods. Liab. Litig.*, 757 F.3d 599, 602 (7th Cir. 2014).

Mullen's common law fraud claim permits recovery of actual damages, as do both of her statutory claims. *See* 815 ILCS 505/10a (ICFA); 815 ILCS 645/11 (IPFSA). Along those lines, Mullen alleges that she would not have transacted with Defendants at all had she known the truth about Rick Butler. (Ex. 1-C, Mullen Decl. ¶ 10.) Thus, she says, she is entitled to a return of all monies paid to Defendants in reliance on their failure to disclose those details. This satisfies *Comcast*. *See, e.g.*, *Suchanek*, 764 F.3d at 760 (damages calculation of price premium based on misrepresentation was acceptable); *Mednick*, 320 F.R.D. at 155-56 (same).

What's more, damages for each class member will be easy to ascertain. Defendants acknowledge that they maintain records and invoices of the amount paid to the club by each player. (*See, e.g.*, Ex. 1-B, GLV's Supp. Ans. Interrog., No. 11.) A claiming class member's damages can be determined simply by searching those records.

Further, it is plain that damages attributable to Defendants' failure to comply with Sections 4 and 6 of the IPFSA are "capable of measurement on a classwide basis." *Comcast*, 569 U.S. at 34. Defendants either failed to provide a required contract at all, or provided their customers with standardized form contracts that Defendants admit were materially consistent across the class period. If a jury determines that Defendants were unjustly enriched by their failure to comply with the IPFSA, they will have been enriched in equal amounts for every noncompliant contract. Thus, damages are capable of classwide measurement. *See Lewis v. First Am. Title Ins. Co.*, 265 F.R.D. 536, 560 (D. Idaho 2010) ("Any putative class members who were overcharged … would be in exactly the same position.").

## IV. Mullen is typical of the proposed class.

Next, Mullen is typical of the proposed class. *See* Fed. R. Civ. P. 23(a)(3). A plaintiff is typical of the class when there is "enough congruence between the named representative's claim

and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." *Spano v. The Boeing Co.*, 633 F.3d 574, 586 (7th Cir. 2011). In other words, typicality exists if the named plaintiff's claim "arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983) (internal quotation omitted). Commonality and typicality overlap, and a finding of one usually results in a finding of the other. *Id.*; *see also Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982) ("The commonality and typicality requirements of Rule 23(a) tend to merge.").

Here, the "essential characteristics" of Mullen's claims and those of the class she seeks to represent are practically identical. Each of Mullen's and the class members' claims arise from the exact same conduct—Defendants' concealment and omissions regarding Butler's history of sexual abuse, which induced parents to sign their children up for Defendants' volleyball club when they otherwise wouldn't have had they known the truth. Defendants' concealment and omission of Butler's conduct was uniform across the class. As a result of that conduct, Mullen's and the class's rights were violated within the same common course of conduct and Mullen and the class suffered the same type of injury (i.e., money paid to Defendants). The typicality requirement is therefore satisfied.

## V. Mullen and her counsel will adequately represent the class.

Next, Mullen and her attorneys will adequately represent the proposed class. *See* Fed. R. Civ. P. 23(a)(4). In assessing adequacy, the Court must determine whether Mullen has: (1) antagonistic or conflicting claims with other members of the class; (2) a sufficient interest in the outcome of the case to ensure vigorous advocacy; and (3) counsel who is competent, qualified,

experienced, and able to vigorously conduct the litigation. *Streeter v. Sheriff of Cook Cty.*, 256 F.R.D. 609, 613 (N.D. Ill. 2009) (quotations omitted). All three requirements are met here.

As explained above, for each claim on which she seeks certification, Mullen's claims are the same as the claims of the proposed class. She also has a sufficient interest to ensure vigorous advocacy: the recovery of money she paid to Defendants for volleyball instruction that she would not have paid had she known the truth of Rick Butler's history of sexual abuse. *See Jackson v. Nat'l Action Fin. Servs., Inc.*, 227 F.R.D. 284, 289 n.6 (N.D. Ill. 2005) ("[P]laintiff has sufficient interest in the outcome of his suit —namely, the recovery of damages—to ensure vigorous advocacy."). Finally, Mullen has vigorously engaged in the litigation of this action. In addition to helping her attorneys conduct a months' long pre-suit investigation, she has also reviewed voluminous legal filings and otherwise assisted proposed class counsel in the prosecution of this case. There can be no question that she is an adequate class representative.

Mullen also has retained able counsel. Attorneys from Edelson PC are "exceptionally qualified and experienced in representing classes." *Wright v. Nationstar Mortg. LLC*, No. 14-cv-10457, 2016 WL 4505169, at *11 (N.D. Ill. Aug. 29, 2016). They have extensive experience litigating a variety of claims on behalf of consumer classes, including consumer-fraud claims. *See* Firm Resume, attached hereto as Exhibit 1-G. Courts nationwide, including this one, have also found that Edelson attorneys are adequate class counsel. *See, e.g., id.*; *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 252 (N.D. Ill. 2014) (Kennelly, J.); *Coulter-Owens v. Time, Inc.*, 308 F.R.D. 524, 535-36 (E.D. Mich. 2015); *Harris v. comScore, Inc.*, 292 F.R.D. 579, 587 (N.D. Ill. 2013); *Schulken v. Wash. Mut. Bank*, No. 09-cv-02708, 2012 WL 28099, at *12 (N.D. Cal. Jan. 5, 2012). The adequacy requirement is therefore satisfied.

**VI.** **A class action is the best method for resolving this controversy.**

Finally, there can be little doubt that a class action is the best way to resolve this controversy. This requirement "is intended to cover cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Birchmeier*, 302 F.R.D. at 255 (internal quotation omitted).

Rule 23(b)(3) sets forth four matters "pertinent" to the determination that a class action is superior. Each is satisfied here. First, there is no indication that class members have a significant interest in individual prosecution of the claims at issue. *See* Fed. R. Civ. P. 23(b)(3)(A). As it stands, "the record is lacking in evidence that another class member seeks to individually control a separate action[.]" *Toney v. Quality Res., Inc.*, 323 F.R.D. 567, 593 (N.D. Ill. 2018). Similarly, the lack of any other cases helps satisfy Fed. R. Civ. P. 23(b)(3)(B). *See* 2 Newberg on Class Actions § 4:69 (5th ed. 2018) (noting that courts generally conclude a lack of similar suits militates in favor of class status). Moreover, while potential damages here are not nominal, neither are they necessarily sufficient incentive for an individual lawsuit or for a lawyer to take the case on contingency.

Next, it is desirable to concentrate this litigation in this forum. *See* Fed. R. Civ. P. 23(b)(3)(C). All claims arise under Illinois law, the lawsuit concerns the provision of volleyball instructional services in Illinois, and Defendants are citizens of this district. *See Tedesco v. Mishkin*, 689 F. Supp. 1327, 1337 (S.D.N.Y. 1988) (finding this factor satisfied because "all but two defendants reside or have their principal offices here[,] [a]ll or substantially all of the relevant records are here[, and] [m]ost of the unlawful acts were allegedly committed here").

Finally, a class action would be manageable. *See* Fed. R. Civ. P. 23(b)(3)(D). First, Illinois law applies classwide to all claims, so the Court is not faced with the Herculean task of juggling different bodies of substantive law. *See In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1015 (7th Cir. 2002) (reasoning that a class in which all litigants were not "governed by the same legal rules" would flunk the superiority requirement). As explained above, Illinois law will require the jury to make a series of decisions about whether to credit the evidence that will be put forward by Mullen or the evidence put forward by Defendants. *See* 2 Newberg on Class Actions § 4:72 (5th ed. 2018) ("Courts generally hold that if the predominance requirement is met, then the manageability requirement is met, as well."). Although the jury's undertaking is no doubt weighty, it is also straightforward, and governed in large part by well-known legal rules. Resolving all class members' claims in a single proceeding, therefore, generates economies of time and expense and promotes uniformity of decision, without risking any procedural unfairness. *See Birchmeier*, 302 F.R.D. at 255. Finally, if the Court is concerned about any lingering issues, it bears noting that "refusing to certify on manageability grounds alone should be the last resort." *Mullins*, 795 F.3d at 664.

## CONCLUSION

The Court should certify the proposed class, appoint Laura Mullen as its proposed representative, and appoint Edelson PC as class counsel under Fed. R. Civ. P. 23(g).

Respectfully submitted,

**LAURA MULLEN,** individually and on behalf of the class of similarly situated individuals,

Dated: September 28, 2018

By: /s/Eve-Lynn J. Rapp
    One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com

Eve-Lynn J. Rapp
erapp@edelson.com
Christopher L. Dore
cdore@edelson.com
Alfred K. Murray II
amurray@edelson.com
Sydney M. Janzen
sjanzen@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

## CERTIFICATE OF SERVICE

I, Eve-Lynn J. Rapp, an attorney, hereby certify that on September 28, 2018, I caused to be served the above and foregoing ***Plaintiff's Motion and Incorporated Memorandum in Support of Class Certification***, by causing a true and accurate copy of such paper to be filed and served on all counsel of record via the Court's CM/ECF electronic filing system.

<u>/s/Eve-Lynn J. Rapp</u>