1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4   LAURA MULLEN, et al.,             )  Docket No. 18 C 1465
                                       )
 5                     Plaintiffs,     )
                                       )
 6              vs.                    )
                                       )
 7   GLV, INC., et al.,                )  Chicago, Illinois
                                       )  March 29, 2019
 8                     Defendants.     )  10:00 o'clock a.m.

 9
                 TRANSCRIPT OF PROCEEDINGS - MOTION
10         BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
     APPEARANCES:
12

13   For the Plaintiffs:    EDELSON PC
                             BY:  MR. JAY EDELSON
14                                MR. RYAN D. ANDREWS
                                  MS. SYDNEY M. JANZEN
15                           350 North LaSalle Street, 14th Floor
                             Chicago, IL  60654
16                           (312) 589-6375

17

18   For the Defendants:    D'AMBROSE P.C.
                             BY:  MS. DANIELLE C. D'AMBROSE
19                           500 North Michigan Avenue, Suite 600
                             Chicago, IL  60611
20                           (312) 396-4121

21

22

23
     Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 2102
25                          Chicago, Illinois  60604
                            (312) 435-5639
```

1    (The following proceedings were had in open court:)

2              THE CLERK:  18 C 1465, Mullen v. GLV.

3              MR. EDELSON:  Good morning, your Honor.  Jay Edelson

4    on behalf of the class.

5              MR. ANDREWS:  Ryan Andrews on behalf of the plaintiff

6    as well, your Honor.

7              MS. JANZEN:  Sidney Janzen on behalf of plaintiffs.

8              MS. D'AMBROSE:  And Danielle D'Ambrose on behalf of

9    the defendants.

10             THE COURT:  Okay.  So let me tell you why I set it

11   for a status hearing.

12             So I read what got filed by class counsel the other

13   day -- or yesterday, I guess it was.  And I'm also aware of

14   what I will call the history.  And the relevant aspect of the

15   history in this situation were I think what I can fairly call

16   arguably misleading efforts on the part of the defendants to

17   communicate with potential class members at earlier points of

18   the case.  So that would give kind of any reasonable person in

19   my position a suspicion that this wasn't just some

20   spontaneous -- "this" being what's described in the status

21   report -- wasn't just some spontaneous effort groundswell of

22   public opinion, if you will, on the part of potential class

23   members and that there's at least some reason to think that

24   there is a possibility that one or both -- one or more of the

25   defendants could be behind it.

1    When I say "the defendants," one of them is an

2  entity, so there could be any number of people acting on

3  behalf of that entity.

4    Now, the plaintiff didn't ask me to do anything at

5  this point, but I have a fiduciary duty to the class

6  completely independent of what plaintiffs counsel had.  And so

7  if where we end up here is we start trotting in Mr. Butler and

8  Ms. Butler and the people who -- the volleyball coaches that

9  work for them who liked it, quote, unquote, gave it a thumbs

10  up or whatever on Facebook, and anybody else who might have

11  information to figure out whether the impetus behind this is

12  traceable in any way, shape, or form back to a defendant in

13  this case or somebody on behalf of the defendant, then that's

14  what we are going to do.  Because I am going to get to the

15  bottom of this.  And I said it slowly for a reason.  I am

16  going to get to the bottom of this, and the chips are going to

17  fall where they fall.  Maybe there's nothing there, but if

18  there's something there, there's going to be hell to pay.

19  Hell to pay.  Okay?

20    So can you shed any light on this at all?

21    MS. D'AMBROSE:  I can, your Honor.  First, I would

22  like to address the coaches, that it says there's about seven

23  coaches who have liked it.

24    The Facebook page, at least to me, it's very private.

25  I can't see anyone who I am not friends with who has liked the

1  page. So I don't know which coaches they're talking about. I

2  don't know how they got that information of the coaches. Many

3  of the coaches are part-time coaches who also have kids in the

4  program who would also be considered --

5              THE COURT: Class members.

6              MS. D'AMBROSE: -- class members as well.

7              THE COURT: Okay.

8              MS. D'AMBROSE: On top of that, I would also like to

9  address the continuous theory that I, myself, along with my

10  clients, have somehow been forcing class members to give this

11  information out to provide misinformation, which I have seen

12  no misinformation --

13              THE COURT: Time out. When you say that -- you just

14  used the word continuing -- "continuous theory." Are you --

15  you're talking about what I just said?

16              MS. D'AMBROSE: No. It started --

17              THE COURT: Okay. So where is it in this paper that

18  the plaintiffs filed yesterday? Just show me where.

19              MS. D'AMBROSE: Which part?

20              THE COURT: You said that you're objecting to this

21  continuous theory that you are somehow behind this or counsel

22  were behind this. Do you see that --

23              MS. D'AMBROSE: Yes, footnote No. 1, they eventually

24  issued discovery to me personally as the attorney for

25  defendants.

1        THE COURT:  So I didn't -- when the plaintiff said,

2    "Plaintiff has subpoenaed Facebook for information regarding

3    the Facebook page and sent requests for production to

4    defendants and their counsel regarding the same," I took that

5    to mean a Rule 34 request.

6        MS. D'AMBROSE:  The following sentence says, "If the

7    facts are subsequently discovered to show defendants or their

8    counsel were involved" --

9        THE COURT:  It says "if."

10       Okay.  So I guess we are in the day and age where

11   raising -- saying "if" is the same thing as an accusation?

12   Maybe it is.  I mean, this is the day of fake news, I guess,

13   so...

14       MS. D'AMBROSE:  Well, I have also been issued

15   discovery as well, and this has also been brought up at the

16   beginning of the case as somehow counsel --

17       THE COURT:  When you say you have been issued

18   discovery, you mean you personally?

19       MS. D'AMBROSE:  It was to defendants and their

20   counsel, requesting that I produce documents on behalf of

21   myself, not just --

22       THE COURT:  Is that right?

23       MR. ANDREWS:  I don't believe so.  We have -- we sent

24   document requests for all communications amongst the

25   defendants and anyone who might have been involved --

1    THE COURT:  Because she is not a party to the case,
2  and so you can't -- you don't have to produce anything if you
3  get a Rule 34 request.  It would have to be a subpoena.
4    Now, you are the agent of your client, and so if you
5  are -- I mean, all requests for production go to the lawyer,
6  and it's pretty much the norm that the lawyer would have
7  documents, and the client can't get out of producing documents
8  by saying, well, I don't have them, my lawyer's got them.
9    MS. D'AMBROSE:  Sure.
10    THE COURT:  So are you telling me -- so you've now
11  said to me twice.  Are you telling me that somebody has
12  subpoenaed you for records or requested records for you in
13  your personal capacity as opposed to your capacity as an
14  attorney for the defendants?
15    MS. D'AMBROSE:  No, as my capacity as attorney for
16  the defendants.
17    THE COURT:  What's even the least bit untoward about
18  that?  I mean, you're saying that like this is some big,
19  sinister plot or something.
20    MS. D'AMBROSE:  Well, it started at the beginning of
21  the case.  It was the first motion I believe plaintiff filed.
22  It was essentially the same thing, saying that either the
23  counsel or the defendants were sending out misinformation,
24  emails.  And at that time, we also represented to the Court
25  that plaintiffs' -- or defense attorneys haven't sent out any

1  information.

2      THE COURT:  You notice when I was talking, I wasn't

3  talking about you.

4      MS. D'AMBROSE:  Yes.

5      THE COURT:  I was talking about the defendants.

6      MS. D'AMBROSE:  Correct.  And --

7      THE COURT:  Okay.  So let's just -- let's now focus

8  on what I asked you.

9      MS. D'AMBROSE:  Sure.

10      So in response to plaintiffs' motion for class

11  certification, plaintiffs' brief included a document which

12  contained, I believe, approximately 700 pages.

13      THE COURT:  Okay.

14      MS. D'AMBROSE:  In that document, there is actually

15  documentation of a very similar campaign that took place

16  in 2015.  There is an email that parents created called spry

17  or die.  That was kind of the slogan at the time.

18      THE COURT:  Say it again?

19      MS. D'AMBROSE:  Spry or die.

20      THE COURT:  What does "spry" mean?

21      MS. D'AMBROSE:  Spry is like the shorthand version

22  for sports performance.

23      THE COURT:  Oh, okay.  Got it.

24      MS. D'AMBROSE:  Parents created that Facebook -- or

25  the email address, shout out -- mass emails to people asking

1   for statements of support for Rick and Cheryl in light of the

2   same allegations that underlie this lawsuit from the same

3   people involved in this lawsuit.

4           THE COURT:  Okay.

5           MS. D'AMBROSE:  There was also a very similar

6   Facebook campaign that included screenshots of Facebook posts

7   in support with a hashtag "spry or die."

8           So while we're not -- defendants aren't

9   necessarily -- we're not behind this, we're not encouraging

10   it, but we're also not necessarily surprised by it because,

11   you know, this took place just in 2015.  I think it rolled

12   into 2016 as well.

13           Let's see what else I have.

14           Oh, the Facebook page, that it somehow is misleading,

15   the Facebook page was created -- I don't know who created it,

16   it doesn't say, but --

17           THE COURT:  To me, the question isn't whether it's

18   misleading, okay?  To me -- and I don't know what Mr. Edelson

19   and his colleagues have in their head.  I am not a mind

20   reader, okay?

21           I am going to tell you what's important to me.

22   What's important to me is whether a party to the case is

23   communicating or causing others to communicate with class

24   members in a way other than the only way that it's appropriate

25   to do that, which is through the notice that I approved after

1   it was litigated.  That's what I am concerned about, okay?
2             MS. D'AMBROSE:  Sure.
3             THE COURT:  That's what I'm concerned about.  So
4   let's focus on that.
5             MS. D'AMBROSE:  So since becoming involved in this
6   case, I know earlier on in the case, you had seen emails from
7   my clients pretty much from the day the lawsuit was filed or
8   the day after, before they had an attorney in the case.
9             THE COURT:  Yes.
10            MS. D'AMBROSE:  Ever since we became involved in the
11  case, I have not seen one bit -- they are -- they are very
12  careful about talking about anything.  They received emails
13  from class members regarding the opt-outs, regarding their
14  opinions on the lawsuit, and every email I've seen them
15  respond with is, I'm very sorry, I can't talk about this right
16  now, you know, thank you, something along those lines.
17            It's -- there is nothing to me that indicates that
18  there's any sort of misinformation or campaign that's backed
19  by Rick and Cheryl.  This is something that the class members
20  are aware of.  They've been -- they've been aware of these
21  allegations.  I think in 2015 was when ESPN's Outside the
22  Lines ran an episode on these allegations, and that's --
23            THE COURT:  I'm sorry.  I don't even know what that
24  is.  I'm not a --
25            MS. D'AMBROSE:  It's a TV show, and it was a TV show

1  that was --

2       THE COURT:  It's a documentary or something --

3       MS. D'AMBROSE:  Yes.  It interviewed the women.  And

4  I believe that's what started the 2015 campaign.

5       THE COURT:  Okay.

6       MS. D'AMBROSE:  So I think that it's not necessarily

7  surprising, but I do -- I can assure the Court that --

8       THE COURT:  Okay.

9       Mr. Edelson or your colleagues, anything you want to

10  tell me at this point?

11       MR. EDELSON:  Your Honor, the --

12       THE COURT:  Is there any -- is there any actual

13  reason to expect that you will actually get anything from

14  Facebook?  Don't they sort of routinely kind of -- isn't there

15  a Stored Communication Act issue on this stuff?

16       The lawyers are nodding.

17       MR. EDELSON:  No -- yes.  We have a number of privacy

18  cases against Facebook, so we have --

19       THE COURT:  So you're very familiar with that.

20       MR. EDELSON:  We're familiar with this.  We are

21  working through that with Facebook.  Facebook has initially

22  said that they are not going to give us information, but we

23  will figure that out one way or the other.

24       To be clear, we are not casting aspersions at

25  counsel, so I don't -- I don't understand that, but just so

1    the record is clear, that is not our concern.

2              I do want to clarify one thing.  The idea that these

3    are just coaches that happen to have kids in the program is

4    not true.  One of the people -- the coaches is Troy Glibb

5    (phonetic), who is the vice president of operations and the

6    boys' master coach.  So my understanding, and defendant --

7    counsel can correct me if I'm wrong, that means he runs the

8    whole boys program, and he liked or followed the page as well.

9              We strongly suspect that the club acting through the

10   coaches have been pushing this.  We've done -- we got through

11   some of the evidence we put in here and also in talking to

12   some of the class members.

13             But we're not asking your Honor for any relief now.

14   We wanted to tell you now because we didn't want to come back

15   in a month and say, by the way, we found out all this stuff

16   and you were upset with us.  All that we want to do is inform

17   the Court of what's going on.  We are also trying to get to

18   the bottom of it.  If it turns out to be nothing, that's

19   perfect.  If not, we will seek relief.

20             THE COURT:  What's the deadline in the notice for

21   when class members have to do something?

22             MS. D'AMBROSE:  April 19th.

23             THE COURT:  So that's about three weeks from now.

24   All right.

25             And the request for production that you sent to the

1    defendant was served when?

2              MS. JANZEN:  I believe it was the 22nd of March.

3              THE COURT:  So a week ago.  All right.

4              And is it -- I mean, I don't -- I don't know if you

5    gave it to me or not.  I don't think you did.

6              MS. JANZEN:  It's not in there.

7              THE COURT:  How many requests are in it?  It's like

8    one or two?

9              MS. JANZEN:  It's one -- yeah, it's very limited.

10             THE COURT:  The deadline for response to that is

11   shortened to a week from today.  In other words, the deadline

12   for response to the document request that's referenced in

13   footnote 1 of document number 116 is shortened to the 5th of

14   April.

15             I'm guessing you're going to know more in a couple of

16   weeks, so I am going to have you come back on April the 15th

17   at 9:30 for a status.

18             MS. D'AMBROSE:  Your Honor, I am out of town that

19   day.

20             THE COURT:  Just that day or is it the whole week?

21             MS. D'AMBROSE:  The 11th through the 15th.

22             THE COURT:  Okay.  Could you come in on the 16th?

23             MS. D'AMBROSE:  Yes.

24             THE COURT:  16th, 9:30.

25             So, you know, I think it's reasonable to assume --

1   for you to assume on the defense side that at some point,

2   whether it's asked for by anybody else or not, that I am going

3   to require the defendants to submit some sort of affidavit,

4   plural, affidavits, regarding their involvement or

5   non-involvement in any -- I mean directly or indirectly in any

6   communications with class members about the decision whether

7   to opt out or not.  So -- but I am not going to do that right

8   now, but just assume that that's going to happen.  So

9   everybody ought to either mind their Ps and Qs or continue to

10  mind their Ps and Qs, whichever the case may be.  Okay?

11          I'll see you on the 16th.

12          MR. ANDREWS:  Thank you, your Honor.

13          MS. D'AMBROSE:  Thank you.

14    (Which were all the proceedings had in the above-entitled

15  cause on the day and date aforesaid.)

16    I certify that the foregoing is a correct transcript from
    the record of proceedings in the above-entitled matter.
17

18  _____                    _____
    Carolyn R. Cox                              Date
    Official Court Reporter
19  Northern District of Illinois

20  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

21

22

23

24

25