1

```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3

 4   LAURA MULLEN, et al.,           )    Docket No. 18 C 1465
                                     )
 5                  Plaintiffs,      )
                                     )
 6           vs.                     )
                                     )
 7   GLV, INC., et al.,              )    Chicago, Illinois
                                     )    April 16, 2019
 8                  Defendants.      )    10:15 o'clock a.m.

 9
              TRANSCRIPT OF PROCEEDINGS - MOTION
10        BEFORE THE HONORABLE MATTHEW F. KENNELLY

11
     APPEARANCES:
12

13   For the Plaintiffs:    EDELSON PC
                             BY:  MR. ALFRED KIRKLAND MURRAY, II
14                                MR. RYAN D. ANDREWS
                                  MS. SYDNEY M. JANZEN
15                           350 North LaSalle Street, 14th Floor
                             Chicago, IL  60654
16                           (312) 589-6375

17

18   For the Defendants:    D'AMBROSE P.C.
                             BY:  MS. DANIELLE C. D'AMBROSE
19                           500 North Michigan Avenue, Suite 600
                             Chicago, IL  60611
20                           (312) 396-4121

21

22

23
     Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 2102
25                          Chicago, Illinois  60604
                            (312) 435-5639
```

1    (The following proceedings were had in open court:)

2            THE CLERK:  Case No. 18 C 1465, Mullen v. GLV, Inc.

3            THE COURT:  Good morning.

4            MR. ANDREWS:  Good morning, your Honor.  Ryan Andrews

5    on behalf of the plaintiffs.

6            MR. MURRAY:  Good morning, your Honor.  Alfred Murray

7    on behalf of the plaintiffs.

8            MS. JANZEN:  Good morning.  Sydney Janzen on behalf

9    of the plaintiffs.

10           MS. D'AMBROSE:  Good morning.  Danielle D'Ambrose on

11   behalf of the defendants.

12           THE COURT:  Okay.

13           MS. D'AMBROSE:  Your Honor, do you mind if I use my

14   computer just to refer to --

15           THE COURT:  It's quite all right.  Go ahead.

16           MS. D'AMBROSE:  Thank you.

17           THE COURT:  Okay.  So, Ms. D'Ambrose, looking at the

18   transcript from the last hearing, which is Exhibit 1 to the

19   status report that got filed by the plaintiff yesterday, so

20   this is the hearing on March the 29th, when you said

21   defendants -- I am going to read it the way it's in the

22   transcript:  So while we're not -- defendants aren't

23   necessarily -- were not behind this, we're not encouraging

24   it -- that's on page 8.  And when you told me on page 9:  They

25   are very careful about talking about anything.  They have

1    received emails from class members regarding the opt-outs,

2    regarding their opinions on the lawsuit.  And every email I've

3    seen them respond with is, I'm very sorry, I can't talk about

4    this right now, you know, thank you, something along these

5    lines.

6              Do you want to take the opportunity to correct what

7    you told me?

8              MS. D'AMBROSE:  Sure.

9              THE COURT:  Because it wasn't true.

10             MS. D'AMBROSE:  There were additional emails that

11   either I may not have seen or they said --

12             THE COURT:  So you don't read your incoming email

13   from your client?

14             MS. D'AMBROSE:  Oh, I do, the ones that I was aware

15   of at the time of the hearing.

16             THE COURT:  So when you got the email eight days

17   before the hearing, Thursday, March the 21st, at 1:13 p.m.,

18   from Mr. Glib, who is the vice president of operations, where

19   he, unsolicited, sends a communication to a significant

20   portion of the class members and cc's you on it, so there is

21   -- I see two possibilities here.  One is you didn't read it

22   and therefore you recklessly misled me, or that, number two,

23   you did read it and you deliberately misled me.  So which is

24   it?

25             MS. D'AMBROSE:  Your Honor, would you just point out

4

1    which page --

2              THE COURT:  It's page 34 of -- in the lower

3    right-hand corner of Exhibit 4, page 34.

4              MS. D'AMBROSE:  Okay.

5              THE COURT:  You responded to it 20 minutes later, I

6    might add.

7              MS. D'AMBROSE:  Correct.

8              THE COURT:  So alternative one is off the table.

9              MS. D'AMBROSE:  But it happened -- I believe it

10   happened -- I did not see that there was another email below

11   that.  I looked at -- I was forwarded the email that said,

12   Troy, I would like the correspondence about the court case --

13             THE COURT:  Are you telling me that the -- are you

14   telling me that Mr. -- is it Glib -- it's Gilb, I guess --

15             MS. D'AMBROSE:  Gilb.

16             THE COURT:  -- G-i-l-b.  Are you telling me that

17   Mr. Gilb's communication to SPVB boys, parents, and players

18   that is in the email string, that you didn't get that?

19             MS. D'AMBROSE:  It would have been below that email

20   that he had forwarded me.

21             THE COURT:  So did you hear my question?

22             MS. D'AMBROSE:  Yes.

23             THE COURT:  Answer it.

24             MS. D'AMBROSE:  That I did not --

25             THE COURT:  Did you get it?

1          MS. D'AMBROSE:  I received it.

2          THE COURT:  Okay.  So then you deliberately lied to

3   me.

4          MS. D'AMBROSE:  I did not deliberately.

5          THE COURT:  So it was reckless then, because you

6   didn't read the whole email?

7          MS. D'AMBROSE:  If those are my only two options,

8   then, yes.

9          THE COURT:  What other option can you think of?

10  Gross negligence, maybe?

11         MS. D'AMBROSE:  It was --

12         THE COURT:  Tell me.  Tell me what other explanation

13  there is.

14         MS. D'AMBROSE:  There really isn't, your Honor, and I

15  apologize.  I was focused on the first email --

16         THE COURT:  Did you ever tell your clients that they

17  are not supposed to communicate with class members about class

18  certification?

19         MS. D'AMBROSE:  Yes.

20         THE COURT:  Because these people are all -- until

21  they opt out, they are all clients of the plaintiff.  These

22  people and your -- and the vice president of operations of

23  your client is directly communicating, with your knowledge,

24  with your knowledge, because it's right here in the email,

25  with members of the class.  I cannot -- I do not know the

1  theory on which that's appropriate.  Do you have one?

2       MS. D'AMBROSE:  No, your Honor.  I did not know --

3       THE COURT:  So since this has now been called to your

4  attention, have you done anything to try to instruct your

5  clients what they're supposed to do and what they may not do?

6       MS. D'AMBROSE:  Yes.

7       THE COURT:  Or should I bring them all in here and

8  trot the whole executive staff in here and explain it to them

9  one by one and explain that one of their options is they leave

10  the courtroom through the side door?  Do you know where the

11  side door goes?

12       MS. D'AMBROSE:  No, your Honor.

13       THE COURT:  It's a jail cell.  So do I need to bring

14  them all in here or what have you done to correct this

15  problem?

16       MS. D'AMBROSE:  No.  I have spoken on the phone.  I

17  have called all the heads of the programs.  I have spoken with

18  Rick and Cheryl.

19       THE COURT:  Did you talk to this guy?

20       MS. D'AMBROSE:  Yes, I talked to him.

21       THE COURT:  What did you tell him?

22       MS. D'AMBROSE:  I told him that he should not be

23  communicating with class members.

24       THE COURT:  What did he say?

25       MS. D'AMBROSE:  He said that this was in response to

1  being called and being approached by numerous class members
2  who were --
3          THE COURT:  So he didn't say okay; he had an --
4          MS. D'AMBROSE:  Oh.
5          THE COURT:  -- he had an explanation?
6          MS. D'AMBROSE:  He did say that he would no longer
7  communicate with them, but he also explained what -- why he
8  had sent out the email in the first place.
9          THE COURT:  So can you think of any theory on which
10 it was appropriate for him to do this, legally appropriate for
11 him to do this, given the fact that I had already certified a
12 class at that point?
13         MS. D'AMBROSE:  No, your Honor, I don't believe it
14 was appropriate.
15         THE COURT:  Okay.  So now we're going to be talking
16 about once the plaintiffs have finished, you know, doing
17 whatever they're doing discovery-wise, we are going to be
18 talking about what do I do about it.  It's not what, if
19 anything, do I do about it.  It's what do I do about it.
20         So what has been -- what has been the -- have you
21 gotten started to get opt-outs yet?
22         MR. ANDREWS:  Yes, we have, your Honor.
23         THE COURT:  Ballpark, how many?
24         MR. ANDREWS:  As of last week, there were 93, but
25 that's slightly not the actual number because several of them

1   are duplicates.  They are from both parents.

2           THE COURT:  So it's no more than 93.

3           MR. ANDREWS:  We got -- no.  We got about

4   140-something this morning.  Several of those are duplicates

5   too.  They literally came in as I was on the way here, so I

6   haven't had a chance to go through the whole file.  Several of

7   them -- lots of them --

8           THE COURT:  It's 10:30.  They all came in today?

9           MR. ANDREWS:  We requested them from the settlement

10  administrator last night --

11          THE COURT:  Oh, okay --

12          MR. ANDREWS:  -- in anticipation of this hearing, and

13  they got them to us.

14          THE COURT:  So they've been coming in, but they

15  didn't all get submitted --

16          MR. ANDREWS:  No.

17          THE COURT:  -- to the administrator at the same time?

18  You --

19          MR. ANDREWS:  No.  They come every -- yeah, they come

20  every week.  First week, there were 63.  Week after that,

21  there were 93.  The last batch, there was 140-something.

22          THE COURT:  Okay.  So that's about 300-ish.

23          MR. ANDREWS:  No, there's only 238 total, several of

24  which at least of the ones I've gone through, have been

25  duplicates, or both --

1          THE COURT:  Oh, I added all numbers.  I should have
2    only added two of the numbers.
3          MR. ANDREWS:  Correct.  238 pieces of paper.
4          THE COURT:  Stop talking.
5          MR. ANDREWS:  Okay.
6          THE COURT:  238 before you eliminate the duplicates?
7          MR. ANDREWS:  Correct.
8          THE COURT:  Okay.  And what's the deadline for
9    opt-outs?
10          MR. ANDREWS:  This Friday.
11          THE COURT:  This Friday.
12          And what was the total number of people that got
13    notice?  Do we know?
14          MS. JANZEN:  It was 1900-something.
15          THE COURT:  Okay.
16          MS. D'AMBROSE:  Your Honor, on that point, there were
17    also duplicates in that total number as well.  I believe the
18    actual number, I think, by my calculation, it's about 1300
19    without the duplicates.
20          THE COURT:  Oh, okay.  So some people sent it in like
21    five times?
22          You are talking about in the number -- in the mail --
23    in the number to whom notice was sent.
24          MS. D'AMBROSE:  Yes, the amount of households,
25    essentially.

1          THE COURT:  It's actually 1300 you said.

2          MS. D'AMBROSE:  Approximately.

3          THE COURT:  Okay.  Because there were duplicates

4   there too.

5          MS. D'AMBROSE:  I believe so, yes.

6          THE COURT:  Okay.  So the deadline is Friday.  And so

7   when do you expect to -- in the ordinary course, you'd

8   probably talk to the administrator the first of the week, and

9   they'd send you -- they'd update you on everything, and then

10  you'll know what the number is.

11         MR. ANDREWS:  Yeah, we generally get a status report

12  that tells us how many opt-outs.  We don't usually actually

13  ever request the opt-outs until much later, but we've been

14  getting them, you know, as a matter --

15         THE COURT:  Who does the dedup'ing?  Is it you or is

16  it the administrator?

17         MR. ANDREWS:  They will.  They haven't processed them

18  yet, your Honor.

19         THE COURT:  All right.  And so in terms of what I'll

20  just call the gathering of information regarding

21  communications by defendants or people associated with them,

22  including the entity, and class members, what more is there

23  for you to do at this point?

24         MR. ANDREWS:  We are still waiting to hear back from

25  Facebook.  Facebook --

1       THE COURT:  Oh, that's right.  You put that in the
2   status report.
3       MR. ANDREWS:  Correct.  Facebook agreed to produce
4   whoever is the host or the administrator of the Facebook page
5   that has the Google Doc.  That's the form that several class
6   members have been using.  That's coming on April 30th, I
7   believe.  The person -- the administrator, I believe, by now
8   has been given notice by Facebook and probably --
9       THE COURT:  They have until X date to object or
10  something?
11      MR. ANDREWS:  Yes.  They can file a motion to quash
12  it, I believe.
13      THE COURT:  Oh, okay.  That's -- got it.
14      And Facebook will be looking to see whether that
15  motion gets filed.  If it does, they are going to hold off.
16  If it doesn't, they are going to go ahead and give you that
17  stuff.
18      MR. ANDREWS:  I believe that is what Facebook is
19  saying, yes.
20      THE COURT:  And what is it you expect to get from
21  Facebook, assuming that they tell you something?
22      MR. ANDREWS:  So Facebook is going to tell us which
23  Facebook member operates the parents against --
24      THE COURT:  Will you get a screen name, or will you
25  get an actual name, or do you know?

1   MS. JANZEN:  They told us basic subscriber

2 information, so I'm assuming that includes --

3   THE COURT:  So it will be a name.

4   MS. JANZEN:  -- of the -- yes.

5   THE COURT:  All right.  Okay.  And so that would be

6 the 30th.  Okay.

7   So it seems to me that what I ought to be doing is

8 setting you for a status sometime in the early part of May

9 then.  By then, you'll have the total universe of opt-outs,

10 you will have had a chance to deduplicate them, you have

11 either gotten what you are going to get from Facebook or I

12 will see a motion to quash.  Does that make sense, for a date

13 in early May?

14   Okay.  Give me a sec here.

15   MS. D'AMBROSE:  Your Honor, may I ask a question?

16   THE COURT:  Sure.

17   MS. D'AMBROSE:  Just to make sure that I am being

18 abundantly clear with my clients.  If they listed an email

19 asking a parent that --

20   THE COURT:  I tell you what.  So here's what we're

21 going to do at this point.  I take back my "sure."  If you've

22 got something, if you want clarification, you file something.

23   MS. D'AMBROSE:  Okay.

24   THE COURT:  You put it in writing.  You tell me

25 exactly what you want to know, and then I'll respond to it.

1    Respectfully, that should have been done a long, long time
2    ago, particularly given the earlier history in this case as I
3    discussed on March the 29th.  That should have -- any request
4    for clarification should have been done a long, long time ago.
5          And I would also suggest to you that -- and I am not
6    saying that it wasn't done, because I don't know, but people
7    should have been instructed -- by "people," I mean the
8    defendants, the individual defendants and the corporate
9    defendant and the people acting on its behalf -- ought to have
10   been instructed at the time of the class certification, the
11   rules have now changed, this is what you may not do.  And it
12   doesn't sound -- either that wasn't done, or it was done and
13   it was ignored, or it was done incompletely or incorrectly.
14   None of those alternatives is a good one for your side of the
15   case or for you.
16          MS. D'AMBROSE:  Understood.
17          THE COURT:  So if you want clarification, put it in
18   writing, and don't delay.
19          MS. D'AMBROSE:  Will do.
20          THE COURT:  I'm here.  Okay?  Except for a few days
21   next week.
22          Can you come in on May the 8th at 9:30?
23          MS. D'AMBROSE:  That's no problem for me.
24          MR. MURRAY:  Yes, your Honor.
25          MS. JANZEN:  That should work for us.

1    THE COURT:  See you then.  Thanks.

2    MR. ANDREWS:  Your Honor, we have two other motions

3    up in this case.

4    THE COURT:  Oh, that's right.  The stuff that I

5    advanced from the other day.

6    There is a motion for a confidentiality order, right?

7    MR. ANDREWS:  Correct.

8    MR. MURRAY:  Correct.

9    THE COURT:  Is there any objection to that?

10    MS. D'AMBROSE:  I have an objection, your Honor.

11    Given the publicity --

12    THE COURT:  Let me just pull it up here.  Hold on one

13    sec.  Go ahead.

14    MS. D'AMBROSE:  Given the very high publicity of

15    these allegations from the accusers themselves that is going

16    back 20-plus years, including the publicity of the allegations

17    that were detailed in the first 50 pages of the complaint, and

18    the fact that even plaintiffs' counsel has appeared on

19    television shows discussing additional details --

20    THE COURT:  Well, if it's not Law & Order, I haven't

21    seen it.

22    MS. D'AMBROSE:  It was Inside Edition.  I believe

23    there's some news -- local news stations.  As I said last time

24    in court, the accusers were on ESPN.  There are dozens and

25    dozens of newspaper articles that detail the allegations.  I

1  think an order of confidentiality only works to prejudice

2  defendants' ability to defend themselves.  And given the --

3       THE COURT:  So what specifically is it that you're

4  asking to be covered by the confidentiality order?

5       MS. JANZEN:  So, your Honor, there's several

6  categories of information.  The first four are what's in the

7  model confidentiality order.

8       THE COURT:  That's not the question.  Seriously.  The

9  question I asked, what are you asking to protect?  I don't

10  care whether it's in the model order or not.

11       MS. JANZEN:  The first category of information is all

12  information prohibited from disclosure by statute.

13       The second is all medical information concerning any

14  individual.

15       The third is all personal identity information.

16       Fourth is all financial information concerning any

17  individual.

18       The fifth, and I think this is where we start to get

19  into what defense counsel is talking about, is on anything

20  likely to create an inference --

21       THE COURT:  I will tell you the reason I'm asking you

22  this question is although you said you sent this thing to my

23  proposed order email address, I ain't got it.

24       When did you send it?

25       MS. JANZEN:  Oh.  I sent it on Friday when I filed

1   the motion, your Honor.  But I have a copy here, if you'd like
2   to see it.
3            THE COURT:  It's not here.  I am looking at the
4   entire inbox.  There's nothing from Friday.  So give it to me.
5   Give it to her.
6            MS. JANZEN:  Okay.  Thank you.
7            THE COURT:  So what page should I be looking at for
8   this?
9            MS. JANZEN:  So in the --
10           THE COURT:  The definition of "confidential," of
11  what's characterized --
12           MS. JANZEN:  It's page 2, paragraph 2(a).
13           THE COURT:  2(a).  Information prohibited from
14  disclosure by statute, medical information concerning an
15  individual, personal identity information, financial
16  information, any information identifying the Jane Doe, and
17  sensitive administration concerning experience of the victims
18  of sexual abuse.
19           MS. JANZEN:  And then I would also point you to
20  paragraph 2-C on the next page at the top, for attorneys' eyes
21  only, a designation for communications sent by or between
22  victims.
23           THE COURT:  Okay.  Now let me get back to you,
24  Ms. D'Ambrose.
25           MS. D'AMBROSE:  Yes.

1       THE COURT:  So you're saying -- so tell me how you

2  think this prejudices you, your clients?

3       MS. D'AMBROSE:  I believe first it creates another

4  hurdle for defendants to be able to produce and to argue

5  documents that may exonerate certain parts of the case.  I

6  believe that it will inhibit defendants' ability to challenge

7  the allegations, to be able to --

8       THE COURT:  Why?  It just means you have to file

9  stuff under seal.  I mean, the only category that really

10  restricts filing of anything or presenting things to me is the

11  attorneys' eyes only, and even that doesn't restrict filing

12  stuff.  It just talks about how it has to be filed.

13       MS. D'AMBROSE:  Well, I think if it's -- to me, it

14  seems -- if I can use the word "unfair" that plaintiff and the

15  woman that's discussed in plaintiffs' complaint have been able

16  to smear my clients' names on every public outlet that would

17  listen, and that when it comes to defendants' ability to

18  defend themselves and to be able to, you know, put that

19  information in a public filing in response to a very public

20  complaint on very public allegations, I think that it's highly

21  prejudicial to defendants' overall defense.

22       THE COURT:  Well, I guess I will just make an

23  observation that nobody -- by "nobody," I mean you -- you have

24  never asked me to -- you've never come in on any kind of a

25  motion or request asking me to restrict what counsel can say

1   about this.

2           MS. D'AMBROSE:  That's true.

3           THE COURT:  Okay.  So --

4           MS. D'AMBROSE:  Can I --

5           THE COURT:  I guess what -- and I don't watch Inside

6   Edition, I don't know what was said, and like I say, nobody's

7   ever told me what was said because I haven't been asked to do

8   anything about it.  But assuming what was said has something

9   to do with the allegations regarding sexual abuse, I'm not

10  sure why the fact that that has been discussed publicly would

11  or ought to have any impact on whether somebody's tax returns

12  can be discussed in the public record or whether their Social

13  Security number can be put in the public record or whether

14  a W-2 form can be put in the public record or whether some

15  medical treatment document from a doctor can be put in the

16  public record.  We are talking about apples and, let's say,

17  guavas.

18          MS. D'AMBROSE:  I agree.  On those aspects of it,

19  that's fine.  I'm specifically more focused on I think it was

20  subparts --

21          THE COURT:  Maybe 5 and 6.

22          MS. D'AMBROSE:  -- 5 and 6, where, you know, any

23  information relating or referring identifying -- are

24  reasonably likely to create an inference identifying the

25  identity of Jane Doe.

1    THE COURT:  But how is it going to hurt you from -- I

2   mean, that part of the protective order just says that it has

3   to be filed under seal.  And you can -- I'm assuming there's

4   something -- I mean, you know, this thing is 15 pages long, I

5   haven't had a chance to look at it, but I know that the model

6   protective order basically allows challenges to this, and it

7   provides when there is a challenge made to the designation of

8   something confidential, that the party that's requesting

9   confidentiality has the burden of justifying it.

10   So, I mean, like I say, it doesn't prevent you from

11   filing anything.  It just means you have to -- it's more

12   cumbersome.  Ask the lawyers in the next case about that.  I

13   am about to chew them out for not doing it right.  Preview.

14   It's just -- it's more cumbersome to file stuff, but --

15   MS. D'AMBROSE:  I agree with that point, and I think

16   specifically No. 6 is very, very broad, and just knowing how

17   this case has --

18   THE COURT:  Okay.  So talk to me about No. 6.  It's

19   pretty vague.

20   MS. JANZEN:  So, your Honor, I just want to make a

21   note that both in paragraph 2(a) and 2-B, it says, Information

22   or documents that are already available to the public may not

23   be designated as confidential.

24   THE COURT:  I read that, but just talk to me about

25   point 6.

1        MS. JANZEN:  So where this stems from is we had

2   received discovery requests from defendants that could include

3   communications from or between victims of the alleged abuse.

4        THE COURT:  Okay.

5        MS. JANZEN:  And the idea is that those victims feel

6   like they need a safe space to talk about their abuse in a way

7   that has not been talked about publicly among each other or to

8   advocates for them.  And the idea of that, especially with the

9   information that we've asked to be attorneys' eyes only, that

10  they're alleged abuser would be able to see that

11  information --

12       THE COURT:  Wait a second then.  The way you

13  described 2(a)(6) sounds like 2(c).

14       MS. JANZEN:  It is similar.  I just think in some --

15       THE COURT:  So what's the difference between the two?

16       MS. JANZEN:  I guess in abundance of caution.  It's

17  more so (c)(1) is the main category of information here.

18       THE COURT:  Yeah, so let me tell you what I see the

19  potential problem being on that, on (c)(1).

20       So I know that one of the other motions that's up --

21  and maybe it's up today, or maybe it's up next week, I don't

22  know -- is something asking me to order Mr. Butler to answer

23  an interrogatory.  Is that one of the things up today?

24       MS. D'AMBROSE:  Yes.

25       MS. JANZEN:  Correct.

1         THE COURT:  Okay.  So, basically, on the attorneys'

2    eyes only category here, (c)(1), that involves communications

3    among people who are claimed to be the victims of sexual abuse

4    by him, which is what interrogatory 1 is about.  So we know

5    that that's an issue in the case.  We know you want to ask him

6    about it.  Okay?

7         So what's the theory on which it makes sense for me

8    not to permit the lawyers to even show that to the client that

9    you're going to ask about it?

10        MS. JANZEN:  I think this is a little more narrow

11   than that.  I think this deals --

12        THE COURT:  Communications sent to, received from, or

13   exchanged between and among any victims of Rick Butler's

14   alleged sexual abuse, dot, dot, dot.

15        MS. JANZEN:  So the idea here is that the alleged

16   victims of the abuse may have communications amongst

17   themselves --

18        THE COURT:  Wait a second.

19        MS. JANZEN:  -- or in a group -- group text or some

20   scenario like that about the alleged abuse.

21        THE COURT:  Yeah, I mean, I get that, but the

22   question is why shouldn't the defendants' lawyer be able to

23   talk to the defendants about what the victims are saying about

24   him?

25        MS. JANZEN:  The idea that --

1    THE COURT:  Okay.  You are not going to be able to

2 convince me.  I am not approving 2(c).  You are going to have

3 to build that into 2(a).  I am not approving 2(c).  I don't

4 believe there is a basis for that kind of attorneys' eyes only

5 order in this case.

6    I mean, you see that sometimes in, for example, cases

7 involving competitors where one side isn't allowed to see the

8 other side's trade secrets because they are competitors of

9 each other.

10    Here you are talking about what people allegedly said

11 about what the defendant did to them, and it's one of the

12 issues in the case that you want to ask the defendant about.

13 I cannot imagine an appropriate theory to approve that.

14    So paragraph 2(c) is disapproved.  The rest of it is

15 fine.  Take out 2(c).  If you want to build 2(c) into 2(a) so

16 it's just the confidential, that's fine too, but there's not

17 going to be any attorneys' eyes only.  So you'll have to take

18 all the AEO stuff out of it and give me a new version of it.

19    So the motion for protective order is granted as

20 modified.

21    MS. D'AMBROSE:  Your Honor, may I point out one

22 thing?

23    THE COURT:  Yeah.

24    MS. D'AMBROSE:  (A)(6), I believe you had said -- I

25 thought it was very broad.  I just wanted to see if there was

1  any possibility to --

2        THE COURT:  I'd do my best to come up with a more

3  specific term than "sensitive information."  I mean, that

4  might mean 15 things to 15 people, okay?  You know, where this

5  is -- yeah, just try to clear that up a little bit.

6        So it's granted as modified, but I am going to wait

7  to see the modified version before I approve anything.

8        On interrogatory No. 1 -- I need to move on to the

9  next thing -- I am going to give you time to file a written

10  response on that.

11        MS. D'AMBROSE:  That's fine.  One other point.  The

12  discovery is due tomorrow.

13        THE COURT:  Which discovery?  The stuff that you're

14  producing under the protective order?

15        MS. D'AMBROSE:  Yes.

16        THE COURT:  You are not going to produce it until the

17  protective order is in place, so that means you are going to

18  work fast.

19        MS. D'AMBROSE:  Correct.

20        THE COURT:  I am getting a revised version --

21        MR. D'AMBROSE:  They haven't produced what it is not

22  subject to, this protective order.

23        MS. JANZEN:  We'll, of course, produce information

24  that wouldn't be subject to the protective order.

25        THE COURT:  There you go.

1    Okay.  So on the motion to compel, it's interrogatory
2  No. 1 or something like that.  Pam, this is docket number --
3    MS. D'AMBROSE:  I could probably dispose of this one
4  relatively quickly.
5    THE COURT:  Go for it.
6    MS. D'AMBROSE:  There is no one else, so I could
7  just -- they were looking to see if there was anybody else I
8  objected to that -- I didn't think it was relevant that any
9  legal consensual relationship be subject to discovery.  But
10  instead of briefing it --
11    THE COURT:  You've lost me.
12    MS. D'AMBROSE:  The argument is that I objected to
13  the request for any and all -- I believe it was any and all
14  sexual advances, romantic relationships, or sexual contact, I
15  believe, with any person under the age of 18 or anyone who was
16  a player.  I objected saying anyone who is under the age of 18
17  was outside the scope of the discovery, but I can provide an
18  amended answer.
19    THE COURT:  Fine.  So then I am going to enter and
20  continue that motion based on the commitment to provide an
21  amended answer.  Do the amended answer within a week.
22    What else is on the table?
23    MS. D'AMBROSE:  I had filed a motion to strike the
24  joint -- or the status report that was filed.
25    THE COURT:  Oh.  There must not have been --

1        MS. D'AMBROSE:  I filed it this morning.  I just got

2   back into town late at night.  It's up next Tuesday.

3        THE COURT:  I am looking at it.  It's denied.  It may

4   be facially inflammatory, but the proposition that it, quote,

5   has no proper place before this Court, dead wrong.  Okay?

6        The motion is denied.  So we will strike the date of

7   next week.

8        Today was a status hearing too, so I think just to

9   make sure that we are moving along here, I am going to set it

10  out just two weeks, April 30th.  Does that day work okay?

11  9:30?

12       MR. ANDREWS:  So not the May 8th date?

13       MR. MURRAY:  You had previously given us --

14       MS. JANZEN:  We have a status on May 8th that you set

15  at the beginning of the call.

16       THE COURT:  That's right.  Then forget -- let's keep

17  it at May 8th then.  We have been talking so long, I already

18  forgot what I said at the beginning.  That's great.

19       See you in May.  Take care.

20       MR. ANDREWS:  Thank you, your Honor.

21       MS. D'AMBROSE:  Thank you.

22    (Which were all the proceedings had in the above-entitled

23  cause on the day and date aforesaid.)

24

25

1      I certify that the foregoing is a correct transcript from
the record of proceedings in the above-entitled matter.

2

3   Carolyn R. Cox              Date
Official Court Reporter

4   Northern District of Illinois

5   /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25