**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| LAURA MULLEN, individually and on behalf of all others similarly situated, | |
| *Plaintiff,* | |
| v. | Case No. 18-cv-1465 |
| GLV, INC., d/b/a SPORTS PERFORMANCE VOLLEYBALL CLUB and GREAT LAKES CENTER, an Illinois corporation, RICKY BUTLER, an individual, and CHERYL BUTLER, an individual, | Honorable Matthew F. Kennelly |
| *Defendants.* | |

## DEFENDANTS' RESPONSE TO PLAINTIFF'S MOTION FOR SANCTIONS

Dated:  July 8, 2019

Danielle D'Ambrose
D'AMBROSE P.C.
500 North Michigan Avenue, Suite 600
Chicago, IL 60611
(312) 396-4121
ARDC No. 6323782

Attorney for Defendants
*Rick Butler, Cheryl Butler, and*
*GLV, Inc. d/b/a Sports Performance Volleyball Club*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**.................................................................................................ii

**I.      HISTORY OF PLAINTIFF MISREPRESENTING FACTS TO THE COURT**........1

**II.     PLAINTIFF CONTINUES HER PATTERN OF PROVIDING MISLEADING
         INFORMATION TO THE COURT IN HER MOTION FOR SANCTIONS**............5

     **A.**   **Plaintiff Has Not Provided Any Proof that Defendants Had a Scheme to
         Encourage or Coerce Class Members to Opt Out**................................................6

     **B.**   **Plaintiff's Plaintiff Grossly Misrepresents the Nature and the Context
         of the Communications Between Defendants and the Class**............................7

     **C.**   **The Defendants Cannot be Held Responsible for Actions of Class
         Members Over Which They had No Control**......................................................12

     **D.**   **Defense Counsel Acted in Good Faith and Did Not Mislead the Court**.........15

          **1.**   **Defense Counsel Did Not Knowingly Make a False Statement to
              the Court**....................................................................................................15

          **2.**   **Defense Counsel's Communication with a Class Member During
              the Opt Out Period Was Justified and Made for a Proper Purpose**...18

**CONCLUSION**.................................................................................................................19

## <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases:**

*National Hockey League v. Metropolitan Hockey Club, Inc.,*
 427 U.S. 639 (1976) ............................................................................................14

**United States Court of Appeals Cases:**

*Marrocoo v. General Motors Corp.,*
 966 F.2d 220 (7th Cir.1992) ...............................................................................14

**United States District Court Cases:**

*Blanchard v. EdgeMark Fin. Corp.,*
 175 F.R.D. 293 (N.D. Ill. 1997) .........................................................................15

*Piekarski v. Amedisys Ill., LLC,*
 4 F. Supp. 3d 952 (N.D. Ill. 2013) .....................................................................13

**Rules and Statutory Authorities:**

Ill. R. Prof'l Conduct 3.3(a)(1) ...............................................................................17

Plaintiff's Motion for Sanctions is a blatant attempt to mislead this Court and cast Defendants in a false and negative light, which is consistent with her actions since the inception of this litigation. Plaintiff fails to provide any communications which support her broad allegations that Defendants orchestrated a scheme to encourage and coerce class member opt outs. Rather, Plaintiff manipulates the evidence in a bad faith attempt to argue in favor of sanctions against Defendants, and her motion should be denied for the following reasons:

## I. HISTORY OF PLAINTIFF MISREPRESENTING FACTS TO THE COURT

Beginning with her Complaint and continuing through the filing of her Motion for Sanctions, Plaintiff has repeatedly and intentionally misrepresented facts to this Court in order to cast Defendants in a false light. In her Complaint, Plaintiff stated that, "for over three decades, Rick Butler has used his position to sexually abuse no fewer than six underage teenage girls, and likely many more," despite now *admitting* she is unaware of any allegation made against Rick Butler in the last three decades. (Dkt. 1, ¶ 1; Dkt. 144, Ex. D, No. 33-34) Shortly thereafter, Plaintiff filed a Motion for Leave to Propound Limited Expedited Discovery, where Plaintiff advanced false accusations, such as that the Defendants were illegally transferring assets to Brazil and traveling overseas to set up a new volleyball business. (Dkt. 17, p. 2) Plaintiff also alleged falsely that the Defendants were improperly communicating with class members by disparaging the lawsuit and calling the lawsuit frivolous. (Dkt. 17, p. 5)

Plaintiff's only evidence of the alleged "misconduct" mentioned in her Motion for Leave to Propound Limited Expedited Discovery was in the form of a declaration submitted by her attorney, Jay Edelson, claiming that he "heard from individuals" and was "informed by a third party" about the information complained of in the motion. (Dkt. 17, Ex. 3, ¶¶ 5, 7) Notably, Mr. Edelson failed to identify any source of the information. *Id.* It is now clear that Laura Mullen was

circulating those rumors on Volley Talk about Defendants moving to another country, posting about it several times both before and after the filing of Plaintiff's motion seeking expedited discovery. *Group Exhibit C*. In fact, Defendants have been unable to identify any user *besides* Mullen who perpetuated this false information. *Id.* Defendants filed a Motion to Strike Mr. Edelson's improper Declaration, as it was based on hearsay and allegations from undisclosed third parties. (Dkt. 19) After Defendants filed a Motion to Strike the Declaration of Jay Edelson, Plaintiff abandoned all but one allegation – that Defendants and their counsel were improperly communicating with members of the class. The Court allowed Plaintiff to proceed with Discovery on that issue. In her motion for expedited discovery, Plaintiff also falsely alleged that defense counsel was "possibly" guilty of the same misconduct, again without providing the Court with a single fact or piece of evidence in support of the allegation. (Dkt. 17, p. 4) After 15 months of Plaintiff repeatedly accusing defense counsel of improperly communicating with the class, Plaintiff now points to a single communication from April of 2019 which contains no evidence of an improper motive.

Plaintiff's Motion to Compel and for Entry of Protective Order, filed on June 8, 2018, contained nearly identical arguments to those set forth in her Motion for Sanctions, with Plaintiff asking the Court for an Order finding, among other things, that Defendants and their counsel engaged in improper communications with putative class members. (Dkt. 48, p. 1) Defendants' Response to the Motion to Compel argued, as they do here, that "[i]t has become overwhelmingly clear that Plaintiff's desire to destroy Defendants' business and reputation far exceeds her desire to prevail in this suit. Plaintiff and her attorneys have established a pattern of grossly misstating the law, mischaracterizing communications with Defendants' counsel, and abusing the discovery process." (Dkt. 64, p. 1)

2

Plaintiff's pattern of constructing a false narrative continued on March 27, 2019, the Plaintiff filed a "Notice Regarding Class Notice," which was a blatant attempt to influence the Court with the false narrative that Defendants were responsible for the Facebook Page and mass emails sent by class members about the Class Notice. (Dkt. 116) Plaintiff's allegations were wholly unsubstantiated. On April 15, 2019, Plaintiff again, without leave of Court, filed a "Status Report Regarding Class Notice". (Dkt. 123) The one-sided Report was deliberately filed the day before the scheduled status hearing, which ensured that Defendants would not have time to file a substantive response. (Dkt. 124) Much like in Plaintiff's Motion for Sanctions, Mullen provided the Court with select excerpts of emails without proper context in a blatant attempt to construe those statements as improper. Plaintiff filed a Motion to Strike the Report (Dkt. 125) in the morning of April 16, 2019, just prior to the 9:30 a.m. hearing, which was later denied. (Dkt. 127)

On May 7, 2019, again just one day prior to a previously-scheduled status hearing set for May 8, 2019, Plaintiff filed an 89-page "Status Report Regarding Class Notice" at 7:07 p.m., again ensuring that Defendants would not have any opportunity to respond. (Dkt. 139) The Report followed Plaintiff's pattern of deliberate misconstruction of communications in an attempt to mislead the Court and prejudice Defendants by casting them in a false light immediately prior to each Court hearing. *Id*. Plaintiff's inexcusable gamesmanship has wasted the resources of the Court, and counsel's conduct is unbecoming of the profession.

## II.   PLAINTIFF CONTINUES HER PATTERN OF PROVIDING MISLEADING INFORMATION TO THE COURT IN HER MOTION FOR SANCTIONS

Plaintiff has concocted a theory that Defendants have encouraged and coerced opt outs from class members who wish to "stay in good standing with Defendants." (Dkt. 143, p. 15)

First, there has been no coercion of class member to opt out of this litigation. Second, this theory is nonsensical. Plaintiff does not even attempt to rationalize how, if class members believe

3

the allegations in her Complaint, they could also have "undoubtedly felt coerced into opting out by Defendants and their proxies in order to stay in good standing with Defendants." (Dkt. 143, p. 15) Plaintiff claims that these parents want so badly for their children to *remain* in the Sports Performance program, make top teams (such as the team trained by Rick Butler), get more "game time," and remain a "friend" in the "Defendants' eyes" that they have been coerced against their will to opt-out of the litigation which seeks to cancel their contracts and end their relationships with the program. (Dkt. 143, p. 15) Plaintiff does not and cannot answer how, if these class members believed that Rick Butler was a "child sexual predator," those same individuals would still belong to the program. (Dkt. 1, ¶ 4) Even assuming, *arguendo*, that, for each of the emails contained in Plaintiff's Motion for Sanctions, Defendants' responses were "improper" as Plaintiff contends, they still do not evidence the existence of any plan or scheme to coerce opt outs. In seeking sanctions against the Defendants, Plaintiff acknowledges that she "bears the burden of establishing a clear record of misleading, coercive, or abusive communications with the class that threaten the proper course of the litigation." (Dkt. 143, p. 12) The evidence Plaintiff provides in support of her motion falls woefully short of meeting this burden.

### A. Plaintiff Has Not Provided Any Proof that Defendants Had a Scheme to Encourage or Coerce Class Members to Opt Out of the Class

Defendants have never planned or schemed to "encourage opt-outs," and Mullen fails to provide any evidence in support of her conspiratorial allegations. In fact, the Plaintiff relies on communications between class members stating that "Rick and Cheryl would never reach out to anyone asking for this type of action." (Dkt. 143, Ex. 3, p. 58) Plaintiff's nevertheless attaches this communication as an exhibit to support her Motion for Sanctions, undermining any notion that the Defendants somehow orchestrated a campaign to coerce class members to opt out of the class action. In order to create the appearance that the Defendants had a long-standing scheme to coerce

members to opt-out of the class, Plaintiff has manufactured another devious and false narrative based on Defendants' proposals of more efficient opt-out procedures, stating that they "were designed to aid their plan of encouraging opt-outs." (Dkt. 143, p. 3) Plaintiff and her counsel live in a fantasy world.

In reality, Defendants anticipated a high number of opt-outs based on the fact that the class included hundreds of class members who knew of Plaintiff's 30-year-old allegations of sexual predation, had rejected those allegations, and wished to continue doing business with the Defendants. (Dkt. 87, Ex. A, C) Moreover, after the filing of this action, hundreds of class members signed new contracts for the 2018-2019 season, while Plaintiff is simultaneously seeking to void their contracts. (Dkt. 87, p. 8, Ex. O) It is simply common sense to conclude that there would be a high opt-out rate. So, Defendants requested an opt-out procedure which would be the most efficient to their customers.

Those individuals who continue to send their children to Sports Performance, send emails of support to the Butlers, and opt-out of the litigation have sent a clear, consistent message that they do not support Mullen's claims. Plaintiff refuses to accept that message. Plaintiff's efforts to construe the high rate of opt-outs as evidence of something more devious is simply an attempt to falsely blame the Defendants for the lack of support she has received from the class. Despite spending four years on teams with dozens of class members, despite 16 months of publicity, and despite class members receiving notice of this litigation, Plaintiff has failed to identify a single Class Member who has come out in support of her claims in this litigation. (Dkt. 144, Ex. C, No. 11) In stark contrast, after the filing of Mullen's case, hundreds of class members returned to Sports Performance and signed contracts for the 2018-2019 season, many of which have offered to act as trial witnesses against Mullen. (Dkt. 87, p. 8, Ex. O)

**B.** **Plaintiff Grossly Misrepresents the Nature and the Context of the Communications Between Defendants and the Class**

First, Plaintiff complains of an email from Cheryl Butler to members of the GLV staff, where she stated that the Class Notice had been sent out, where she stated, "I wanted you to be aware of what it looks like as we are starting to get phone calls about it and I am sure others will be asking as they receive it." (Dkt. 143, p. 4) Plaintiff falsely claims this email "clearly" shows that the Defendants were encouraging opt-outs, despite the fact that Cheryl Butler explicitly stated that the facility was receiving calls about the Notice, and those calls had been initiated by class members asking whether the Class Notice was real, and they requested information on how to exclude themselves from the litigation. *Group Exhibit A, p. 1-2, ¶ ¶ 2-5.* Cheryl provided employees with the Court-approved language in her email, stating that the section about opt outs was "crucial," as she anticipated that additional calls requesting that information would be forthcoming. *Id.* There was no scheme to encourage opt-outs, as Cheryl provided employees with the *Court-approved* opt-out instructions to provide class members who call requesting information on opting out. (Dkt. 143, Ex. 3, p. 4) In fact, it shows the Defendants were careful to provide Court-approved language in response to class members' requests for information about how to opt out of the class. *Id.*

Troy Gilb, as the Director of the Sports Performance Boys Program, had also received several calls about the Class Notice from parents with questions about whether the boys' program was included in the suit and/or asking him if they had to send a letter to be excluded. *Group Exhibit A, p. 3, ¶ 3.* Parents also informed him of other Class Members with similar questions. In order to address the circulating concerns, Troy sent an email to families in the boys' program, which stated:

> If you haven't already, you will probably be receiving a notice of a class action lawsuit against Sports Performance Volleyball/GLV Inc. and Rick & Cheryl Butler. Because your son played in the Sports Performance Volleyball program between the years of 2013

& 2018 it is important that you understand you are now a part of the lawsuit as a member of the class.

After receiving the notice of the class action lawsuit, you can choose do nothing and you will remain as a member of the class and a plaintiff in the lawsuit against Sports Performance/GLV Inc. and Rick & Cheryl Butler.

If you choose to not be part of the lawsuit against Sports Performance/GLV Inc. and Rick & Cheryl Butler you must send a letter to the class administrator before April 19th, 2019 and tell them you want to opt out and have your name removed from the lawsuit.

More information on how to proceed is included in your notice from the class administrator. (Dkt. 143, Ex. 3, p. 52)

Plainly, Troy did not ask or otherwise compel any class member to opt out. In his email to the boys' program, Troy provided unbiased, accurate information about the options presented to Class Members in the Notice, and directed class members to the Class Notice for further information. Nevertheless, Plaintiff makes the false claims that Troy's email contained an "emphasis on opting out." (Dkt. 143, p. 5) Notably, Troy did not include directions on how to opt-out, and instead pointed Class Members to the Class Notice for that information.

Plaintiff also claims that Troy sent the email to the boys' program which was "consistent with Cheryl's instruction," but fails to explain what that "instruction" actually was. (Dkt. 143, p. 5) As discussed above, Cheryl's email provided employees Court-approved language about the opt-out process because the facility was receiving phone calls from Class Members requesting that information. Plaintiff has provided zero evidence that Troy was following Cheryl's "instruction," particularly because he omitted the very information contained in Cheryl's email to GLV employees. Most notably, however, is that Troy's email did not create an influx of opt-outs which would indicate that his email provided class members with the "encouragement" that Plaintiff asserts. In fact, of the individuals who received Troy's email, approximately[1] 15% opted out, in

---

[1] Based on defense counsel's calculations from the class administrator's reports. *Group Exhibit A, p. 6, ¶ 6.*

comparison to the total opt-out rate of approximately 24%. To sanction the Defendants would be a severe consequence for an employee's good-faith attempt to provide class members with answers to their questions in an unbiased and factual manner and to avoid individual conversations with class members about the case.

Plaintiff then provides mischaracterizations of several responses to Troy's email from class members who express their support for Sports Performance and inform him of their intent to opt out of the class. Throughout her motion, Plaintiff argues that the Defendants somehow coerced Class Members to opt-out of the litigation *after* the class members had already made the opt out decision. For example, attorney Dave Clark emailed Troy saying that "We not only opted out-- but my children… and myself stand ready to testify or provide affidavits in SUPPORT of the Butlers." (Dkt. 143, Ex. 3, p. 44-45) Nevertheless, Plaintiff contends that Troy's response to this email could somehow coerce the attorney or improperly encourage him to make a decision he has already reached. Likewise, Plaintiff argues that Troy inappropriately responded to an email from a class member who stated, "I want nothing to do with this. Do you have the address I [sic] can ask to opt out. [sic] I have some choice words for this lawyer and resent being pulled into something like this without my consent." (Dkt. 143, Ex. 3, p. 55-57) Troy's response consisted of *the entire Court-approved Class Notice* and said, "If you have any questions, please let me know." *Id.* This is no evidence of coercion to compel class members to opt out. Plaintiff's concocted theory of coercion is only a bad faith manipulation of benign communications.

Plaintiff grossly mischaracterizes emails from class members by excluding[2] the portions which evidence that the class members had already come to their own conclusions about the

---

[2] Plaintiff also presents two emails to the same class member as though they were made to different people, listing one as (a) and another as (e). (Dkt. 143, p. 5, 39) That class member expressed his opinion about the lawsuit to Troy, stating, "I have not looked at it closely but I want to make sure I indicate that I don't want any part of it. As we have talked before it sounds like someone that is bitter or wants notoriety or money." (Dkt. 143, Ex. 3, p. 42)

8

lawsuit prior to communicating with the Defendants. For example, the class member who asked Rick and Cheryl about Jill Clark's e-mail stating, "Just ignore this or do the opt out?" and also stated that the lawsuit "[s]eems like ridiculous [EXPLETIVE]." (Dkt. 143, Ex. 3, p. 60) Even after the class member expressed his opinion and pointedly asked = if he should opt out, Rick declined to answer and instead provided both options to the class member in a factual, unbiased manner. *Id.*

In the same section of her Motion, Plaintiff complains that Cheryl informed two class members (who had both initiated the communications informing Cheryl of their support and intent to opt out while criticizing the opt-out procedure) that the Defendants filed a publicly available motion seeking email opt-outs which was denied. (Dkt. 143, p. 7) Plaintiff does not explain how this information supports any theory set forth in her Motion or why she believes Defendants should be sanctioned for the communication. Plaintiff does, however, exclude portions these communications which undermine her claims, such as Jennifer Marcotte-Burke's statement that "When we signed [K.B.] up for sports performance we heard all of the stories…we googled and read and made our own decision and couldn't be happier." (Dkt. 143, Ex. 3, p. 66)

Next, Plaintiff argues that Cheryl improperly thanked Teresa Papa Surges after she sent Cheryl a text message offering to write a letter or make a public statement in support of the Butlers and stating, "I received that RIDICULOUS email today about the class action lawsuit…I will be recusing us from that lawsuit and I will pray for those PATHETIC people." (Dkt. 143, Ex. 3, p. 70) Plaintiff's argument that, by thanking class members who sent messages of support and opted out of the litigation, "Defendants were hoping word would spread and others would do the same." (Dkt. 143, p. 7) This falls far short of the clear evidence required to establish an award of sanctions.

`        Plaintiff complains that Jennifer Jennings, who is a GLV coach and a class member, "lets the members of the group chat know what parents need to do in order to opt out." (Dkt. 143, p. 7)

However, the communication was sent in response a player asking, "So what's the goal like we want our parents to reply to it or something[?]" (Dkt. 143, Ex. 3, p. 69) Jennifer stated, "Just want to have parents know rhat [sic] it has been sent…It is completely up to [the parents] what they choose to do." *Id.* Plaintiff's description of this communication is misleading, and it again shows that coaches are not encouraging opt outs as Plaintiff claims.

Mullen then lists a series of emails she contends are "improper communications" with the class which took place after the March 29th hearing. (Dkt. 143, p. 11) Beginning with an email from Claudine Dale, who is also a class member, who emailed two fellow class members with instructions about how to opt-out after they had called her to request that information. *Group Exhibit A, p. 4, ¶ 3.* Yet again, the class members had independently made the decision to opt-out and merely reached out requesting instructions about how to do so. *Id.*

At several points in Plaintiff's Motion, she describes communication in a manner which is inconsistent with the actual text of the communication, such as her claim that "Cheryl responded to an e-mail from a class member, where she expressed her preference for opting out and encouraged the class member to speak with defense counsel." Yet again, it was the class member who initiated the communication by expressing his preference to opt out, stating, "We support you and Sports Performance. We received a letter regarding a lawsuit (Mullen v. GLV) and not sure if it's legit. If it is, I will send info to opt out." (Dkt. 143, Ex. 3, p. 19) Cheryl simply responded to his questions, stating, "Yes, it is legit. If you opt out then you would not be suing Rick, myself and Sports Performance. I have copied our attorney on this so if you need any further Information [sic] she can assist you. We are limited to what we can say to the class members so I can't go into any more detail." *Id.* This is another example of Plaintiff's attempts to mislead this Court to believe that Defendants have engaged in misconduct to warrant sanctions.

### C.     <u>The Defendants Cannot be Held Responsible for Actions of Class Members Over Which They had No Control</u>

In her Motion for Sanctions, Plaintiff accuses Defendants of trying to undermine the judicial process. However, Plaintiff has conspicuously disregarded proof to the contrary. On March 19, 2019, class member Jill Clark emailed Jerry Haggerty stating, "I sent out all my emails. Laura Davis sent hers…we are all trying." (Dkt. 143, Ex. 3, p. 58) Jerry responded, "Nice of everyone to do this! Rick and Cheryl would never reach out to anyone asking for this type of action but a lot of the parents just figured the least we could do is all make sure everyone is aware that if you do nothing, you are included in the lawsuit. Thanks for your part Jill." *Id.* Plaintiff references several communications between Defendants and Class members which she claims "demonstrated their knowledge of unauthorized e-mails encouraging opt outs." (Dkt. 143, p. 6) However, Mullen fails to establish how Defendants' knowledge of the e-mails—which were sent by class members to class members—constitutes a sanctionable offense, particularly since Defendants did not learn about the emails until *after* they were sent. Certainly, there was no effort to conceal these communications, as Defendants had produced evidence of similar campaigns previously initiated by members of the class in response to the same allegations Mullen sets forth in her Complaint.

Plaintiff falsely blames Defendants for the creation of a Facebook Page, despite documentation that Defendants were unaware of the Facebook Page until being informed of it by class members. For example, in response to Plaintiff's Third Set of Requests for Production, Defendants produced a text message exchange between Rick Butler and class member Jerry Haggerty where Jerry states, "Did you see the Spri Parents Against Lawsuit Facebook page?" *Exhibit B.* Rick responds, 'No, who started that?" Jerry then emailed Rick the link and stated that he believed it was created by a parent who received an email about the lawsuit. *Id.*

Plaintiff's manipulation of the facts continues with baseless accusations that "the Facebook Page was not created by happenstance." (Dkt. 143, p. 8) Cheryl's communication with class member Marianne Sedacki Drenthe, who appears to have created the Facebook page, was no different than any other class member who reached out to Cheryl to express support for the Defendants. Here, Marianne initiated the communication with Cheryl by forwarding her the Class Notice and stating, "[We] [w]ill be opting out of this ridiculous (time and money wasting) class action suit." (Dkt. 143, Ex. 3, p. 65) To further the false narrative, Plaintiff misrepresents the nature of Marianne's email to Cheryl by arguing that "showering praise on class members who opt-out, Defendants were hoping word would spread and others would do the same,". (Dkt. 143, p. 7) Plaintiff's sophistry has no end. Next, Plaintiff makes the strained argument that:

> [S]everal coaches also publicly "liked" or "shared" the Facebook Page so the message to their players and parents would be clear. As Plaintiff alleges, Rick's personal influence with colleges provides Defendants with substantial latitude to place players (or keeping them from being placed, if they so choose) in top volleyball programs. Thus, the coach who determines how much game time a player gets, what team they make, or their standing in Defendants' eyes (friend or foe) wants you to opt-out of this class action. (Dkt. 143, p. 14)

Plaintiff claims that "[a]t least seven of Defendants' coaches liked the Facebook Page." (Dkt. 143, p. 9) However, Plaintiff has failed to provide the names of those seven coaches, however, based on the few names Plaintiff has mentioned in her improper status reports and in Court hearings, Defendants believe that six of those individuals who Plaintiff may be referencing are part-time coaches who are also class members. Defense counsel previously mentioned in Court that the private page does not allow Facebook members to see who else has "liked" the page, therefore it is noteworthy that Plaintiff has done nothing to prove otherwise (such as providing the Court with a screenshot of all the individuals who have "liked" the page). Plaintiff cannot establish whether any parents or players are even Facebook friends of the coaches and, even if they were,

Plaintiff cannot prove that those class members would be notified of their coaches' Facebook activity. Plaintiff's contention that the coaches who "liked" that Facebook page also "suggested to their current players and parents what was expected of them" is based on nothing but Plaintiff's own desire to besmirch Defendants and weave a false narrative to prejudice the Court against Defendants. (Dkt. 143, p. 9)

In her Motion, Plaintiff is apparently arguing that Class Members who believe their children are unsafe and are being coached by a "sexual predator" could be influenced to opt out of the litigation after seeing a GLV coach "like" a Facebook page, because they are more concerned with "how much game time" their children get and "what team they make." (Dkt. 143, p. 14) Not only is this argument insulting to the class members she purports to represent, but it is not supported by any factual allegations or evidentiary support. This is simply no evidence of coercion to compel class members to opt out. *See Piekarski v. Amedisys Ill., LLC*, 4 F. Supp. 3d 952, 954-55 (N.D. Ill. 2013) ("[W]here there is an ongoing business…relationship between the class and the class opponent, communications may be inherently coercive."). Here, the business relationships which existed at the inception of this litigation ended after the 2017-2018 season, and every class member who is currently in the Sports Performance program made the choice to return to the program and sign a new contract *after this lawsuit was filed*. As Plaintiff is well aware (since her daughters have played at four different clubs in the area), Sports Performance is not the only option for volleyball training available to class members. It is offensive to every parent in the program to suggest that they are so blinded by their desire to obtain a scholarship that they would send their children to be coached by someone they believe is a "child sexual predator" rather than send them to play for a different club. (Dkt. 1, ¶ 4)

Plaintiff's deliberate effort to foist a false narrative upon the Court is exposed by Plaintiff's knowledge of similar campaigns initiated by Sports Performance families. (Dkt. 87, Ex. A, C) These campaigns, which have taken place at various times over the last 25 years, have been organized to support the Butlers against the same allegations set forth in Plaintiff's Complaint. *Id.* This suit has interfered with their relationship and ability to communicate with the Defendants, while seeking to prohibit them from coaching their children. It should come as no surprise that those same individuals who took part in public displays of support for the Defendants would protest a lawsuit which has now positioned them as Defendants' adversary without their consent.

"The Supreme Court has expressly stated that sanctions may be appropriate in any one of three instances—where the noncomplying party acted either with willfulness, bad faith or fault." *Marrocoo v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir.1992) (quoting *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 640 (1976)). Here, Defendants provided court-approved language in response to class members who have requested such information. Defendants often informed class members that they were not able to speak about the litigation. Defendants also limited their communications with class members to unbiased, factual information. The only communication that was initiated by any GLV employee was from Troy to members of the boys' program, which provided them with impartial and accurate information, directing them to the class notice. Defendants have not acted in bad faith or with fault. *See Marrocoo*, 966 F.2d at 224. Instead, the evidence shows that Defendants acted in good faith to abide by the existing case law as well as this Court's guidance.

### D.     Defense Counsel Acted in Good Faith and Did Not Mislead the Court

Sanctions against defense counsel are not appropriate in this case; defense counsel was acting in good faith and did not violate the rules of ethics. In ascertaining the appropriate sanctions

to impose for the ethical violation committed by an attorney, the Court considers the seriousness of the violation and whether the violation was intentional, in addition to considering the nature and extent of the prejudice to the plaintiff class arising from the violation. *Blanchard v. EdgeMark Fin. Corp.*, 175 F.R.D. 293, 304 (N.D. Ill. 1997). Because defense counsel did not make a false statement to the Court and did not commit an ethical violation when she communicated with a former class member, Plaintiff's request for sanctions should be denied.

### 1. Defense Counsel Did Not Knowingly Make a False Statement to the Court

Plaintiff seeks to impose sanctions on defense counsel, claiming that she provided misinformation to the Court on March 29th, when she claims counsel said: "'defendants aren't necessarily – we're not behind this, we're not encouraging it…' and later responded to the Court's comment with: '…every email I've seen them respond with is, I'm very sorry, I can't talk about this right now, you know, thank you, something along those lines.'" (Dkt. 143, p. 10)

The full context of the courtroom exchange shows Plaintiff's claims to be meritless. The first comment was made in connection with the Facebook page, which we now know was created by a class member, and defense counsel's full comment was that "defendants aren't…behind [the Facebook page], we're not encouraging it, but we're also not necessarily surprised by it because, you know, this took place just in 2015. I think it rolled into 2016 as well." (Dkt. 143, Ex. 6, p. 6-9) As discussed above, Defendants did not know about the Facebook page until after it was created. Rick Butler was informed of the page by a class member and asked the class member who created the page. Additionally, counsel reminded Plaintiff that this type of action by Sports Performance parents is not unusual and has happened multiple times in the recent past. *Id*.

Defense counsel's second statement, in context, shows a much more narrow scope than Plaintiff has represented to this Court: "[the Defendants] received emails from class members

regarding the opt-outs, regarding their opinions on the lawsuit, and every email I've seen them respond with is, I'm very sorry, I can't talk about this right now, you know, thank you, something along those lines. [T]here is nothing to me that indicated that there's any sort of misinformation or campaign that's backed by Rick and Cheryl." (Dkt. 143, Ex. 6, p. 6-9) Plaintiff contends that defense counsel's statements "were false" because Troy Gilb sent an email to the boys' program informing them that they would be receiving the Class Notice. (Dkt. 143, p. 5, fn. 3) However, taken in context, defense counsel was discussing emails sent from Rick and Cheryl Butler *in response* to class members' emails about the lawsuit, which would not have included Troy's email, even if she had been aware of it at the time.

While defense counsel later acknowledged that Troy should not have sent the email, she also stated to this Court on April 16th that she did not remember viewing Troy's email prior to the March 29th hearing. Plaintiff has provided the Court with a response from defense counsel to an email from Troy which forwarded a class member's response to Troy's email. (Dkt. 143, Ex. 3, p. 20) There, the class member expressed his support for the Defendants and stated that he would be opting out of the case. However, defense counsel's response stated that she had emailed the administrator about sending a Class Notice to a new address. When viewing defense counsel's email to Troy regarding a change of address, it is out of place because the below conversation does not mention any change of address. *Id.* Instead, defense counsel was referring to an email from Troy which was sent five minutes prior to the email referenced by Plaintiff. At 1:13 p.m., Troy emailed defense counsel about a class member who had moved to a new address and wanted to receive information about the lawsuit. *Exhibit D.* Just 5 minutes later, at 1:18 p.m., Troy forwarded another email to defense counsel, which counsel did not see because she was drafting an email to the class administrator about the change of address in Troy's first email. (Dkt. 143, Ex. 3, p. 20)

16

At 1:32 p.m., defense counsel sent an email to the class administrator, and at 1:33 p.m. she responded to Troy stating she had emailed the class administrator with the updated address. *Id.*

Defense counsel previously stated to this Court that she did not see Troy's original email. Counsel's response to the second email sheds light on why this was the case. While she admittedly made an error when she failed to continue to scroll past the class member's request for information, it was because she was taking proactive steps to ensure the class member received a Notice from the administrator. Because Troy's email from the class member prompted counsel to take action, she immediately composed an email to the class administrator upon viewing the class member's request for information rather than scrolling down past the class member's request. *Exhibit D.* This was an inadvertent, if unfortunate, oversight. The email evidences the fact that both Troy and defense counsel ensured that the class member received a Notice from the administrator, debunking any notion that they were engaged in a "campaign to solicit opt-outs." (Dkt. 143, p. 15)

Illinois Rule of Professional Conduct 3.3(a)(1) states that "[a] lawyer shall not knowingly make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." Ill. R. Prof'l Conduct 3.3(a)(1). "In ascertaining the appropriate sanctions…the Court considers the seriousness of the violation and whether the violation was intentional, in addition to considering the nature and extent of the prejudice to the plaintiff class arising from the violation. *Blanchard*, 175 F.R.D. at 304. Here, the allegations are fallacious and exhibit Plaintiff's attempt to foist a fraud upon the Court. There is no evidence in any of the documents presented by the Plaintiff to support Plaintiff's allegations against defense counsel. Rather, the Defendants stated repeatedly[3] that they could not discuss the litigation, showing that they were instructed by counsel not to speak with class members.

---

[3] *See* (Dkt. 143, Ex. 3, p. 16) (with Cheryl stating, "I can't really respond to this…"); (Dkt. 143, Ex. 3, p. 20) (with Cheryl stating, "We are limited to what we can say to the class members so I can't go into any more detail."); (Dkt.

### 2. Defense Counsel's Communication with a Class Member During the Opt Out Period Was Justified and Made for a Proper Purpose

Plaintiff's contention that defense counsel "communicated directly with members of the certified class with the purpose of encouraging the filing of opt outs" is false. (Dkt. 143, p. 14) In reality, defense counsel responded to *one* former class member who initiated a communication with the Defendants. The class member contacted Defendants for the specific purpose of informing defense counsel about certain emails from class members who she claimed were "asking to be removed from this list" after they had received a group email from another parent informing them of the lawsuit. (Dkt. 143, Ex. 3, p. 70) The substance of defense counsel's response was, "Would you please forward those to me?" *Id.* Defense counsel requested copies of the emails because the class member vaguely referred to individuals requesting to be removed from a "list." *Id.* Counsel was unsure whether the class member's email referenced individuals who were asking to be removed from the email "list" or individuals who were mistakenly responding to the email asking to be removed from the class "list." *Group Exhibit A, p. 5-6, ¶ ¶ 4-5.* There was no communication coercing – or even encouraging – opt outs.

Plaintiff's contention that defense counsel's communication was sent "for the purpose of encouraging the filing of opt outs" is a flagrant misrepresentation of facts, as Plaintiff admits in her Motion for Sanctions that it was "unclear what Ms. D'Ambrose intended to do with the names of class members that didn't want their emails shared or didn't want to be told to opt-out." (Dkt. 143, p. 11, 14) Plaintiff has consistently made serious allegations against both Defendants and their counsel without knowledge of the basic facts underlying her allegations, and the Court should impose sanctions to deter this pattern of conduct from both Plaintiff and her attorneys.

143, Ex. 3, p. 60) (where, in response to a class member asking whether he should opt out, Rick states, "I cannot comment other than to say if you opt out you are not involved in the suit and if you stay in you become a member of the class."); (Dkt. 143, Ex. 3, p. 65) (with Cheryl stating, "Sorry I can't say more we just can't at this time legally.")

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that this Court enter an

Order denying all relief requested in Plaintiff's Motion for Sanctions and granting any further relief

this Court deems just and proper.

Date: July 8, 2019

Respectfully Submitted,
GLV, INC., RICK BUTLER, and
CHERYL BUTLER

By: */s/ Danielle D'Ambrose*
One of Their Attorneys

Danielle D'Ambrose
D'AMBROSE P.C.
500 North Michigan Avenue, Suite 600
Chicago, IL 60611
P: (312) 396-4121 | F: (312) 574-0924
Danielle@DambrosePC.com
ARDC No. 6323782

*Attorney for Defendants*

## <u>CERTIFICATE OF DELIVERY</u>

The undersigned, an attorney, certifies that pursuant to Section X (E) of the General Order on Electronic Case Filing for the Northern District of Illinois, service of the above and foregoing document on all attorneys of record was accomplished through the Court's Electronic Notice for Registrants on July 8, 2019.

*/s/ Danielle D'Ambrose*