**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **LAURA MULLEN, individually and on behalf of others similarly situated,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | **Case No. 18 C 1465** |
| **GLV, INC., RICK BUTLER, and CHERYL BUTLER** | ) ) ) | |
| **Defendants.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Laura Mullen has sued GLV, Inc., a youth volleyball training business, and its owners and operators, Rick Butler and Cheryl Butler. Mullen alleges that the defendants concealed Rick Butler's history of sexual abuse of underage girls from her and other parents who enrolled their children in GLV's programs. The Court granted Mullen's motion to certify a class of similarly situated parents, and in February 2019, the Court approved a class notice with April 19, 2019 as the deadline for class members to opt out.

Mullen has moved for sanctions against the defendants for improperly interfering with the class notice process. Mullen has also moved for sanctions against defendants' counsel, alleging that she violated her ethical responsibilities by communicating directly with represented parties and knowingly misrepresenting to the Court her clients' conduct during the opt-out period. The defendants have separately moved for summary

judgment. The Court is largely granting that motion in a separate opinion. But that ruling does not render moot the motion for sanctions, which the Court grants for the reasons stated below.

## Background

GLV is a youth volleyball business that offers coaching, training programs, and camps; it is known for placing its participants in competitive college sports programs. Mullen has sued GLV and its owners, Rick and Cheryl Butler, in a class action alleging fraud, fraudulent concealment, unjust enrichment, and violations of the Illinois Physical Fitness Services Act and the Illinois Consumer Fraud Act. Mullen alleges that the defendants wrongfully concealed from parents of GLV's program participants that, in the 1980s, Rick raped and sexually abused several underage women. In this decision, the Court will refer to the Butlers by their first names for the sake of simplicity.

In January 2019, the Court certified a plaintiff class consisting of persons who paid for youth volleyball instruction through GLV's Sports Performance programs in Illinois between February 27, 2013 and January 10, 2018. In February 2019, after getting input from both sides, the Court approved a class notice, which included a brief description of the case, informed class members about their options to either stay in the suit or opt out of the class, and explained the legal implications of both options. The notice also advised that class members choosing to opt out had to do so via mail by April 19, 2019.

On March 19, 2019, the class administrator published the class website and distributed class notices via e-mail. Later that day, Cheryl e-mailed GLV's employees alerting them that GLV was "starting to get phone calls" about the class action. Pl.'s

Mot. for Sanctions, Ex. 3, dkt. no. 141-3, at 4. Cheryl told the employees that "Opt out is crucial!" and included an excerpt of the opt-out details from the class notice. *Id.*

That same day, Troy Gilb, GLV's Vice President of Operations (and one of the recipients of Cheryl's e-mail), received an e-mail from a recipient of the class administrator's e-mail notice, asking him about the lawsuit and whether it would affect the club the following year. Gilb responded shortly thereafter, saying this: "Yes, I am aware of the lawsuit. For next year our plan is to continue doing what we are doing. If there is a groundswell of parents that opt out of the lawsuit, which I think will happen, then it most likely will get dismissed. If you have any questions please let me know." *Id.* at 35.

The next day, March 20, Gilb sent a mass e-mail to class members describing the suit and implications of opting out. Gilb told the recipients that it was "important that you understand you are now a part of the lawsuit as a member of the class." *Id.* at 56. He stated that "you can choose [to] do nothing and you will remain as a member of the class and a plaintiff in the lawsuit against Sports Performance/GLV Inc. and Rick & Cheryl Butler." *Id.* at 57. He continued, "[i]f you choose not to be part of the lawsuit . . . , you must send a letter to the class administrator before April 19th, 2019. " *Id.* On March 21, 2019, Gilb forwarded this e-mail to defense counsel Danielle D'Ambrose as part of a longer e-mail string. *See id.* at 44-45.

Several class members replied to Gilb's e-mail. In one e-mail, a class member stated that he had already opted out, to which Gilb responded: "Thank you very much for the show of support!! We all know what is going on with the lawsuit and I hope that with enough voices of support that this whole thing will be thrown out! We are doing all

3

we can to fight this and we have great defense council [sic] on our side!"  *Id.* at 44.  The exhibits submitted by plaintiff reflect that, on March 21, 2019, Gilb forwarded this e-mail exchange to defense counsel.  *Id.* at 44.  That day, Gilb also forwarded to D'Ambrose at least one additional e-mail conversation that included both his March 20 mass e-mail to class members and a class member's response to that message.  Pl.'s Status Report Re: Class Notice, Ex. 4, dkt. no. 123-4, at 35.

Gilb continued to receive e-mails from class members with questions about the suit.  On March 26, 2019, Gilb replied to one such e-mail by stating:  "Everyone knows what this lawsuit is about and I know that there are a lot of parents opting out.  I hope that . . . all the opt outs will have a positive impact on the judge."  Pl.'s Mot. for Sanctions, Ex. 3, dkt. no. 141-3, at 42.  (Based on the record before the Court, it does not appear that this e-mail was forwarded to attorney D'Ambrose.)

Meanwhile, Cheryl was also communicating with class members about the suit. When a class member texted her with a question about opting out, Cheryl directed the class member to a Facebook page, "Parents against the Sports Performance Class Action Lawsuit," where the class member could find "a letter you can print out . . . to make [opting out] easy."  *Id.* at 67.  Cheryl also e-mailed one class member expressing her displeasure about the requirement that class members submit opt-outs by mail rather than e-mail.  *Id.* at 9.  Replying to another class member's inquiry about the suit, Cheryl wrote: "several alumni and current parents are trying to help us in anyway [sic] possible in regards [sic] to this."  *Id.* at 16.  Additionally, Cheryl sent text and e-mail messages expressing thanks to class members who expressed their intentions to opt out but who had not yet done so.  *Id.* at 65, 68.

4

After the class notice issued, some class members began e-mailing others to encourage them to opt out. On March 19, 2019, a class member forwarded one such e-mail to Cheryl and Rick, seeking their opinion of the e-mail's author and whether the Butlers recommended acting on the advice to opt out. To this, Rick responded that the e-mail's author "[i]s a great friend!" *Id.* at 60.

On March 27, 2019, class counsel notified the Court that they suspected the defendants were improperly communicating with class members and encouraging them to opt out. The Court held a status hearing on March 29, 2019. During the status hearing, the Court asked D'Ambrose whether the defendants were communicating with class members "in a way other than the only way that it's appropriate to do that, which is through the notice." Mar. 29, 2019 Hearing Tr., dkt. no. 136, at 8:24–25. D'Ambrose responded with an unequivocal denial:

> Ever since we became involved in the case, I have not seen one bit—they are—[the defendants] are very careful about talking about anything. They received e-mails from class members regarding the opt-outs, regarding their opinions on the lawsuit, and every e-mail I've seen them respond with is, I'm very sorry, I can't talk about this right now, you know, thank you, something along those lines.

*Id.* at 9:10–16.

After the March 29 hearing, the defendants continued to communicate with class members about the suit, despite what D'Ambrose had told the Court. On April 11, 2019, GLV's office administrator e-mailed two class members with instructions for opting out of the class. Pl.'s Mot. for Sanctions, Ex. 3, dkt. no. 141-3, at 79. And on April 15, 2019, Cheryl responded to a class member's inquiry about opting out: "If you opt out then you would not be suing Rick, myself and Sports Performance." *Id.* at 20.

D'Ambrose also communicated with a class member regarding the suit after the

March 29 hearing. Specifically, on April 11, 2019, after receiving what appears to be a forwarded e-mail conversation dated March 26, 2019 (the date D'Ambrose received it is not clear), D'Ambrose directly contacted a class member involved in the exchange. The e-mail forwarded to D'Ambrose included two messages. The first, dated March 26, was a mass e-mail from two class members to several others with details about opting out. *Id.* at 70. In the second message, also dated March 26, one of the class members who received the mass e-mail forwarded it to the Butlers and Gilb, alerting them that several people had responded asking to be "removed from this list." *Id.* After these two messages were forwarded to attorney D'Ambrose, she responded directly to the class member, requesting the names of the parents who wanted to be removed from the e-mail list. *Id.* at 70. It is conceivable that the class member with whom D'Ambrose communicated opted out of the class at some point, but the defendants do not suggest in their response that the individual had already opted out as of the date D'Ambrose e-mailed her. Regardless, there is nothing in the e-mail exchange filed with the Court that suggests that D'Ambrose attempted to ascertain the class member's current status before communicating with her on April 11.

Prior to the next status hearing in the case, held on April 16, 2019, Mullen submitted to the Court copies of several of the defendants' e-mail and text exchanges described above, including Gilb's mass e-mail that he had forwarded to D'Ambrose on March 21. At the April 16 hearing, the Court reminded D'Ambrose of her statement at the March 29 hearing that the defendants (including GLV) had received e-mails from class members about the lawsuit and that "every email I've seen them respond with is, I'm very sorry, I can't talk about this right now, you know, thank you, something along

6

these lines."  Apr. 16, 2019 Hearing Tr., dkt. no. 137, at 2–3.  The Court asked

D'Ambrose if she wanted to correct that statement.  D'Ambrose then acknowledged that

she had received a copy of Gilb's mass e-mail to class members, and she conceded

that the e-mail was an inappropriate communication.  D'Ambrose explained her contrary

statement at the March 29 hearing by asserting, in essence, that she had received

Gilb's mass e-mail as part of an e-mail conversation with more than one message and

that she "did not see" his improper message.  *Id.* at 4; *see also id.* at 5.

### Discussion

Mullen has moved for sanctions against both the defendants and D'Ambrose for

their actions vis-à-vis class members during the opt-out period.  The Court will first

address the defendants first and D'Ambrose second.

**A.    Defendants**

Mullen asserts that the defendants' communications with class members during

the opt-out period amounted to misconduct warranting sanctions under the Court's

inherent authority.  "District courts possess certain inherent powers, not conferred by

rule or statute, to manage their own affairs so as to achieve the orderly and expeditious

disposition of cases."  *Fuery v. City of Chicago*, 900 F.3d 450, 452 (7th Cir. 2018).  This

power is "at its pinnacle" when parties' behavior threatens a court's ability to control its

own proceedings.  *Id.* at 464.  To sanction a party under its inherent authority, a court

must find that the party "willfully abused the judicial process or otherwise conducted

litigation in bad faith."  *Id.* at 463.

Mullen contends that the defendants willfully abused the process set out in the

Federal Rule of Civil Procedure 23, which governs class actions.  Under this rule,

district courts have "both the duty and the broad authority to exercise control over a class action," due to the potential for abuse of these proceedings. *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99–100 (1981). Rule 23(c)(2)(B) charges a court with "direct[ing] to class members the best notice that is practicable," which means ensuring that class members receive "objective, neutral information about the nature of the claim and the consequence of proceeding as a class." *See Kleiner v. First Nat'l Bank of Atl.*, 751 F.2d 1193, 1202–03 (11th Cir. 1985). The court-approved class notice helps ensure that a class member's decision to opt out or join the class is an informed choice. *See id.* at 1203.

When a party communicates with class members during the notice period in a way that is potentially misleading or may discourage class participation, it disrupts a court's authority over the class notice process. *See Wiginton v. Ellis*, No. 02 C 6832, 2003 WL 22232907, at *2 (N.D. Ill. Sept. 16, 2003); *cf. Camilotes v. Resurrection Health Care Corp.*, No. 10 C 366, 2012 WL 245202, at *4 (N.D. Ill. Jan. 25, 2012) (explaining, in the context of deciding whether to limit a party's class contacts, that communications with class members that contain misrepresentations or that may discourage class participation are "generally concerning to courts"). Misrepresentations about the suit to class members gives rise to "an obvious potential for confusion and/or adversely affecting the administration of justice" in class proceedings. *Gulf Oil*, 452 U.S. at 100 n.12. Communications that are potentially coercive by encouraging individuals to opt out can affect a class member's decision to participate in the suit, undermining Rule 23's policy of ensuring that this is an informed choice based on unbiased information. *See Kleiner*, 751 F.3d at 1203; *Piekarski v. Amedisys Ill., LLC*, 4 F. Supp. 3d 952, 955–

56 (N.D. Ill. 2013); *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 927–28 (N.D. Ill. 2013); *Wiginton*, 2003 WL 22232907, at *2.

The defendants argue that there was nothing improper about their communications with class members, saying they did not discourage class participation. With respect to Gilb's mass e-mail, the defendants contend that there was no potential for coercion because the message "provided unbiased, accurate information about the options presented to [c]lass members in the [n]otice." Defs.' Resp. Br., dkt. no. 165, at 10. This argument, however, disregards the potential for coercion arising from the context and source of a party's communications with class members.

Courts have identified two circumstances in which party communications with class members may be considered coercive: unilateral communications, in other words, communications made by only one side in the case; and the existence of a business relationship between class members and the class opponent. *See Kleiner*, 751 F.2d at 1202; *Reid*, 964 F. Supp. 2d at 927–28. A unilateral communication from a party to class members is "rife with potential for coercion," because it is a "one-sided presentation of the facts, without an opportunity for rebuttal." *Kleiner*, 751 F.2d at 1202-3. In the context of a business relationship in which class members are dependent in some way on the class opponent, communications from the class opponent to class members may be inherently coercive. *See id.*; *see also, Piekarski*, 4 F. Supp. 3d at 955; *Reid*, 964 F. Supp. 2d at 927. In such situations, class members may feel compelled to opt out to stay in the class opponent's good graces. For example, the Eleventh Circuit in *Kleiner* concluded that notice-period communications from a bank— the class opponent—to a class of the bank's borrowers were inherently coercive

9

because many of the class members were depending on the bank for future financing. *Kleiner*, 751 F.2d at 1202.

Gilb's mass e-mail brought both of these concerns into play. Given the circumstances, it had a significant coercive potential. It was a unilateral communication from a party to class members that described the case in Gilb's own words rather than in the language of the class notice, which the Court had approved after obtaining input from both parties. *See Kleiner*, 751 F.2d at 1203. And Gilb's communications could have affected class members' decision to remain in the class given their business relationship with GLV . As the defendants themselves highlight in their brief, many of the class members are current clients of GLV, namely they are parents of youth volleyball players in GLV's programs. As such, they have an interest in maintaining a positive relationship with the defendants. Among other things, GLV is known for placing its participants in elite college volleyball programs, and class members may be depending on the defendants to help place their children in those programs. Thus, communications like Gilb's mass e-mail, sent by the defendants to class members in what was quite obviously an effort to encourage opt-outs, are potentially coercive. *See Piekarski*, 4 F. Supp. 3d at 955; *Kleiner*, 751 F.3d at 1202.

The defendants also argue that their other e-mails and messages to class members raised no potential for coercion. They contend that many of their communications could not have affected class members' decisions to opt out because they were directed to individuals who had already expressed intentions to do so. The defendants also contend that many of their messages were to class members who remain clients and supporters of the defendants and who thus would have opted out

regardless of defendants' messages. The defendants are essentially suggesting that these communications were not improper because there is no evidence of actual coercion of class members. But a communication that is even potentially coercive undermines the purposes of Rule 23. *See, e.g.*, *Reid*, 964 F. Supp. 2d at 927–28; *Camilotes*, 2012 WL 245202, at *4 (explaining that a party communication to class members that "may discourage" class participation is an abuse of Rule 23).

There is ample evidence here that the defendants' communications were potentially coercive by endorsing and enabling decisions to opt out of the class. This risk was heightened by the fact that class members were communicating with each other about the lawsuit and the opt-out decision: it's one thing for a party to ,communicate with a single class member but something else altogether to communicate with class members when the party is aware they are communicating among themselves and thus likely transmitting the party's statements.

In addition, Cheryl directed a class member to a Facebook page with a form opt-out letter that, in her words, would "make it easy" to opt out. Pl.'s Mot. for Sanctions, Ex. 3, dkt. no. 141-3, at 67. Her texts and e-mail messages thanking class members for their plans to opt out endorsed the choice before it was made. When a class member reached out to Rick and Cheryl asking for advice regarding another class member's e-mail encouraging opt-out, Rick endorsed the e-mail by noting that its author "[i]s a great friend." *Id.* at 60. And on April 15—after the Court had specifically reminded the defendants that the class notice was the only proper means of communicating with class members—Cheryl responded to a class member's inquiry about the suit by explaining the implications of opting out in her own words.

GLV's employees' communications with class members were also potentially coercive. As the Court has discussed, Gilb, in responding to one class member's inquiry about the suit, stated: "Everyone knows what this lawsuit is about and I know there are a lot of parents opting out." *Id.* at 42. Additionally, GLV's office administrator e-mailed two class members instructions for opting out. Sending these instructions, outside of the context of the class notice, was potentially coercive because it omitted other information that would be critical to the opt-out decision: the nature of the claims underlying the suit and the implications of joining the class or opting out. Receipt of opt-out instructions from GLV might have inclined a class member to make an uninformed decision to opt out, particularly if the class member had a business relationship with GLV, as many did.

In sum, the Court concludes that the defendants' communications with class members during the notice period were potentially coercive and therefore undermined the notice process set forth in Rule 23.

The Court may sanction the defendants, however, only if it also finds that their abuse of Rule 23 was willful. *See Fuery*, 900 F.3d at 463. The evidence gives rise to a reasonable inference that the defendants intended to undermine the class notice process by discouraging class participation. On the day the class notice was issued, Cheryl e-mailed GLV employees to prepare them to respond to inquiries regarding the suit. Her e-mail stated that "Opt out is crucial!" and excerpted opt-out details from the notice. Pl.'s Mot. for Sanctions, Ex. 3, dkt. no. 141-3, at 4. This was a clear direction by Cheryl to her employees to respond to class members' inquiries by emphasizing and focusing on opting out, not by directing them to the class notice.

12

Gilb's mass e-mail to class members likewise indicates an intent to encourage opt-out. The day after the class notice was issued, Gilb addressed his mass e-mail to individuals who had received or would "probably be receiving a notice." *Id.* at 56. This indicates that he wanted to connect with class members just as they were learning about the suit via the class notice, or even before that. And Gilb's use of his own language—rather than the complete language of the class notice—to describe the suit indicates an intention to influence class members' opinions. He attempted to catch people early in their thinking about the case and provide his own take on the implications of joining the class or opting out.

Finally, the messages from Rick and Cheryl directly to class members indicate that they likewise intended to encourage class members to opt out. For example, Rick endorsed the opt-out choice by telling a class member that an e-mail encouraging opt-out was written by a "great friend." *Id.* at 60. And in response to an inquiry about the suit, Cheryl directed a class member to a Facebook page that would "make it easy" to opt out rather than to the class notice. *Id.* at 67.

In sum, the Court finds that the defendants intentionally interfered with the class notice and opt-out process and therefore grants Mullen's motion for sanctions against them. The sanctions the Court imposes under its inherent authority must be proportionate to the gravity of the offense. *Montaño v. City of Chicago*, 535 F.3d 558, 563 (7th Cir. 2008). At this point, the Court is, in a separate decision, largely granting summary judgment against the defendants. As a result, in the final analysis, the defendants may have harmed only themselves by encouraging opt-outs—as those individuals will not be bound by a judgment against the class and may still be able to file

13

individual suits. But the defendants did not know that at the time. It is clear from the evidence that they were attempting to come up with enough opt-outs that they would be able to convince the Court to dismiss the case.

The defendants' concerted effort to interfere with the class notice and opt-out process unreasonably imposed an unfair and undue burden on the class and class counsel. They were required—justifiably, in the Court's view—to conduct extensive discovery and file motions to get at the bottom of what had occurred, and they were also required—again, justifiably—to file and pursue the motion for sanctions. The plaintiffs are entitled to recover from the defendants their reasonable attorney's fees and expenses in this regard. In addition, because the defendants conducted a campaign to interfere with the processes of the Court, each of them (GLV, Cheryl, and Rick) is assessed a civil sanction of $5,000, payable to the Clerk, as a penalty for their misconduct. *See McCready v. eBay, Inc.*, 453 F.3d 882, 892 (7th Cir. 2006) (federal courts' inherent powers include authority to impose fines paid to the court).

**B.    Defense counsel**

Mullen has moved for sanctions against D'Ambrose for violating two provisions of the ABA Model Rules of Professional Conduct, which this Court has adopted as its rules of professional ethics.[1] A district court's inherent authority over its proceedings includes the power to discipline attorneys appearing before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). In determining whether to sanction an attorney for an attorney's

---

[1]  Mullen cites the Illinois Rules of Professional Conduct, but this Court has adopted the ABA Model Rules of Professional Conduct, so the Court considers those rules, not the parallel Illinois rules.

ethical violation, a court considers "the seriousness of the violations and whether the violations were intentional, as well as the nature and extent of prejudice suffered or likely to be suffered by the parties in the future as a result of the violation." *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, No. 15 C 1785, 2017 WL 157858, at *16 (N.D. Ill. Jan. 12, 2017).

### 1. Communicating with a class member

First, Mullen contends that D'Ambrose violated Model Rule 4.2, which prohibits attorneys from directly contacting parties they know to be represented by counsel. Mullen contends that D'Ambrose's April 11 e-mail to a class member requesting a list of names violated this rule. D'Ambrose does not deny communicating directly with a class member.[2] She argues, however, that the communication was excusable because she did not initiate the contact and her communication was not coercive.

Once a class has been certified, class members who have not opted out are regarded as clients of class counsel—which in this case was D'Ambrose's opponent. *See* Manual Complex Lit. § 21.33 (4th ed. 2019). In January 2019, the Court certified the class and appointed class counsel. D'Ambrose obviously knew that the class had been certified, and thus she knew that class members were represented by counsel— indeed, the Court's class certification order expressly appointed counsel to represent the class. As a result, D'Ambrose's April 11 e-mail directly to a class member requesting a list of names was a prohibited communication with a party she knew to be

---

[2] As noted earlier, it is not one hundred percent clear that the individual in question was still a class member as of the date of D'Ambrose's communication. But as the Court has stated, the defendants have offered no evidence that the person had already opted out, nor is there any evidence that D'Ambrose did anything to ascertain that person's class status before sending the April 11 e-mail.

15

represented by counsel.  *See* Model Rules of Prof'l Conduct r. 4.2.

Contrary to D'Ambrose's arguments, her conduct is not excusable just because she did not initiate the contact or because her message was not coercive.  The comments to Model Rule 4.2 state that its broad prohibition applies even when a represented party initiates the contact, and further, that the lawyer's duty in that situation is to "immediately terminate communication."  *Id.*, cmt. 3.  And the rule has no carve-out for communications that are not coercive.

In determining whether to sanction D'Ambrose for this violation, the Court considers the "nature and extent of prejudice suffered or likely to be suffered by the parties in the future" due to this conduct.  *See Landmark Am. Ins. Co.*, 2017 WL 157858, at *16.  Mullen has offered evidence of a single direct communication with a class member (although D'Ambrose's misinterpretation of the rule in her brief suggests there may have been others).  The Court will impose a sanction, but given the nature of the communication—a request for information—it is unclear how Mullen or the class were prejudiced.  Without more, the Court is reluctant to impose a monetary or other severe sanction D'Ambrose for her violation of Rule 4.2.  The Court hereby reprimands D'Ambrose for her misconduct.

## 2.    Making a false statement to the Court

Mullen has also moved for sanctions against D'Ambrose for violating Model Rule 3.3, which prohibits attorneys from knowingly making false statements to the Court. Mullen alleges that D'Ambrose made a knowing misrepresentation to the Court at the March 29 hearing when she stated:

> Ever since we became involved in the case, I have not seen one bit—they are—[the defendants] are very careful about talking about anything.  They

16

received e-mails from class members regarding the opt-outs, regarding their opinions on the lawsuit, and every e-mail I've seen them respond with is, I'm very sorry, I can't talk about this right now, you know, thank you, something along those lines.

Mar. 29, 2019 Hearing Tr., dkt. no. 136, at 9:10–16.

D'Ambrose's characterization of the defendants' statements to class members contained a significant falsehood. Specifically, her statement that the defendants were only responding to class members' e-mails about opting out and, in doing so, were declining to say anything, was untrue. Gilb sent an unsolicited mass e-mail to class members describing the suit and the implications of opting out. And in response to an inquiry by a class member, Gilb most certainly did not decline to comment. Rather, he stated that "[e]veryone knows what this lawsuit is about and I know that there are a lot of parents opting out. I hope that . . . all the opt outs will have a positive impact on the judge." Pl.'s Mot. for Sanctions, Ex. 3, dkt. no. 141-3, at 42. Finally, that was not the only e-mail in which defendants did something other than decline to comment; the Court has described several such communications in the facts section of this opinion, at least some of which had been forwarded to D'Ambrose before the March 21 hearing.

D'Ambrose received Gilb's mass e-mail on March 21, prior to the March 29 hearing, and she now acknowledges that it was an improper communication. She argues, however, that her statement to the Court did not run afoul of Model Rule 3.3 because it was not knowingly false. D'Ambrose says that she received Gilb's e-mail as part of an exchange with multiple messages and that she simply neglected to scroll down far enough to see it. Therefore, she asserts that her March 29 characterization of the defendants' communications with class members was not a knowing misrepresentation.

17

But D'Ambrose's purported failure to scroll down in the e-mail exchange does not allow her to avoid culpability for knowing conduct. A person is considered to have acted knowingly if she believed there was a high probability that a fact existed and took deliberate actions to avoid learning the fact. *Fish v. Greatbanc Tr. Co.*, 749 F.3d 671, 684 (7th Cir. 2014). "Under this formulation, a willfully blind [party] is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts." *Id.* (quoting *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)). D'Ambrose made a statement to the Court characterizing the defendants' communications, despite knowing that she had not seen all of them or even thoroughly reviewed the e-mail exchanges that had been forwarded to her.

D'Ambrose's claimed "failure to scroll" amounts to willful blindness. Gilb forwarded to D'Ambrose a three-message e-mail exchange that started with his March 20 mass e-mail to class members. In the most recent of these messages, dated March 21, 2019, Gilb thanked an individual for his decision to opt out of the class. D'Ambrose replied to that e-mail within the hour she received it, and she concedes she knew that Gilb's e-mail was part of a longer e-mail exchange. And the timing of Gilb's thank-you e-mail—only two days after the class notice was issued—suggests a high probability that the preceding e-mails had been exchanged before the person opted out. This meant it was highly probable that the earlier e-mails contained an improper communication by Gilb to a then-class member. By choosing not to take the relatively simple step of scrolling down to read the preceding messages to confirm whether Gilb had been improperly communicating with class members, D'Ambrose took deliberate

action to avoid confirming a high probability of wrongdoing. *See id.*

D'Ambrose's willful blindness to Gilb's mass e-mail does not allow her to escape culpability for misrepresenting to the Court on March 29 that all of her clients' communications with class members had been proper. The Court turns now to the seriousness of D'Ambrose's violation and prejudice to other parties due to her conduct. *See Landmark Am. Ins.*, 2017 WL 157858, at *16.

D'Ambrose's violation is quite serious. Making misrepresentations to the Court undermines its ability to ensure that matters before it proceed fairly and efficiently. The Seventh Circuit has recognized the heightened importance of the duty of candor to a court, noting that "violations of this duty can lead to sanctions even more severe than payment of an opponent's fees and costs." *Cleveland Hair Clinic, Inc. v. Puig*, 200 F.3d 1063, 1067 (7th Cir. 2000).

The Court also concludes that D'Ambrose's conduct prejudiced the class, as least to some extent. Her misrepresentation contributed to the need for Mullen to conduct discovery on the defendants' conduct during the notice period and to file motions, including the present motion. On the other hand, all of that would have been required even without D'Ambrose's misrepresentation, due to the misconduct of her clients that preceded her statement to the Court on March 29. This mitigates, to some extent, the degree of prejudice caused by her conduct, as opposed to that of the defendants.

For the reasons discussed above, and due to D'Ambrose's relative lack of practice experience, the Court will impose a non-monetary sanction. The Court hereby reprimands D'Ambrose for her false statement to the Court and directs her to complete,

19

for her next continuing legal education cycle imposed by the state bar, twice the required amount of professional responsibility hours and certify this to the Court.

## Conclusion

For the foregoing reasons, the Court grants Mullen's motion to sanction the defendants for their interference with the class notice process and to sanction D'Ambrose for communicating directly with a represented party and violating her duty of candor to the Court [dkt. no. 143]. The Court orders Rick Butler, Cheryl Butler, and GLV, Inc. each to pay a penalty of $5,000 to the clerk of this Court within 14 days of this order and to reimburse the plaintiffs' reasonable attorney's fees and expenses incurred to litigate this motion. Plaintiffs are directed to file an appropriate fee petition and supporting material by no later than March 27, 2020. The Court hereby reprimands attorney D'Ambrose for communicating directly with a represented party and for making false statements to the Court and orders her to complete, in the next continuing legal education compliance cycle, twice the professional responsibility credit hours required by the state bar. The case is set for a status hearing on April 2, 2020 at 9:30 a.m.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 13, 2020