IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| LAURA MULLEN, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>GLV, INC., d/b/a SPORTS PERFORMANCE VOLLEYBALL CLUB and GREAT LAKES CENTER, an Illinois corporation, RICKY BUTLER, an individual, and CHERYL BUTLER, an individual,<br><br>*Defendants.* | Case No. 18-cv-1465<br><br>Honorable Matthew F. Kennelly |

**DEFENDANTS' MOTION FOR LEAVE TO FILE MOTION AND INCORPORATED MEMORANDUM FOR SANCTIONS AGAINST PLAINTIFF AND HER ATTORNEYS IN EXCESS OF 15 PAGES**

Defendants GLV, Inc., ("GLV") Ricky Butler ("Rick"), and Cheryl Butler ("Cheryl") by and through their counsel, Danielle D'Ambrose of D'Ambrose P.C., respectfully request that this Court enter an Order allowing them to file a Motion and Incorporated Memorandum for Sanctions against Plaintiff and Her Attorneys in Excess of 15 Pages and, in support thereof, state as follows:

1. Defendants file this Motion for Leave to respectfully request this Court grant them leave to file a 98-page Motion and Incorporated Memorandum for Sanctions against Plaintiff and Her Attorneys. (Exhibit A) Defendants do not take the rules of this District lightly, and they recognize that their Motion and Memorandum of Law extends far beyond the page limit imposed by the local rules. However, a pervasive, fraudulent scheme on the Court was orchestrated by Jay Edelson and advanced by Laura Mullen, which demands this Court's attention. The Supreme Court has held that "[n]o fraud is more odious than an attempt to subvert the administration of justice." *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 251 (1944). Defendants should not be prevented from setting forth the aberrant extent of Plaintiff's transgressions.

1

2. The governing rules and case law require that Defendants describe the "specific conduct" to be sanctioned and prohibit the Defendants from incorporating arguments by reference. *See Delaware Motel Associates, Inc. v. Capital Crossing Servicing Company LLC*, Case No. 17 C 1715, 2019 WL 1932586 at *3 (N.D. Ill. May 1, 2019) (refusing to consider arguments incorporated by reference and stating that defendants' attempt to do so was "inappropriate" under "Rule 11(c)(2), which requires a moving party to make a motion for sanctions 'separately from any other motion' and 'describe the specific conduct that allegedly violates Rule 11(b),'" as well as under section 1927, which "similarly must articulate bases for relief in a separate filing").

3. The gross misconduct of Plaintiff and her attorney began during their investigation of the claims in the Complaint and has continued even after this Court granted summary judgement in favor of Defendants.

4. In 2017, Laura Mullen became involved in an ongoing scheme to remove the Butlers from volleyball through "extreme measures." (Exhibit 2, p. 111) Similarly, in 2017, Jay Edelson was hired by Rick's accusers to help them "reach their goals" of removing the Butlers from volleyball, and he began his investigation for this lawsuit "well before" the end of 2017. (Exhibit 5) In January of 2018, Laura Mullen received a private message on Volleytalk asking her to help Rick's accusers "with the legal aspect" of reaching their goals to remove Rick from the sport. *Id.* The evidence in Defendants' Motion for Sanctions verifies that Plaintiff's counsel orchestrated this duplicitous litigation in conjunction with the alleged victims for the improper purpose of removing the Butlers from the sport of volleyball.

5. Furthermore, in the months before filing this lawsuit, Mullen was actively engaged in discussions about how to inflict the most financial and reputational harm on the Defendants. (Exhibit 3; Exhibit 6) For example, Mullen supported and boasted about her own efforts to publicly

pressure college coaches to boycott the recruitment of Sports Performance athletes, threaten companies with negative publicity if they refuse to cut ties with the Defendants, and ban all Sports Performance athletes from participating in national tournaments. (Exhibit 4, pp. 18, 23) Evidence regarding Mullen's participation in these discussions demonstrates her intent to abuse the judicial system for the improper purpose of inflicting financial and reputational harm on the Defendants and destroying their business.

6. Prior to and even during this litigation, Laura Mullen encouraged, participated in, and oftentimes led a campaign to harass the Defendants by vandalizing their property, photographing them in public, and threatening their personal wellbeing. Mullen even expressed her pleasure at the idea that her lawsuit took "years off [Rick's] life because of the immense stress and scrutiny he is under fire for," and she similarly endorsed a post wishing Rick "the most painful remaining life and a miserable death." (Exhibit 6, pp. 27, 29) Evidence related to Mullen's participation in these discussions evidences her improper intent to abuse the judicial system and subject the Defendants to harassment.

7. After this lawsuit was filed, Mullen was engaged in discussions about this litigation, and her social media activity provides direct evidence that her lawsuit is meritless and was brought for an improper purpose. For example, in a public discussion about the merits of this litigation, Mullen confirmed that her "***true intentions are to completely destroy everything [Rick] has built and absolutely demolish any reputation [the Butlers] will ever have again***." (Exhibit 2, p. 106) Similarly, Mullen endorsed a post expressing "doubt [that] there is a viable theory of damages" and that the goal is to "punish the defendant with the process." (Exhibit 2, p. 39)

8. Laura Mullen's activity log on Volleytalk contains over 700 entries—500 of which occurred in 2018 alone—vastly taking place within threads or discussions related to Rick and

3

Cheryl Butler. (Exhibit 8) Between 2016-2018, Mullen was active in at least 17 different threads discussing the allegations of abuse and the various ways in which the Butlers could be attacked, both professionally and personally. (Exhibit 8; Exhibit 3) Mullen's activity demonstrates her intent to abuse the judicial system for the improper purpose of inflicting financial and reputational harm on the Defendants and destroying their business. *See Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (finding that bad faith may be found in the actions that led to the lawsuit).

9. Defendants' Motion also sets forth the core claims of Plaintiff's Complaint that have been proven false, which her attorneys knew or should have known were false before the Complaint was filed.[1] For example, Mullen's claims were predicated on her assertion that she sent her child to the Defendants' organization without knowledge of Butler's history of sexual abuse. (Dkt. 1, ¶ 4) This was a lie. On summary judgment, this Court ruled that "Mullen's contention does not withstand scrutiny. By the summer of 2015, Mullen was aware of Rick's reported history of sexual abuse… But despite her awareness of all of this information, Mullen chose to enroll her daughters in GLV's programs for both the 2015-16 and 2016-17 volleyball seasons." (Dkt. 183, pp. 21-22)

10. Likewise, Mullen claims that, had she and members of the class known "the truth" about the allegations of sexual abuse against Rick Butler from the 1980s, they would "not have participated in any GLV associated volleyball programs." (Dkt. 1, ¶ 160) This is a lie. Furthermore, she argued that "had she known about Butler's past abusive behavior she would not have sent her daughters to GLV at all." (Dkt. 83-1, p. 6) This is another lie. This Court noted as much when it found that, even after filing this lawsuit, Mullen "enrolled one of her daughters in a GLV summer

---

[1] As set forth more fully in Defendants' Motion, Mullen was recruited through Volleytalk to be the class representative in this litigation by one of the accusers. Therefore, Mullen's attorneys would have knowledge of her Volleytalk username and had access to hundreds of entries in Mullen's activity log, including those from 2015-2016 in threads discussing the allegations of abuse against Rick Butler.

4

program in 2018, and this program took place at a facility in which Rick had an office. Thus, even after she had learned, in her words, the 'truth of the allegations against Rick,' Mullen chose to pay for GLV's services." (Dkt. 183, p. 22)

11. Plaintiff and her attorneys made numerous false assertions to this Court to advance claims which were doomed from the start. For example, Plaintiff urged the Court to deny Defendants' Motion to Dismiss, arguing that "[t]he Court should decline to take judicial notice of the news articles appended to [Defendants'] Motion, as none of the articles are referenced in the Complaint and they are inconsistent with her claims that *she did not see any information online until June of 2017* due to Defendants' concealment." (Dkt. 57, p. 20 fn. 4) (emphasis added). Again, Plaintiff and her attorneys lied to this Court. The ESPN article was, in fact, mentioned in the very first paragraph of her Complaint, and the Court determined on summary judgment that "[i]n the summer of 2015, Mullen commented on a Volleytalk thread discussing the EPSN.com article about Rick's history of abuse." (Dkt. 1, ¶ 1; Dkt. 183, p. 21) In addition, the Court stated, "Mullen concedes that, between 2015 and 2017, she was generally aware of the allegations regarding sexual abuse by Rick and had reviewed news articles on the subject." (Dkt. 183, p. 4)

12. The Court's ruling on summary judgment leaves no question that Plaintiff and her counsel knowingly lied about the core facts of her claims, but that is just the beginning of their fraud on this Court. Each misrepresentation advanced during this litigation added to the abuse of the judicial process. *See Fuery v. City of Chicago*, 900 F.3d 450 (7th Cir. 2018) (noting that "the whole of abusive action is greater than the sum of the parts of which it is made"). The Seventh Circuit has stated, "[w]ere we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment. But these incremental abuses chip away at the fair administration of justice and frustrate a trial judge's faith that she can rely upon the lawyers before her—officers of

the court—to set forth a fair and accurate presentation of the facts and law." *Id*. (citing *Chambers v. NASCO, Inc*., 501 U.S. 32, 35 (1991) and *Tucker v. Williams*, 682 F.3d 654, 661 (7th Cir. 2012)).

13. The 72-page Complaint is rife with irrelevant, false claims, and they should not be disregarded or lost among the more substantial falsities at issue. For example, Mullen and her attorneys included the fictional and reprehensible claim that, "[o]n information and belief, in the late 1980s, Cheryl arrived at a friend's apartment crying and very upset because Butler had asked Cheryl if he could call her by one of those girl's names while they were having sex." (Dkt. 1, ¶ 137 fn. 6) This allegation, along with many others in the Complaint which are irrelevant, redundant, and/or sexually explicit, serves absolutely no purpose but to publicly humiliate the Defendants with false and salacious accusations that are wholly unnecessary for Mullen to plead her cause of action. *Jimenez v. Madison Area Tech. Coll*., 321 F.3d 652, 656-57 (7th Cir. 2003) (sanctions imposed for "false, fraudulent and salacious" accusations which "exploited the judicial process" and subjected opposing party to harassment, including "unnecessary embarrassment and mental anguish").

14. Defendants' Motion addresses the abundance of false claims made by Plaintiff and her counsel. For example, Plaintiff lied about when her daughters left the program, she lied about why her daughters left the program, and she lied about whether she received contracts for the program. Plaintiff lied about when her husband passed away, she lied about why her daughter saw a therapist, and she lied about when and why her daughter started losing weight. Plaintiff also lied about the number of accusations against Rick, and she lied about when those allegations took place. Plaintiff lied about the purpose of the USAV and DCFS proceedings, she lied about the findings of those proceedings, and she lied about the publicity related to those findings. Defendants address each of these lies in their Motion for Sanctions. While each falsity may not be independently

sanctionable, Plaintiff's pattern of deceit chipped away at the fair administration of justice and ensured that this case began with a prejudicial and inaccurate presentation of the facts and law.

15. Mullen was shameless in her open acknowledgement of the falsity of her allegations, and she made it clear that her goal was to attract headlines in this case. Defendants provide numerous instances where Mullen's activity on Volleytalk directly undermines a claim made to this Court. For example, within 24 hours of her Complaint being filed, alleging a "special relationship" with Michigan State University, Mullen endorsed the comment that "Michigan State ***isn't unique*** in having coaches with ties to Butler/SPVB, but the choice to highlight THAT program and not others was certainly deliberate on the part of the attorneys drafting the complaint. It sends a specific signal." (Exhibit 2, p. 23) Mullen endorsed a post stating the lawsuit was "well-timed," noting "the strategic references" to Michigan State University and another calling the university an "easy target." (Exhibit 3, pp. 5, 8) This is just one of many misrepresentations which evidence Plaintiff's pervasive scheme to attract publicity and harm the Defendants' business with false and/or irrelevant claims.

16. The Complaint also contains numerous "exhibits" which are misleading excerpts of inadmissible documents of which she and her attorneys have zero personal knowledge. Then, on summary judgment, Plaintiff attempted to introduce another set of inadmissible and irrelevant documents. The fact that Plaintiff and her attorneys cited to such plainly inadmissible matter is evidence of their improper motive. Additionally, where those documents contradict her assertions, they demonstrate the bad faith arguments made to this Court by Mullen and her counsel. For example, on summary judgment, Plaintiff's brief argues the USAV findings were non-public because, according to Mullen, in a letter written in 1995, "USAV's attorney even wrote that 'the Committee is doing its best to keep this matter confidential.'" (Dkt. 171, p. 12) Plaintiff, attempting

to advance a fictional theory, intentionally misleads the court by quoting only half of the sentence. The sentence, in full, states, that "[t]he Committee is doing its best to keep this matter confidential *despite the unfortunate publicity that has already occurred*." *Id*. (emphasis added) Plaintiff's "evidence" of her claims was a brazen attempt to mislead the Court with a document that clearly contradicted her position.

17. Mullen has also used Volleytalk during this litigation to disparage Defendants, their attorney, and their arguments in this litigation. For example, Mullen openly mocked the Defendants on June 2, 2018, stating that "the 'continuously evolving allegations' are NOT 'evolving' in his favor. These deflection tactics aren't going to work anymore...green attorney." (Exhibit 4, p. 3) Just two days later, Mullen ridiculed Defendants' arguments in their Motion to Dismiss and liked a post which said, "[Butler's] attorney needs to quit saying everything is false, unsubstantiated, and without merit. If your client feels wrongfully accused, he should sue. If not, shut up and go away." (Exhibit 3, p. 34)

18. Defendants' Motion discusses two letters sent to Plaintiff's counsel warning Plaintiff's attorney, Jay Edelson, that Defendants would seek sanctions pursuant to Rule 11. In their first letter, Defendants listed approximately 14 different points and attached 60 pages of evidence which disproved the claims in the Complaint. (Exhibit 20) Defendants' second letter addressed Mullen's decision to send her daughter to a GLV program during this litigation, showing an unabashed disregard for her claims during this judicial process. (Exhibit 21; Dkt. 183, p. 22) Each of these letters contained arguments which were later confirmed in the Court's summary judgment ruling in favor of the Defendants.

19. Furthermore, both Laura Mullen and Jay Edelson have, at various points in this litigation, submitted carefully contrived, ubiquitous, perjurious statements within sworn

8

declarations to this Court. Such conduct, alone, warrants severe sanctions. *See Alexander v. Caraustar Industries, Inc.*, 930 F.Supp.2d 947 (7th Cir. 2013) (finding that severe sanctions were justified when falsehoods constituted perjury on matters at the core of the case). For example, it was Plaintiff's attorney, Jay Edelson who provided the only evidence used in support of Plaintiff's wild theories in her motion for expedited discovery. There, Mr. Edelson stated in a sworn declaration that he "heard from individuals following the case" that the Butlers were traveling overseas to transfer funds or start a new business. (Dkt. 17-3, ¶ 2-7) In reality, it was Laura Mullen who was spreading these false rumors about the Defendants on Volleytalk. (Exhibit 4, pp. 4, 6, 11, 13) That it was Mr. Edelson, as opposed to Laura Mullen, who advanced the false claims under oath is just one example of his complicity in bringing Mullen's bad faith claims before this Court.

20. In their Motion for Sanctions, Defendants set forth the pattern of prejudicial and deceptive litigation tactics employed by Plaintiff's counsel throughout this matter, including their improper course of conduct referred to as "litigation by sanction." The "sanctions tort" has been described as discovery gamesmanship in which one party will "exploit or abuse judicial procedures" to generate sanctions against an opposing party. Defendants point to several filings, transcripts, phone calls, and emails which evidence Mr. Edelson's abuse of the judicial process.

21. For example, attorneys employing these strategies are known to intentionally provoke disputes to create the perception of bad faith, for example, by inundating courts with "motions for sanctions based upon speculation that responsive material is being withheld with nefarious intent." This is precisely the strategy employed by Jay Edelson. For example, Plaintiff filed a Motion for Rule to Show Cause against Defendants, arguing that Defendants were in contempt of court for their allegedly deficient discovery responses and claiming that "[e]ven the most basic and obviously relevant pieces of information were withheld—e.g., the contract(s)

9

Defendants contend they entered into with Plaintiff and are operative here, any marketing materials Defendants issued during the relevant period, and the like." (Dkt. 59, ¶ 5) Remarkably, Plaintiff's argument omitted a crucial piece of information – *that Plaintiff never actually requested those contracts and marketing materials be produced*. (Dkt. 71, p. 5) Defendants' Motion for Sanctions sets forth additional evidence of Mr. Edelson's abusive, deceitful, and prejudicial tactics, such as Mr. Edelson's propensity for making unreasonable demands of Defense counsel and threatening her with violations of non-existent laws or rules.

22. Plaintiff's false accusations with class members have consistently included baseless accusations towards Defense counsel. For example, Plaintiff's attorneys argued that Defense counsel intended to mislead the class when she "issued a statement to the press falsely claiming" that "[t]he recent lawsuit against Rick Butler, filed by a disgruntled parent, concerns alleged misrepresentations related to contracts and business practices." (Dkt. 48, pp. 1, 4-10) When the Parties appeared at a hearing on Plaintiff's accusations, this Court flat-out rejected Plaintiff's position, explaining that Defense counsel's statement "is absolutely true…It's not false at all. It's not misleading at all. It is. I mean, each one of [Plaintiff's] claims is a claim for deception. You have a claim for deception under the IPFSA. You have a claim for deception under the ICFA. You have a common law misrepresentation claim. You have an unfair practices claim under the ICFA. You have a contract deficiency claim under the IPFSA, and you've got an unjust enrichment claim. All of those concern misrepresentations related to contracts and business practices. So that statement is true." (Dkt. 141-2, pp. 10-11) Then, several months later, Plaintiff filed a motion for sanctions which referenced Plaintiff's prior, baseless arguments to this Court that Defense counsel "engaged in misleading and improper communications with class members since the beginning of this case." (Dkt. 143, p. 5) Defendants' Motion for Sanctions outlines additional, similar tactics

10

employed by Plaintiff's counsel which evidence a pattern of misconstruing communications in an attempt to mislead the Court and prejudice Defendants by falsely casting them in a negative light.

23. Furthermore, Rule 37 "provides for the imposition of sanctions against a party that fails to make disclosure or cooperate in discovery." *Dotson v. Bravo*, 202 F.R.D. 559 (N.D. Ill. 2001). Under the rule, when a party engages in abusive and obstructive discovery tactics by failing to properly respond to discovery requests in any way, the court may impose sanctions directly, without first issuing an order to compel discovery. *Dotson v. Bravo,* 202 F.R.D. 559, 570 (N.D. Ill. 2001). Defendants' Motion for Sanctions describes the manner in which Jay Edelson abused Local Rule 37.2 requiring a good faith effort to resolve discovery disputes. For example, Defendants provide evidence that Mr. Edelson used the meet and confer requirement to interrogate Defense counsel on a phone call which, unbeknownst to her at the time, was an attempt to manufacture evidence to be used against her clients in a motion seeking sanctions against Defendants. (Dkt. 48-4, pp. 6-12)

24. Furthermore, Defendants' Motion for Sanctions argues that Plaintiff and her attorneys used the Complaint to obtain discovery to which she was not entitled. Defendants also contend that Plaintiff's attorneys intentionally provided unreasonable responses to interrogatories, that they intentionally deceived Defense counsel to induce her to agree to a substantial extension of a deadline, and that they provided intentionally evasive responses, presumably to conceal evidence of bad faith on the part of both Mullen and her attorneys. To illustrate just one of many instances of discovery misconduct, when Mullen was asked to state the facts upon which she based her allegation that "Defendants have a 'special relationship' with Michigan State University," Plaintiff merely provided Defendants with the title—not even a link—to a Chicago Tribune article which was published *after this litigation* was filed. (Dkt. 144-4, pp. 29-30) Mullen was not

11

interviewed in the article, so Plaintiff's response gives no information about what information was known to Laura Mullen prior to filing her Complaint. Defendants' Motion for Sanctions provides additional evidence of the discovery abuse perpetrated by Mullen and her attorneys, justifying sanctions pursuant to Rule 37.

25. Remarkably, Plaintiff filed this action claiming to represent the interests of *thousands* of individuals. (Dkt. 1, ¶ 178) Yet, after spending four years in GLV programs and meeting dozens—if not hundreds—of other parents, Mullen and her attorneys could not identify a single person who supported her claims. (Dkt. 195) After over two years of litigation and countless national headlines, Plaintiff's attorneys could not find *one* member of the class to replace Laura Mullen as the class representative. After nearly two thousand class members were sent the court-approved notice of Plaintiff's claims, not a single person was persuaded to carry on the class allegations. Plaintiff attempts to save face by inventing a theory that the Defendants and their attorney have intimidated these class members—most of which are no longer in the program—from coming forward. (Dkt. 195, ¶ 10)

26. The day after this lawsuit was filed, Jay Edelson boasted to a news publication that his firm received "many calls and emails from people offering to provide further evidence in support of our lawsuit." Yet, no such evidence of these communications has been produced. Instead, the record supports an inference that Mr. Edelson intended to publicly create the false impression that additional allegations of abuse were made after the case was filed when, in reality, Plaintiff had no factual basis for the claim that Rick "sexually abuse[d] no fewer than six" women, and no facts upon which to assert there were "likely many more." (Dkt. 1, ¶ 1)

27. Mullen's Complaint was not filed as a class action to advance claims on behalf of the class. It was filed as a class action so her attorneys could exploit the rules governing class

actions and improperly interfere with the Defendants' relationships with their customers. Within the first weeks of this litigation, Plaintiff sought "expedited discovery concerning Defendants' communications with potential Class members…in order to ensure the proper administration of justice and that Defendants abide by the class action process." (Dkt. 17, p. 3) From there, Plaintiff's attorneys carried out a scheme prohibit the Butlers from defending themselves. According to the Plaintiff, the Butlers could not call this lawsuit frivolous, even though it was; they could not say Mullen was lying, even though she was; they could not say they that their evidence would defeat Mullen's claims, even though it did.

28. It is clear that Plaintiff and her attorneys were attempting to prohibit the Butlers from doing anything which would even suggest that the allegations against Rick were false. Plaintiff urged the Court to prohibit the Butlers from: (1) denying and/or discrediting the accusers, (2) referring to the stories as "allegations," (3) calling an accusation a "false statement," (4) raising the implication that evidence "relating to the allegations" could show another "side of the story," (5) stating that there exists "another side to the story," and (6) collecting positive testimonials from parents about their experiences in various GLV programs. (Dkt. 171, pp. 20-21) The idea that any of these actions could support a fraud claim is a frightening notion that has no basis in law or fact.

29. The length of Defendants' Motion for Sanctions is required to address the abundance of relevant evidence of Plaintiff and her attorneys' sanctionable conduct. There is no doubt that Plaintiff and her attorneys have taken comfort in the fact that it takes nearly 100 pages to set forth the devious, calculated scheme of fraud they perpetrated on this Court. (Exhibit A) Defendants would be highly prejudiced if they were forced to remove relevant arguments and references to evidence to meet a shorter page limit for this Motion. For example, Defendants cite to several court orders, court transcripts, motions, status reports, pleadings, and numerous exhibits

in the Court's record. (Exhibit A) In addition, they intend to introduce 34 exhibits, attached hereto, which further evidence the misconduct of Plaintiff and her attorneys. *See Life After Hate, Inc. v. Free Radicals Project, Inc.*, No. 18 C 6967, 2020 WL 992696 at *1 (E.D. Ill. March 2, 2020) ("Here, as always, evidence, not partisan conclusions, must govern.") Defendants have worked tirelessly on their Motion for Sanctions to ensure that, while they are addressing an abundance of arguments and issues, they do so in a concise, logical manner. For example, Defendants efficiently present evidence by utilizing bullet points and numbered lists to avoid repetitive arguments.

30. The sheer volume of false claims and assertions advanced by Laura Mullen and Jay Edelson is appalling. Having trampled on the integrity of the court, their sanctionable misconduct should be set forth in full. To do so, Defendants are required to exceed the page limits set by the rules of this District and implore this Court to grant this Motion and allow Defendants to file a 98-page Motion and Incorporated Memorandum for Sanctions Against Plaintiff, Laura Mullen, and her attorneys, attached hereto as Exhibit A.

WHEREFORE, Defendants respectfully request that this Honorable Court enter an Order granting Defendants' Motion and allowing them to file a 98-page Motion and Incorporated Memorandum for Sanctions Against Plaintiff and Her Attorneys and granting any other relief that this Court deems just and proper.

Date: May 18, 2020

>Respectfully Submitted,
>GLV, INC., RICK BUTLER, and
>CHERYL BUTLER
>
>By: */s/ Danielle D'Ambrose*
>One of Their Attorneys

Danielle D'Ambrose
D'AMBROSE P.C.
500 North Michigan Avenue, Suite 600
Chicago, IL 60611
P: (312) 396-4121 | F: (312) 574-0924
Danielle@DambrosePC.com
ARDC No. 6323782

*Attorney for Defendants*

**CERTIFICATE OF DELIVERY**

The undersigned, an attorney, certifies that pursuant to Section X (E) of the General Order on Electronic Case Filing for the Northern District of Illinois, service of the above and foregoing document on all attorneys of record was accomplished through the Court's Electronic Notice for Registrants on May 18, 2020.

<i>/s/ Danielle D'Ambrose</i>