# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

LAURA MULLEN, individually and on
behalf of all others similarly situated,

        *Plaintiff,*

v.

GLV, INC., d/b/a SPORTS
PERFORMANCE VOLLEYBALL CLUB
and GREAT LAKES CENTER, an Illinois
corporation, RICKY BUTLER, an individual,
and CHERYL BUTLER, an individual,

        *Defendants.*

Case No. 18-cv-1465

Honorable Matthew F. Kennelly

## DEFENDANTS' MOTION AND INCORPORATED MEMORANDUM
## FOR SANCTIONS AGAINST PLAINTIFF AND HER ATTORNEYS

Dated: May 18, 2020

Danielle D'Ambrose
D'AMBROSE P.C.
500 North Michigan Avenue, Suite 600
Chicago, IL 60611
(312) 396-4121
ARDC No. 6323782

Attorney for Defendants
*Rick Butler, Cheryl Butler, and*
*GLV, Inc. d/b/a Sports Performance Volleyball Club*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**................................................................................................iii

**PROCEDURAL BACKGROUND** ....................................................................................1

**ARGUMENT** .................................................................................................................2

I.     **PLAINTIFF AND HER ATTORNEYS FILED THIS LAWSUIT FOR AN IMPROPER PURPOSE TO HARASS DEFENDANTS, TO DESTROY THEIR BUSINESS, AND TO PUBLICIZE IRRELEVANT AND SALACIOUS CLAIMS**................................................................................................11

     A.     **Mullen and the Ongoing Campaign to Remove Butler from Volleyball Through "Any Means Necessary"** .......................................................12

     B.     **This Sham Lawsuit, Plagued by False Statements, Was a Pretext for Mullen's and her Counsel's Coordinated Aim to Remove the Butlers from the Sport of Volleyball**.......................................................19

II.     **MULLEN'S PUBLIC HARASSMENT OF DEFENDANTS CONTINUED THROUGHOUT THIS LAWSUIT**................................................................20

III.     **MULLEN ADMITS HER LAWSUIT WAS MERITLESS AND FILED FOR AN IMPROPER PURPOSE**.............................................................................24

IV.     **PLAINTIFF AND HER ATTORNEYS ADVANCED FALSE AND IRRELEVANT FACTUAL ALLEGATIONS TO PUBLICLY DAMAGE DEFENDANTS' REPUTATIONS AND BUSINESS** ...................................26

     A.     **The Complaint's Core Allegations Are False**................................27

     B.     **The Complaint Pleads Nearly 50 Pages of Irrelevant and Salacious Allegations**................................................................................31

     C.     **Plaintiff Misrepresents and Improperly References the DCFS Proceedings**................................................................................40

     D.     **Mullen's False Allegations Related to Her Own Experience with Sports Performance**........................................................................43

          1.     **Mullen's Claims of Physical and Emotional Abuse of Her Daughter Are False**................................................................44

          2.     **Mullen Lied About When and Why Her Younger Daughter Left the Sports Performance Program**........................................46

i

        3.      **Mullen Falsely Claimed She Did Not Receive a Copy of Her Contract to Deceive This Court and Survive Defendants' Motion to Dismiss**............................................................47

    E.    <u>**Defendants Warned Plaintiff That They Would Seek Sanctions for Her False Claims and Assertions to the Court**</u>...................................47

**V.    SANCTIONS ARE WARRANTED FOR PLAINTIFF'S BAD FAITH ASSERTIONS**............................................................................................51

    A.    <u>**Plaintiff's Fraudulent Concealment Claim Was Brought in Bad Faith and Relies Upon False Claims**</u>...................................................52

    B.    <u>**Sanctions Are Warranted for Pursuing Meritless Claims on Summary Judgment**</u>..........................................................................55

        1.      **Mullen Should Be Sanctioned for Arguing New and Contradictory Facts in Bad Faith**...................................................................56

        2.      **Mullen's Attempts to Mislead the Court About the Significance of the USAV and DCFS Proceedings on Summary Judgment**............57

    C.    <u>**Plaintiff's Version of "The Truth" is Asserted in Bad Faith**</u>.........................59

    D.    <u>**Plaintiff's Attorneys Employed Improper Litigation Tactics to Advance Bad Faith Accusations Against Defendants and Their Counsel**</u>...................61

        1.      **Plaintiff's Attacks on Defendants and Their Attorney Were Part of a Pattern that Plagued This Entire Litigation**...................................62

        2.      **The False Claims of Misconduct Created by Edelson PC Had a Distinct and Inappropriate Focus on Defense Counsel**...................65

**VI.    PLAINTIFF AND HER ATTORNEYS SHOULD BE SANCTIONED FOR DISCOVERY MISCONDUCT**...........................................................................68

    A.    <u>**Plaintiff and Her Attorneys Relied Upon Fabricated Claims and Evidence to Obtain Discovery**</u>...............................................................74

    B.    <u>**Plaintiff and Her Attorneys Answered Discovery in Bad Faith**</u>...................76

    C.    <u>**Plaintiff Intentionally Engaged in Unnecessary Discovery to Harass Defendants**</u>.............................................................................81

**VII.** **THE COURT SHOULD SANCTION MULLEN AND HER ATTORNEYS AND AWARD DEFENDANTS ATTORNEYS FEES, COSTS AND EXPENSES**...................................................................................82

    **A.** **Edelson PC Orchestrated This Litigation in Bad Faith**.................................84

    **B.** **Sanctions Are Warranted Under Rule 11**.................................88

    **C.** **Sanctions Are Warranted Under 28 U.S.C. § 1927**.................................90

    **D.** **Sanctions Should Be Entered Pursuant to This Court's Inherent Power**......91

**CONCLUSION**.................................................................................98

# TABLE OF AUTHORITIES

**United States Supreme Court Cases:**

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) ....................................................................................*passim*

*Cooter & Gell v. Hartmarx Corp.,*
    496 U.S. 384 (1990) .............................................................................29, 89

*Goodyear Tire & Rubber Co. v. Haeger,*
    137 S. Ct. 1178 (2017) ................................................................................91

*Hazel–Atlas Glass Co. v. Hartford–Empire Co.,*
    322 U.S. 238 (1944) .....................................................................................59

*Roadway Express, Inc. v. Piper,*
    447 U.S. 752 (1980) .....................................................................................62


**United States Court of Appeals Cases:**

*Alexander v. Caraustar Industries, Inc.,*
    930 F.Supp.2d 947 (7th Cir. 2013) ...............................................31, 44, 59

*Allen v. Chi. Transit Auth.,*
    317 F.3d 696 (7th Cir. 2003) .......................................................................75

*Barnes v. Dalton,*
    158 F.3d 1212 (11th Cir. 1998) ...................................................................88

*Carr v. Tillery,*
    591 F.3d 909 (7th Cir. 2010) .......................................................................91

*Fabriko Acquisition Corp. v. Prokos,*
    536 F.3d 605 (7th Cir. 2008) .......................................................................89

*Fednav Int'l Ltd. v. Cont'l Ins. Co.,*
    624 F.3d 834 (7th Cir. 2010) .......................................................................90

*First Bank of Marietta v. Hartford Underwriters Ins. Co.,*
    307 F.3d 501 (6th Cir. 2002) .........................................................................8

*Fries v. Helsper,*
    146 F.3d 452 (7th Cir.1998) ........................................................................88

iv

*Fuery v. City of Chicago,*
    900 F.3d 450 (7th Cir. 2018) ..................................................................10, 51

*Golden v. Helen Sigman & Assocs.,*
    611 F.3d 356 (7th Cir. 2010) .........................................................................89

*Holly v. Wexford Health Services, Inc.,*
    339 Fed.Appx. 633 (7th Cir.2009) ..................................................................4

*Jimenez v. Madison Area Tech. Coll.,*
    321 F.3d 652 (7th Cir. 2003) ...........................................................19, 61, 97

*Jolly Grp. Ltd. v. Medline Indus. Inc.,*
    435 F.3d 717 (7th Cir. 2006) ...................................................................57, 90

*LHO Chicago River, L.L.C. v. Perillo,*
    942 F.3d 384 (7th Cir. 2019) .........................................................................12

*Mach v. Will County Sheriff,*
    580 F.3d 495 (7th Cir. 2009) ...........................................................................7

*Profile Gear Corp. v. Foundry Allied Indus,*
    937 F.2d 351 (7th Cir. 1991) .........................................................................79

*Rivera v. Drake,*
    767 F.3d 685 (7th Cir. 2014) .........................................................................27

*Samuels v. Wilder,*
    906 F.2d 272 (7th Cir. 1990) .........................................................................90

*Secrease v. Western & Southern Life Ins. Co.,*
    800 F.3d 397 (7th Cir. 2015) .........................................................................27

*Tillman v. New Line Cinema,*
    374 Fed. Appx. 664 (7th Cir. 2010) ..........................................................57, 90

*Tucker v. Williams,*
    682 F.3d 654 (7th Cir. 2012) .........................................................................11

**United States District Court Cases:**

*In re Alberto,*
    119 B.R. 985 (Bankr. N.D. Ill. 1990) .........................................................19, 89

*Dotson v. Bravo,*
    202 F.R.D. 559 (N.D. Ill. 2001) ................................................................76, 90

*Dupuy v. McDonald*,
    141 F. Supp. 2d 1090 (N.D. Ill. 2001) ............................................................42

*Egan v. Maguire*,
    338 F.Supp.3d 799 (N.D. Ill. 2018) ................................................................89

*Jacks v. DirectSat USA LLC*,
    No. 10 C 1707, 2011 WL 382858 (N.D. Ill. Feb. 1, 2011) ...............................77

*Officer v. Duran*,
    No. 12-cv-10195, 2014 WL 51330 (N.D. Ill. Jan. 2, 2014) .............................81

*Rackemann v. LISNR, Inc.*,
    2018 WL 3328140, No. 1:17-cv-00624-MJD-TWP (N.D. Ill. July 6, 2018) .................73

*Thompson v. Fajerstein*,
    No. 08-cv-3240, 2010 WL 4628515 (N.D. Ill. Nov. 8, 2010) ..........................74

**Rules and Statutory Authorities:**

28 U.S.C. § 1927 ..............................................................................................90

Fed. R. Civ. P. 11 ...................................................................................*passim*

Fed. R. Civ. P. 12 ..............................................................................................63

Fed. R. Civ. P. 37 .................................................................................76, 80, 91

Fed. R. Civ. P. 56 ..............................................................................................56

**Other Authorities:**

Christian Red, *Coach Rick Butler, already booted from USA Volleyball and AAU following sex abuse allegations, now banned from youth tournament at Disney*, NY Daily News, June 1, 2018, https://www.nydailynews.com/sports/more-sports/ny-sports-butler-volley ball-disney-20180601-story.html (last visited May 17, 2020) ................................................81, 93

Christian Red, *New Federal Class-Action Suit Against Rick Butler Seeks to Prevent Him from Interacting With Minors*, New York Daily News, March 1, 2018, http://www.nydaily news.com/sports/more-sports/new-suit-rick-butler-seeks-protect-minors-article-1.3850082 (last visited May 17, 2020) ...........................................................................................83

Cindy Kuzma, *Jay Edelson Is the King of the Court(room)*, Chicago Magazine, June 14, 2009, http://www.chicagomag.com/Chicago-Magazine/June-July-2019/Jay-Edelson -Is-the-King-of-the-Courtroom/ (last visited May 17, 2020) ........................................20

Conor Dougherty, *Jay Edelson, the Class-Action Lawyer Who May Be Tech's Least Friended Man*, The New York Times, April 4, 2015, https://www.nytimes.com/2015/ 04/05/technology/unpopular-in-silicon-valley.html (last visited May 17, 2020) ........................87

Dan Churney, *Plaintiffs' lawyer Edelson: Defense firm Johnson & Bell's defamation action an improper SLAPP suit*, Cook County Record, July 4, 2018, https://cookcounty record.com/stories/511474556-plaintiffs-lawyer-edelson-defense-firm-johnson-bell-s- defamation-action-an-improper-slapp-suit (last visited May 17, 2020) ......................................87

Hannah Leone, *Federal lawsuit accuses Aurora volleyball coach, club of covering up sex abuse*, Aurora Beacon-News, Chicago Tribune, February 28, 2018, https://www. chicagotribune.com/suburbs/aurora-beacon-news/ct-abn-class-action-butler-st-0228- 20180228-story.html (last visited May 17, 2020) ..........................................................84

Illinois State Senate *Task Force Hearing*, May 15, 2018, http://www.ilga.gov/senate/ committees/100Documents/SDHA/Hearing%20Packet%205.15.2018.pdf (last visited May 17, 2020) ....................................................................................................................35, 85

Kenneth W. Starr, *Law and Lawyers: The Road to Reform*, 63 Fordham L. Rev. 959 (1995) ...................................................................................................................................69

Lauraann Wood, Less Talk, More Walk In Volleyball Sex Abuse Suit: Judge, Law 360, July 3, 2018, https://www.law360.com/articles/1059888/less-talk-more-walk-in-volley ball-sex-abuse-suit-judge   (last visited May 17, 2020) .............................................................81

Mary Ann Georgantopoulos, *A Top US Youth Volleyball Coach Is Accused Of Raping Teenage Girls Hundreds Of Times*, BuzzFeed News, February 28, 2018, https://www. buzzfeednews.com/article/maryanngeorgantopoulos/youth-volleyball-coach-lawsuit (last visited May 17, 2020) .................................................................................................68, 79

Michael Tarm, *Coach's accusers: Schools should end relationships with him*, The Associated Press, April 25, 2018, https://apnews.com/871f109e9fe2433b8959a1d7898 ea517/Coach's-accusers:-Schools-should-end-relationships-with-him (last visited May 17, 2020) ..............................................................................................................................33

Michael Tarm, *Michigan State kept ties to Aurora volleyball coach accused of sexual abuse*, The Associated Press, April 24, 2018 https://www.chicagotribune.com/news/ breaking/ct-michigan-state-kept-ties-to-coach-accused-of-sexual-abuse-20180423- story.html (last visited May 17, 2020) ...............................................................................33, 78

Defendants, GLV, Inc. d/b/a Sports Performance Volleyball Club and Great Lakes Center ("GLV"), Rick Butler ("Rick"), and Cheryl Butler ("Cheryl") submit this Memorandum of Law in support of their Motion requesting this Court impose Sanctions against Plaintiff and her attorneys. Before filing this lawsuit, Laura Mullen and her attorneys at Edelson PC, knew they had no case against the Defendants, but they nonetheless required Defendants to spend the time, effort, and money defending Plaintiff's frivolous claims. This lawsuit was filed and pursued in bad faith from the start, and the appropriate sanction is an award of all reasonable attorneys' fees, expenses, and costs related to the defense of this litigation, a fine payable to the Court, a public reprimand of each of Plaintiff's attorneys, additional hours of continuing legal education for each of Plaintiff's attorneys, and a referral of this matter and Plaintiff's attorneys' conduct to the Illinois Attorney Registration and Disciplinary Commission.

## **PROCEDURAL BACKGROUND**

Plaintiff filed this action pursuant to the Illinois Physical Fitness Services Act, 815 ILCS 645/1 *et seq.* (the "IPFSA"), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "ICFA"), common law fraud, common law fraudulent concealment, and unjust enrichment for Defendants' alleged failure to disclose claims of sexual abuse made against Rick Butler which allegedly occurred in the 1980s. (Dkt. 1, ¶ 181) On May 28, 2019, Defendants filed their Motion for Summary Judgment on all claims arguing, *inter alia*, that Laura Mullen was not deceived by any act of the Defendants and that she did not suffer any injury caused by the Defendants. (Dkt. 144) On September 4, 2019, Plaintiff filed her Response in Opposition to Defendants' Motion for Summary Judgment, largely ignoring Defendants' arguments and instead focusing on the underlying allegations, relying on inadmissible evidence, and advancing a new theory of factual liability against Defendants. (Dkt. 171) On September 18, 2020, Defendants

1

filed their Reply, objecting to the admissibility of Plaintiff's evidence and similarly objecting to Plaintiff's new theory. (Dkt. 172) On March 13, 2020, this Honorable Court entered a Memorandum Opinion and Order granting Defendants' Motion for Summary Judgment on all claims against Laura Mullen and allowing time for the Plaintiff Class to substitute a new class representative for her contract claim under the IPFSA, her deceptive practices claim under the ICFA, and for unjust enrichment.[1] (Dkt. 183, p. 26) On May 7, 2020, Edelson PC filed a Status Report stating that "Plaintiff does not intend to substitute a class representative" and asking the Court to enter final judgment in favor of Defendants. (Dkt. 195, ¶ 1)

## ARGUMENT

The Class Action Complaint in this case resembles a tabloid with lurid headlines and little substance. Laura Mullen, a mother of two daughters who played volleyball in Defendants' programs between 2012-2017, claims that Defendants fraudulently concealed claims of sexual abuse made against Rick Butler from the 1980s. (Dkt. 1, ¶¶ 160, 166) Mullen claims that, had she and members of the class known about those allegations, they would "not have participated in any GLV associated volleyball programs." (Dkt. 1, ¶ 160) Mullen's claims are predicated on her assertion that she sent her child to the Defendants' organization without knowledge of Butler's history of sexual abuse. (Dkt. 1, ¶ 4) However, it is difficult to surmise these basic facts of Mullen's case, since they do not appear until page 49 of the 72-page Complaint.

Instead of framing issues for the Court and pleading facts within her personal knowledge, the Complaint is filled with unabashed, irrelevant, and knowingly false claims, and Plaintiff includes innumerable "exhibits" of which she and her attorneys have zero personal knowledge.

---

[1] On April 3, 2020, Defendants filed a Motion to Amend/Correct the summary judgment Order to correct certain background facts and to clarify that the underlying allegations of abuse were not at issue in Defendants' motion. (Dkt. 188) While Defendants' motion is pending with this Court, the corrections Defendants seek should have no impact on the Court's ruling, as they relate entirely to allegations which were not at issue on summary judgment.

The Complaint begins with a patently false allegation that, "for over three decades, Rick [Butler] has used his position of power to sexually abuse no fewer than six underage teenage girls, and likely many more." (Dkt. 1, ¶ 1) This sensational claim was made to create the false perception that the allegations were recent, as opposed to taking place entirely in the 1980s. In reality, Plaintiff does not know of six accusers and she cannot point to a single allegation of abuse from the last three decades. (Dkt. 144-5, p. 17; Dkt. 144-4, pp. 15-18) The following 264 paragraphs reveal a pattern of gross mischaracterizations of fact and outright lies which continued throughout the course of this litigation.

Plaintiff and her attorneys included claims which were intentionally inappropriate and crafted to guarantee media coverage and public outrage. In fact, Mullen has recognized this litigation was filed for the purpose of "itemizing all the allegations in great deal in one place for news agencies to disseminate both local and national" and that she intended to "make it as public and embarrassing as possible for the Butlers." (Exhibit 2, pp. 44-46)

No more.

In the months leading up to this lawsuit, Mullen joined a campaign with a group of individuals, including those who have accused Butler of abuse, who have vowed to do whatever it takes to force the Defendants out of business. Mullen personally campaigned for college coaches to boycott recruitment from Defendants' program, she encouraged the stalking and harassment of the Defendants at their business, and she pressured and threatened businesses to cut all ties with the Defendants. (Exhibit 4, pp. 18, 23; Exhibit 31) Her conduct leading up to the filing of this litigation evidences her willingness to take extreme measures to put Defendants out of business. Mullen was actively engaged in discussions about how to inflict the most financial and reputational harm on the Defendants. (Exhibit 6) At the beginning of 2018, Mullen endorsed the idea that Rick

3

"has dealt with the [public relations] scrutiny for decades now but where it will really start to bother him is when he is losing registrations in his club and camps." (Exhibit 3, p. 2) While Mullen acknowledged that "getting all the parents to pull their funding is next to impossible," she also supported the proposal that "[w]hen it hurts more than helps to be associated with SPVB…that's when you'll see change." (Exhibit 3, pp. 12, 40) Yet, those involved in these discussions eventually determined that, so long as the Defendants had customers, they could not be put out of business.

Realizing that families would not willingly withdraw their support of the Butlers and the Sports Performance program, the women who accused Butler of abusing them in the 1980s retained attorney Jay Edelson, who they claimed had "some good angles" to reach their "goals." (Exhibit 5) Then, they found Laura Mullen, who was posting on an anonymous message board about her daughters having played for Sports Performance and sent Mullen a private message asking questions specific to the issues in this case, such as, "Do the Butlers inform [Sports Performance] parents about Rick's past?" *Id.* She explained that Mullen "may be able to help [the accusers] with the legal aspect" of removing the Butlers from the sport of volleyball. *Id.* It is clear that this lawsuit was created for Rick's accusers to evade the statute of limitations on their own claims, inflict financial and reputational harm on the Defendants, and abuse the judicial system in the process. The claims in this case are not the claims of Laura Mullen, who clearly knew about the allegations from the 1980s and actively discussed them on public forums. (Dkt. 183, p. 20) Nevertheless, Plaintiff's attorneys moved forward with Mullen as the class representative knowing that her case was a sham.

Within weeks of being contacted, Mullen's Complaint was filed. Laura Mullen was an eager conduit for the accusers and their supporters to "achieve their goals" of destroying the Butlers in any way possible. (Exhibit 5) In Mullen's own words, she and the accusers "are trying

to get him obviously monetarily but more importantly and hurtful to Rick Butler by going after his name." (Exhibit 7, p. 4) On March 7, 2018, Mullen liked a Facebook post from an attorney named Emily Swanson, discussing this lawsuit and explaining, "Rick and Cheryl Butler have been sued in a class action lawsuit (attached, for your viewing *pleasure*)…I'm proud to say I had a part, if only a minor one, in the ***justice being served on behalf of his survivors*** ." (Exhibit 30, p. 27) (emphasis added) This case was never about protecting players or recovering fees. It was about the financial and reputational destruction of Rick and Cheryl Butler.

This lawsuit was part of a deceitful, calculated plan to cut off Defendants from their supporters, punish customers for their association with Sports Performance, and destroy the Defendants' business. To carry out their plan, Mullen and her attorneys filed this case with knowledge that the core allegations of their Complaint were patently false. Therefore, Plaintiff invented the theory that it was "the truth" that was never revealed to her. (Dkt. 1, ¶ 221) To further obscure her baseless claims, Plaintiff's own evidence often conflicted with the stories in her Complaint, leaving Defendants to guess which version Mullen has decided to believe. After two years of litigation, Mullen has never explained what "the truth" means to her, which allowed her to morph her claims to suit whatever argument was necessary to survive each stage in this case.

Even when Plaintiff turns to her own experience at Sports Performance, her claims are egregiously false. For example, Mullen claims that Butler "physically and emotionally" abused her daughter, that Rick caused her daughter to see a therapist, and that Mullen pulled her daughter from the program due to Rick's coaching. (Dkt. 1, ¶¶ 171, 175) In reality, Mullen admits that her daughter's illness was triggered before she was ever on Rick's team. (Exhibit 17) Furthermore, Mullen actively sought the assistance of Rick with her daughter's illness, Rick is the one who suggested her daughter see a therapist, and it was Rick who suggested that her daughter may need

to leave the program to focus on her health. *Id.* Mullen's lies were quickly recognized by the class members who had children playing on the same team as Mullen's daughter in 2017, when Rick supposedly "verbally and emotionally abused Laura's daughter and other teammates." (Dkt. 1, ¶ 171; Dkt. 71, p. 14) One such parent offered to help in the defense of this lawsuit and said he was "beyond pissed after reading the crap in this BS lawsuit being filed by Laura…She was crazy." (Dkt. 71, p. 14) Another parent from that team offered to testify against Mullen and said the Defendants had "the truth" on their side. (Dkt. 71, p. 13) Similarly, a different parent from the team said, "I know for a fact [Mullen] is lying about certain points (we all do)." (Dkt. 87-6)

Most critically, however, is that Mullen's action was dependent on her allegation that she joined Defendants' program "without knowledge" of the claims of abuse made against Rick Butler dating back to the 1980s. (Dkt. 1, ¶ 4) Without this allegation, her Complaint falls apart. Despite facing ample evidence to the contrary, Mullen and her attorneys continued to pursue her claims. Mullen's claim that the Butlers fraudulently concealed the allegations is pure nonsense in light of the near-constant publicity they have received since the mid-1990s. (Dkt. 183, pp. 18-19) On summary judgment, this Court held that, "[a]t all relevant times, there was enough information available to make it unjustifiable for any class member to rely on the defendants' omissions (or, for that matter, their denials) about Rick's history of sexual abuse." (Dkt. 183, p. 20) Even more, Mullen sent her daughter to a GLV program during this litigation, showing an unabashed disregard for her claims during this judicial process. (Dkt. 183, p. 22) In its Order granting summary judgment, the Court noted that "even after she had learned, in her words, the 'truth of the allegations against Rick,' Mullen chose to pay for GLV's services." *Id.*

Mullen has shown herself to be particularly cruel towards Defendants, which is evident in a series of disturbing, personal attacks on the Butlers' well-being and livelihood. She has publicly

encouraged and participated in the harassment of Defendants at their place of business, and she has encouraged the vandalism of their property. (Exhibit 4, pp. 5, 12, 17-18; Exhibit 2, p. 158) Mullen has publicly referred to Cheryl in several demeaning ways, such as calling her "bat s$&t crazy" and saying, about Rick and Cheryl, "he's the dick, she the balls." (Exhibit 3, p. 16; Exhibit 4, pp. 20, 32)  Similarly, Mullen openly mocked Rick when she claimed that "the guy now has a twitch" due to the stress of the near-constant harassment towards Defendants, and she has spread vicious, false rumors about the Butlers' relationship with their son. (Exhibit 4, pp. 32, 17; Exhibit 33) Mullen agreed with the idea that Rick "is a despicable human being" who "deserves any terrible thing that will come his way now until he decides to go hide in the mountains." (Exhibit 3, p. 15) Similarly, Mullen encouraged the idea that, if Rick was spotted at a tournament, it would be a "figurative and possible literal death sentencing," and she endorsed a post "wish[ing] [Rick] the most painful remaining life and a miserable death." (Exhibit 6, pp. 14, 29) Then, on April 24, 2018, Mullen encouraged the idea that "[Butler] has lost millions in value over the last couple years. I wouldn't just look at the money he has lost but probably the years off his life because of the immense stress and scrutiny he is under fire for…there is no way this is not taking an effect on him mentally and physically at his age." (Exhibit 3, p. 27)

In sum, Laura Mullen's activity log on Volleytalk contains over 700 public entries—500 of which occurred in 2018 alone—almost entirely taking place within threads or discussions related to Rick and Cheryl Butler. (Exhibit 8) Between 2016-2018, Mullen was active in at least 17 different threads discussing the allegations of abuse and the various ways in which the Butlers could be attacked, both professionally and personally. (Exhibit 8; Exhibit 3) Laura Mullen's social media activity is critical evidence of her improper motives in filing this action. *See Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (finding that bad faith may be found in the

actions that led to the lawsuit). Even after this case was initiated, the comments and encouragement shown by Mullen paint a clear picture that this case had nothing to do with compensating class members for alleged fraud.

In the days after her filing her Complaint, Mullen all but confirmed that her "true intentions are to completely destroy everything he has built and absolutely demolish any reputation they will ever have again." (Exhibit 2, p. 106) Mullen and her attorneys improperly used the court system with a clear focus on harming the Defendants' reputations, inflicting enough financial harm to put Defendants out of business, and cutting Defendants off from their base of support—the class members. (Exhibit 6) Both Mullen and her attorneys should be sanctioned for their bad faith abuse of the judicial system. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 523-24 (6th Cir. 2002) (finding bad faith when plaintiff "improperly used the court system to try to force a result that it could not obtain under the applicable law").

The improper conduct of Plaintiff and her attorneys was not confined to their improper Complaint. Throughout this action, they repeatedly advanced unfounded, illogical arguments to gain additional publicity, needlessly increase the cost of litigation, and prejudice Defendants with baseless allegations which painted them in a negative light with this Court. (*See infra*, Part V-VI) Plaintiff's attorneys engaged in a pattern of abusive discovery tactics, demanding that Defense counsel immediately supplement answers, provide documents which were never requested, and amend responses with more preferable language or information. *Id*. Plaintiff's attorneys would often reference nonexistent "authority" and threaten Defense counsel with a motion for sanctions if she did not comply with their unreasonable demands. *Id.* Even after Defense counsel, attempting to avoid the waste of time and resources attendant to yet another motion with baseless accusations of misconduct, provided several versions of the same discovery responses, Plaintiff was never

satisfied. *Id.* Plaintiff's attorneys were able to create the perception that Defendants and their counsel were acting in bad faith by employing this deceitful procedure and filing repeated motions and unsolicited "status reports" with the Court accusing the Defendants and their attorney of discovery misconduct.

In the end, this Court saw through Mullen's lies and granted summary judgment in favor of Defendants on every claim she made. (Dkt. 183, p. 26) The Court's ruling confirmed facts which prove that Mullen and her attorneys intended to commit a fraud upon the Court by pleading false claims and advancing baseless arguments. For example, in response to Defendants' Motion to Dismiss, Plaintiff argued that "[t]he Court should decline to take judicial notice of the news articles appended to [Defendants'] Motion, as none of the articles are referenced in the Complaint and they are inconsistent with her claims that *she did not see any information online until June of 2017* due to Defendants' concealment."[2] (Dkt. 57, p. 20 fn. 4) (emphasis added). Plaintiff and her attorneys lied to this Court. Now, "Mullen concedes that, between 2015 and 2017, she was generally aware of the allegations regarding sexual abuse by Rick and had reviewed news articles on the subject." (Dkt. 183, p. 4) Plaintiff survived Defendants' motion with false allegations and bad faith assertions, which forced Defendants to incur substantial legal fees until those lies ultimately defeated each of Laura Mullen's claims on summary judgment. (Dkt. 183, p. 26)

While Mullen's claims were fully disposed of on summary judgment, the Court gave the Plaintiff class time to find a new class representative who could maintain viable claims under three of the six counts alleged. *Id.* On May 7, 2020, Edelson PC filed a Status Report with this Court admitting there is not one class member who can maintain viable claims under the facts alleged by

---

[2] Furthermore, even if Mullen did learn of the allegations for the first time in June of 2017, her daughter attended a lesson at GLV on September 3, 2017 and a clinic on September 16, 2017. (Dkt. 153, pp. 27-28) Therefore, before she filed this lawsuit, she had allowed her daughter to return to GLV programs at least twice after she "learned the truth" of the allegations.

the Complaint, therefore, those claims will be also dismissed. (Dkt. 195) Remarkably, Plaintiff filed this action claiming to represent the interests of *thousands* of individuals. (Dkt. 1, ¶ 178) Yet, after spending years in the Sports Performance program meeting dozens of parents, and after nearly two thousand class members were notified of her claims by this Court, Mullen and her attorneys could not identify a *single* person who supported her claims. (Dkt. 195) Plaintiff attempts to save face by inventing a theory that the Defendants and their attorney have intimidated these class members—most of which are no longer in the program—from coming forward. (Dkt. 195, ¶ 10) The notable lack of support for Plaintiff's claims cannot be attributed to anything besides the obviously false claims brought by the Plaintiff and her attorneys for the improper purpose of harming the Defendants' business and reputations and interfering with Defendants' relationships with those who continue to support them.

The lawsuit filed by Laura Mullen was a sham, and the bad faith acts by Plaintiff and her attorneys began before this lawsuit was filed and continued even after summary judgment. The misconduct of Mullen and Edelson PC justifies an award of attorney's fees, costs, and expenses required to defend against their baseless claims. The Court has inherent authority to enter sanctions when a litigant's course of conduct throughout the lawsuit evidenced bad faith. *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). Each lie, post, and "like" from Mullen added to the abuse of the judicial process. *See Fuery v. City of Chicago*, 900 F.3d 450, 455 (7th Cir. 2018) (noting that "the whole of abusive action is greater than the sum of the parts of which it is made"). "Were we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment. But these incremental abuses chip away at the fair administration of justice and frustrate a trial judge's faith that she can rely upon the lawyers before her—officers of the court—to set forth a fair and accurate presentation of the facts and law." *Id*. (citing *Chambers*, 501 U.S. at 35

and *Tucker v. Williams*, 682 F.3d 654, 661 (7th Cir. 2012)). Mullen's blatantly false claims and unabashed disparagement of Defendants demonstrates a brazen abuse of the judicial system, and her attorneys were aware of, and often complicit with, her actions every step of the way.

In this motion, the Defendants seek sanctions in the form of (a) an award of Defendants reasonable attorneys' fees, costs, and expenses associated with defending this action; (b) monetary sanctions in the form of a fine payable to the Court (in an amount to be determined by the Court); (c) a published, public reprimand of Jay Edelson, Alfred Kirkland Murray, Eve-Lynn J. Rapp, J. Eli Wade Scott, Ryan D. Andrews, Sydney M. Janzen, and Christopher Lillard Dore; (d) that Jay Edelson, Alfred Kirkland Murray, Eve-Lynn J. Rapp, J. Eli Wade Scott, Ryan D. Andrews, Sydney M. Janzen, and Christopher Lillard Dore attend 20 hours of continuing legal education in professionalism and legal ethics; and (e) a referral of this matter and Plaintiff's attorneys' conduct to the Illinois Attorney Registration and Disciplinary Commission. Nothing less will deter future abuse of the judicial system by those involved in the prosecution of this action.

I.   **PLAINTIFF AND HER ATTORNEYS FILED THIS LAWSUIT FOR AN IMPROPER PURPOSE TO HARASS DEFENDANTS, TO DESTROY THEIR BUSINESS, AND TO PUBLICIZE IRRELEVANT AND SALACIOUS CLAIMS**

On February 28, 2018, just one day after filing her Complaint, Mullen was involved in a conversation where she exposed that her lawsuit was not grounded in fact or law, and that it was filed for the improper purpose of damaging the Defendants' reputations and dismantling their business. One Volleytalk user astutely noted, "The plaintiff's initial goal is likely discovery. After that, ***they want to drag this out as long as possible and make it as public and embarrassing as possible for the Butlers/SPVB. Anything they can do to damage the Butlers and their business has to be considered a positive.***" (Exhibit 2, p. 46) (emphasis added) In response, another user commented, "Everyone in the Chicago club scene has heard this all before and it hasn't hurt the

club. If what you're saying is the goal then they need to try a different angle. Again, this hasn't been a secret in the Chicago volleyball community for as far as I can remember." *Id.*

Mullen endorsed a reply arguing that this lawsuit was, indeed, a new tactic to publicly damage the Butlers and their business, stating that "***a major law firm filing a suit demanding a jury trial and itemizing all the allegations in great deal in one place for news agencies to disseminate both local and national is 'a different angle.'***" *Id.* (emphasis added) This is just one of many comments and endorsements by Mullen confirming that she and her attorneys intended to make this litigation "as public and embarrassing as possible for the Butlers," and that this Complaint was filed in bad faith. *Id.*; *See LHO Chicago River, L.L.C. v. Perillo*, 942 F.3d 384, 386 (7th Cir. 2019) (finding that an abuse of process occurs when a party brings a frivolous claim with the purpose of obtaining an advantage external to the litigation). Plaintiff and her attorneys should be sanctioned for their dishonesty and abuse of the judicial system.

A. **Mullen and the Ongoing Campaign To Remove Butler From Volleyball Through "Any Means Necessary"**

Prior to this lawsuit, Mullen became involved in a campaign to destroy the Defendants' business, and she established a clear record of her efforts to diminish the willingness of third parties to associate with Defendants. On June 13, 2017, Emily Swanson made a Facebook post stating, "As many of you know by now, his victims, Julie, Sarah, and Christine have re-fueled their fight against Rick Butler and the fact that he is allowed to coach kids…A simple google search, if you're interested, will give you the additional details…please share. The more people know, the stronger the fight against this outrageous conduct is strengthened."[3] (Dkt. 171-18, p. 2) Kay Rogness,

---

[3] In this Motion, Defendants cite documents submitted by Mullen in support of her Response in Opposition to Defendants' Motion for Summary Judgment. Defendants argued and presently contend that Plaintiff failed to meet admissibility requirements on summary judgment. (Dkt. 172, Part C) Defendants only rely on these documents to show Mullen's knowledge at the time she filed her Complaint and, if the documents are what Plaintiff claims them to be, that Plaintiff's own arguments and evidence constitute additional proof of her and her attorneys' bad faith.

Butler's former business partner and mother of Beth Rose, commented on the post calling Rick a "[m]anipulative, pathetic pedophile," declaring she knows this "for a fact."[4] (Dkt. 171-18, p. 4)

On June 16, 2017, Swanson authored another post titled "FIGHT TO BAN RICK BUTLER FROM COACHING UPDATE AND BREAKING INFORMATION" where she urged others to share her post and noted that she had "permission from the victims named to post this." (Dkt. 171-18, p. 9) Swanson later posted a letter on Facebook from Kay Rogness on June 22, 2017, which stated:

> Rick Butler should be banned from any kind of membership or participation in all activities involving youth BECAUSE OF WHAT HE DID. And USAV and AAU need to take the steps to make that happen. This is what all this activity is about. This is what we're trying to accomplish. This is what we are determined to pursue until all the volleyball organizations – USAV, AAU, AVCA, and JVA – step up and take substantive action. This is about helping those victims who have come forward…

(Dkt. 171-18, p. 53) In addition to the Rogness letter, Swanson's post delivered a warning to the Butlers: "You can't stop me. You can't stop us. You've won a few battles. We will win this war: Checkmate." (Dkt. 171-18, p. 52)

Beginning in June of 2017 and leading up to the filing of this litigation, Mullen contributed to the campaign to push the Butlers out of the sport of Volleyball and concentrated her efforts on the promotion of negative press about the Defendants.[5] Mullen would often utilize negative

---

[4] Notably, Kay Rogness is Rick Butler's former business partner who claims to have witnessed the abuse during the 1980s, which forms her (erroneous) belief that Rick is a "pedophile." However, Rogness, an attorney who is 14 years older than Rick, previously admitted to maintaining a 10-year long sexual relationship with Rick between 1979-1989, which is the entire period of time she claims to have witnessed the abuse. This factual inconsistency was known to Mullen and her attorneys before they initiated this lawsuit.

[5] Plaintiff has argued to this Court that when someone "likes" a post on social media, the "message" they send is "clear" that they have "voiced their approval" of the post and shown "what was expected of" those who view the post. (Dkt. 143, pp. 13, 18) Her attorney, Jay Edelson, explained to this Court just weeks after this case was filed that Volleytalk "is something that the volleyball community and class members look at regularly" and that "they have been discussing this case" on the public forum. (Dkt. 141-1, p. 12; Dkt. 17, pp. 1-2; Exhibit 7, p. 2) Based on Plaintiff's strong belief that "liking" a post sends a clear message and even suggests to others what is expected of them, Laura Mullen's publicly-available Volleytalk activity is particularly relevant evidence of the message she intended to send to class members on the forum. In fact, Mullen was so active on the pages "discussing this case" that her anonymous

publicity to pressure and shame individuals who continued to do business with Defendants.[6] For

example:

- On June 26, 2017, Mullen posted that "[i]t is encouraging that some of the Rick Butler cronies/long Time [sic] recruiters from the program are getting outed and fired from coaching…Has the NCAA been made aware of his abuse?" (Exhibit 4, p. 40)
  - Mullen's comment was in response to the idea that "[i]f enough schools were banned from recruiting [from SPVB] (or having any contact with Butler), the reason to go to SPRI would disappear and…would achieve her goal without the help of the justice system." (Exhibit 3, p. 43)

- On October 23, 2017, Mullen posted "He's the Weinstein of volleyball!! I certainly wish that the corporations that no longer do business with the club would issue a statement saying why. Mizuno is being cowardly by just quietly going away. Disappointing!" (Exhibit 4, p. 37)

- On October 30, 2017, Mullen advised another user to "ask [SPVB] why they are no longer sponsored by Mizuno" and told them to do their "due diligence on Rick Butler. Just Google Rick Butler underage sex and check out Emily Swanson's Facebook page...dig a bit." (Exhibit 4, p. 37)

- On November 10, 2017, Mullen posted "I heard from a very reputable source that there may be something brewing legally with USAV...Parents are pressuring clubs to not participate in [GLV events] after the continued bad press [Rick] has received." (Exhibit 4, p. 36)

- November 25, 2017, Mullen posted "I plan to provide this [Chicago Sun-Times] article to every High School [athletic director] in the Chicagoland area whom I know work with Butler. That should be interesting." (Exhibit 4, p. 34)

- On November 28, 2017, Mullen liked a comment which boasted that user's harassment of AAU, Big 10 Volleyball, and numerous SPVB alumni on twitter "asking them to defend the relationship" they had with the program, and he commented that he was blocked by the Defendants on twitter. Mullen sent this user a message containing Rick Butler's personal email address so the person could continue his campaign of harassment and "contact [Rick] directly." (Exhibit 3, p. 8; Exhibit 27)

- On November 28, 2017, Mullen posted to "[a]dd Cathy George to the list [of places to send the Sun-Times article about the allegations]." Mullen also advised that "[t]he Butlers also own Atlanta Performance Volleyball, Southern Performance Volleyball, and Tennessee Performance Volleyball. Also Batavia District 101 Athletics should be hit (Lori Trippi-

---

username did not prevent her from being identified as the Plaintiff, because it was "not hard to connect the dots." (Dkt. 141-1, p. 12; Exhibit 7, p. 2)

[6] Mullen's total activity could not possibly be addressed in an efficient manner, so Defendants have chosen to highlight some of the more egregious comments and have attached a wider array of comments in Exhibit 3 to this motion.

Payne their HS volleyball coach was quoted as supporting him in the article) and Benet Academy (Brad Baker is a huge supporter)." (Exhibit 4, p. 33)

- o Notably, Mullen's daughter transferred to Batavia District 101, where she played in the volleyball program run by Lori Trippi-Payne, participated in a GLV event after filing this lawsuit, and lied to this Court in an affidavit about the circumstances leading up to her participation in the GLV event. (Dkt. 94-4; Dkt. 99-1)

- On December 3, 2017, Mullen posted "I think after the latest outing of the facts, a lot of parents from other clubs really don't even want to cross the threshold of the Great Lakes Center anymore... I think the 18s [GLV event] might have a different look in 2018/19. I wish Mizuno would have done the honorable thing too and made a public statement about why they dropped Sports Performance." (Exhibit 4, p. 32)

- On December 5, 2017, Mullen was engaged in a discussion promoting harassment of the Defendants. One user suggested that people "print off 100's of copies of the love letters and laminate them then post to the back of the bathroom doors, in the stalls, and above the urinals... get a permit to protest or go picket the entrance to that little business park on the public areas not owned by SPRI. Just bring a ton of commotion and chaos right in his front yard in the same way you see those big rats or abortion photos, I am sure you get could get the Herald, Tribune, Sun Times to come take some pictures and allow for continued coverage of the story that finally made it to print in a locally massive newspaper." (Exhibit 4, p. 32) Mullen added that they "should make posters/signs for the AAU Finals that are on ESPN3." *Id.*

- On December 7, 2017, Mullen posted "Parents educate your children, their parents, their friends. Post about this bastard on social media. If any time was ripe for action, it is NOW! C.T.E. indeed...Commitment To Ex (posure)!" (Exhibit 4, p. 31)

- December 15, 2017, Mullen liked a post commenting on a call to "start putting our anger into action by calling and writing to AAU and USAV to protest Butler's membership! There is also a change.org page calling for Butler's ban that you should sign, showing your solidarity with these brave women" and that "[t]oday would be a great day to ask AAU, USA Volleyball, and the AVCA to provide an update. They are all here in Kansas and it would be nice for them to hear our concerns over the next couple days." (Exhibit 3, p. 41)

- On January 10, 2018, Mullen posted "Letters need to be sent out/phone calls made to the [athletic directors] of the coaches still recruiting SPVB kids." (Exhibit 4, p. 29)

- o Mullen's message was in furtherance of the campaign's ultimate goal, with one user explaining that "[p]ublic pressure on AAU has to amp up [in 2018]. 2017 was a good year. SPRI lost all major sponsors. I am taking personal credit for Athletico being the last to force him to remove their logo from his website…Need college coaches to get into the fight." (Exhibit 3, p. 54)

- On January 14, 2018, Mullen urged, "please keep your children out of any program associated with Sports Performance. As a reminder, that includes: Southern Performance Volleyball, Atlanta Performance Volleyball, Tennessee Performance Volleyball. These

15

programs are all tied to the mother ship. They also hold various camps and clinics in TX, NC, LA, FL, MI, NM, GA, and OR during the summer, although I have heard that he has been barred from some high school gyms in OR, as his reputation was too much of a risk." (Exhibit 4, p. 27)

- On January 19, 2018, Mullen liked a post saying "Watching…statements to the judge today for her to consider when sentencing Nassar for his crimes got me thinking: why don't Butler's accusers do something similar? Chicago. Press conference. All his accusers. Media outlets. USAV rep. Live. It would be pretty hard for anyone to ignore. Why hasn't something like this happened?" (Exhibit 5, p. 2)
  - On January 19, 2018, Mullen liked a response to the above post, saying that "things like that take time to develop, interviews to get done, lawyers to consult, meetings to take place, etc. But make no mistake most of what you mentioned is being worked on. Expect to see some movement and I think soon." (Exhibit 5, p. 2) Notably, this user claimed to be one of Rick's accusers who participated in this lawsuit, which was filed just weeks after posting this comment. *Id*.

- On January 24, 2018, Mullen wrote, "Sports Performance recently posted their 2018 summer camp schedule. Please make yourself aware of where NOT to send your young adult to camp. These locations also support Rick, obviously, so if you don't want to support a #freeabuser, then do not attend! C.T.E. (Committed to Exposure)" (Exhibit 4, p. 23)
  - Despite her strong directives to the public, Mullen made exceptions for herself when she paid GLV for two lessons for her daughter just a few months prior to posting this message and, again, when she allowed her daughter to participate in a GLV program held at the Great Lakes Center in July of 2018, during the pendency of this lawsuit. (Dkt. 144-5, pp. 6-9; Dkt. 183, p. 22)

- On January 25, 2018, Mullen liked a post saying, "The Only way to get the attention of the powers-that-be is:  1). Continue to do what is working (albeit slowly, at times) so far - this is Way more in the public mainstream, than ever before!  2). Get a high-profile attorney/ set up a 'presser' media-event Right Outside of the AAU-GLC HQ's/ have all of Rick's accusers-victims speak in (shorter) Nassar-like witness testimonials;  3). Send video-letters to JVA's/AAU's/GLC's SPONSORS-'corporate partners' (and/or instruct those media as to where to go to interview the companies' spokespersons, thereof):  PLUS Keep The Pressure On said sponsors-partners-media to keep this 'fresh'/ not fade into 'old-news' irrelevance-oblivion (USA Gymnastics just lost Major sponsors in the past couple of days; I predict More defections are forthcoming). THIS will get GLC/AAU's attention." (Exhibit 3, p. 42)

- On January 25, 2018, Mullen posted, "I think that billboards are a good idea, especially near the Great Lakes Center and the AAU office. The t-shirt campaign at AAU Nationals last year was effective in getting news coverage (a station attempted to interview RB but Cheryl stepped in and made an ass of herself as per usual). #askmewhy As for what should be on the billboards, maybe an image of the Sun Times story and another image of the hardware earned at AAU Nationals with the hashtag, #shameonyouaau" (Exhibit 4, p. 23)

- o Here, Mullen references a campaign organized by Sarah Powers-Barnhard for the 2017 AAU tournament, where she encouraged her players and parents to wear matching tee shirts referencing her allegations against Rick Butler. Her efforts culminated in several acts of intimidation, harassment, and confrontations initiated by members of her club towards players and parents of Sports Performance and even clubs affiliated with Sports Performance. AAU officials were eventually required to intervene.

- On January 26, 2018, Mullen posted that it was a "[m]ajor win!!" when two organizations pulled their contract to host a tournament at the Great Lakes Center. Then, Mullen let others users know that she had inside knowledge of when press releases would take place regarding the tournament cancellation, saying one had not been made "a friend told" her that "one will be forthcoming." (Exhibit 4, p. 22)

- On January 29, 2018, Mullen hinted at this lawsuit being filed. A user mentioned that "the people speaking out against Butler are clearly not going away" and Mullen responded "no, we are not going away...quite the contrary." (Exhibit 4, p. 20)

- On February 5, 2018, Mullen expressed her disappointment when the media did not cover every negative event related to Defendants, saying that it was "rather pathetic that neither Prepvolleyball.com, nor Flovolleyball have had any mention of RB's most recent ban, the MU/UW match relocation, or the USA Badminton decision." (Exhibit 4, p. 19)

- February 10, 2018 liked a post "With such large organizations taking a stand against him the next route is to just empty his backlog, as I said before he has dealt with the PR scrutiny for decades now but where it will really start to bother him is when he is losing registrations in his club and camps, partnerships from satellites and whatever royalties they pay, the schools and third parties that pay him to run camps, and the advertisers that may feel being around him and the club have a particular stank to it." (Exhibit 3, p. 2)

- On February 10, 2018, Mullen posted "[t]o everyone seeing this news [of AAU banning Butler], please post on social media, inform your coaches, club directors, high school coaches, and parents. We need to keep the topic alive and *he really needs to feel the hit financially*, not just symbolically." (Exhibit 4, p. 18)

- On February 20, 2018, Mullen liked a post stating that "the only way for SPVB to survive is for [Rick] to step away, even if only to appease his accusers and critics." (Exhibit 3, p. 20)

- On February 26, 2018, Mullen again hinted at this lawsuit being filed after a user posted about the topic of Butler dying down "[i]n years past… until the following May/June when AAU would come around and *everyone fighting the good fight would use that time frame to get the most exposure*. This conversation is not going away any time soon this season." Mullen responded, "The conversation is not going away anytime soon. One could say that it is, in fact, gaining momentum." (Exhibit 4, p. 14)

Along with plans to incite public outcry against the Butlers, the campaign turned its attention to the Defendants' finances. In the months leading up to this litigation, they aimed to harm the Butlers by shifting their efforts to a new target: the parents who pay GLV for volleyball services. (Exhibit 6) Mullen engaged in a lengthy and detailed discussion of plans to interfere with the relationship between Defendants' and their customers:

- "[T]he key is to get parents to the point that they believe training at sports performance is detrimental to their daughter reaching that next level. How do we accomplish that? Clearly, we are not there yet, as the club still enjoys fairly strong parental support, for now. But it is something to work toward. As long as parents continue to BELIEVE [Sports Performance] is good for their kids' college [volleyball] aspirations or the only path the [sic] college, then it is true. The moment they stop believing in the product, then it is no longer true. That is the work that lies ahead." (Exhibit 6, p. 20)

- "[Finding the best way to shut down the Butlers' business] is exactly what threads like these are about, if we knew he would likely be gone by now. Obviously the best way is for parents to stop sending their children to a child rapist, but for some reason that has not happened.  Social media has certainly helped push USAV to go back to a full ban…the only way, short of parents not sending their children to him, is to get any and all governing bodies of volleyball to ban him for life from attending their events." (Exhibit 6, p. 31)

- "We have a whole system set up for taking kids away from parents who may be doing what they think is best for their individual kid but who the rest of society considers to be abusing their individual kid…parents are not the ultimate authority on what they can do with their individual kids." (Exhibit 6, p. 22)

- "Who will continue to associate with Butler and his club? Who wants to share the shame? Teenage girls and their parents? Other clubs? His JVA pals? AAU leaders? The AVCA? College coaches? I guess plenty of people will still buy into what he sells. Their values are a mess. But I hope most people will have the decency to think, 'That's enough. It's too clear. I can't do this anymore. I can't pretend it doesn't matter.'" (Exhibit 6, p. 10)

- "The issue of real importance here is whether or not the abuse happened. All of this back and forth…is a sideshow and distraction that is typical and demonstrative of why this type of abuse has remained a persistent problem. The other important thing is finding a modicum of justice for the actual victims and perhaps an opportunity for some redemption for the circle of people around the abuser or the abused who might feel some guilt or remorse for wittingly or unwittingly having enabled the abuse. I don't have any hope that Rick Butler will feel that remorse or will ever do the right thing, but all of this back and forth is distracting from the final piece of this puzzle that needs to be put in place: ensuring that Butler's reach and influence and existence in the realm of club volleyball in particular ends as soon as possible. The battle isn't over." (Exhibit 3, p. 6)

**B.    This Sham Lawsuit, Plagued by False Statements, Was a Pretext for Mullen's and her Counsel's Coordinated Aim to Remove the Butlers from the Sport of Volleyball**

This lawsuit is an abuse of justice and the culmination of a meritless and vindictive campaign that has unfairly tarnished the Defendants' reputations and inflicted irreparable harm on their business. *See Jimenez v. Madison Area Tech. Coll.*, 321 F.3d 652, 656-57 (7th Cir. 2003) (sanctions imposed for "false, fraudulent and salacious" accusations which "exploited the judicial process" and subjected opposing party to harassment, including "unnecessary embarrassment and mental anguish"). Mullen and her attorneys have, on multiple occasions, explained their joint efforts in pursuing this litigation, and both should be sanctioned. *See In re Alberto*, 119 B.R. 985, 993 (Bankr. N.D. Ill. 1990) ("[w]hen an attorney and client share responsibility for litigation strategy and such strategy violates Rule 11, courts can impose joint and several liability."). Plaintiff's Complaint directly credits the "investigation conducted" by Plaintiff's attorneys. (Dkt. 1, Intro.) Similarly, Plaintiff's motion in support of class certification explained that "Mullen has vigorously engaged in the litigation of this action. In addition to helping her attorneys conduct a months' long pre-suit investigation, she has also reviewed voluminous legal filings and otherwise assisted proposed class counsel in the prosecution of this case."[7] (Dkt. 83-1, p. 32) Edelson PC assumed responsibility for alleging facts which were not within Mullen's personal knowledge, and, in doing so, assumed a role greater than that of an attorney who pleads facts solely within the knowledge of his client.

Plaintiff's attorneys have used this case to gain publicity and create a perception of an authority on sexual abuse litigation, all the while having a "rather large interest in volleyball."

---

[7] The claim that Mullen was involved in a "months' long pre-suit investigation" make little sense considering that she was contacted by an accuser on Volleytalk (who asked her to help with "the legal aspect" of removing Butler from coaching) on January 19, 2018, and this lawsuit was filed on February 27, 2018. (Exhibit 5; Dkt. 1)

(Exhibit 26) Jay Edelson offered his own testimony in this matter to confirm that he was "actively engaged in the prosecution of this matter on behalf of Plaintiff throughout the course of [his] Firm's investigation of the lawsuit and since its filing." (Dkt. 17-3, ¶ 2) That it was Mr. Edelson, as opposed to Laura Mullen, who often advanced the false claims in this litigation, even doing so under oath, exemplifies his complicity in bringing Mullen's bad faith claims before this Court. (Dkt. 17-3, ¶¶ 2-7) The record in this case leaves no question that Edelson PC's interest in this lawsuit goes beyond that of a typical attorney/client relationship. Therefore, Plaintiff's attorneys should be sanctioned along with Laura Mullen for their fraud on this Court.

## II.     MULLEN'S PUBLIC HARASSMENT OF DEFENDANTS CONTINUED THROUGHOUT THIS LAWSUIT

While Plaintiff brought several baseless motions alleging that the Defendants were engaged in improper communications, including those supposedly made on Volleytalk, Laura Mullen was continuing her attack in the court of public opinion. Immediately after this lawsuit was filed, Mullen was engrossed in Volleytalk threads discussing this litigation and was publicly commenting and "liking" dozens of posts, including those in a thread titled "Class Action Lawsuit Filed Against Butlers, GLC." (Exhibit 2) There, users ridiculed and demeaned the Defendants in just about every way imaginable. Mullen endorsed posts calling Rick "a sick individual," a "heinous man," and a "monster." (Exhibit 2, pp. 11, 15, 54) Mullen continued to participate in public discussion of her case, while undermining the legitimacy of her claims and illustrating a disturbing culture of harassment with Defendants as the clear targets. Mullen endorsed each of the following statements made about the Defendants and/or this litigation:

- "Parts of [the Complaint] certainly is a window into the sick mind of a depraved human. I feel like wanting to take a shower after reading that." (February 27, 2018) (Exhibit 2, p. 13)

- "I imagine that this is only going to get bigger, it was just one of the lead stories on Fox Chicago at 9pm…The firm doing this for free is only positives for press and I imagine they will exhaust all media resources going forward as well. Soon the cameras will be outside his house and club if this gains enough steam." (February 27, 2018) (Exhibit 2, p. 16)
  o When cameras did show up to the Butlers' home, Mullen commented on their home and informed the public that the Butlers have a house in another state. (Exhibit 4, p. 12)

- "[I]f he loses it would most probably cause bankruptcy for his corporation.  This club is now untouchable to a potential buyer.  Him walking away with nothing would be sweet justice indeed!" (February 27, 2018) (Exhibit 2, p. 7)
  o During this lawsuit, Mullen even attempted to use Volleytalk to gather information about the Defendants for the purpose of inflicting financial harm, asking "[h]ow is SPVB insured?" (Exhibit 4, p. 9)

- "[Rick] is such an incredibly arrogant fool for not walking away and seeing the writing on the wall… I would love to watch all the money just start pouring out of his and SPVB's bank account." (February 27, 2018) (Exhibit 2, p. 12)

- "This will bankrupt Butler." (February 28, 2018) (Exhibit 2, p. 37)

- "Butler is going to be bled to death financially" by her lawsuit and it is "[a]ll over for him now." (February 28, 2018) (Exhibit 2, pp. 41-42)

- "I can only hope this [lawsuit] is causing them as much pain as I think it is…The best part of this is that the 'Our story' that Cheryl threw out there got picked up and used to beat them over the head. Her arrogance used against her. SWEET SWEET REVENGE." (March 2, 2018) (Exhibit 2, p. 72)

- "The term collateral damage keeps coming into play here, whether it be kids at SPVB, coaches in the region, college coaches, partnering clubs, or anyone else who has their name attached to this man. If the ultimate goal from lots of people now that this thing has picked up steam is to not only get him removed from coaching jr girls, but all of volleyball in general, then you need to take a measure this harsh and unfortunately the boys and coaches within that program will also fall into the category of collateral damage." (March 6, 2018) (Exhibit 2, p. 110)

- "Nothing is to stop him from coaching private lessons in his gym, he just wouldn't be insured under the applicable policy for the governing body. And nothing stops him from going and starting another organization. Nothing stops him from running his own unaffiliated leagues, etc. And nothing ever can, except for the Court of public opinion." (March 7, 2018)

- "All is not well within [Sports Performance] 'Rick Butler is a RAPIST' was written all over a bathroom in sharpie and they closed it." (March 7, 2018) (Exhibit 2, p. 158)

- "I would love to see the picture of ['Rick Butler is a RAPIST'] written on the bathroom, If everyone just keeps doing it in all the bathrooms they can not close them as they will be in a building code violation." (March 7, 2018) (Exhibit 2, p. 160)

- "Ricky hasn't suffered. He's never faced ANY consequences other than being called a child molester, monster, pervert, etc. on Facebook, Volleytalk and newspapers. His club is thriving and he's a wealthy man, I assume. I hope he…gets put in prison for the other inmates to do what they usually do to child molesters. But if that doesn't happen, the only punishment possible is his wallet and his club. The bans are great, but this man should not be around young girls, in any capacity. And the only way for that to happen is a boycott of his club from players, parents, college coaches, high school coaches. No one attend his camps or tournaments at his facility or any facility." (March 7, 2018) (Exhibit 2, p. 165)

- On March 21, 2019, Mullen liked a public post on the Champion Women Facebook page, which is the organization responsible for sending hundreds of letters threatening legal action against organizations with ties with the Defendants. The post was publicly shaming the families that opted out of this litigation, and it referred to Rick Butler as a "pedophile coach." (Exhibit 30, p. 4) When a woman questioned the legitimacy of the claims made in the post, Sarah Powers-Barnhard responded with the flagrantly false claim that, "[Rick] sexually abused us from the ages of 14-17." Mullen "liked" Sarah's comment. *Id.*

- "Rick Butler deserves my boot up his a—" (March 22, 2018) (Exhibit 3, p. 21)

- Mullen referred to Rick Butler as "the narcissistic authoritarian." (March 24, 2018) (Exhibit 4, p. 11)

- "Part of me wants to smack the smug off of him with a well placed brick, but I'm better than that...If volleyball wants him gone from volleyball, then it will have to happen financially/locally. No way around it…Until it hits him in the bank, he'll keep sticking around. It sucks, but you don't have to like it or take it. Stop going to the GLC. Talk to your club director about playing in tournaments that don't involve [Sports Performance]." (April 9, 2018) (Exhibit 3, p. 10)

- "Organize an email or other public campaign prior to each event [Rick's] team is participating in. Tell the organizer that he should not be permitted around teen girls, even as a spectator." (April 10, 2018) (Exhibit 3, p. 11)

- "[W]hatever the situation he has lost millions in value over the last couple years. I wouldn't just look at the money he has lost but probably the years off his life because of the immense stress and scrutiny he is under fire for. He may come off a calm, cool, and collected lately but there is no way this is not taking an effect on him mentally and physically at his age." (April 24, 2018) (Exhibit 3, p. 27)

- "I think it should become clear [after the Nassar publicity] that the case against [Rick Butler] is serious and could take everything from him and his family…Butler was stupid to keep this going and not walk away especially after the metoo movement and the latest

press he had been getting. I believe he will regret this for the rest of his life. He will spend his dying years fighting this lawsuit and if (when) he loses, he will retire broke." (May 17, 2018) (Exhibit 3, p. 30)

- "THIS is what is going to keep on happening to Butler, from now on. Both economic and public relations pressure on youth [volleyball]'s corporate sponsors is turning the tide. His ego must be hurting!" (May 30, 2018) (Exhibit 3, p. 33)

- "The walls are closing in, soon he will have nowhere to go concerning volleyball." (June 1, 2018) (Exhibit 3, p. 56)

- On December 15, 2018, Mullen liked a public post on the Champion Women Facebook page boasting about the "Herculean efforts to remove Rick Butler from Volleyball" by the organization and calling Sarah Powers-Barnhard "an awesome teammate," with Kay Rogness commented that they make "an incredible team." (Exhibit 30, p. 10)

Mullen was so active in public social media threads related to this litigation that Mullen's disguised Volleytalk username was identified as the Plaintiff because it was "not hard to connect the dots." (Exhibit 7, p. 2) Mullen openly mocked the Defendants, their attorney, and their arguments in this litigation on June 2, 2018, stating that "the 'continuously evolving allegations' are NOT 'evolving' in his favor. These deflection tactics aren't going to work anymore...green attorney." (Exhibit 4, p. 3)

Just two days later, Mullen ridiculed Defendants' arguments in their Motion to Dismiss and liked a post which said, "[Butler's] attorney needs to quit saying everything is false, unsubstantiated, and without merit. If your client feels wrongfully accused, he should sue. If not, shut up and go away." (Exhibit 3, p. 34) Mullen's flagrant disparagement of Defendants and their counsel, and attempt to influence putative class members, was taking place at the same time her attorneys were asking this Court to punish Defendants for communicating about the lawsuit "in a non-neutral manner." (Dkt. 17) Plaintiff's hypocrisy demonstrates the disingenuous nature of her arguments to this Court.

### III.    MULLEN ADMITS HER LAWSUIT WAS MERITLESS AND FILED FOR AN IMPROPER PURPOSE

This case was never about protecting class members. It was not about the players. It was not about the parents. It was about Plaintiff's aim to destroy the reputations and livelihoods of Rick and Cheryl Butler. The day this lawsuit was filed, a thread was created on Volleytalk titled "Class Action Lawsuit Filed Against Butlers, GLC." (Exhibit 2) Mullen was immediately engaged in public discussion of the lawsuit, and quickly endorsed several posts which expose that the lawsuit was not filed for its merits but for its impact upon defendants. Thus, the lawsuit was a harassment campaign brought for an improper purpose, which justifies the imposition of sanctions against Plaintiff's counsel. *In Re Aircrash Disaster*, 909 F. Supp. 1083, 1124 (N.D. Ill. 1995) ("In deciding the appropriate sanctions…it is appropriate to consider the seriousness of the violations and whether the violations were intentional").

For example, the day after Plaintiff's Complaint was filed, Mullen supported the idea that "[t]his suit is not going to end anytime soon with an appeals process in place. This could drag on for years. It will be a 'death by a thousand cuts' on the club…. Most importantly, Butler goes down slowly and painfully...just as he deserves!" (Exhibit 2, p. 23) Later, in a private message about the lawsuit, Mullen explained her motives, as well as the motives of her attorneys, saying, "***we are trying to get him obviously monetarily but more importantly and hurtful to Rick Butler by going after his name*** (ego)." (Exhibit 7, p. 4) (emphasis added)

On March 7, 2018, a Volleytalk user expressed concern that this action against the Butlers was going too far, noting that "all of these hundreds/thousands of comments [on Volleytalk] are now related to you personally punishing him because your governing bodies and the courts and laws of the land won't do it to your personal satisfaction." (Exhibit 2, p. 149) In response, Mullen endorsed a comment from Emily Swanson, the attorney who prompted Mullen to join the

24

campaign against the Butlers in 2017, explaining the purpose of this lawsuit: "When the criminal justice system fails, and the judicial system is limited in its powers to control behavior, as are administrative bodies, sometimes another form of justice is the only one left." (Exhibit 2, p. 151)

Even worse, after this lawsuit was filed, Mullen harassed members of the class and their children during a tournament in April of 2018. During her daughter's match against a Sports Performance team of 15-year-olds, Mullen was "inappropriately loud and aggressive" and "taunting" Sports Performance parents, players, and coaches. (Exhibit 10, pp. 2-3; Exhibit 32) Sports Performance won the match, and, the next day, Mullen continued to lurk around the court where that 15-year-old Sports Performance team was playing. (Exhibit 10, pp. 4, 6; Exhibit 32) Then, as Mullen walked past their court, she turned back to the Sports Performance players and raised her middle finger towards them. (Exhibit 10, pp. 3-4) Hours after her daughter's team was finished for the day, Mullen then attended the Sports Performance team's last match, where she again engaged in aggressive and intimidating behavior towards the team. (Exhibit 10, p. 4; Exhibit 32)

Mullen never cared about the parents or athletes in the Sports Performance program, and she even campaigned for efforts which would inflict harm on the class members she claimed to represent. For example, numerous individuals on Volleytalk noted the potential harm this lawsuit would inflict on the athletes currently in the program, and, after a former Sports Performance parent argued that the families should be left out of the attacks on Rick Butler, Mullen liked a response stating:

> And for the hundreds of kids and parents there? That is really simple, they are collateral damage - you and every other parent that sends their kids there, and the kids themselves, know what they are going to be associated with whether they like it or not. If they do not want the criticism by association then it is really simple, go play somewhere else as we have very well documented there are lots of other options in the area.

(Exhibit 3, p. 13) Mullen even liked a post blaming the athletes for any harm that may come to them because "[k]ids have a choice" and that "their decision to continue to go to SPVB" was to blame for any harm resulting from the efforts to remove the Butlers from the sport. (Exhibit 3, p. 5) Yet, Mullen and her attorneys argued to this Court that this litigation was "brought by a parent who is concerned about the welfare of the kids in Defendants' care." (Dkt. 54, p. 13)

In the days prior to the filing of this lawsuit, Mullen complained that she did not "get the logic of the argument of 'not punishing the kids', because they aren't the ones paying or making the ultimate decisions" and she encouraged others to "educate, bitc$ slap" or use "whatever means necessary" to keep parents from sending their children to the volleyball program. (Exhibit 3, p. 45; Exhibit 4, p. 18) Finally, in a public discussion about the merits of this litigation, Mullen confirmed that her "***true intentions are to completely destroy everything [Rick] has built and absolutely demolish any reputation [the Butlers] will ever have again***." (Exhibit 2, p. 106) Plaintiff and her attorneys should be sanctioned for their abject abuse of the judicial system.

## IV. PLAINTIFF AND HER ATTORNEYS ADVANCED FALSE AND IRRELEVANT FACTUAL ALLEGATIONS TO PUBLICLY DAMAGE DEFENDANTS' REPUTATIONS AND BUSINESS

While the salacious allegations in the Complaint have made great headlines for Plaintiff's nefarious cause, they are false and inflammatory, legally baseless, and brought improperly in the form of a class action to gain as much publicity as possible. The pursuit of factually and legally baseless claims invites the inference that the Complaint was filed in bad faith and for improper purposes. Mullen has publicly confirmed as much. Just one day after filing her Complaint, Mullen endorsed a post expressing "doubt [that] there is a viable theory of damages" and stating that "the merits of the case as a whole aren't necessarily what the lawyers are thinking about...The

plaintiff's lawyers are thinking, if we can just hold on long enough to get to discovery, we can punish the defendant with the process." (Exhibit 2, p. 39)

On February 28, 2018, after claiming to this Court that class members were deliberately deceived by omission about the allegations of abuse, Mullen liked a post stating that "*[p]eople in chicago [sic] might be used to [hearing about the allegations] - and it's nothing new* - but now anyone choosing this club has attention on them and their decisions. I think that will deter some. They may not have cared before - but now they are choosing [Sports Performance] and cannot deny knowing what Rick Butler has done. That has to make a difference." (Exhibit 2, p. 46) Plaintiff and her attorneys were fully aware that the allegations against Rick were common knowledge to those in the volleyball community, and especially to those involved with Sports Performance. Plaintiff and her attorneys filed this lawsuit to further their scheme to harass Defendants and to publicly pressure and shame those who continued to do business with the Defendants.

### A.   <u>The Complaint's Core Allegations Are False</u>

To back her false claims, Mullen states under penalty of perjury that she "would not have paid for any volleyball training from Defendants if [she] had known that the sexual abuse allegations against Rick Butler were true." (Dkt. 171-19, ¶ 19) Falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. *Secrease v. Western & Southern Life Ins. Co*., 800 F.3d 397, 401 (7th Cir. 2015) If successful, the effort produces an unjust result. *Id.* Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly. *Id.* (citing *Rivera v. Drake*, 767 F.3d 685, 686–87 (7th Cir. 2014)).

Throughout this litigation, Plaintiff echoed her claim that, "had she known about Butler's past abusive behavior, she would not have sent her daughters to GLV at all." (Dkt. 83-1, p. 6) It was recognized by the Plaintiff, Defendants, and the Court that "the common conduct at the crux of Plaintiff's claims is Defendants' uniform omission of material information about the truth of Butler's past sexual abuse from all class members, regardless of which program they paid for at GLV." (Dkt. 94, p. 10) However, "the crux" of Plaintiff's case relied upon abjectly false and baseless allegations from the start.

Furthermore, in approximately June of 2017, Mullen contacted Emily Swanson explaining that she "knew about the allegations" when her daughters were in the program, but that she "wasn't worried about them" because she believed Rick was under a microscope. (Exhibit 2, p. 173-77; Dkt. 144-4, p. 30) Mullen confirmed in October of 2017 that the relevant information was publicly available when encouraged others to "[j]ust Google" and do their "due diligence on Rick Butler." (Exhibit 4, p. 37) While she claimed that parents did not know about the allegations, Mullen wrote in November of 2017 that "parents at Sports Performance joke about the accusations...seriously it is a 'joking matter' there with the long time parents." (Exhibit 4, p. 33) Before she filed this lawsuit—prominently claiming that the allegations against Rick were concealed from her—Mullen openly acknowledged that the allegations against Rick were publicly known "for decades now." (Exhibit 3, p. 2)

On March 13, 2020, this Court granted summary judgment in favor of Defendants on all claims against Mullen, finding that online articles dating back to the mid-1990s "featured highly detailed descriptions of the allegations against Rick and mentioned the USAV coaching ban and the DCFS finding." (Dkt. 183, p. 18) Mullen and her attorneys prosecuted this action with the knowledge that the "essential characteristics of Mullen's claims" were being fabricated, and their

continued pursuit of this litigation without the necessary factual allegations to state a claim merits sanctions. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (holding that one of the basic purposes of Rule 11 is to "deter baseless filings in the district court").

Indeed, Mullen's false assertions allowed her to exploit the judicial process and evade early dismissal so the Defendants would be "bled to death financially." (Exhibit 2, p. 41) The Court relied upon Mullen's false claims when it denied Defendants' Motion to Dismiss, stating, "Mullen has alleged that she relied on defendants' deceptive conduct and was misled, and this is sufficient for present purposes." (Dkt. 68, p. 5) Mullen's extensive Volleytalk record, known to her attorney prior to this action, plainly demonstrates that Mullen was involved in detailed discussions about the allegations as early as 2015, yet she continued to send her daughters to GLV programs. (Exhibit 8, pp. 42-45) Plaintiff and her attorneys concocted this class action based upon false allegations and bad faith arguments to maximize the publicity of the Complaint, destroy Defendants' reputation, and obliterate their business relationships. Because Mullen's claims were doomed from the start, her headline-generating Complaint is riddled with patently false claims to inflict as much damage as possible, as quickly as possible:

- Plaintiff states in the first paragraph of her Complaint that Rick Butler has abused athletes, "for over three decades" (Dkt. 1, ¶ 1) Now, Mullen admits that there have, in fact, been ***no allegations of abuse made against Butler in the last three decades***. (Dkt. 144-5, p. 17; Dkt. 144-4, pp. 15-18)

- Plaintiff also introduces this lawsuit with the allegation that Butler abused "no fewer than six underage teenage girls, and likely many more." (Dkt. 1, ¶ 1) Now, Mullen admits that she does not know of "six underage teenage girls" and there is no factual basis for her claim that there are "likely many more" victims. (Dkt. 144-5, p. 17; Dkt. 144-4, pp. 15-18)

- Mullen argued that, prior to 2017, she "was unaware of the findings of both USAV and DCFS" and that, in the public record, there is "no acknowledgement that both DCFS and USAV deemed these allegations credible." (Dkt. 171, pp. 31, 26) Yet, this Court noted that Mullen commented on "an article in the Outside the Lines section of ESPN.com [that] reported on the DCFS and USAV decisions." (Dkt. 183, p. 19)

29

- "Mullen argued to this Court that, "[n]ot released or published to the public, for instance, was the fact that [USAV and DCFS] deemed Rick Butler's denials non-credible." (Dkt. 171, p. 22) Yet, the ESPN article she viewed in 2015—which is also *referenced in her Complaint*—states that "the [DCFS] investigated and found 'credible evidence' the allegations in 1995 were true" and that, "[i]n its August 1995 decision banning Butler from coaching girls for life, a USA Volleyball ethics panel rejected Butler's denials." (Dkt. 1, ¶ 1)

- Complaint states that "the transcripts of these hearings and the findings of USA Volleyball and the Illinois Department of Child and Family Services have not been made available to the public and are not searchable online" (Dkt. 1, ¶ 1 fn. 1) Yet, a 2016 demand letter sent by attorneys for Sarah Powers-Barnhard to the AAU included a copy of the USAV transcript and findings, was well-publicized, and was available online in the summer of 2016, all before Mullen brought her daughters back to Sports Performance for the 2016-2017 season. (Exhibit 13; Exhibit 16)

- While arguing in favor of class certification, Mullen claimed that "the Butlers…fraudulently suppressed information about Rick's predatory past, and failed to disclose that same information to new customers." (Dkt. 83-1, p. 18) However, in light of evidence to the contrary, Plaintiff manufactured a new argument on summary judgment that "everyone knew" about the allegations and that "Butler challenged people to Google him any time he was questioned about the allegations." (Dkt. 171, p. 32)

- Mullen's concealment claim is directly contradicted by two press releases, a public blog, a public demand letter, and a lawsuit filed by an accuser who was supposedly "shamed and intimidated into silence." (Exhibit 13; Exhibit 14; Exhibit 15; Exhibit 16) The public demand letter states that the "sexual misconduct is very well documented, starting over 20 years ago…[and] was widely reported in the media…None of these facts were buried but rather broadly publicized in 1995 and again in 2015." (Exhibit 16, p. 2)
  - Furthermore, this Court ruled that, "[g]iven the amount of publicly available information about Rick's history of abuse and the USAV and DCFS decisions against him, no reasonable juror could find that class members justifiably relied on the defendants' alleged concealment of information on this subject." (Dkt. 183, p. 19)

- Plaintiff's lawsuit is predicated on her theory that, "had she known about Butler's past abusive behavior, she would not have sent her daughters to GLV at all." (Dkt. 83-1, p. 5) Yet, Plaintiff sent her daughter to play in a GLV summer league tournament after this case was filed, which took place in the Great Lakes Center, which is named in the caption of this lawsuit. Therefore, on summary judgment this Court determined that, "even after she had learned, in her words, the 'truth of the allegations against Rick,' Mullen chose to pay for GLV's services." (Dkt. 183, p. 22)

- In Response to Defendants' Motion to Dismiss, Mullen argued to this Court that she "adequately alleged that she had no reasonable alternatives" to Sports Performance, despite the fact that her Complaint *already admitted* that her daughters played for another club. (Dkt. 57, p. 32, fn. 1; Dkt. 1, ¶ 166)

30

Through their numerous false, fraudulent and salacious charges against Defendants, Plaintiff and her attorneys exploited the judicial process. *Chambers*, 501 U.S. at 50 (using inherent power to assess attorney's fees as a sanction where the "entire course of conduct throughout the lawsuit evidenced bad faith and an attempt to perpetrate a fraud on the court"). These falsehoods cannot be written off as innocent or *de minimis* overestimates about matters on the periphery of the case. *See Alexander v. Caraustar Industries, Inc*., 930 F.Supp.2d 947, 961 (7th Cir. 2013). Rather, those falsehoods were pervasive, malicious, and constituted the core of her case, and Plaintiff and her attorneys should be sanctioned accordingly.

### B.    The Complaint Pleads Nearly 50 Pages of Irrelevant and Salacious Allegations

The allegations in the Complaint are not just false, they are outrageously and flagrantly so. Plaintiff managed to plead nearly 50 pages of slanderous, irrelevant, and unsubstantiated allegations wholly "on information and belief" and an "investigation conducted by her attorneys," further proving that Plaintiff and her counsel abused the judicial system and discovery process to maximize the publicity of this lawsuit and harm to Defendants' business and reputation. (Dkt. 1, Intro.) The Complaint makes it abundantly clear that Mullen and her attorneys intended to humiliate and degrade the Defendants both personally and professionally. For example, they included a fictional and reprehensible claim that, "in the late 1980s, Cheryl arrived at a friend's apartment crying and very upset because Butler had asked Cheryl if he could call her by one of those girl's names while they were having sex." (Dkt. 1, ¶ 137 fn. 6) This allegation serves absolutely no purpose but to publicly humiliate the Defendants with false and salacious accusations and to prejudice Defendants with sexually explicit allegations of sexual abuse in a fraud case.

The signature of an attorney on a Complaint constitutes a certificate by him that he has read the pleading, motion, or paper, that to the best of his knowledge, information, and belief

31

formed after reasonable inquiry it is well-grounded in fact and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. *Chambers*, 501 U.S. at 67 (stating that Rule 11 "requires a district court to impose reasonable sanctions, including attorney's fees, when a party or attorney violates" the rule by filing "groundless, unwarranted, vexatious" documents with a court). If a pleading violates this Rule, the Court is required to impose sanctions. *Id.* Here, the false statements in Plaintiff's Complaint were specifically designed to attract publicity of her claims and cause reputational and financial harm to the Defendants.

**The "Special" Relationship with Michigan State** The Complaint contains the irrelevant and false claim that "Butler has a special relationship with Michigan State University." (Dkt. 1, ¶ 17) Mullen's Volleytalk activity confirms that the superfluous and inflammatory claim was made for one purpose: publicity.[8] Prior to her Complaint being filed, Mullen acknowledged that the "outrage [against Rick] has only gained steam recently because of the national coverage of the Larry Nassar scandal." (Exhibit 3, p. 12) Within 24 hours of her Complaint being filed, alleging a "special relationship" with MSU, Mullen endorsed the comment that "Michigan State isn't unique in having coaches with ties to Butler/SPVB, but the choice to highlight THAT program and not others was certainly deliberate on the part of the attorneys drafting the complaint. It sends a specific signal." (Exhibit 2, p. 23) That same day, Mullen also agreed that her claims would not be getting the attention they had been receiving "without the Nassar and MSU stuff" and that "[the story about Rick] is extremely well known around here for at minimum the last 10 years…We can only

---

[8] This strategy was not new to Mullen. Beginning in 2017, Mullen was pushing to take action against Butler, believing there would be an increased likelihood of success due to the "recent turn of events and the current climate regarding [sex] crimes" and urging others to take action against the Butlers, saying "[i]f any time was ripe for action, it is NOW!" (Exhibit 4, pp. 38, 31) In December of 2017, Mullen endorsed a post stating, "I think with how the environment currently is that finally the pressure will be too much for USAV or AAU to ignore. I would like to personally thank all the idiots/gropers/predators in the US Congress that brings Butler's actions back to the forefront!" (Exhibit 3, p. 50)

hope he loses it all because of his incredible arrogance." (Exhibit 2, p. 49; Exhibit 3, p. 25) Mullen endorsed a post stating the lawsuit was "well-timed," noting "the strategic references" to Michigan State University, and another one calling the university an "easy target." (Exhibit 3, pp. 5, 8) Laura Mullen was shameless in her open acknowledgement of the falsity of her allegations, and she made it clear that her goal was to attract headlines in this case.[9]

    ***The "Stories" of Abusive Coaching from The 1980s*** Plaintiff's lengthy, detailed stories of "abusive coaching" from the 1980s are irrelevant to the claims of Mullen and the class. These allegations were not the subject of prior hearings, they do not have any relation to the claims of the class over 30 years later, and they were only included in the Complaint to publicly harass the Defendants and harm their business. The injuries alleged in the Complaint stem from Mullen's claim that, "[h]ad she and members of the putative Class known" of the allegations of sexual abuse from the 1980s, "they never would have given money to Defendants and never would have sent their girls to Sports Performance." (Dkt. 1, ¶ 4; Dkt. 83-1, pp. 5, 16) The "stories" of abusive coaching from the 1980s are even further removed from Mullen's claims on summary judgment, when she admits that she, "of course," was generally aware of the allegations of sexual abuse. (Dkt. 171, pp. 17, 32) Instead, Mullen claims that was specifically concerned with the findings of the USAV and DCFS, which, again, have nothing to do with the "stories" of harsh coaching from the 1980s. *Id*. Given the irrelevance of these allegations from Mullen's witnesses, who are also

---

[9] Mullen's tactic worked. The Associated Press ran two stories which focused on the "connection" between Rick Butler and Michigan State University, while also reporting on the additional false claims in the Complaint. The story was then reported in dozens, if not hundreds, of news publications across the nation. Soon, a new Volleytalk thread was created, titled, "Butler…AP chimes in" and Mullen was quickly engaged, tallying nearly two dozen comments or "likes" in just two days before the thread was shut down by Volleytalk. (Exhibit 8, pp. 6-7) *See* Michael Tarm, *Michigan State kept ties to Aurora volleyball coach accused of sexual abuse*, The Associated Press, April 24, 2018 https://www.chicagotribune.com/news/breaking/ct-michigan-state-kept-ties-to-coach-accused-of-sexual-abuse-20180423-story.html (last visited May 17, 2020); *see also* Michael Tarm, *Coach's accusers: Schools should end relationships with him*, The Associated Press, April 25, 2018, https://apnews.com/871f109e9fe2433b8959a1d7898ea517/Coach's-accusers:-Schools-should-end-relationships-with-him (last visited May 17, 2020) ("The campaign against Butler comes as Michigan State deals with questions about whether it could have done more to thwart Dr. Larry Nassar from abusing scores of young gymnasts over 20 years.").

clients of Edelson PC, it is clear that the inclusion of "abusive coaching" was a deliberate attempt to harm the Defendants and their business.

***Christine Tuzi*** Mullen's version of the "truth" is that, when Rick went to California for Christine's abortion in January of 1987, it "was the last time she had any contact with Butler." (Dkt. 1, ¶ 82) Yet, in the 1995 DCFS Recommendation and Opinion that Mullen inappropriately submitted to the Court on summary judgment, the Administrative Law Judge summarized Christine's sworn testimony in 1995, stating, "In December of 1987 [Christine] was 20 years old. She was still having a relationship with [Butler]…She asked [Butler] to come to California for Thanksgiving and gave him a Christmas present…In the summer of 1988 he employed her at camp." The judge further stated that it was not until "December 1990 when she was twenty-three, she was not having a relationship with him." (Dkt. 171-18, pp. 20-21) The "Our Story" document contained records of Christine's employment in 1988 and photographs of the present, therefore, Mullen and her attorneys knew that Rick and Christine were in a relationship for years after they allege in Plaintiff's Complaint. (Dkt. 79-1, pp. 58-83)

Similarly, the Complaint states that Rick "conceded" paternity in 1987 when Christine was pregnant, yet the administrative law judge wrote that Rick "denied paternity of Christine's baby." (Dkt. 1, ¶ 80; Dkt. 171-18, p. 20) The Complaint states that Rick "forced" Christine to attend Western Michigan and that, by the time Christine got there, Rick was no longer coaching at the school, so she "quickly transferred to University of Southern California in an attempt to get further away from him." (Dkt. 1, ¶ 79) Yet, the summary of Christine's 1995 testimony states that she was "angry" with Butler when he left and was no longer her coach. (Dkt. 171-18, p. 20)

***Julie Bremner*** While the Complaint claims that Rick "mentally and emotionally abused Julie" at practices, prior statements made by Julie disprove Mullen's claim. (Dkt. 1, ¶ 87) In a

34

September 5, 1990, article in the Chicago Sun-Times, Julie Bremner explains her belief that Rick "is an incredible motivator" and that she was always "very competitive inside and he found the proper way to channel it." (Exhibit 28) Bremner, who had graduated from the Sports Performance program years prior, continued, "He does it in such a way that you want to do it. You really respect him because he's in it with you. He even ran the sprints with us." *Id.* Shortly before this case was filed, Julie became a client of Edelson PC.[10] Therefore, Mullen and her attorneys knew or should have known that their irrelevant claims of abusive coaching were undermined by Julie's public endorsement of Rick's coaching techniques.

  ***The Chicago Breeze Draft*** Plaintiff accuses Cheryl of making the "unequivocally false" statement that Sarah willingly joined the Chicago Breeze because, according to Mullen, Sarah "was drafted by Butler without her consent."[11] (Dkt. 1, ¶ 149) The Complaint alleges that Sarah "begged" Rick not to draft her to the Chicago Breeze, a professional volleyball team he was coaching, and claims that Sarah had "no choice" in the decision. (Dkt. 1, ¶ 50) However, in a February 18, 1987, news article about the Chicago Breeze, Powers tells a very different story, saying, "Rick (Butler) called me one night right after my [college] season ended, and I said I didn't want to think about it right away because we just finished, and ***he said 'Well you have to decide by tomorrow morning.' I said o.k.***" (Exhibit 29) (emphasis added) Sarah's version of the events leading up to the 1986 draft directly contradict Mullen's version of the "truth." This article was referenced in Defendants' "Our Story" document, so Plaintiff and her attorneys had knowledge of the false claims before the Complaint was filed. (Dkt. 79-1, p. 52) The allegations related to a 1986 volleyball draft have no impact on the claims brought by Laura Mullen, and the fact that her

---

[10] *See* Illinois State Senate *Task Force Hearing*, May 15, 2018, http://www.ilga.gov/senate/committees/100Documents/SDHA/Hearing%20Packet%205.15.2018.pdf (last visited May 17, 2020).

[11] Mullen never alleges that she or anyone from the class relied on, or even read, Cheryl's alleged statement, and she wholly fails to address how the 1986 volleyball draft would be relevant to any class member. (Dkt. 1, ¶ 149)

Complaint included a false portrayal of these irrelevant facts is direct evidence that her claims were brought in bad faith.

*Beth Rose* The allegations from Beth Rose were improperly included in the Complaint so Plaintiff could claim there were "new allegations" in support of her false assertion that "for over three decades" Butler abused "underage girls." (Dkt. 1, ¶ 1) The allegations from Rose were not made against Rick prior to Mullen joining the Sports Performance program, and the claims are irrelevant to the time period in which the class members joined the Defendants' program. (Dkt. 171, p. 32) Mullen admits she has never communicated with Rose, yet she pleaded explicit details of Rose's "story," including her thoughts and personal motivations, and she later produced sworn declarations from Rose. (Dkt. 144-4, pp. 15-18; Dkt. 1, ¶¶ 52-62; Dkt. 171-11) Notably, Rose was not "underage," she was not a volleyball player, and Butler was not in any "position of power" over her. (Dkt. 1, ¶ 53) Rose's story is irrelevant to the merits of Mullen's claim and again exposes that Plaintiff's focus was not on the merits of her claims but, rather, the reputational and financial damage to Defendants. (Dkt. 57, p. 8)

*Jane Doe* Like Rose, the allegations from Jane Doe were not made against Rick at any point prior to Mullen joining the Sports Performance program, and her "story" was improperly included so Plaintiff could give the appearance that there were "new allegations" against Rick. (Dkt. 1, ¶ 1) Mullen admits she has never communicated with Jane Doe and, presumably, does not know her identity. (Dkt. 144-4, pp. 15-18) Yet, Mullen "believes" Jane Doe, and pleaded explicit details of her "story," including her thoughts and personal motivations. (Dkt. 171, p. 7)

*The Unidentified Sixth "Victim"* Plaintiff repeatedly referenced "a sixth girl not described or identified in this Complaint" and now admits there was no such person. (Dkt. 1, ¶¶ 1, 25; Dkt. 144-4, pp. 15-18)

36

*Allegations of "Rape" and "Child" Abuse* The Complaint intentionally combines allegations of "rape" with misleading headings such as "Rick Butler's Conduct Has Been Confirmed Through Multiple Official Proceedings" to give the false perception that the "stories" in the Complaint have been proven to be true. (Dkt. 1, ¶¶ 1, 118) In reality, the "official proceedings" found that Rick had "sexual intercourse and a subsequent physical and emotional relationship" with Sarah, Julie, and Christine, two of whom were 16 at the time and the other 17. (Dkt. 1, ¶ 121) However, the age of consent in Illinois at all times between 1981 and 1987 was sixteen years old and, therefore, the relationships described in the findings of the "official proceedings" were not illegal under the Illinois law. *See* IL Rev Stat ch 38 section 11-4(a) (1983) and IL Rev Stat ch 38 section 12-15 (1985). Plaintiff's use of the word "rape" and "child abuse" is false and intentionally misleading. None of the former players alleged any relationship with Rick when they were under the age of consent. (Dkt. 1, ¶ 126) The Complaint intentionally and falsely suggests that factual findings were made which would implicate criminal conduct, where the actual findings do not amount to any illegal conduct.

*The 2018 Bans* The Complaint contains irrelevant references to USAV, AAU, and JVA's 2018 action against Rick Butler, which took place after Mullen had left the program. (Dkt. 1, ¶¶ 127-32) When referencing these bans, Plaintiff has even admitted their irrelevancy, stating that the 2018 bans "had not yet occurred during the operative time." (Dkt. 57, p. 11) The sections of the Complaint titled "2018 Disciplinary Actions" and "Butler Continues to Attend Tournaments [sic] Even After Ban" contain irrelevant and misleading accusations, such as that Rick "was viewed standing by the court that one of his teams was playing on" after he was banned from coaching.[12]

---

[12] Mullen has also shown that she has been actively engaged in the stalking and harassment of the Butlers at their place of business, posting several times about her efforts: "And another pic of RB coaching from the stair stoop of court 1 at the Great Lakes Center to add to my collection"; "Butler was also watching his team from the stoop of the stairs"; "Looks like Elite has a new coach for the tournament this weekend…I still plan to video if he is on the bench."; "I

(Dkt. 1, ¶ 131) Mullen and her attorneys were aware that, at the time she filed her Complaint, the coaching ban did not prohibit Rick's attendance at tournaments taking place in GLV's building. (Exhibit 3, pp. 46-47)

Mullen actively involved herself in efforts to place undue pressure on the sport's governing organizations to ban Rick Butler, threatening USAV, AAU, and the JVA with negative publicity in the wake of the Michigan State scandal and the legal proceedings of Larry Nassar. (Exhibit 3, pp. 5, 46) In January of 2018, Mullen supported the idea that, "[p]ublic pressure on AAU has to amp up" and that "2017 was a good year" because Sports Performance "lost all major sponsors." (Exhibit 3, p. 46) When AAU banned Butler in February of 2018, Mullen acknowledged that "the Nassar trial has everything to do with the [AAU] ban and the universities withdrawing [from hosting events at the Great Lakes Center]...If it wasn't for the timing of the Nassar trials, I don't think the AAU would have caved that easily." (Exhibit 3, p. 5) The organized efforts were ultimately successful due to public pressure.

The evidence further shows that Mullen and her attorneys misrepresented the significance of the 2018 bans both in her Complaint and throughout her subsequent filings. In fact, Mullen has endorsed the belief that the 2018 USAV ban was a sham.[13] After USAV issued a public statement about the AAU and JVA actions against Butler, Mullen liked a post mocking USAV's "holier than

---

will personally go over and film [Rick], providing he is on the bench."; "Next Power League some people should be up in the balcony of court one [of the Great Lakes Center] wearing Mickey Mouse ears...I'll buy!"; "I think that billboards are a good idea, especially near the Great Lakes Center." (Exhibit 4, pp. 5, 12, 15, 17-18, 23; Exhibit 30)

[13] Mullen liked a post which noted that, since Sports Performance teams had not participated in a USAV event since 2007, the USAV ban "meant nothing" to the organization. (Exhibit 3, p. 48) Mullen is also aware that the 2018 ban was the second "lifetime ban" issued by USAV within weeks of each other. (Exhibit 3, p. 49) At the end of 2017, USAV decided to ban Butler for allegedly breaching a "protective order" when he issued a general denial in response to a reporter asking him about the already-public allegations. (Exhibit 3, p. 51) Mullen acknowledged that Butler was issued a lifetime ban in December of 2017 "by whatever means or technicality" USAV could employ. (Exhibit 3, p. 8) Then, in January of 2018, USAV sought to impose a second lifetime ban by holding a hearing in Colorado based upon claims of "harsh" coaching and "abuse" from the 1980s. (Exhibit 3, p. 48) Butler did not participate in the hearing. Nevertheless, USAV issued a Media Statement announcing its decision and Mullen now points to that ban to give the false perception that her claims are credible. (Dkt. 1, ¶ 127)

thou act" and calling the statement it made to the media "hilarious" and "a joke." (Exhibit 3, p. 13) Yet, in her Motion in Support of Class Certification, Mullen credits that same ban as the event which informed the public of the accusations against Butler. (Dkt. 83-1, p. 10)

Furthermore, Mullen and her attorneys are aware that the AAU only banned Butler after USAV threatened to decertify the AAU as an affiliated organization if it refused. The USAV even issued a public statement criticizing the JVA for suspending Butler "only a result of the recent decision made by the AAU to ban Rick Butler and *not a result of their belief that Mr. Butler has done any wrong*." (Exhibit 3, p. 48) (emphasis added) USAV's statement about the JVA was referring to a statement made by Jenny Hahn, executive director of the JVA, publicly stating that "it's just curious" that decades-old allegations against Butler are surfacing now and added, "it's much more than what's on the forefront." (Exhibit 3, p. 52) It is obvious that even the governing bodies of the sport have reason to disbelieve the "stories" in Plaintiff's Complaint. Therefore, Plaintiff's reliance on those bans as though they somehow add legitimacy to her claims is yet another misrepresentation to this Court.

*The Allegations Against Cheryl* The Complaint's allegations related to Cheryl Butler are irrelevant to the claims of Laura Mullen and the class. (Dkt. 1, ¶¶ 133-49) Not once does the Complaint allege that Cheryl's acts had any impact on Mullen's decision to join the Defendants' program. Mullen never says she viewed any of Cheryl's comments or that any of Cheryl's acts had any impact on Mullen whatsoever. Yet, the Complaint is rife with cherry-picked excerpts from letters, transcripts, and court documents from the 1980s and 1990s, often void of any identifying information, that do nothing to advance or support Plaintiff's claims; the fact that Mullen cited to such plainly inadmissible matter shows her hasty attempt to reframe the salacious, provably false accusations from the 1980s to gain publicity and harm Defendants' reputations and business. (Dkt.

39

1, ¶¶ 21-165) In fact, the Complaint is not only used to publicize allegations against the Butlers, but it is also used to publicly attack and ridicule the Butlers' defenses to the false claims. Plaintiff attempts to preemptively and publicly discredit the defenses to her claims, and she did so by intentionally excluding relevant facts, distorting the evidence, and blatantly lying to this Court.

For example, the Complaint contains a lengthy discussion of the "Our Story" document, which was published just days before this case was filed. (Dkt. 1, ¶¶ 135-50) Therefore, no class member could have relied upon any of its contents prior to enrolling their children in the Sports Performance program.[14] Nevertheless, the Complaint devotes six pages to the "Our Story" document in a clear attempt to provide false information and arguments related to the Butlers' potential defenses. (Dkt. 1, ¶¶ 135-50) The Complaint all but admits to doing so, stating that "Cheryl's document sets forth *many arguments she and Rick have relied on for decades.*" (Dkt. 1, ¶ 136) (emphasis added) In reality, the "Our Story" document contains an abundance of evidence refuting Mullen's version of the "truth," and demonstrates the absurdity of Plaintiff's contention that Defendants committed fraud when they referenced documentation supporting their defenses, such as a court ruling, copies of contracts, photographs, cancelled checks, receipts, emails, and letters. (Dkt. 171, pp. 26-27; Dkt. 79-1) The Complaint's twisted, selective presentation of the "Our Story" document confirms that Mullen and her attorneys pursued this litigation with knowledge of the falsity of the claims. (Dkt. 1, ¶¶ 135-50; Dkt. 79-1)

**C.** **Plaintiff Misrepresents and Improperly References the DCFS Proceedings**

Plaintiff, in her Complaint and throughout this litigation, made several references to Illinois Department of Children and Family Services ("DCFS") proceedings. (Dkt. 1, ¶¶ 123-26; Dkt. 171)

---

[14] Nevertheless, Mullen contended in her discovery responses that the "Our Story" document was an act of concealment, erroneously claiming that it was "distributed to an unknown number of people, including potential class members." (Dkt. 144-4, pp. 23-24)

To start, Plaintiff's Complaint falsely alleges that the DCFS made findings of fact after "an extensive hearing" and based its decision upon "conclusive and credible evidence." (Dkt. 1, ¶ 164) Plaintiff continues, stating that the DCFS "concluded that Butler in fact engaged in inappropriate sexual contact with at least three teenage girls at the time he coached them." (Dkt. 57, p. 11) These claims are false. (Dkt. 1, ¶ 164)

Plaintiff contends that it was "simply false" when Cheryl stated that, "in 1994, the Illinois DCFS conducted an investigation of the Sports Performance program and spoke to the players that Rick was training at the time. That investigation found nothing at all regarding any type of inappropriate behavior." (Dkt. 1, ¶¶ 139-40) However, *Mullen's own evidence* shows that Cheryl's statement is true and accurate, where the 1995 DCFS administrative law judge states, in no uncertain terms, that "[a]ll the present players [the investigator] interviewed said they neither observed nor experienced any inappropriate behavior on the part of [Butler]. None of the parents [the investigator] talked to observed any or heard any complaints of inappropriate behavior." (Dkt. 171-18, p. 18)

The DCFS hearing did not adjudicate alleged acts in the 1980s, but instead evaluated whether there was any risk of harm posed to players in 1994-1995. (Dkt. 171-18, p. 36) In fact, the DCFS did not call any accuser from the 1980s to testify.[15] Furthermore, it is undisputed that all records of the 1994-1995 DCFS investigation were removed and destroyed by the Department over two decades ago. (Dkt. 1, ¶ 152) Nevertheless, the Complaint contains the erroneous and irrelevant claim that, in June of 2017, after Mullen left the program, "Sports Performance coach Erik Vogt incorrectly assert[ed] that the findings of the Illinois DCFS are no longer applicable."

---

[15] One accuser was subpoenaed to testify by Rick Butler. (Dkt. 171-18, p. 3) The other two accusers did not attend the hearing to testify under oath. (Dkt. 171-18, p. 38) The administrative law judge nevertheless made credibility determinations and findings of fact as to the complaints of the absent women. *Id.*

(Dkt. 1, ¶ 152) In fact, not only are the findings inapplicable, but it is a crime to publish them. *See* 325 ILCS 5/11.3 (West 2014). The Abused and Neglected Child Reporting Act establishes a unique privacy interest for individuals subject to DCFS indicated findings of abuse or neglect. (325 ILCS 5/11 (West 2014)).

The DCFS privacy interest was created to avoid the precise issue raised by Plaintiff's unauthorized disclosure of cherry-picked excerpts of the 1995 DCFS opinion and subsequent filing of the full document. (Dkt. 1, ¶ 126; Dkt. 171-18) It is clear that the harm caused by publicly releasing the findings of a DCFS report is severe and the risk that those findings will be misused is very high, especially in light of the particularized rules of the DCFS and low burden of proof needed to support a report of suspected abuse. *See Dupuy v. McDonald*, 141 F. Supp. 2d 1090 (N.D. Ill. 2001). Emily Swanson's unauthorized disclosure of the information she states was "never publicly released" constitutes a Class A misdemeanor pursuant to the provisions of the Abused and Neglected Child Reporting Act. (Dkt. 171-18, pp. 9-42) Similarly, Plaintiff's own unauthorized disclosure violates the language of the Act prohibiting such disclosures.

As this Court has noted, those who have accused Butler of abuse have publicly discussed the DCFS proceedings for decades, and the findings of the DCFS related to the allegations of abuse have been widely reported in the media.[16] (Dkt. 183, p. 2) However, any improper publicity of the DCFS decision in the past does not excuse the conduct of Plaintiff and her attorneys, who intentionally misrepresented the DCFS proceedings for the purpose of publicly damaging the

---

[16]  The publications referenced in the Memorandum Opinion and Order, and many others, focus their reporting on the DCFS findings which are specific to the allegations of abuse. (Dkt. 183, p. 18)(2015 ESPN web article stating that "the Illinois Department of Children and Family Services investigated and found 'credible evidence' the allegations in 1995 were true"); *Id.* (2016 New York Daily News article stating that "the Illinois Department of Children and Family Services (DCFS) said in 1995 that it found "credible evidence" the allegations against him were true"); *Id.* (1995 Los Angeles Times article stating that the DCFS "found evidence to substantiate the charges of sexual misconduct"); *Id.* (1996 Chicago Magazine article stating, "DCFS investigators classified the case against Butler as 'indicated for risk of harm.' This means authorities believe the evidence supports the allegations, and that the information will be kept on file for five years.")

Defendants' reputation and business. Even after it became clear that Mullen's lies would ultimately end her case on summary judgment, Plaintiff's response included a document dump of irrelevant and inadmissible evidence related to the underlying claims of abuse, which did nothing to counter the arguments made by the Defendants. (Dkt. 171-9; Dkt. 171-12; Dkt. 171-13; Dkt. 171-14; Dkt. 171-15; Dkt. 171-16; Dkt. 171-17; Dkt. 171-18; Dkt. 171-25) Plaintiff was merely using the publicity of this case as a means to distribute information she deemed harmful to the Defendants.

### D. Mullen's False Allegations Related to Her Own Experience with Sports Performance

When Plaintiff finally pleads facts within her personal knowledge, she is no less dishonest. Mullen lies about when her daughters left the program, she lies about why her daughters left the program, and she lies about what happened while they were in the program. (Dkt. 1, ¶¶ 166-76) Mullen falsely claims she did not receive a copy of her contract, then later admits that she did. (Dkt. 1, ¶ 199; Dkt. 144-5, pp. 15-16) Mullen falsely claims that Rick caused her daughter, [A.M.] to lose weight, despite asking Rick to "continue to encourage her to eat a lot" because she "think[s] that it helps." (Exhibit 17, p. 7) Mullen falsely claims that Rick's "coaching techniques" caused her daughter to see a therapist, when it was Rick who suggested that Mullen's daughter see a therapist. (Dkt. 1, ¶ 171; Exhibit 17, p. 5)

Finally, Mullen claims that Defendants engaged in unfair methods of competition to induce Plaintiff to enter a contract with GLV. (Dkt. 1, ¶¶ 189, 204) Yet, when Plaintiff's daughter emailed Rick in 2015 about her decision to switch clubs, Rick said, "My gut feeling is that you should stay where you are. It seems like you have a lot going for you and I believe that Sports Performance is a place that you REALLY have to want to be a part of. If you're not feeling that then you shouldn't make the switch back. Ultimately, your happiness with your situation is the most important thing." (Dkt. 144-13) There is not one objective piece of evidence that supports Mullen's contention that

there was any "physical and emotional abuse" towards her daughter. (Dkt. 1, ¶ 175) In fact, the emails exchanged between Mullen and Rick throughout 2017 show the opposite.

Of course, nearly every allegation about Mullen's daughter is irrelevant to her cause of action, yet she chose to concoct a narrative that would publicly damage the Defendants' reputations and discourage families from participating in the Defendants' programs. However, these allegations were not innocent exaggerations or misstatements. *See Holly v. Wexford Health Services, Inc.*, 339 Fed.Appx. 633 (7th Cir.2009) (imposing severe sanctions for dishonesty to the court "even though that lie does not bear upon the truthfulness of the allegations in the underlying lawsuit"). They were intentional lies meant to further harm the Defendants' business. Even after Defendants informed Plaintiff's counsel of Mullen's lies, they still persisted. (Exhibit 20) Therefore, severe sanctions are warranted against Mullen and her attorneys for their intentional misrepresentations to this Court in the Complaint and throughout this litigation.

### 1. Mullen's Claims of Physical and Emotional Abuse of Her Daughter Are False

Under penalty of perjury, Plaintiff repeats the false claims alleged in her Complaint, stating that "Rick Butler verbally and emotionally abused my eldest daughter, A.M., by regularly making comments about her weight and appearance. This caused my daughter to lose weight and to develop self-esteem issues, ultimately causing her to see a therapist as a result." (Dkt. 171-19, ¶ 6; Dkt. 1, ¶ 171) Each of these claims is false, and Plaintiff and her attorneys should be sanctioned for committing an intentional assault on the integrity of the judicial system. *See Alexander,* 930 F.Supp.2d at 960 (citing *Holly v. Wexford Health Services, Inc.*, 339 Fed.Appx. 633 (7th Cir.2009)). An email exchange between Rick and Mullen leaves no question that Rick had serious concerns for her daughter's well-being and was actively working with Mullen to provide her daughter the resources and support needed to overcome her condition. (Exhibit 17)

On March 28, 2017, while her daughter was in China on a team trip, Rick Butler and Laura Mullen exchanged a series of emails that refute her false claims that Rick "physically and emotionally abused" her daughter. [17] (Exhibit 17; Dkt. 1, ¶ 171) Rick emailed Mullen about her daughter, [A.M.] because he believed her daughter was having "serious eating issues," and he explained, "I want to give [A.M.] a chance to beat this thing that she has, but she's going to need lots of help and support." (Exhibit 17, p. 5) Therefore, Rick asked Mullen to "start working on finding a counselor" for her daughter. *Id.* Mullen responded that she would "find one immediately" and ended her message saying, "As we all agreed, her health is the #1 priority." *Id.* Mullen followed up the next day, explaining, "I am to blame for letting it get out of hand as well, and for trusting [A.M.] too much…Like I mentioned before, something was triggered over the end of high school season/beginning of club season." (Exhibit 17, p. 6) Mullen's communications are evidence of Mullen's perjury, where Mullen claimed that Butler's "coaching techniques" caused her daughter to see a therapist, since she admits to Rick in her email that "something was triggered" to cause her daughter's condition before she was even placed on Rick's team. (Dkt. 171-19, ¶ 6; Exhibit 17, p. 6)

Then, on April 4, 2017, Mullen emailed the Butlers to share with them that her daughter's first meeting with her therapist was "successful" and specifically requested Rick's continued encouragement, stating, "Rick, if you could continue to encourage her to eat a lot (large quantities of healthy food) I think that it helps." (Exhibit 17, p. 7) The efforts of Mullen and the Defendants

---

[17] Plaintiff additionally lied about her husband passing away while her daughter was on a trip to China. After receiving Defendants' first warning that they would be seeking sanctions for her false claims, Plaintiff included a footnote in her Response to Defendants' Motion to Dismiss claiming that "[t]he Complaint mistakenly states that Plaintiff's husband passed away while her daughter was at a volleyball tournament with Butler in China, when in fact he passed away during the following tournament." (Dkt. 57, p. 13 fn 1) Furthermore, because Mullen's daughter wanted to go on the trip to China, Rick met with Mullen and her daughter and coordinated travel insurance, which GLV paid for, so that her daughter's ticket could be easily refunded or rescheduled in case of an emergency related to her father's health. (Exhibit 18)

culminated in a lengthy email from Rick on April 5, 2017, discussing his concern for A.M.'s wellbeing and saying, "I think the best thing to do is for us all to sit down together next week and try to decide what the best path forward is based on what her therapist and her Dr. are recommending. I'm not sure this is something she can beat while maintaining the schedule and physical demands of an elite level athlete." (Exhibit 17, p. 9) Rick requested a meeting the following week, however, Mullen's husband passed away before that meeting took place. At that time, it was decided that it would be in A.M.'s best interest to leave the program and focus on her mental and physical well-being.[18] (Exhibit 17, pp. 10-12) While Mullen would have this Court believe that she pulled her daughters as a result of "physical and emotional abuse," the evidence demonstrates nothing of the sort. Then, after her daughter left the program, Mullen emailed Rick saying, "Thank you very much for the outpouring of love and support shown to our family from Sports Performance." (Exhibit 17, p. 12)

### 2. Mullen Lied About When and Why Her Younger Daughter Left the Sports Performance Program

Mullen's younger daughter remained in the program until May 21, 2017, when she was pulled immediately prior to the final trip of the season due to Mullen's concerns over playing time and because, according to Mullen, her daughter did "not get set by the current setter." (Exhibit 19) Her claim that "in June of 2017…Laura was already pulling her daughters from the program based upon the physical and emotional abuse" is false. (Dkt. 1, ¶ 175) Mullen brazenly argued that she "did not receive the full benefit of the services she paid for, because Defendants' physically and emotionally abusive behavior towards her daughter, combined with her discovery of the details of

---

[18] On April 15, 2017, the Butlers organized for Sports Performance teams to support Mullen's daughters after the passing of their father by attending the "Celebration of Life" held by Mullen. (Exhibit 17, pp. 11-12) Mullen emailed Rick, "Thank you very much for the outpouring of love and support shown to our family from Sports Performance over the past week. Numerous people came up to me Saturday, totally impressed with the fact that so many of the girls and coaches were there! As you can imagine, it is difficult for [A.M.] to separate herself from volleyball, yet she knows it is the right thing to do for herself at the moment…Again, thank you for all of the support!" *Id.*

Butler's history of sexual abuse, caused her to withdraw her daughter from the program prior to the end of the season she had paid for." (Dkt. 1, ¶ 175) This is, again, false. Mullen admits that she pulled her older daughter in April of 2017 and her younger daughter in May of 2017, and she alleges that "she did not see any information online until June of 2017 due to Defendants' concealment." (Dkt. 144-5, pp. 5-6; Dkt. 57, p. 20 fn. 4; Dkt. 1, ¶ 175)

### 3.    Mullen Falsely Claimed She Did Not Receive a Copy of Her Contract to Deceive This Court and Survive Defendants' Motion to Dismiss

Plaintiff claimed that Defendants "failed to provide Plaintiff with a copy of her contract" and called Defendants hypocritical for, in her words, "[g]rasping at straws" when they (correctly) argued that Plaintiff did receive a copy of the contract and, therefore, should have attached the contract to her Complaint. (Dkt. 57, pp. 27-28; Dkt. 1, ¶ 199) Then, Plaintiff produced a copy of the contract in discovery and has since admitted that she received a copy of the contract for each year her daughters were in the Sports Performance program. (Dkt. 144-7; Dkt. 144-5, pp. 5-6)

The Court relied upon Mullen's false claims in denying Defendants' Motion to Dismiss, stating, "Defendants argue that Mullen has failed to attach a contract to her complaint, but that would be a bit odd, seeing as how she contends defendants violated a provision of IPFSA requiring a copy of a contract with a physical fitness center to be given to the customer…she has adequately alleged a violation of sections 4 and 6 of the IPFSA." (Dkt. 68, p. 8)

### E.    Defendants Warned Plaintiff That They Would Seek Sanctions for Her False Claims and Assertions to the Court

In nearly every brief filed with this Court, Defendants have stressed that this action was filed for improper purposes by Plaintiff and her counsel and identified various misrepresentations. The Seventh Circuit has held that no warning is required for sanctions where the conduct is severe and the party represented, such as the case here. *Matter of Bluestein & Co.*, 68 F.3d 1022, 1026

(7th Cir. 1995). But even if warnings were required, Mullen and her attorneys had plenty. Defendants sent two letters to Plaintiff in compliance with the Rule 11, one in June of 2018 and another in August of 2018. Defendants' June 18, 2018 letter explained that "[d]espite the requirements of Federal Rule of Civil Procedure 11, it is clear that Plaintiff's Complaint, and the allegations contained therein, were presented to the Court for an improper purpose, namely, to harass the Defendants, cause damage to Defendants' business and reputation, and to gain publicity…it has become increasingly more obvious that Plaintiff is merely being used as a conduit to smear my clients' reputations and cause permanent and irreparable harm to their business." (Exhibit 20) For their Rule 11 letter, Defendants attached sixty pages of documents in support of their contentions and outlined:

(1) that the Complaint begins with nearly 50 pages of scandalous, immaterial, unsubstantiated, and patently false allegations of sexual abuse concerning third parties which were included for an improper purpose, in violation of FRCP 11;

(2) that Laura Mullen paid GLV for her daughter to participate in two programs, one in August of 2017 and another in September of 2017, after learning "substantial details" of the allegations (Dkt. 71-8);

(3) that Mullen could be identified posting under the username "Swimrowvball" on Volley Talk, and her posts leave no question that she was aware of the allegations made against Rick Butler as early as 2015 (Dkt. 71-9, Dkt. 71-10);

(4) that Mullen's daughter emailed Rick in 2015 saying that "[i]t is unfortunate to hear about all of the bad press" and that she supported Rick and Cheryl (Dkt. 71-7);

(5) that the Complaint falsely claims that Mullen's daughters left the program due to Rick Butler's allegedly abusive coaching techniques in or around June of 2017 (Dkt. 71-11);

(6) that the Complaint contains the erroneous allegation that the Defendants have a "special relationship" with Michigan State University, which was only alleged as an attempt to connect this case to the publicity of the unrelated Nassar case in order to induce further harassment of the Defendants;

(7) that the Complaint also contains the false accusation that Plaintiff's husband passed away while her daughter was in China[19];

(8) that Defendants produced dozens of emails to Plaintiff showing putative class members' support for the Defendants against the allegations in Plaintiff's Complaint (Dkt. 71-4);

(9) that Plaintiff's claim that Defendants owed a duty to disclose to Plaintiff the allegations which have been known to the public since 1995 is not grounded in fact or in law, has been presented for an improper purpose, and was not alleged in good faith since she was aware of the allegations as early as 2015 (Dkt. 71-7; Dkt. 71-9, Dkt. 71-10);

(10) that Mullen has not suffered an injury;

(11) that Mullen has repeatedly acknowledged the value and benefit she received from her daughters' participation in the Defendants' program;

(12) that Plaintiff and her attorneys have chosen to cherry-pick excerpts from the "Our Story" document for the Complaint in an attempt to fit Plaintiff's narrative and improperly included portions of hearing testimony, hand-written letters, and other excerpts are largely void of identifying information, and the entire complaint contains allegations that are not within the personal knowledge of Plaintiff (Dkt. 79-1);

(13) that Plaintiff's repeated use of the word "rape" was improper when no agency, organization, or court has made any finding which would support such a contention (Dkt 1, ¶¶ 121, 126, 140, 164; Dkt. 71-12; Dkt. 71-13);

(14) that a 1995 Guardian Ad Litem (GAL) Report, submitted to the adoption court by an attorney representing the adoptive child of Rick and Cheryl Butler, found, *inter alia*, that the allegations made to DCFS. could not be substantiated by anything other than the accusers' allegations, that he disagreed with the DCFS findings, and, most importantly, that **"Mr. Butler did not break any criminal laws then or now"** (Dkt. 71-12);

(15) that, shortly after the allegations were made and investigated, a judge found Rick and Cheryl Butler to be "reputable persons with character, ability and means to rear, nurture and educate the child in a suitable and proper manner" (Dkt. 71-13); and

(16) that the use of the DCFS investigation was improper, and that Plaintiff was aware that all information related to the DCFS investigation was removed by the State Central Register and destroyed by DCFS in 1999 (Dkt. 1, ¶ 152).

---

[19] After receiving Defendants' Rule 11 letter, Plaintiff acknowledges that her husband did not pass away while her daughter was in China, yet she never amends her Complaint to remove the irrelevant, false narrative of Butler's "pressure and shaming" leading up to the China trip, which was merely included to damage the Defendants' reputation and paint Rick Butler in a negative light. (Dkt. 1, ¶¶ 172-73)

(Exhibit 20; Dkt. 71, pp. 16-20; Dkt. 59, ¶ 8; Dkt. 59-1, ¶ 11) Mullen and her attorneys were steadfast in their desire to harm the Defendants by prolonging this litigation in bad faith. After being presented with the evidence and arguments described above, Mullen was undeterred, claiming that the Court should sanction the Defendants and issue corrective notice to the class because, according to Plaintiff, "not one of the documents produced [with Defendants' Rule 11 letter] exculpates Defendants or proves anything, and Defendants' suggestion to the class that they [have evidence to] definitively do so is entirely misleading." (Dkt. 67, p. 14)

Then, after learning that Mullen's daughter participated in GLV's summer league in July of 2018, Defense counsel sent a second Rule 11 letter to Plaintiff in August of 2018 stating that their "client has yet again entered into a contract with my clients for volleyball services and has been allowing her younger daughter to play volleyball at the Great Lakes Center since approximately July 10, 2018." (Exhibit 21) Defendants stressed that Mullen's decision to allow her daughter to play in the Defendant's summer league, hosted in the Great Lakes Center – which is named in the caption of her Complaint – invalidated her claims that she would "not have participated in any GLV associated volleyball programs" had she known of the allegations in her Complaint. (Dkt. 1, ¶ 160)

Defense counsel continued, stating, "The damage this lawsuit has inflicted on my clients is irreversible. Your client's actions plainly evidence that her intent was to do just that. Laura Mullen's case is not grounded in fact or in law, and any furtherance of this matter would constitute a grave violation of your duties as an officer of the court." *Id.* In response, Mullen's attorneys dismissed both of Defendants' warnings, simply stating that each "letter does not comply with the Federal Rules." (Exhibit 22) Plaintiff proceeded with a series of meritless motions and filings until this Court granted summary judgment on March 13, 2020. In its Memorandum Opinion and Order,

the Court found that Mullen "enrolled one of her daughters in a GLV summer program in 2018, and this program took place at a facility in which Rick had an office. Thus, even after she had learned, in her words, the 'truth of the allegations against Rick,' Mullen chose to pay for GLV's services." (Dkt. 183, p. 22)

## V.     SANCTIONS ARE WARRANTED FOR PLAINTIFF'S BAD FAITH ASSERTIONS

Plaintiff's allegations intentionally distort reality, and this Court should impose sanctions in the form of Defendants' attorneys' fees that resulted from the bad faith conduct of Laura Mullen and Edelson PC. *See Fuery*, 900 F.3d at 475-78 (affirming sanctions based on "the total effect of the misconduct on the integrity of the proceedings" and the need to "maintain the integrity of the trial process"). In this case, severe sanctions are warranted, because Plaintiff and her attorneys took steps to vexatiously and unreasonably increase the attorneys' fees throughout this litigation. To start, Plaintiff improperly brought her claims as a class action lawsuit to maximize publicity and force Defendants to incur substantial legal fees they would not have incurred otherwise. Upon first review of Mullen's Complaint, Defendants knew she was lying. Then, in the following hours and days, they compiled an abundance of evidence that proved she was lying.

However, because this lawsuit was brought as a class action, Defendants were forced to deal with the claims of individuals who did not exist. In addition, because Mullen's claims were so full of falsehoods, Defendants realized that Plaintiff's counsel was willing to advance the class claims with a representative who they knew was unsuitable for the position. Therefore, while Defendants were highly confident that they would be granted summary judgment on all claims brought by Laura Mullen, they were required to engage in a demanding, time-consuming class notice process to foreclose the class claims on summary judgment along with claims from Mullen.

In the end, Defendants were awarded summary judgment on all claims of Laura Mullen, based largely upon the evidence they collected in the days after the Complaint was filed, and granted Plaintiff's counsel time to substitute a new class representative on three of the six causes of action alleged. (Dkt. 183, p. 26) Remarkably, Plaintiff filed this action claiming to represent the interests of *thousands* of individuals. (Dkt. 1, ¶ 178) Yet, after spending years in the Sports Performance program, spending nearly every weekend at tournaments with other parents, and after nearly two thousand class members were notified of her claims by this Court, Mullen and her attorneys could not identify a *single* person to carry on the claims of the class. (Dkt. 195 ¶ 1)

## A. Plaintiff's Fraudulent Concealment Claim Was Brought in Bad Faith and Relies Upon False Claims

The crux of Mullen's claims rests upon her assertion that "Butler's scandalous past was covered up by GLV. Rick and Cheryl Butler shamed and intimidated victims into silence and the relevant information was kept from parents who wanted to enroll their children in GLV or Sports Performance programs." (Dkt. 83-1, p. 9) However, this Court found that, "[g]iven the amount of publicly available information about Rick's history of abuse and the USAV and DCFS decisions against him, no reasonable juror could find that class members justifiably relied on the defendants' alleged concealment of information on this subject." (Dkt. 183, p. 19) Furthermore, the Court held, in no uncertain terms, that "[a]t all relevant times, there was enough information available to make it unjustifiable for any class member to rely on the defendants' omissions (or, for that matter, their denials) about Rick's history of sexual abuse. No reasonable jury could find otherwise." (Dkt. 183, p. 20)

Mullen also asserted that "[e]ach member of the class was plainly subject to a common course of conduct here. Any attempt by victims to discuss publicly their treatment at Butler's hands was suppressed, and no class member ever was informed about the truth of Butler's past." (Dkt.

83-1, p. 22) These allegations are false and the evidence submitted by Plaintiff to support her claims undermines the contention that the Defendants prevented the allegations from going public. (Dkt. 83-2) In support of her untruthful claims, Plaintiff submitted sworn declarations from the accusers that are each conspicuously missing a claim that they actually withheld information from the public.[20] *Id.* Notably, each declaration relates to acts that allegedly took place after 1994 – well after the expiration of the applicable statute of limitations. Plaintiff even admits that it is purely speculative whether she would have ever learned of the allegations if Defendants had not engaged in the alleged acts of concealment. (Dkt. 144-4, p. 24)

In fact, a June 26, 2017 Facebook post published by Swanson (which Mullen attempted to introduce on summary judgment) includes a 1995 letter written by USAV referencing the "pre-hearing publicity" that had taken place even back in 1995 when the allegations were first becoming public. (Dkt. 171-18) Mullen makes the dubious argument that, because the USAV and DCFS proceedings were confidential, the Defendants had a duty to disclose the testimony, evidence, and findings of such proceedings. (Dkt. 171, pp. 12-13) However, common sense would clearly indicate that, if those proceedings remained confidential in 1995, Laura Mullen would have no right to obtain that information nearly two decades later, and Defendants' failure to affirmatively supply that information would not be considered evidence of fraud.[21]

Shortly before this lawsuit was filed, Mullen liked a post which mocked a comment Rick made to the press and said that "[a]nybody that follows [Rick's] advice of 'I hope your readers

---

[20] Furthermore, as Defendants previously noted, Jane Doe's declaration is lacking in credibility and reliability due to its anonymous nature, which effectively shields her from potential liability for defamation or prosecution for perjury, thus defeating one of the purposes of the testimonial oath she took. (Dkt. 87, pp. 22-23) Moreover, her claim that "Cheryl Butler called me and threatened me to keep quiet" is void of any actual facts from which Cheryl's alleged "threat" could possibly be construed. *Id.*

[21] It is also curious that Mullen now credits the 2018 USAV ban as the event which informed the public of the accusations about Rick, when she acknowledges that the 2018 ban was a result of "*a closed hearing*" before "an ethics panel" – which is exactly how the 1995 ban was imposed. (Dkt. 83-1, pp. 9-10) (emphasis added)

will take the time to look a little deeper', will find the Chicago Tribune series, the NY Daily News series, the ESPN [Outside the Lines] pieces, the letters, judges releasing info…" (Exhibit 3, p. 16) The post urged "everyone new to this story" to "follow Butler's own advice and 'look a little deeper.'" *Id*. Unfazed by clear evidence to the contrary, Mullen and her attorneys advanced the theory that Defendants fraudulently concealed and suppressed information related to the third-party allegations, going so far as to allege that "five women [including Powers-Barnhard] have attested to the lengths the Butlers went to in order to prevent the story of Rick's behavior from becoming public knowledge." (Dkt. 83-1, p. 18) Yet, the Complaint also makes reference to "many arguments [Cheryl] and Rick have relied on for decades" in response to the public allegations. (Dkt. 1, ¶ 136) On one hand, Mullen claims that the allegations are not public knowledge, and, on the other, she claims that the Butlers have publicly argued over the allegations "for decades." *Id*.

Furthermore, when Plaintiff and her attorneys initiated this lawsuit, they were aware of a 2016 lawsuit filed by Powers-Barnhard against AAU, as it is mentioned twice in Mullen's Complaint. (Dkt. 1, ¶ 151) Their knowledge of the 2016 lawsuit further evidences the bad faith of Plaintiff's concealment claims because, according to Powers-Barnhard, "Butler's sexual misconduct is very well documented, starting over 20 years ago. Some of it is documented in formal, published proceedings before the congressionally-sanctioned governing body of women's volleyball, USA Volleyball…Butler's criminal misconduct was widely reported in the media. Sports Illustrated Story of the year 1995; See ESPN broadcast on July 28, 2015…" (Exhibit 16. p. 2) Furthermore, a public demand letter, released in June of 2016—before Mullen returned to GLV for the 2016-2017 season—included the transcript of the USAV proceedings, the USAV order banning Butler, and the Illinois appellate court decision related to the USAV ban of Butler. (Exhibit 16, p. 2) Powers-Barnhard's lawsuit and related statements expose Mullen's abuse of

process in this Court, expressly repudiating any notion that the victims were silenced or the allegations were suppressed because, according to Powers-Barnhard, "***None of these facts were buried but rather broadly publicized in 1995 and again in 2015***." *Id.* (emphasis added)

Mullen's factual claims of concealment were simply invented out of whole cloth as this Court ascertained with Mullen's own admissions. Mullen's claims of concealment were central to this litigation and was particularly critical to the certification of Plaintiff's putative class. (Dkt. 101, pp. 14-15) (finding that "[e]ven if it were true that the defendants' statements…were made to class members at different times, Mullen also alleges that the defendants fraudulently concealed Rick Butler's alleged sexual misconduct" and that "the defendants engaged in the alleged fraudulent concealment with respect to the class as a whole") Here, it was not simply the pursuit of a baseless claim without an appropriate inquiry into the facts, it was the initiation and pursuit of claims that the Plaintiff and her attorneys, themselves, knew were false and which they sought to further through knowingly false sworn statements.

## B.  Sanctions Are Warranted for Pursuing Meritless Claims on Summary Judgment

While acknowledging that Defendants' Motion for Summary Judgment turned on Mullen's personal knowledge of the allegations (as opposed to whether those allegations were true), the Plaintiff chose to spend nearly 11 pages of her response brief discussing details of the underlying allegations, some of which were being introduced for the first time. (Dkt. 171, pp. 7-17) Remarkably, the Plaintiff does not attempt to overcome or even address the abundance of evidence showing that she had actual knowledge of the information she claims was concealed from her. (Dkt. 171, p. 18 fn. 1) For example, Plaintiff never addresses the obvious discrepancy between her claim that "she did not see any information online until June of 2017" and her concession "that, between 2015 and 2017, she was generally aware of the allegations regarding sexual abuse by Rick

55

and had reviewed news articles on the subject." (Dkt. 57, p. 20 fn. 4; Dkt. 183, p. 4) In response to a summary judgment motion, the plaintiff must "set forth" by affidavit or other evidence "specific facts," which for purposes of the summary judgment motion will be taken to be true. Fed.R.Civ.P. 56(e). Plaintiff submitted transcripts, court documents, letters, and eight affidavits containing substantial discrepancies with Mullen's version of "the truth."[22] (Dkt. 171-6 – Dkt. 171-18; Dkt. 171-25) However, Mullen simply claimed that she "believes the women, and further contends that Butler's refusal to acknowledge the truth of his past abusive behavior is fraudulent." (Dkt. 171, p. 1)

### 1. Mullen Should Be Sanctioned for Arguing New and Contradictory Facts in Bad Faith

Up until summary judgment, Plaintiff's claims rested upon her assertion that Mullen "sent her child to the organization without knowledge of Butler's history of sexual abuse." (Dkt. 1, ¶ 4) However, facing evidence that she was, in fact, aware of the allegations she claims were unlawfully suppressed, Laura Mullen suddenly declared that she, "of course, was aware generally of the allegations against Butler." (Dkt. 171, p. 11) In a bad faith attempt to survive summary judgment, Plaintiff, for the first time, complained that she, of course, knew about the allegations, but that "[c]ertain key facts regarding Butler's conduct were never part of the public record." (Dkt. 171, p. 27) Mullen's new theory focused heavily on the false premise that she was defrauded by the Defendants because, while she had knowledge of the allegations, she "was unaware of the findings of both USAV and DCFS" and states that those findings "were non-public." (Dkt. 171, p. 32) This is unquestionably false, and Plaintiff should be sanctioned for continuing to pursue her false

---

[22] Defendants objected to the admissibility of almost every document and maintain that those documents are inadmissible in support of Plaintiff's brief on summary judgment. Defendants only reference such documents in this motion as evidence that Mullen had prior knowledge of contradictory facts and prior testimony of the witnesses which conflicts with the stories in her Complaint.

claims. *See Tillman v. New Line Cinema*, 374 Fed. Appx. 664, 666 (7th Cir. 2010) (discussing the duty on attorneys to abandon proceedings when they are "fac[ed] with evidence showing [they] had no chance to prevail").

The USAV and DCFS proceedings received substantial press coverage beginning in 1995 and continuing through the present day. (Dkt. 183, p. 2) In July of 2016, before Mullen returned to Sports Performance in the fall for the 2016-2017 season, she liked a post which said that Rick was "banned by the governing body of his sport" and stated that, "[a]ccording to the women involved and according to the findings of the USAV ethics panel, he was a serial rapist." (Exhibit 3, p. 36) In the end, this Court saw through Mullen's false claims that held that "[i]t is undisputed that even at the beginning of the class period, information about Rick's history of sexual abuse of female youth athletes was available in the public domain" and that those online articles "featured highly detailed descriptions of the allegations against Rick and mentioned the USAV coaching ban and the DCFS finding." (Dkt. 183, p. 18)

Mullen's revised core claim that she "was unaware of the findings of both USAV and DCFS" is a sanctionable fabrication that should not be tolerated by this Court. (Dkt. 171, p. 31) *See Jolly Grp. Ltd. v. Medline Indus. Inc.*, 435 F.3d 717, 720 (7th Cir. 2006) (explaining that courts have discretion to impose sanctions when an attorney has pursued a claim that is without plausible legal or factual basis and lacking in justification or pursued a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound).

## 2. Mullen's Attempts to Mislead the Court About the Significance of the USAV and DCFS Proceedings on Summary Judgment

As mentioned above, the relationships described by USAV and DCFS were not illegal under the Illinois law in effect at the time. Therefore, it is certainly not the findings of DCFS and USAV which led Mullen to the conclusion that Rick Butler is "a child sexual predator" or that he

"raped" anyone. (Dkt. 1, ¶¶ 4, 38, 68, 96). Yet, on summary judgment, the Plaintiff focused on the USAV and DCFS, arguing that the Defendants had a duty to disclose to her the testimony, documents, and findings of those proceedings from 1995 and that those findings were material to her decision to allow her daughters to participate in the Sports Performance program between 2012-2017. [23] (Dkt. 171, pp. 21-22)

However, Mullen's argument that those findings were material to the "safety of the program" are purposefully misleading. *Id.* According to public statements made by USAV's Great Lakes Region commissioner, at the time Mullen joined the program, Rick Butler was "absolutely in good standing" with the USAV Great Lakes Region. (Dkt. 144-17, p. 10) Even more, Mullen's daughter played in the program with the relative of a long-standing officer and board member of the USAV Great Lakes Region. (Exhibit 11, ¶ 20; Exhibit 12, ¶ 15) If that was not enough, by the time Mullen's daughters joined the program, the Sports Performance junior girls had not participated in a USAV event for five years and would not be participating in any USAV events in the future. (Exhibit 3, p. 48) Mullen's emphasis on "the significance and weight" of the USAV findings is intentionally misleading in light of the Region's confirmation of Rick's good standing and the fact that Mullen's daughters would not be participating in any USAV-sanctioned events. (Dkt. 171, p. 12)

Moreover, Plaintiff's claim that the findings of USAV were non-public flies in the face of all evidence and common sense. Mullen references a letter which she claims was written in 1995 by a USAV attorney, and she contends that this letter is proof that the USAV findings were non-public because, according to Mullen, "USAV's attorney even wrote that 'the Committee is doing its best to keep this matter confidential.'" (Dkt. 171, p. 12) Plaintiff, attempting to advance her

---

[23] Defendants also contend that the Plaintiff's use of the DCFS documents on summary judgment was improper for reasons set forth above in Part IV(C) of this Motion.

fictional theory, misleads the court by quoting only half of the sentence. The sentence, in full, states, that "[t]he Committee is doing its best to keep this matter confidential ***despite the unfortunate publicity that has already occurred***." *Id.* (emphasis added) Plaintiff's "evidence" was a brazen attempt to mislead the Court with a document that clearly contradicted her position. Rather than acknowledging the overwhelming evidence against her false claims and dismissing Plaintiff's bogus lawsuit, her attorneys invented a new theory on summary judgment and attempted to mislead the Court with inadmissible and intentionally deceptive evidence. Their unreasonable conduct was a fraud on this Court and should be sanctioned as such. *See Alexander,* 930 F.Supp.2d at 961 (citing *Hazel–Atlas Glass Co. v. Hartford–Empire Co*., 322 U.S. 238, 251 (1944) ("No fraud is more odious than an attempt to subvert the administration of justice.").

### C.  Plaintiff's Version of "The Truth" is Asserted in Bad Faith

Plaintiff claims that, "[h]ad parents and players been aware of the true state of the facts regarding Butler's sexual abuse…they would not have participated in any GLV associated volleyball programs and would not have paid substantial money to Defendants." (Dkt. 1, ¶ 160) Yet, Mullen has never identified which factual allegations she believes represent "the truth." Her version of "the truth" is simply whatever version she subjectively decides to believe, which has allowed her to morph her claims to suit whatever argument was necessary to survive different phases of this litigation.

Prior to initiating this action, Mullen and her attorneys had access to an abundance of evidence showing that her allegations and arguments are not true. (Dkt. 1, ¶ 135; Dkt. 79-1; Dkt. 183, p. 2) Defendants' first Rule 11 letter to Plaintiff's attorneys explained that evidence and provided documentation that undermined Mullen's claims. (Exhibit 20) For example, Defendants explained that while the DCFS and USAV proceedings were taking place, the Butlers were also in

the process of adopting a child.[24] *Id.* Defendants attached a November 1995 Guardian Ad Litem (GAL) Report, submitted to the adoption court by an attorney representing the adoptive child of Rick and Cheryl Butler. (Dkt. 71-12; Dkt. 87-14) Defendants explained that the GAL and the Presiding Judge were granted access to the confidential reports of the USAV hearing and the GAL met with the DCFS regarding its investigation prior to submitting his report to the Court in the adoption proceedings. (Exhibit 20; Dkt. 71-12; Dkt. 87-14; Dkt. 71-13; Dkt. 87-13)

Defendants pointed Plaintiff to sections of the GAL Report stating, *inter alia*, that the allegations made to DCFS could not be substantiated by anything other than the accusers' allegations, that he disagreed with the DCFS findings, and, most importantly, that ***"Mr. Butler did not break any criminal laws then or now."*** (Exhibit 20; Dkt. 71-12; Dkt. 87-14) (emphasis added) After reviewing substantial evidence including, for example, the USA Volleyball investigation, the DCFS investigation, the GAL report, and a report of the DuPage County Probation Department, an independent investigating agency that recommended the court approve the adoption, the court approved the adoption finding Rick and Cheryl Butler to be "reputable persons with character, ability and means to rear, nurture and educate the child in a suitable and proper manner." (Exhibit 20; Dkt. 71-13; Dkt. 87-13)

The 1995 Decree of Adoption was part of the "Our Story" document, so Mullen and her attorneys undoubtedly knew that a judge had deemed the Butlers' home to be safe for children prior to arguing in this case that "[a]s an objective matter, Butler is not qualified to be alone in a room with children, let alone coach them." (Dkt. 57, p. 24) Nevertheless, even after receiving

---

[24] Mullen is certainly aware of the Butlers' adopted child. Shortly before this action was filed, Volleytalk users were mocking the defenses the Butlers have made in the past, and they referenced the adoption proceedings. It was then that Mullen posted a blatantly false, personal, and targeted accusation against the Butler family, sarcastically stating, "Oh and they were such wonderful parents that the child now wants nothing to do with them..." (Exhibit 3, p. 53) Several users even corrected Mullen for bringing their son into the discussion in an unnecessary and obviously false personal attack on the Butlers. (Exhibit 3, pp. 53-55)

Defendants' Rule 11 letter, Plaintiff maintained her position that "the truth" is that Rick Butler is a "child sexual predator" who should be barred from all contact with children. (Dkt. 1, ¶ 4) Plaintiff's contention throughout this matter is clearly not fact-based in light of a court ruling, *at the time the allegations were made*, approving the Butlers' petition to adopt a child and finding Rick and Cheryl to be "reputable persons with character" after reviewing substantial evidence, including the DCFS and USAV investigation and findings. (Dkt. 71-13; Dkt. 87-13)

Mullen and her attorneys were aware that Plaintiff's version of "the truth" has been rejected by officers of the court, and judicial decisions. Given the egregious nature of their conduct, sanctions should be imposed and Mullen and her attorneys should be responsible for the attorneys' fees and expenses related to the defense of Plaintiff's frivolous and improper actions. *See Jimenez*, 321 F.3d at 656-57 (sanctions imposed for "false, fraudulent and salacious" accusations which "exploited the judicial process" and subjected opposing party to harassment, including "unnecessary embarrassment and mental anguish"). Plaintiff's attorneys investigated the accusations against Butler for months before bringing this lawsuit, and they contend that the Complaint represents the "truthful" stories of abuse against Rick Butler. Yet, the evidence clearly establishes that this simply is not true.[25] The version of events in Plaintiff's Complaint are often directly contradicted by public documents and evidence *she* produced and relied upon throughout the course of this litigation. The truth is that Mullen has mislead this Court from the beginning.

D. **Plaintiff's Attorneys Employed Improper Litigation Tactics to Advance Bad Faith Accusations Against Defendants and Their Counsel**

Plaintiff and her attorneys engaged in an abusive litigation tactic called "litigation by sanction." This "sanctions tort" has been described as discovery gamesmanship in which one party

---

[25] Defendants contend that this evidence is inadmissible and only rely on it to the extent that the information contained therein put Plaintiff and her attorneys on notice that their claims were untrue prior to the filing of this litigation.

will "exploit or abuse judicial procedures" to generate sanctions against an opposing party. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 757 n.4 (1980). The lawyer attempts to stoke a judge's anger at the opposing party, accusing it of intentionally obstructing justice, and seeks broad sanctions. Here, Plaintiff's counsel used this playbook to repeatedly attack the Defendants and their attorney with false, misleading, and bizarre accusations.

### 1. Plaintiff's Attacks on Defendants and Their Attorney Were Part of a Pattern that Plagued This Entire Litigation

Beginning with her Complaint and continuing through the entire litigation, Plaintiff has repeatedly and intentionally misrepresented facts to this Court in order to cast Defendants in a false and negative light. Shortly after filling her Complaint, which was chockfull of falsehoods, Plaintiff filed a Motion for Leave to Propound Limited Expedited Discovery, alleging—with no facts to support the allegations—that the Defendants and their counsel were improperly communicating with class members. (Dkt. 17, p. 5) Plaintiff also advanced bizarre and unsubstantiated accusations that the Defendants were illegally transferring assets to Brazil and traveling overseas to set up a new volleyball business. [26] (Dkt. 17, p. 2) Plaintiff's motion was based on anonymous information that, it turns out, *came from Laura Mullen herself*, who was repeatedly posting these false claims on Volleytalk.[27]

Then, Plaintiff continued their "litigation by sanction" scheme with a Motion for Rule to Show Cause, arguing that Defendants were in contempt of court for allegedly deficient discovery responses and claiming that "[e]ven the most basic and obviously relevant pieces of information

---

[26] In response to the outlandish claims set forth in Plaintiff's motion, Defense counsel emailed Plaintiff's attorney, Jay Edelson, expressly referencing the improper purpose of this lawsuit and stating that Plaintiff's motion "misses the basic premise which is that it would be ludicrous for anybody to start to move money around in the face of a baseless and frivolous lawsuit." (Dkt. 17-1, p. 4) Defense counsel continued, "I want you to guarantee me that this case is actually about money, which is what you've pleaded, and not some type of smear campaign which is exactly what it feels like to me. I have serious concerns about that." *Id.*

[27] *See* Part E (detailing Plaintiff's discovery abuses) for further discussion of Plaintiff's false claims used to obtain expedited discovery shortly after the filing of this action.

were withheld—e.g., the contract(s) Defendants contend they entered into with Plaintiff and are operative here, any marketing materials Defendants issued during the relevant period, and the like." (Dkt. 59, ¶ 5) Remarkably, Plaintiff's argument omitted a crucial piece of information – *that Plaintiff never actually requested those contracts and marketing materials be produced.* (Dkt. 71, p. 5) Nevertheless, Plaintiff asked this Court to punish the Defendants.

Then, on June 8, 2018, Plaintiff filed a Motion to Compel and for Entry of Protective Order asking the Court for an Order finding, *inter alia*, that Defendants and their counsel engaged in improper communications with putative class members and requiring Defendants to issue corrective notice to putative class members. (Dkt. 48, p. 1) Plaintiff's motion presented one bizarre argument after another, including, *inter alia*, (1) asking this Court to sanction Defendants because Cheryl Butler, a non-attorney, was not aware of the procedural distinctions between a Motion to Dismiss and a Motion for Summary Judgment, (2) arguing that Defendants lied when they said they had evidence to counter Mullen's claims, because they did not attach such evidence to their 12(b)(6) Motion to Dismiss, when doing so would clearly violate the Rule, and (3) asserting that Defendants "misrepresent the fundamental nature of the lawsuit, stating that the misconduct at issue stems from fraud," when Plaintiff was, in fact, suing them for fraud under five different legal theories.[28] (Dkt. 48, pp. 4-10) The Court declined Plaintiff's request for corrective notice, pointing out that the Defendants' statements to class members explained the lawsuit by referencing some of the same issues the Court "relied on in denying the motion to dismiss." (Dkt. 141-2, pp. 11-12)

---

[28] Plaintiff's argument is particularly bold in light of statements made to the press by attorney Jay Edelson, stating that Defendants' argument "that parents might have sent their kids to a different club and paid money to that other club seems to be a bit of a red herring." (Exhibit 2, p 27) (comment posted by John Tawa, founder of PrepVolleyball.com) Mr. Edelson's statement is false, as this Court ruled on summary judgment that "Mullen could—and did—purchase volleyball training services from other sports clubs, and she therefore does not have a viable ICFA claim under an unfair practices theory." (Dkt. 183, p. 24)

Plaintiff's deceitful litigation tactics continued in a March 27, 2019, "Notice Regarding Class Notice," which was a blatant attempt by Plaintiff's counsel to influence the Court early on that Defendants were responsible for actions which were initiated by members of the class. Plaintiff falsely alleged that Defendants were involved in the creation of the Facebook Page and mass emails sent by class members about the Class Notice without any actual evidence to support these claims. (Dkt. 116) Plaintiff's accusations prompted the Court to enter an Order requiring the parties to appear the following day "to address the matters in 'Plaintiff's Notice Regarding Class Notice.'" (Dkt. 118) The status hearing began with the Court explaining that the Plaintiff's previous complaints about the Defendants' communications with class members raised the suspicion that the Defendants were responsible for the communications between members of the class. (Dkt. 141-6, pp. 4-5) However, Defense counsel explained that the "spontaneous effort groundswell…on the part of potential class members" in the face of the allegations of abuse against Butler was nothing new to Defendants. (Dkt. 141-6, pp. 9-10) In fact, based on Mullen's Volleytalk activity and the "investigation" conducted by her attorneys, the actions taken by the class should have been of no surprise to any party to this case. (Dkt. 89-1) Nevertheless, the allegations in Plaintiff's Notice became the basis for additional expedited discovery regarding Defendants' communications with class members regarding the Notice and opt outs. (Dkt. 141-6, p. 14)

On April 15, 2019, Plaintiff again filed a "Status Report Regarding Class Notice" which was not requested by the Court. (Dkt. 123) The Report was filed the day before the Parties previously-scheduled status hearing, which all but ensured that Defendants would not have time to file a substantive response to its misleading claims. (Dkt. 124) Much like in Plaintiff's Motion for Sanctions, Mullen provided the Court with select excerpts of emails without proper context in a clear attempt to construe those statements as improper. *Id.* Defendants filed a Motion to Strike

the Report (Dkt. 125) in the morning of April 16, 2019, just prior to the 9:30 a.m. hearing, because report was yet another effort to cast Defendants and their counsel in a negative light with this Court immediately prior to a court appearance. (Dkt. 127) Furthermore, the timing of the report ensured that Defendants were stripped of an opportunity to review, investigate, and/or prepare a response to the accusations and, instead, forced Defense counsel to defend against the misleading claims, without proper notice, in open court.

Continuing their "litigation by sanction" scheme, on May 7, 2019, again just one day prior to a previously-scheduled status hearing set for May 8, 2019, Plaintiff filed an 89-page "Status Report Regarding Class Notice" at 7:07 p.m., again ensuring that Defendants would not have any opportunity to respond. (Dkt. 139) The Report followed Plaintiff's pattern of misconstruing communications in an attempt to mislead the Court and prejudice Defendants by falsely casting them in a negative light immediately prior to each Court hearing. *Id*. Notably, Plaintiff made the baseless accusation that "Defendants and their counsel have engaged in misleading and improper communications with class members since the beginning of this case." (Dkt. 143, p. 1) Clearly, Plaintiff was hoping that if she repeated the accusation enough times, the Court would eventually be convinced it was true.

### 2. The False Claims of Misconduct Created by Edelson PC Had a Distinct and Inappropriate Focus on Defense Counsel

Plaintiff's counsel had a particular focus on Defense counsel beginning with the first motion filed in this matter and continuing even after summary judgment. On April 3, 2018, Plaintiff sought production of Defense counsel's communications with class members and accused Defense counsel of communicating with class members "for the purposes of misleading them about the nature of Plaintiff's lawsuit" (Dkt. 17, p. 1) On April 17, 2018, Plaintiff's attorney Jay Edelson, before this Honorable Court, again accused the Defendants and their attorney of

"improperly communicating with putative class members" without any facts to support such an allegation. (Dkt. 141-1, p. 6) Throughout this case, Plaintiff has failed to present evidence to substantiate her two-year-long contention that Defense counsel communicated with class members "for the purposes of misleading them about the nature of Plaintiff's lawsuit." (Dkt. 17, p. 1)

Plaintiff's counsel apparently believed they could create such evidence on a telephonic meet and confer regarding discovery issues. (Dkt. 48-2) There, Jay Edelson interrogated Defense counsel about whether she had "spoken to anyone who's part of the class or who's on the teams or anything like that." (Dkt. 48-4, p. 12) When Defense counsel stated that she had not spoken with class members about the lawsuit, he pushed further, "you're saying, you're telling me as an officer of the court, you haven't spoken to anybody else. None of the girls on your team. None of the parents, nobody, not a word about the suit." *Id.* Again, Defense counsel said she had not.

Just days later, on June 8, 2018, Motion to Compel and for Entry of Protective Order, Plaintiff argued that Defense counsel engaged in improper communications with putative class members and asked this Court to enter an Order requiring Defendants to issue corrective notice to putative class members. (Dkt. 48, p. 1) Plaintiff argued, *inter alia*, that Defendants should be sanctioned for their "failure to produce Defense counsel's written statements to the press" in response to discovery requesting all communications with class members, and that that Defense counsel "issued a statement to the press falsely claiming" that "[t]he recent lawsuit against Rick Butler, filed by a disgruntled parent, concerns alleged misrepresentations related to contracts and business practices." (Dkt. 48, pp. 1, 4-10)

This Court flat-out rejected Plaintiff's position. At a hearing on July 3, 2018, the Court confirmed that Defense counsel's statement "kind of seems like it's right on the money" about the claims at issue in this case. (Dkt. 141-2, pp. 10-11) The Court continued, "The statement is

66

absolutely true…It's not false at all. It's not misleading at all. It is. I mean, each one of [Plaintiff's] claims is a claim for deception. You have a claim for deception under the IPFSA. You have a claim for deception under the ICFA. You have a common law misrepresentation claim. You have an unfair practices claim under the ICFA. You have a contract deficiency claim under the IPFSA, and you've got an unjust enrichment claim. All of those concern misrepresentations related to contracts and business practices. So that statement is true." *Id.*

Plaintiff's bizarre, unsubstantiated attacks on Defense counsel continued even after summary judgment. On May 7, 2020, Plaintiff filed with this Court a Status Report which was not requested by this Court and contains improper and misleading information. (Dkt. 195) The latest filing by Edelson PC contains a screenshot of a Facebook post from Defense counsel's private Facebook page. (Dkt. 195) Plaintiff's counsel insists that the Facebook post is evidence that Defense counsel "use[d] her personal connection to the Class members to communicate with them" and that her statements were "threats" to members of the class. (Dkt. 195, ¶ 10) Like those before it, Plaintiff's Status Report is loaded with false, uninformed accusations. In reality, Defense counsel is not friends with class members on Facebook, Defense counsel does not communicate with class members on Facebook, and, most importantly, Defense counsel does not even use her own name on Facebook. (Dkt. 195, ¶ 6; Exhibit 34, ¶¶ 32-34)

Edelson PC's attempt to police what Defense counsel can say about this case to her friends and family is profoundly inappropriate. Apparently, Edelson PC is not concerned with exercising professionalism and discretion, and has instead made this personal. In turn, the improper actions of Plaintiff's counsel now require Defense counsel to divulge aspects of her personal life which should have no place before this Court, such as the fact that she is also a comedian who, due to her appearance in this high-profile litigation, maintains all of her social media under a stage name. *Id.*

Edelson PC's fixation on disparaging Defense counsel with baseless accusations has been inappropriate throughout this entire litigation, and, at this point, has become downright creepy. It appears that the firm conducted a considerable investigation into Defense counsel's personal life, which is the only way the firm could discover her private Facebook page. *Id.*

Laura Mullen and her attorneys lied to get this case into this Court and continued to lie for over two years, until her claims were ultimately disposed of on summary judgment. (Dkt. 183, p. 22) Plaintiff's attorneys seem to believe that they can manufacture a cause of action, falsify evidence, and abuse the judicial system with impunity. It speaks volumes about the legitimacy of their claims that even the "hint" of accountability for their actions sends them running back to this Court with more false claims. (Dkt. 195) Plaintiff has now admitted that, after two children were in GLV programs over a period of four years, after she traveled all over the country with class members, and after she sat with class members at countless tournaments, she cannot point to a single individual who can carry on her class allegations. (Dkt. 195, ¶ 1) The day after this lawsuit was filed, Jay Edelson boasted in the media that his firm received "many calls and emails from people offering to provide further evidence in support of our lawsuit," yet, over two years later, Plaintiff has not identified a single class member who supports her claims.[29] It is abundantly clear that it is the Plaintiff and her attorneys who have been intentionally misleading this Court and the public from the moment this lawsuit was filed.

## VI.   PLAINTIFF AND HER ATTORNEYS SHOULD BE SANCTIONED FOR DISCOVERY MISCONDUCT

The case was assigned to this Court on April 13, 2018. By June 20, 2018—just over two months later—Plaintiff had already presented this Court with four discovery-related motions, all

---

[29] Mary Ann Georgantopoulos, *A Top US Youth Volleyball Coach Is Accused Of Raping Teenage Girls Hundreds Of Times*, BuzzFeed News, February 28, 2018, https://www.buzzfeednews.com/article/maryanngeorgantopoulos/youth-volleyball-coach-lawsuit (last visited May 17, 2020).

of which sought sanctions or attorneys' fees. Plaintiff's "litigation by sanction" tactic culminated in an unending stream of discovery demands. Lawyers engaged in this type of procedural abuse have developed techniques for setting "traps" to trigger sanctions. *See, e.g.,* Kenneth W. Starr, *Law and Lawyers: The Road to Reform*, 63 Fordham L. Rev. 959, 965 (1995) (instigating sanctions "is now a standard part of the modern litigation's play book"). They intentionally provoke disputes to create the perception of bad faith, for example, by inundating courts with "motions for sanctions based upon speculation that responsive material is being withheld with nefarious intent." *Id*.

On April 12, 2019, Defendants filed a Motion for an Extension of Time to Respond to Outstanding Discovery Requests, explaining that "[t]he unreasonable manner in which Plaintiff continuously issues sets of discovery requests and, almost immediately, demands supplemental responses has created an unmanageable state of outstanding written discovery…Defendants have been in a near-constant state of answering discovery and producing documents. The supplemental discovery and the answers to Plaintiff's recently-issued discovery overlap in the types of information and documents requested or relied upon." (Dkt. 132, p. 1) Defendants explained, for example, that "[o]n March 14, 2019, approximately 5 hours after Defendants produced their supplemental discovery responses, Plaintiff requested a meet and confer claiming that portions of Defendants' discovery responses and production were deficient." *Id.*

The timeline of Defendants' production exemplifies the "traps" created by Plaintiff's unmanageable and unreasonable demands. To illustrate Plaintiff's devious tactic, as well as Defendants' attempts to comply with Plaintiff's unreasonable demands, the following discovery-related matters took place on or around:

- May 1, 2018, Defendants' Answer to Interrogatory No. 1
- May 9, 2018, Defendants' Supplemental Answer to Interrogatory No. 1 (containing the full text of emails referenced in their original answer, per

Plaintiff's request, yet, within hours, Plaintiff's counsel emailed Defendants demanding immediate production of PDFs of the emails)

- May 11, 2018, Defendants' Second Supplement to Interrogatory No. 1 (producing PDFs of emails)
- June 18, 2018, Rick Butler's Answer to Plaintiff's First Set of Interrogatories
- June 18, 2018, Cheryl Butler's Answers to Plaintiff's First Set of Interrogatories
- June 18, 2018, Defendants' Response to Plaintiff's First Set of Requests to Produce Documents and Things
- August 10, 2018, Defendants' Second Supplemental Responses and Production "Pursuant to July 17, 2018 Joint Status Report"
- August 29, 2018, GLV's Answers to Plaintiff's Second Set of Interrogatories
- August 29, 2018, Defendants' Response to Plaintiff's Second Set of Requests to Produce Documents and Things
- September 6, 2018, Defendants' Supplemental Response to Plaintiff's Second Set of Requests to Produce Documents and Things
- September 6, 2018, GLV's Supplemental Answers to Plaintiff's Second Set of Interrogatories
- November 17, 2018, Rick Butler's Answers to Plaintiff's Third Set of Interrogatories
- November 17, 2018, GLV's Answers to Plaintiff's Third Set of Interrogatories
- March 14, 2019, Cheryl Butler's Supplemental Answers to Plaintiff's First Set of Interrogatories
- March 14, 2019, Butler's Supplemental Answers to Plaintiff's First Set of Interrogatories
- March 14, 2019, Defendants' Supplemental Response to Plaintiff's First Set of Requests to Produce Documents and Things
- March 29, 2019, Plaintiff issued a Fourth Set of Requests to Produce Documents and Things to All Defendants
- March 29, 2019, Plaintiff issued a Fourth Set of Interrogatories Directed to Defendant GLV
- April 11, 2019, Defendants Expedited Response to Plaintiff's Third Set of Requests to Produce Documents and Things
- May 3, 2019, Defendants' Supplemental Response to Plaintiff's Third Set of Requests to Produce Documents and Things to Defendants and Their Counsel
- May 3, 2019, Cheryl Butler's Second Supplemental Answers to Plaintiff's First Set of Interrogatories
- May 3, 2019, Rick Butler's Second Supplemental Answers to Plaintiff's First Set of Interrogatories
- May 30, 2019, Rick Butler's Answers to Plaintiff's Requests to Admit (containing 117 requests)
- May 30, 2019, GLV's Answers to Plaintiff's Requests to Admit

(Exhibit 34, ¶¶ 28-29) When viewing repeated efforts made by Defendants to avoid discovery disputes and comply even with Plaintiff's unreasonable requests, it is clear that Plaintiff's counsel

intended to create a state of chaos likely to result in an error, setting a "trap" with which to sanction Defendants.

Within the first months of proceedings, it became clear to Defense counsel that she could not have a productive, good-faith conversation with Plaintiff's attorneys due to their abusive, inappropriate conduct and gross misrepresentations of the parties' telephonic meet and confer conferences.[30] In a June 15, 2018 email from Defense counsel to Plaintiff's attorneys, she expressed her frustrations with their abusive tactics:

> As for your mischaracterizations, you are an attorney, Jay. The transcript from our phone call is clear. Read it. You repeatedly mischaracterized what I had previously said, and, at least three times, I explicitly had to correct you, saying "that's not what I said/admitted." I shouldn't have to explain to you how you are mischaracterizing my words, because you clearly know what you're doing and when you're doing it – each self-serving mischaracterization is an attempt to construe my words into an admission. Local Rule 37.2 requires a good faith effort to resolve discovery disputes. It is clear that you are unable to have a productive, good faith conversation on the phone regarding discovery disputes.

(Dkt. 59-2, p. 8) The phone call Defense counsel referenced above took place on May 24, 2018, to discuss discovery disputes with Plaintiff's attorney, Jay Edelson. (Dkt. 48-4) It is clear from the transcript of that phone call that the attorneys for the Parties had two very different agendas when discussing the discovery at issue. (Dkt. 48-4) Defense counsel attempted in good faith to resolve a discovery dispute, while counsel for Plaintiff attempted to extract evidence and misstate the law in a transparent attempt to intimidate her into complying with their unreasonable demands. *Id.*

Furthermore, Mr. Edelson used the phone call to interrogate Defense counsel which, unbeknownst to her at the time, was an attempt to manufacture evidence to be used against her

---

[30] The first of those motions was based, in part, upon the first phone call between the parties. (Dkt. 17, pp. 2-3; Dkt. 17-1) Similarly, the first phone call between the parties more closely resembled an interrogation conducted by Plaintiff's attorneys. After the call Mr. Edelson sent an email which was, in his words, "memorializing the brief phone call." (Dkt. 17-1, p. 2) In response, Defense counsel stated that Mr. Edelson's "self-serving statement does not memorialize our call in any way." (Dkt. 17-1, p. 3)

clients in a motion seeking sanctions against Defendants. (Dkt. 48-4, pp. 6-12) There, Plaintiff alleged that Cheryl Butler was "falsely" claiming to have evidence which showed that Mullen was lying, and that Cheryl "falsely" stated that Defendants would be filing a counterclaim against Mullen. (Dkt. 48-4, pp. 1-2) Of course, Plaintiff never explained how she could possibly know Defendants' litigation strategy and evidence to support her conclusion that Cheryl's statements were untruthful. [31] The following excerpts from a transcript of that phone call between the attorneys exemplifies Mr. Edelson's proclivity for violating Local Rule 37.2 requiring attorneys to act in good faith in resolving discovery disputes:

> Jay: …Are you guys filing a counterclaim?
> Danielle: I do not believe so.
> Jay: Okay, And-
> Danielle: But I mean at this point, I do not believe so.
> Jay: What would the basis of your counterclaim be?
> Danielle: Well, I just said that we wouldn't be filing one right now. So there
> Jay: So there'd be no basis?
> Danielle: Of what? No basis of what? I just said that we're not filing a counter claim.
> Jay: Okay, sorry, thank you. You're not filing one, thank you.
> …
> Jay: Okay, so here's the issue. In the emails with the class, Cheryl said things that we both know aren't true. She said that she's filing a counterclaim…And none of that's true.
> Danielle: I disagree with that.
> …
> Jay: …I'm saying is that she's making demonstrably false statements to the class. Number one, that you guys were filing a counterclaim, which isn't true… And you've said, we've got this all on recording that none of that's true.
> Danielle: That's not what I said.
> Jay: It is.
> …

---

[31] Of course, Cheryl was indeed correct that Defendants had evidence that Mullen was lying, and summary judgment was granted in favor of Defendants based, at least in part, on those lies. (Dkt. 183, pp. 20-22) Mullen's case relied upon her assertion that she would "not have participated in any GLV associated volleyball programs" had she known of the allegations of abuse, which she claims to have learned of "in June of 2017." (Dkt. 1, ¶¶ 160, 175) The Defendants knew Mullen's claims were false because they identified Mullen on Volleytalk posting in a thread about the allegations in 2015, and they knew that Mullen's daughter attended lessons at GLV after June of 2017, when she claims to have learned "the truth" of the allegations. (Dkt. 71-8; Dkt. 183, p. 21)

Jay: …When Cheryl sends out an email and says we're filing a counterclaim which is you've admitted that there is no basis for it at all.

Danielle: That is not what I admitted, I said, that we have decided not to file a counterclaim.

Jay: What would the basis be for a counterclaim? This has all been recorded it's right here. Now, explain the basis for a counterclaim.

Danielle: I'm saying we are not pursuing a counterclaim, but it's absolutely something we considered.

…

Jay: …so she will be filing a countersuit.

Danielle: Jay, I'm telling you right now, it could happen.

Jay: Okay, what would the basis be?

…

Jay: What would it be?

Danielle: I'm not telling you.

Jay: Okay, but you have one?

Danielle: … I mean this is not an appropriate question and…we could be filing a counterclaim. We very well considered it.

(Dkt. 48-4, pp. 6-12)

Plaintiff's tactics concerning Defendants' potential filing of a counterclaim continued into the Parties' court appearance on July 3, 2018. There, the Court noted that it was "sort of mystified" by Plaintiff's contention that Defendants were required to anticipate and include a potential counterclaim in their Rule 26(a) disclosure. (Dkt. 141-2, p. 7) After, Plaintiff's attorney intentionally distorted the Court's analysis of his argument, the Court stated, "That's not what I said. And that's the kind of thing I'm talking about. You take something somebody says and then you just sort of flip it on its head…don't clutter this stuff up with bogus arguments. That was a bogus argument." (Dkt. 141-2, pp. 7-9)

In the end, it is clear that Plaintiff counsel militarized the requirement for attorneys to make good faith efforts to settle discovery disputes in order to manufacture discord. "When a party's attorney is at fault for a discovery violation, the appropriate remedy is to shift costs to the party's counsel." *Rackemann v. LISNR, Inc.*, 2018 WL 3328140, No. 1:17-cv-00624-MJD-TWP, at *7

(N.D. Ill. July 6, 2018) (holding Plaintiff's counsel, Edelson PC, responsible for the payment of attorneys' fees to Defendants); *Thompson v. Fajerstein*, No. 08-cv-3240, 2010 WL 4628515, at *1 (N.D. Ill. Nov. 8, 2010). In a good faith effort to resolve differences without court intervention, Defendants often produced supplemental responses (and even second supplemental responses) only to end up on yet another meet and confer with counsel for Plaintiff dictating the exact information he desired in each answer, which was often not requested in, or made clear by, the original request. (Exhibit 34, ¶ 29) If Defendants refused, Plaintiff would accuse counsel of ethical misconduct, distort the parties' prior discovery agreements, and threaten to—and often did—file yet another sanctions-related motion with this Court. (Dkt. 48-4; Dkt. 48)

### A. <u>Plaintiff and Her Attorneys Relied Upon Fabricated Claims and Evidence to Obtain Discovery</u>

Beginning with her first motion and continuing through summary judgment, Plaintiff advanced bizarre and unsubstantiated accusations against Defendants. For example, in Plaintiff's Motion for Leave to Propound Limited Expedited Discovery, Mullen and her attorneys claimed the Defendants were illegally transferring assets to Brazil and traveling overseas to set up a new volleyball business. (Dkt. 17, p. 1) Plaintiff's only evidence of the alleged "misconduct" was in the form of a declaration submitted by her attorney, Jay Edelson, which conspicuously failed to identify the "individuals following the case" who, apparently, was the only person with personal knowledge of the accusations in Plaintiff's motion. (Dkt. 17-3, ¶¶ 5-6) In the end, it was Laura Mullen, posting anonymously on Volleytalk, who was circulating the rumors that Defendants were hiding assets and planning to leave the country:

a. On March 6, 2018, in a discussion about whether Rick would sell the business, Mullen said, "Speaking of walking away, I wonder how his trip to Brazil went?" (Exhibit 4, p. 13)

b. On March 24, 2018, in a discussion about Sports Performance's yearly trip to compete abroad, Mullen posted, "And that's why he's been job hunting in Brazil and the [Dominican Republic]." (Exhibit 4, p. 11)

c. On May 16, 2018, shortly Mullen posted, "I would also be shocked, if it wasn't in Cheryl's name...also remember folks they were recently out of the country, shopping as some would say, others, creative banking." (Exhibit 4, p. 6)

d. On May 31, 2018, Mullen posted, "I venture to guess that Brazil is starting to look more attractive for them...I hope they have been notified as well." (Exhibit 4, p. 4)

That it was Mr. Edelson, as opposed to Laura Mullen, who advanced these false claims under oath is further evidence of his complicity in bringing Mullen's bad faith Complaint before this Court. (Dkt. 17-3, ¶¶ 2-7) Plaintiff falsely represented to this Court that "good cause" existed to grant her motion and falsely assured the Court that the motion was "not brought for the purpose of harassment or undue delay." (Dkt. 17, p. 8) In reality, the opposite was true. "Perjury committed in the course of legal proceedings is a fraud on the court" which justifies sanctions. *Allen v. Chi. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003).

This filing commenced Plaintiff's scheme to cast Defendants and their counsel in a negative light with this Court with baseless accusations of misconduct which were often abandoned shortly thereafter. (Dkt. 17) Shortly after filing her motion, the parties appeared in Court on April 17, 2018. (Dkt. 29) There, Plaintiff's counsel abandoned his claim that the Butlers were fleeing the country, presumably because he knew that the claim was a fraud on this Court, saying, "we had two requests, but we're foregoing the other one which had to do with concerns about transferring their assets, so forget about that." (Dkt. 141-1, p. 9)

Plaintiff's attorneys advanced these sensational, false claims to generate additional publicity and create a false air of legitimacy to her claims with a false narrative that the Butlers were so concerned with her lawsuit that they began transferring assets and traveling overseas "to

75

avoid the potential judgment."[32] From the start, Mullen and her attorneys resorted to "extreme measures" to ensure this case would play out like a courtroom drama for the public, all the while intentionally increasing the costs of litigation for the Defendants. (Exhibit 2, p. 111)

**B.** **Plaintiff and Her Attorneys Answered Discovery in Bad Faith**

Rule 37 provides for the imposition of sanctions against a party that fails to make disclosure or cooperate in discovery. *See Dotson v. Bravo*, 202 F.R.D. 559 (N.D. Ill. 2001). Under the rule, when a party engages in abusive and obstructive discovery tactics by failing to properly respond to discovery requests in any way, the court may impose sanctions directly, without first issuing an order to compel discovery. *Id.* at 570 ("The federal discovery rules give ample notice to litigants regarding how to properly conduct themselves. In a discovery disclosure system, designed to operate insofar as possible without judicial intervention, issuance of a court order in the first instance is unnecessary before a violation of the rule can be found."). Here, Plaintiff's counsel should be sanctioned for discovery gamesmanship and intentionally deceptive responses to Defendants' requests.

On April 15, 2019, Plaintiff provided Defendants with grossly inadequate responses to discovery propounded by the Defendants. (Dkt. 144-3) Rather than answering the Interrogatories as requested, Plaintiff's counsel made the unreasonable decision to treat each subpart of Interrogatory No. 1 and Interrogatory No. 5 as separate Interrogatories, which was clearly unreasonable and done in bad faith. (Dkt. 144-3, pp. 3-6; 9-18) Interrogatory No. 1 requested Mullen's personal information, such as her full name, phone number, and address. Plaintiff decided that Interrogatory No. 1 was, instead, a total of five different Interrogatories. (Dkt. 144-3, pp. 3-6)

---

[32] Jon Seidel and Michael O'Brien, *Rick Butler lawsuit gets contentious with claims he might move overseas*, Chicago Sun-Times, April 3, 2018, https://chicago.suntimes.com/2018/4/3/18316254/rick-butler-lawsuit-gets-contentious-with-claims-he-might-move-overseas (last accessed May 6, 2020).

Similarly, Plaintiff also decided that Interrogatory No. 5, which asked Mullen to describe the circumstances under which she was exposed to each alleged misrepresentation listed in her Complaint, should be treated as *fifty-two* separate Interrogatories. (Dkt. 144-3, pp. 9-18) Notably, Defendants' subparts listing the alleged misrepresentations in Interrogatory No. 5 were mirrored after Plaintiff's subparts—listing those same alleged misrepresentations—as set forth in her Complaint. (Dkt. 1, ¶ 162) Apparently, because Defendants described the type of information sought as to each misrepresentation (such as the speaker, the location, and the date upon which each statement was alleged to have been communicated), Plaintiff multiplied the different types of information sought by the total number of misrepresentations listed in her Complaint, and refused to provide answers to the remaining Interrogatories after reaching her self-imposed limit. (Dkt. 144-3)

Defendants sent a letter to Plaintiff's counsel requesting a meet and confer and explaining their position that Plaintiff's responses fell far short of meeting their obligation to act in good faith. (Exhibit 23) Defense counsel explained that long-standing precedent left no question that both Interrogatory No. 1 and Interrogatory No. 5 were proper, with courts repeatedly holding that "an interrogatory containing subparts directed at eliciting details concerning a common theme should be considered a single question." *Id*. (citing *Jacks v. DirectSat USA LLC*, No. 10 C 1707, 2011 WL 382858, at *2 (N.D. Ill. Feb. 1, 2011)). Furthermore, Defendants explained that a question asking about communications of a particular type should be treated as a single interrogatory even though it requests that the time, place, persons present, and contents be stated separately for each such communication. *Id*. (citing Fed. R. Civ. P. 33(a) advisory committee's note (1993 Amendments)). Therefore, in light of Plaintiff's deliberate attempt to avoid answering discovery, Defendants requested supplemental responses within 7 days. (Exhibit 23) When the Parties spoke

on the phone, Plaintiff requested an extension of over 30 days, and promised Defense counsel that, if she agreed to the much-extended deadline, they would provide substantive responses to every Interrogatory over their objections. (Exhibit 34, ¶ 29) Based on this promise (and considering Plaintiff counsel's "litigation by sanction" approach to this matter, which had already frustrated the Court with discovery disputes), Defense counsel agreed to the extension. *Id*.

When Plaintiff's supplemental responses were served, they were yet again inadequate, with Plaintiff largely failing to provide substantive responses to Defendants' requests. (Dkt. 144-4) For example, when Plaintiff was asked to state the facts upon which she based her allegation that "Defendants have a 'special relationship' with Michigan State University," Plaintiff merely provided Defendants with the title—not even a link—to a Chicago Tribune article which was published *after this litigation* was filed. (Dkt. 144-4, pp. 29-30) Mullen was not interviewed in the article, so Plaintiff's response gives no information about what information was known to Laura Mullen prior to filing her Complaint.[33]

Plaintiff's remaining responses were similarly evasive, with many of her answers (1) merely citing the Complaint, (2) stating, in lieu of an answer, that the Plaintiff would produce responsive documents which were not produced, (3) pointing to Plaintiff's Rule 26 disclosures, or (4) providing nonsensical answers in a clear effort to avoid the question. (Dkt. 144-4) To illustrate, Plaintiff's claim of damages varied throughout this lawsuit, yet when Defendants propounded discovery requesting that Mullen itemize and/or explain her damages, she simply referred to her Rule 26 disclosures. (Dkt. 144-4, pp. 8-9; Dkt. 144-6, pp. 3-4) Similarly, in response to Defendants' request that Plaintiff "[i]dentify the owners and/or users of every VolleyTalk

---

[33] *See* Michael Tarm, *Michigan State kept ties to Aurora volleyball coach accused of sexual abuse*, The Associated Press, April 24, 2018 https://www.chicagotribune.com/news/breaking/ct-michigan-state-kept-ties-to-coach-accused-of-sexual-abuse-20180423-story.html (last visited May 17, 2020).

username of which You have knowledge…" (Dkt. 144-4, pp. 18-19) Plaintiff ignored the actual request and responded that "she used the VolleyTalk username swimrowvball. Plaintiff has not owned and/or used any other VolleyTalk usernames." *Id.* Plaintiff's answer is either intentionally nonsensical or outright false, because Defendants were clearly requesting Mullen's knowledge of other users. *Id.* It is without question that Mullen did not provide a true and accurate response, because she communicated on Volleytalk with the accuser who first contacted her about becoming the Plaintiff in this lawsuit and would, at the very least, know that user's identity. (Exhibit 5)

Furthermore, the day after this lawsuit was filed, Plaintiff's attorney told a news publication that his firm received "many calls and emails from people offering to provide further evidence in support of our lawsuit."[34] Therefore, Defendants propounded discovery which asked Plaintiff to identify any such communication or individual who offered evidence related to this litigation. (Dkt. 144-4, pp. 15-16, 19) In response, Plaintiff did not disclose any of the communications her attorney discussed with the news outlet, and instead stated that she would provide responsive documents (which were never provided) or that the requested information would be produced in "accordance with the trial plan and schedule ultimately entered by the Court." *Id.*

It is clear that Plaintiff's discovery responses were intentionally evasive to avoid disclosure of the communications showing Mullen's prior knowledge of the allegations she claims were concealed from her, as well as her participation in the scheme to destroy Defendants' business and reputation. *See Profile Gear Corp. v. Foundry Allied Indus*, 937 F.2d 351 (7th Cir. 1991) (sanctioning a party for engaging in "evasive conduct" when, instead of answering interrogatories, the party responded "See Complaint and "See Documents Produced."). For example, in

---

[34] Mary Ann Georgantopoulos, *A Top US Youth Volleyball Coach Is Accused Of Raping Teenage Girls Hundreds Of Times*, BuzzFeed News, February 28, 2018, https://www.buzzfeednews.com/article/maryanngeorgantopoulos/youth-volleyball-coach-lawsuit (last visited May 17, 2020).

approximately June of 2017, Mullen contacted Emily Swanson explaining that she "knew about the allegations" when her daughters were in the program, but that she "wasn't worried about them" because she believed Rick was under a microscope. (Exhibit 2, pp. 173-77; Dkt. 144-4, p. 30) Yet, none of these communications were produced, even after Defendants specifically asked about the communication. (Dkt. 144-4, p. 30) That Plaintiff resisted admitting the truth when confronted with it in discovery is further evidence of her bad faith.

The relationship between Emily Swanson, Laura Mullen, the accusers, and Plaintiff's counsel raises a strong suspicion that Mullen and/or her attorneys were involved when Swanson abruptly, and falsely, stated on Volleytalk that Mullen was not the parent who she wrote about in June of 2017. (Exhibit 2, pp. 173-175) Swanson has even exposed the improper purpose of this lawsuit, stating that "[w]hen the criminal justice system fails, and the judicial system is limited in its powers to control behavior, as are administrative bodies, sometimes another form of justice is the only one left." (Exhibit 2, p. 151) If Swanson was honest about her conversation(s) with Plaintiff, it would have outed Laura Mullen as a liar on Volleytalk and, eventually, in this Court of law. *Id.* Similarly, if Plaintiff provided these responsive communications as requested, the depth of her lies would have been exposed to this Court.

However, Plaintiff's evasive responses sought to prevent Defendants from discovering communications between those in the scheme against Defendants which would explicitly confirm that Mullen and her attorneys brought this case for an improper purpose. When a party fails to adhere to discovery requirements, Federal Rule of Civil Procedure 37 identifies a range of sanctions that the Court may impose on a party, including "directing that…other designated facts be taken as established for purposes of the action." Fed. R. Civ. P. 37(b)(2)(i). The Court should exercise its discretion to order sanctions under Rule 37(b) by finding that Defendants' unproduced

answers and documents are presumed to contain communications which evidence Mullen and her attorneys' participation in a scheme to commit a fraud upon this Court. *See* Fed. R. Civ. P. 37(b)(2)(1) (sanctions available include "directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action"); *Officer v. Duran*, No. 12-cv-10195, 2014 WL 51330, at *3 (N.D. Ill. Jan. 2, 2014) (presuming certain facts, as a sanction, when defendant repeatedly violated discovery order).

### C.    Plaintiff Intentionally Engaged in Unnecessary Discovery to Harass Defendants

Lead attorney for Plaintiff, Jay Edelson, repeatedly stated to the press how badly he wanted to depose Rick Butler, stating, for example, "We want him under oath. We want to see what he says. We are very eager to get that done as quickly as possible, and the same thing with his wife."[35] Plaintiff repeatedly attempted to obtain depositions of Rick and Cheryl Butler during this litigation, and finally had the chance after insisting that Plaintiff needed to take depositions of every person who submitted an affidavit in support of Defendants' Motion for Summary Judgment. (Dkt. 154-1, ¶ 16) Defendants argued that none of the depositions were necessary for Mullen's defense, because Defendants' motion focused on matters solely within Mullen's personal knowledge. (Dkt. 162, ¶ 1) Defendants' motion primarily focused on two arguments: (1) that Mullen was not deceived, and (2) that Mullen was not injured. *Id.*

Nevertheless, Plaintiff insisted on taking the depositions of Rick Butler and Cheryl Butler, along with Luke Stapleton, Claudine Dale, Troy Gilb, and Erik Vogt, regardless of the fact that the Declarations of the latter four simply stated their job titles and confirmed that the emails

---

[35] Christian Red, *New Federal Class-Action Suit Against Rick Butler Seeks to Prevent Him from Interacting With Minors*, New York Daily News, March 1, 2018, http://www.nydailynews.com/sports/more-sports/new-suit-rick-butler-seeks-protect-minors-article-1.3850082 (last visited May 17, 2020); *see also* Lauraann Wood, Less Talk, More Walk In Volleyball Sex Abuse Suit: Judge, Law 360, July 3, 2018, https://www.law360.com/articles/1059888/less-talk-more-walk-in-volleyball-sex-abuse-suit-judge (last visited May 17, 2020) ("Edelson said he and his clients are 'very excited' that their case gets to move forward, noting that…[the motion to dismiss] ruling gives them the opportunity to challenge the Butlers' public denials of the suit's allegations 'under oath and subject to perjury rules.'").

referenced in Defendants' motion were "true and accurate copies." (Dkt. 162, ¶ 25) Despite the extremely limited subject matter at issue in the depositions of the GLV employees, each deposition lasted approximately two hours and were substantially focused on matters outside the scope allowed by this Court. (Exhibit 34, ¶¶ 30-31; Dkt. 171-20; Dkt. 171-21; Dkt. 171-22, Dkt. 171-24) The depositions of Rick and Cheryl Butler each lasted approximately four hours, and were similarly focused on matters outside the scope allowed by this Court. (Exhibit 34, ¶¶ 30-31; Dkt. 171-5; Dkt. 171-23) These depositions were plainly used as a fishing expedition to question Defendants on matters outside the scope allowed by the Court, and to further harass the Defendants and needlessly increase their litigation costs. (Exhibit 34, ¶¶ 30-31)

## VII. THE COURT SHOULD SANCTION MULLEN AND HER ATTORNEYS AND AWARD DEFENDANTS ATTORNEYS FEES, COSTS AND EXPENSES

The campaign to harm Defendants' business with this litigation was, ultimately, successful. The publicity of Plaintiff's false and salacious claims, combined with the organized threats of public shaming (largely led by Mullen and others in the campaign) towards anyone doing business with the Butlers, caused many organizations to buckle under the pressure. (Exhibit 11, ¶¶ 23-30; Exhibit 12, ¶¶ 18-24; Exhibit 25) To ensure that "it hurts more than helps to be associated with SPVB," Plaintiff's Complaint listed 15 organizations where Mullen claims GLV "received substantial monetary fees for various camps nationwide." (Dkt. 1 ¶ 20; Exhibit 3, pp. 12, 40) Mullen and her attorneys succeeded, as several of those organizations received substantial backlash, many were forced to cut ties with the Defendants against their will, and at least one was close to losing her business entirely. (Exhibit 11, ¶¶ 22-30; Exhibit 12, ¶¶, 17-24; Exhibit 25, p. 6) Mullen agreed that "THIS is what is going to keep on happening to Butler, from now on. Both economic and public relations pressure on youth [volleyball]'s corporate sponsors is turning the tide. His ego must be hurting!" (Exhibit 3, p. 33)

As a result, Defendants' business suffered immensely. Schools which held GLV camps year after year suddenly pulled their contracts with the Defendants. Teams withdrew from Defendants' events. Certain colleges refused to recruit players who played in Defendants' program. It is no coincidence that Laura Mullen has personally taken action to ensure each of these took place, so that the Butlers "feel the hit financially, not just symbolically." (Exhibit 4, p. 18; Exhibit 25; Exhibit 30; Exhibit 31) The Butlers certainly felt "the hit" from Mullen's false claims, as their business suffered extensive losses, and they were forced to sell their home due to the harassment and to help pay for the legal fees required to defend this class action. (Exhibit 11, ¶ 15; Exhibit 12, ¶, 10) During this lawsuit, Laura Mullen was extending personal thanks to club directors who arranged for the boycott of Defendants' program. (Exhibit 24) At the same time, Plaintiff's attorneys were engaged in a media campaign discussing the salacious details of the Complaint and declaring their intention to remove the Butlers from the sport.[36]

Even worse, Mullen encouraged the public to harass the Butlers, and the public listened. Their business was vandalized, they were followed and photographed at events, Rick was even verbally attacked with a death threat at a tournament in front of Sports Performance athletes, Rick received death threats on his voicemail, the Sports Performance email accounts and Facebook pages were flooded with abusive comments, Sports Performance alumni, parents, and players were harassed on twitter for maintaining a connection with the Butlers, former players were photographed and shamed on social media pages of those associated with the campaign against the Butlers, and even their attorney was threatened. (Exhibit 25; Exhibit 11, ¶¶ 9, 14-19; Exhibit

---

[36] Christian Red, *New federal class-action suit against Rick Butler seeks to prevent him from interacting with minors*, New York Daily News, March 1, 2018, https://www.nydailynews.com/sports/more-sports/new-suit-rick-butler-seeks-protect-minors-article-1.3850082 (last visited May 17, 2020) (stating that, according to Plaintiff's attorney, Jay Edelson, the main objective behind the lawsuit is to prevent the Butlers from ever interacting with minors, and quoting Mr. Edelson, who stated, "Our view is that a large number of adults in organizations have supported Butler and his club, either implicitly or explicitly… we're in a different era than we were even last year…I think that's why there was so much pressure on these three organizations to finally step up and do the right thing.").

12, ¶¶ 8-14) This is all a direct result of the culture that Mullen, her attorneys, and the accusers have created towards the Butlers.

Furthermore, Mullen expressed support at the idea that parents and coaches should forcibly remove Rick Butler from attending events, even if they have to take illegal acts to do so, when she endorsed a post stating, "I'm much less concerned with the law than I am with what is right. The laws be damned…. If I ever cross paths with [Rick Butler] at a youth sports event, I will ask him to leave…please support me/him/her and let us as a community of morally confident parents/coaches/friends stand up for what is right and remove him from a youth sports event." (Exhibit 3, p. 9) It would not take long for this idea to become a reality. In January of 2020, when Rick was speaking with the Sports Performance program captain at an out-of-town scrimmage, another coach aggressively approached Butler and belligerently yelled, "leave this gym now or I'm going to have to put you down!" (Exhibit 11, ¶ 17) There is no question that the last statement made was a threat to Mr. Butler's life, taking place in front of dozens of players, parents, and event staff. *Id.* "The laws be damned," indeed. (Exhibit 3, p. 9) Mullen's social media activity establishes a pattern of explicitly directing and encouraging such actions against the Defendants. Her behavior is clearly sanctionable, if not criminal.

### A. Edelson PC Orchestrated This Litigation in Bad Faith

Plaintiff's counsel orchestrated this duplicitous litigation in conjunction with the alleged victims to advance their goals of removing the Butlers from the sport of volleyball. In the news, Jay Edelson claims to have "started investigating for the litigation well before USA Volleyball banned Butler for life in December" of 2017.[37] In January of 2018, one of Rick's accusers posted

---

[37] Hannah Leone, *Federal lawsuit accuses Aurora volleyball coach, club of covering up sex abuse*, Aurora Beacon-News, Chicago Tribune, February 28, 2018, https://www.chicagotribune.com/suburbs/aurora-beacon-news/ct-abn-class-action-butler-st-0228-20180228-story.html (last visited May 17, 2020).

on Volleytalk that the alleged "victims of Butler just acquired representation from a very caring and very powerful lawyer" who "has some good angles for us to reach our goals."[38] (Exhibit 5) Of course, this lawyer was Jay Edelson.[39] On May 15, 2018, Jay Edelson, Sarah Powers-Barnhard, Julie Romias, and Kay Rogness appeared before an Illinois State Senate Task Force to testify about this lawsuit. With knowledge of the intentional, pervasive lies in the Complaint, these individuals brazenly argued that state legislatures must strengthen existing perjury laws "to specifically to protect survivors of child sexual abuse."[40] The hypocrisy is astounding.

This litigation was a calculated, blatant abuse of the judicial process. The accuser said it best when she told Mullen, "you may be able to help us with the legal aspect to get [Rick] away" from those who continue to support the Defendants and pay GLV for volleyball training. (Exhibit 5) This case was never about recovering fees. It was never about fraud. It was always about finding a way to destroy the Defendants' business; if people would not leave the program on their own, the accusers were going to make them. Plaintiff's attorneys manufactured a cause of action to create a barrier between the Defendants and their customers. Plaintiff's absurd motion for expedited discovery and for entry of a protective order, filed within weeks of the commencement

---

[38] This same accuser was fishing for evidence on Volleytalk shortly before this lawsuit was filed, publicly challenging supporters of the Defendants, saying, for example, "I am one of Rick's victims. He raped me when I was under 18 and his player. Do you believe me or Rick? I want to know if you believe me and it doesn't matter enough to support us or you believe Rick? If you believe Rick why do you think we are speaking up? What motive is he telling you that each of us has- and our number is growing." (Exhibit 5) Less than a hour later, when she did not receive an answer to her questions, she continued, "please answer my question- Do you believe me that I was under 18 and a player on his team when he raped me?" *Id.* Then, after another hour passed, she again said, "do you believe me that I was under 18 sndvplayer [sic] of his or Rick's version? Are me and all the others lying? why would we?" *Id.* The next morning she still did not have an answer, so she continued, "do you believe me or RB's version?" *Id.*

[39] While it remains unclear when Edelson PC began preparing for this case, on April 3, 2017, a representative from Edelson PC contacted Rick Butler's requesting private lessons for the firm. An employee of Edelson PC contacted Rick Butler's personal email address, said that Rick was recommended by a coach in Utah, and specifically requested that Rick Butler coach the firm twice per week in group lessons. (Exhibit 26) Rick referred the firm to a former SPVB player who confirmed that he did several lessons with Edelson in Chicago. If Edelson PC was, in fact, contacting Rick Butler and/or seeking lessons from him as part of their "investigation," it is clear that Mr. Edelson's interest in this matter is personal in nature.

[40] Illinois State Senate, *Task Force Hearing*, May 15, 2018, http://www.ilga.gov/senate/committees/100Documents/SDHA/Hearing%20Packet%205.15.2018.pdf (last visited May 17, 2020) (meeting agenda listing this case on the agenda, with the full Complaint being publicly-accessible as an attachment to the Task Force agenda).

of this litigation, was the first step in a scheme to strain the Defendants' business relationships and ability to communicate with their clients. (Dkt. 17)

From start to finish, Jay Edelson, along with numerous attorneys at Edelson PC acting under his direction, undoubtedly orchestrated this fraud on the Court. Jay Edelson even appeared before the Illinois State Senate with the accusers to discuss their claims in this litigation, with Mullen later sharing an article about the Senate hearing. (Exhibit 4, p. 7) Mullen admits she never spoke with Jane Doe or Beth Rose, yet her attorneys have produced sworn declarations from each of them. (Dkt. 144-4, pp. 15-18; Dkt. 1, ¶¶ 52-62; Dkt. 171-11) Defendants suspect that Plaintiff's attorneys were involved in the campaign to remove the Butlers from volleyball, that they took an active role in pressuring the sport's governing bodies to ban Butler, and that they have been active in discussions about the Defendants on Volleytalk prior to this litigation.[41] However, as mentioned above, Plaintiff provided evasive discovery answers, likely to prohibit Defendants from uncovering just how deep their network runs.

Obviously, Mr. Edelson and the accusers have known Mullen's Volleytalk username since they first made contact with her prior to the filing of the Complaint. (Exhibit 5) They had access to Mullen's entire Volleytalk history prior to bringing this suit, including her comments on threads discussing details of the allegations of abuse which were posted as early as 2015. (Exhibit 3; Exhibit 4; Exhibit 8; Exhibit 9) Although Mullen was most certain a willing accomplice, it was

---

[41] There are several Volleytalk users who appear to have legal knowledge and a particular interest in issues presented in this litigation, even before it was filed. For example, on February 14, 2018, less than two weeks before filing her Complaint, Mullen liked a post which appears to illustrate the purpose and intent of this suit: "The issue of real importance here is whether or not the abuse happened…The other important thing is finding a modicum of justice for the actual victims and perhaps an opportunity for some redemption for the circle of people around the abuser or the abused who might feel some guilt or remorse for wittingly or unwittingly having enabled the abuse…all of this back and forth is distracting from the final piece of this puzzle that needs to be put in place: ensuring that Butler's reach and influence and existence in the realm of club volleyball in particular ends as soon as possible. The battle isn't over." (Exhibit 3, p. 6) Plaintiff's Complaint mirrors the language used by the poster, referencing Butler's "far-reaching sphere of influence" in club volleyball. (Dkt. 1, ¶ 19)

Plaintiff's attorneys who were responsible for filing a frivolous claim with an extraordinarily improper Complaint. It was Plaintiff's attorneys who filed baseless motions used to further harass and prejudice the Defendants, increase their legal fees, and create additional negative publicity. It was the Plaintiff's attorneys who ignored two Rule 11 letters, abused the discovery process, and proceeded to summary judgment with inadmissible and irrelevant evidence. As described in various parts of this motion, Edelson PC broadcasted Plaintiff's false claims before state legislatures, on television programs, and in numerous news publications to generate publicity of their salacious, false statements at a time that would all but guarantee Defendants would suffer both personally and professionally.

Edelson PC and, specifically, Jay Edelson is no stranger to engaging in improper litigation tactics.[42] According to a 2017 lawsuit against Edelson PC, the firm's practice "largely consists of nothing more than preying upon unsuspecting businesses, conjuring up nonexistent issues and then attempting to extort settlements that benefit no one but themselves through payments for their nuisance lawsuits."[43] That lawsuit also accused Edelson PC of using abusive litigation tactics similar to those committed in this case, explaining that the firm "illegally abused the process of the courts to further their own self-aggrandizement and have engaged in a self-serving publicity tour spreading their lies and defamatory statements." *Id.*

In this case, Edelson PC utilized its abusive litigation tactics in full force against the Defendants. While Defendants warned Plaintiff—twice—that they would seek sanctions pursuant

---

[42] Conor Dougherty, *Jay Edelson, the Class-Action Lawyer Who May Be Tech's Least Friended Man*, The New York Times, April 4, 2015, https://www.nytimes.com/2015/04/05/technology/unpopular-in-silicon-valley.html (last visited May 17, 2020) (describing attorney Jay Edelson as "a leech tarted up as a freedom fighter," while an attorney was quoted explaining that "[Edelson] tries to convince you that because there's a legal gotcha with a big number [in a class action], you should pay him instead of litigating. That's his business model.").

[43] Dan Churney, *Plaintiffs' lawyer Edelson: Defense firm Johnson & Bell's defamation action an improper SLAPP suit*, Lawsuits, Cook County Record, July 4, 2018, https://cookcountyrecord.com/stories/511474556-plaintiffs-lawyer-edelson-defense-firm-f-bell-s-defamation-action-an-improper-slapp-suit (last visited May 17, 2020).

to Rule 11, the misconduct in this litigation is far beyond "the pursuit of a claim without reasonable inquiry into the underlying facts." *See, e.g., Barnes v. Dalton*, 158 F.3d 1212 (11th Cir. 1998). Rather, it was the calculated initiation and pursuit of claims that the Plaintiff and her attorneys knew were false and which they sought to further through knowingly false accusations and sworn statements. Plaintiff's carefully contrived, pervasive, perjurious statements created a factual dispute where there was none, costing the defendants time and resources. In fact, the Plaintiff's pattern of perjury played a role in this Court's decision regarding class certification. (Dkt. 101, pp. 14-15) In short, the misconduct was not harmless.

In addition to imposing monetary sanctions on Plaintiff's counsel, the Court should refer this matter to disciplinary authorities. The Court "has available a variety of possible sanctions to impose for violations," including "referring the matter to disciplinary authorities." *See* Fed. R. Civ. P. 11(c) (advisory committee notes to 1993 Amendments). To the extent that attorney Jay Edelson "knowingly advance[d] a claim or defense that is unwarranted under existing law," or "knowingly asserted material factual statements that are false," or that the filing of the Complaint "serves merely to harass or injure another," he has also violated his ethical responsibilities under Rule 3.1 of the Illinois Rules of Professional Conduct.

### B.  Sanctions Are Warranted Under Rule 11

Rule 11 requires that an attorney or party, certify to the best of his "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that any pleading presented to the court is not presented for an improper purpose, that the claims therein have a legally sufficient basis, and that the allegations and other factual contentions have evidentiary support.  Fed.R.Civ.P. 11(b). Under Rule 11(c), a district court may impose sanctions on a party or her counsel (or both), for failing to comply with Rule 11(b). Fed.R.Civ.P. 11(c); *Fries*

*v. Helsper*, 146 F.3d 452, 458 (7th Cir.1998) ("a court may impose sanctions on a party for making arguments or filing claims that are frivolous, legally unreasonable, [or] without factual foundation ."); *see also In re Alberto*, 119 B.R. at 993 ("[w]hen an attorney and client share responsibility for litigation strategy and such strategy violates Rule 11, courts can impose joint and several liability.").

Before filing this lawsuit, Mullen and her attorneys knew they had no case against the Defendants, but they nonetheless required Defendants to spend the time, effort, and money moving to dismiss, participating in discovery, briefing class certification issues, participating in class notification, and moving for summary judgment. It is sanctionable to continue the case against the exonerated defendant, particularly to press on in the hopes of using the claim to extract some sort of settlement, either global or individual. *Egan v. Maguire*, 338 F.Supp.3d 799 (N.D. Ill. 2018) (citing *Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 610 (7th Cir. 2008) (rejecting the argument that the propriety of a Rule 11 sanction "focuses solely on the knowledge [the attorney] had as of the date of its filing of the case," and affirming sanctions against an attorney who "continued to advocate a claim that had no legal basis and refused to alter or withdraw it when that deficiency was pointed out")).

The appropriate sanction here is the amount Defendants expended to defend the suit because at all times Plaintiff and her attorneys had knowledge of the falsity of her claims. *See* Fed. R. Civ. P. 11(c)(4) ("The sanction may include…part or all of the reasonable attorney's fees and other expenses directly resulting from the violation."); *Golden v. Helen Sigman & Assocs.*, 611 F.3d 356, 365 (7th Cir. 2010). One of the basic purposes of Rule 11 is to "deter baseless filings in the district court ." *Cooter*, 496 U.S. at 393. Plaintiff and her counsel created a factual dispute where there was none, costing the defendants significant time and resources. Considering the need

"to deter future parties from trampling upon the integrity of the court," the imposition of severe sanctions is entirely warranted. *Dotson*, 321 F.3d at 668; *see Salmeron*, 579 F.3d at 797.

### C.   Sanctions Are Warranted Under 28 U.S.C. § 1927

The Seventh Circuit has explained that Section 1927 addresses prolonging litigation whereas Rule 11 addresses particular filings and therefore, unlike Rule 11, Section 1927 does not require reasonable investigation. *Samuels v. Wilder*, 906 F.2d 272, 275 (7th Cir. 1990). Pursuant to 28 U.S.C. § 1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 n.1 (7th Cir. 2010).

A district court "has discretion to impose § 1927 sanctions when an attorney has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice, pursued a claim that is without plausible legal or factual basis and lacking in justification or pursued a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." *Jolly Grp. Ltd.*, 435 F.3d at 720. This standard does not require subjective bad faith as long as the "attorney's actions otherwise meet the standard of objective unreasonableness." *Id.* The Seventh Circuit has interpreted the § 1927 standard to impose a duty on attorneys to abandon proceedings when they are "fac[ed] with evidence showing [they] had no chance to prevail." *Tillman*, 374 Fed. Appx. At 666. As discussed throughout this Motion, Mullen and her attorneys had knowledge of their false claims before this lawsuit was ever filed. Nevertheless, they pursued Mullen's claims in bad faith and with an improper purpose to harass Defendants, increase their costs of litigation, and put them out of business. Therefore, sanctions are warranted under § 1927 for Plaintiff counsel's unreasonable and vexatious conduct multiplying

the proceedings in bad faith, causing Defendants to expend substantial attorneys' fees, costs, and expenses.

### D.   <u>Sanctions Should Be Entered Pursuant to this Court's Inherent Power</u>

In addition to the rule and statutory bases discussed above (including sanctions pursuant to Rule 37 discussed in Part VI), the Court has inherent authority to enter sanctions. "[I]f a court finds that fraud has been practiced upon it, or that the very temple of justice has been defiled, it may assess attorney's fees against the responsible party, as it may when a party shows bad faith by delaying or disrupting the litigation." *Chambers*, 501 U.S. at 46. "A court has inherent power, which is to say a common law power, to punish by an award of reasonable attorneys' fees or other monetary sanction . . . misconduct by lawyers appearing before it." *Carr v. Tillery*, 591 F.3d 909, 919 (7th Cir. 2010) (citing *Chambers*, 501 U.S. at 43-46). The Supreme Court has made clear that "the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct." *Chambers*, 501 U.S. at 49. This Court should use its inherent power to sanction both Mullen and her counsel for the lies which Mullen told and which her counsel must have known were lies when stated.

At every point in this litigation, Defendants urged the Court to dismiss the Complaint in its entirety. Yet, because this case was filed improperly as a class action, Defendants were forced to incur substantial attorneys' fees, costs, and expenses associated with class certification and notice. Therefore, Defendants filed an early Motion for Summary Judgment in an attempt to dispose of the litigation at the earliest feasible time. An "all-fees award" is justified upon a showing that the Plaintiff's false claims "so permeated the suit as to make that misconduct a but-for cause of every subsequent legal expense" incurred by the Defendants. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1183 (2017). The substantial amount of fees, costs, and expenses related to the

91

defense of Mullen's claims was caused not by lack of diligence or any delays of this matter by Defendants, Defense counsel, or the Court, "but solely by the relentless, repeated fraudulent and brazenly unethical efforts" of Mullen and her attorneys at the moment she filed her deceitful Complaint and continuing thereafter. *Chambers*, 501 U.S. at 57.

"It is well established that courts possess the inherent power to protect the orderly administration of justice and to preserve the dignity of the tribunal and that the inherent power of a court to manage its affairs necessarily includes the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *Blanchard v. EdgeMark Finan. Corp*., 175 F.R.D. 293, 303 (N.D.Ill.1997). Courts also consider the prejudice to the judicial system and the potential for punishment and deterrence when assessing sanctions. *Quela v. Payco–Gen. Am. Credits, Inc*., No. 99 C 1904, 2000 WL 656681, *8 (N.D. Ill. Mar. 26, 2000). It is proper for a trial court to impose a severe sanction where the sanction is sufficient to deter repetition of the misconduct or to deter similar conduct by third parties. Fed.R.Civ.P. 11(c)(2). Here, there exists ample evidence justifying severe sanctions to deter similar misconduct.

Plaintiff abused the judicial system as a means to dismantle a business and destroy the reputations of others. Plaintiff's counsel has stated to this Court and to the public that, while suing to recover fees paid to Defendants, this case is not really about money. Plaintiff and her attorney never expected or cared to benefit financially. Jay Edelson benefitted by manufacturing a false public perception by alleging irrelevant, scandalous, sexually explicit allegations in a climate that all but guaranteed a high-publicity case, and Laura Mullen benefitted by furthering the goal of removing the Butlers from volleyball and inflicting irreparable harm on their business and reputations. (Dkt. 71, pp. 6-7) Mr. Edelson has used this case to promote his firm in the media, which alone serves as motive for other attorneys to similarly abuse the judicial system, harm the

Defendants, and receive public praise for doing so. In fact, many of those involved in the scheme against the Butlers are attorneys who have done just that – using the allegations against Defendants and their efforts to ban the Butlers from volleyball as a way to publicly promote their businesses. (Exhibit 25; Exhibit 33)

This Court should award severe sanctions in an amount which would deter future abuse of the judicial system.[44] The scheme against the Butlers is led by Sarah Powers-Barnhard, along with Kay Rogness, an attorney, Emily Swanson, an attorney, Nancy Hogshead-Makar, an attorney, and Jay Edelson, an attorney, Marci Hamilton, an attorney, and many others. Those attorneys and others who have participated in the scheme have certainly benefitted from the publicity, notoriety, and opportunities they have received as a result of their involvement, even if their lawsuit was ultimately unsuccessful. There is no question that this action was brought against the Defendants in hopes they would "be bled to death financially". (Exhibit 2, pp. 7, 37, 41-42) If substantial sanctions are not imposed for the egregious misconduct of Plaintiff and her attorneys, the illicit scheme against the Butlers will continue to abuse the judicial system in furtherance of their "goals." (Exhibit 5; Exhibit 3, p. 56-57) Those involved in the scheme have shamelessly confirmed as much, boasting about their efforts to harass and harm the Defendants:

- In 2016, Sarah Powers-Barnhard filed a civil complaint against the Amateur Athletic Union (AAU), alleging they violated the Florida Deceptive and Unfair Trade Practices Act. Marci Hamilton, who represented Powers-Barnhard in her 2016 AAU lawsuit, demanded in 2018 that Disney prohibit Rick from attending the AAU National Championships on its property, and "made sure to mention the Larry Nassar sex abuse scandal that has roiled USA Gymnastics and Michigan State University in her letter to Disney."[45]

---

[44] The Defendants have consistently been the subject of public attacks in the media since the allegations were first made. (Dkt. 183, p. 18) However, in recent years, those involved in the campaign against the Butlers have taken advantage of the judicial system and the publicity related to the #MeToo movement, such as threatening legal action under Title IX, broadcasting a Change.org petition, bringing a case in New York pursuant to the Child Victim's Act, and filing lawsuits to force Butler out of the sport. (Exhibit 30)

[45] Christian Red, *Coach Rick Butler, already booted from USA Volleyball and AAU following sex abuse allegations, now banned from youth tournament at Disney*, NY Daily News, June 1, 2018, https://www.nydailynews.com/sports/more-sports/ny-sports-butler-volleyball-disney-20180601-story.html (last visited May 17, 2020).

- In 2017, the accusers retained Jay Edelson to manufacture another lawsuit to remove Rick from the sport, boasting about their efforts on Volleytalk in January of 2018. Just weeks later, this lawsuit was filed, and Mullen, her attorneys, the accusers, and those involved in the campaign against the Butlers capitalized on the publicity of the Complaint to inflict as much harm as possible.[46] (Exhibit 5) Mullen publicly thanked the Defendants' competitors on the USAV Great Lakes Region Facebook page when they took advantage of the negative press to persuade clubs to leave the Defendants' events and enter tournaments at other facilities. (Exhibit 24)

- On April 24, 2018, Mullen commented on a Facebook post written by Nancy Hogshead-Makar, founder of Champion Women. The public post was written about the Defendants' alleged "special relationship" with Michigan State University and references a letter sent by Hogshead-Makar filled with false and misleading information, threatening the school with Title IX violations, and declaring that it was the school's "legal duty" to disassociate with Rick Butler. (Exhibit 30, pp. 12-16) Hogshead-Makar, a lawyer, threatened hundreds of organizations with similar legal threats based on her grossly inaccurate portrayal of the facts, urging them to cut ties with Butler and Sports Performance. (Exhibit 30, p. 6) The post acknowledges there has been "a lot of effort to remove one coach." *Id.*

- On June 15, 2018, Mullen liked a Facebook post written by Nancy Hogshead-Makar, founder of Champion Women, boasting that the organization had "written 130+ letter [sic] to all these organizations" demanding they disassociate from Rick Butler. Kay Rogness commented, "I am thankful USAV and AAU finally stepped up…it took me and a number of others more than 30 years to get them to do it." (Exhibit 30, p. 6)

- On July 4, 2018, Nancy Hogshead-Makar, founder of Champion Women, took credit for this Court's ruling on Defendants' Motion to Dismiss, boasting on Facebook that her organization's "work played a part" in the Court's decision. (Exhibit 30, p. 3) Laura Mullen, Sarah Powers-Barnhard, and Kay Rogness agreed, as they each "liked" the post. *Id.* Hogshead-Makar continued to post about this lawsuit with the encouragement and participation of Laura Mullen. When one woman questioned the legitimacy of the class action, Sarah Powers-Barnhard chimed in to explain her take on the class notice process, and made the patently false claim that Rick "sexually abused [the accusers] from the ages of 14-17." (Exhibit 30, p. 5) Laura Mullen "liked" the comment. *Id.*

- In 2019, Sarah Powers-Barnhard filed another lawsuit, which is currently pending in the Northern District of New York, attempting to take advantage of the state's newly-enacted Child Victim's Act. Sarah sued Rick Butler, who she claims kissed her during a 1981 trip

---

[46] Edelson PC also involved itself in another lawsuit related to the campaign against the Butlers. After an individual callously involved the birth mother of the Butlers' adopted child into their attacks on the Butlers, the birth mother filed a lawsuit for defamation. The lawsuit was based on a false claim, posted on Facebook, that Rick was the biological father of his son, and the defendant even tagged the birth mother's place of employment in his post. Edelson PC contacted the defendant offering to represent him pro bono, and, before the firm even filed an answer to the complaint, it began issuing subpoenas for Rick Butler's deposition. Furthermore, Edelson PC had already received the adoption records in Defendants' June 2018 Rule 11, and the attorneys had indisputable proof that Rick Butler was not the biological father of the child he and Cheryl adopted.

through New York, Cheryl Butler, who was not employed by Sports Performance until 1986, and GLV, Inc., which did not exist until 1990. *See Sarah Powers-Barnhard v. Rick Butler, et al*, Case No.: 5:19-cv-1208 (N.D.N.Y. 2019) (awaiting decision on Defendants' Motion to Dismiss).

- After public pressure on Mizuno in 2017 caused the Defendants to lose a 10-year deal worth over $1 million to their business, the company recently approached the Defendants to reestablish the business relationship. (Exhibit 25, p. 13; Exhibit 4, pp. 32, 37) On May 15, 2020, the Defendants announced that they entered into a new deal with Mizuno after the company recently approached the Defendants to reestablish the business relationship.[47] (Exhibit 25, p. 13) Immediately, Volleytalk users in the thread titled *Rick Butler/SPVB lawsuit* began scheming to interfere with that deal, saying "I guess Mizuno is going to get a few calls on Monday to verify if this is true…I would suggest everyone consider moving to Asics, Under Armor, Adidas, or Nike if the information is true." (Exhibit 3, 59) Then, a Change.org petition created, titled *Boycott Mizuno for SPRI sponsorship*, which was posted on Facebook and Twitter. Laura Mullen commented on a Facebook post about the petition, asking if anybody knew "who the sales rep" was for Defendants' area and said she would be calling them. (Dkt. 25, pp. 24-27)

The attorneys involved in the scheme against the Butlers have shown that they are willing to abuse the judicial system in furtherance of their goal. As recently as May 9, 2020, Volleytalk users were still discussing this case, saying that "with so many people out of work" because of COVID-19, people would be desperate for money and hoping that "one or more would now consider representing the class." (Exhibit 3, p. 58) Those involved in the campaign against the Butlers are steadfast in their desire to harm the Defendants, and have recently stated that:

> *Of course people are looking to take down SPRI otherwise there wouldn't [be] a lawsuit against the butlers* [sic]…As I have said many times over the years in these threads as long as you are a paying, supporting member of spvb and the butlers [sic] you are subject to collateral damage…*Even if [the Butlers] get this lawsuit thrown out, or it is diminished beyond the initial intent, there will be people who will come and find other ways to get him away from the game.* So instead of blowing all that money and time in the courts, exposing the athletes they supposedly care so much about, and their coaching staff who some use as their means of income, just pack it up sell the business and go away *before some angry parent finds a way to ruin their lives beyond volleyball.*

---

[47] In a 2017 meeting with Defendants, Mizuno explained that they were getting bombarded with letters and threats which were nearly identical, so they believed they were the focus of an organized attack. (Exhibit 11, ¶¶ 24-26; Exhibit 12, ¶¶ 20-21) Mizuno had been sponsoring Sports Performance since 1996, and, when they met with Defendants in 2017, the company acknowledged that it knew about the allegations since the beginning of the business relationship, but that it was worried about the company being targeted with the Butlers. *Id.*

(Exhibit 3, p. 56) (emphasis added). One poster mentioned Sarah's New York lawsuit against the Defendants, stating that "[i]n this current environment, Rick Butler is TOAST…he will be sued for every penny he owns." (Exhibit 3, p. 57) Similarly, another posted that the Defendants will need to "increase overhead to cover legal fees," adding that the legal fees "won't be ending anytime soon as the new lawsuit[s] are being filed." *Id.*

The evidence is clear that this case was brought as part of a bigger scheme to shut down the Defendants' business through any means necessary, and the actions of those in that scheme leading up to, and throughout, this litigation show that their threats against Defendants should be taken seriously. The need "to deter future parties from trampling upon the integrity of the court" is extremely high in this case, as those involved in the scheme have already vowed that there will be additional action taken to ensure the Defendants are removed from the sport. (Exhibit 3, p. 56)

In deciding the appropriate sanctions, courts "consider the seriousness of the violations and whether the violations were intentional, as well as the nature and extent of the prejudice suffered or likely to be suffered by the parties in the future as a result of the violation." *In re Air Crash Disaster*, 909 F.Supp. at 1124. Mullen and her attorneys ensured that the Defendants would suffer permanent and irreparable harm upon filing her Complaint. Their decision to plead nearly 50 pages of salacious allegations of sexual abuse of "underage athletes," combined with a misleading and improper reference to Michigan State, was certainly calculated to incite immediate, prejudicial publicity of Plaintiff's Complaint. What is profoundly obvious from the hundreds of posts, comments, and "likes" set forth in this Motion is that the actual victims alleged in this lawsuit – the class members – are rarely, if ever, mentioned. Furthermore, the actual harm alleged in this lawsuit – the fraud – is rarely, if ever, complained of. In fact, Plaintiff's attorneys were so determined to mislead the public about this lawsuit that they asked this Court to punish the

96

Defendants for telling people that this case was about fraud. (Dkt. 48, pp. 1; 4-10) The Defendants were deeply prejudiced by the misconduct of Plaintiff and her attorneys from the moment this lawsuit was filed.

Through their false, fraudulent and salacious claims, Mullen and her attorneys exploited the judicial process to harass the Butlers and subjected the Defendants to unnecessary embarrassment and mental anguish. In Mullen's own words, they were pursuing this case to financially destroy the Butlers, "but more importantly and hurtful to Rick Butler by going after his name." (Exhibit 7, p. 4) Mullen confirmed their intention "to drag this out as long as possible and make it as public and embarrassing as possible for the Butlers/SPVB" and that "[a]nything they can do to damage the Butlers and their business has to be considered a positive." (Exhibit 2, p. 46) After Defendants warned the Plaintiff that they would be seeking sanctions for her misrepresentations in this lawsuit, Mullen doubled down on her false claims and allowed her daughter to play in a GLV program during the pendency of this lawsuit. (Dkt. 183, p. 22) Mullen's claims were so meritless and her behavior so unethical that the filing of her baseless Complaint amounts to a veritable attack on the judicial system. *See Jimenez*, 321 F.3d at 656-57.

This was never about fraud, because Plaintiff and each of her attorneys knew that the allegations against Rick Butler from the 1980s were never concealed. This was never about protecting athletes, because Plaintiff and each of her attorneys knew there had not been a single allegation of abuse made against Rick Butler since the 1980s. Through their false, fraudulent, and salacious claims, Mullen and her attorneys exploited the judicial process to publicly harass and humiliate the Butlers in hopes they would "be bled to death financially." (Exhibit 2, p. 41) The evidence confirms that Plaintiff intentionally lied about her motives, knowledge, and actions alleged in this litigation, justifying severe sanctions against Laura Mullen and her attorneys.

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that this Court grant Defendants' Motion for Sanctions against Plaintiff and her attorneys and enter an Order granting the following relief:

**A.** Awarding Defendants reasonable attorneys' fees, costs, and expenses associated with defending this action;

**B.** Monetary sanctions in the form of a fine payable to the Court (in an amount to be determined by the Court);

**C.** A published, public reprimand of Jay Edelson, Alfred Kirkland Murray, Eve-Lynn J. Rapp, J. Eli Wade Scott, Ryan D. Andrews, Sydney M. Janzen, and Christopher Lillard Dore;

**D.** That Jay Edelson, Alfred Kirkland Murray, Eve-Lynn J. Rapp, J. Eli Wade Scott, Ryan D. Andrews, Sydney M. Janzen, and Christopher Lillard Dore attend 20 hours of continuing legal education in professionalism and legal ethics;

**E.** Referring this matter and Plaintiff's attorneys' conduct to the Illinois Attorney Registration and Disciplinary Commission; and

**F.** Any other relief that this Court deems just and proper.


Date: May 18, 2020

<div style="margin-left:50%">

Respectfully Submitted,
GLV, INC., RICK BUTLER, and
CHERYL BUTLER

By: */s/ Danielle D'Ambrose*
One of Their Attorneys

</div>

Danielle D'Ambrose
D'AMBROSE P.C.
500 North Michigan Avenue, Suite 600
Chicago, IL 60611
P: (312) 396-4121 | F: (312) 574-0924
Danielle@DambrosePC.com
ARDC No. 6323782

*Attorney for Defendants*

## **CERTIFICATE OF DELIVERY**

The undersigned, an attorney, certifies that pursuant to Section X (E) of the General Order on Electronic Case Filing for the Northern District of Illinois, service of the above and foregoing document on all attorneys of record was accomplished through the Court's Electronic Notice for Registrants on May 18, 2020.

<p style="text-align: right;">/s/ Danielle D'Ambrose</p>