# Exhibit A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

LAURA MULLEN, individually and on
behalf of all others similarly situated,

*Plaintiff,*

v.

GLV, INC., d/b/a SPORTS
PERFORMANCE VOLLEYBALL CLUB
and GREAT LAKES CENTER, an Illinois
corporation, RICKY BUTLER, an individual,
and CHERYL BUTLER, an individual,

*Defendants.*

Case No. 18-cv-1465

Honorable Matthew F. Kennelly

## DEFENDANTS' MOTION AND INCORPORATED MEMORANDUM
## FOR SANCTIONS AGAINST PLAINTIFF AND HER ATTORNEYS

Dated:  May 26, 2020

Danielle D'Ambrose
D'AMBROSE P.C.
500 North Michigan Avenue, Suite 600
Chicago, IL 60611
(312) 396-4121
ARDC No. 6323782

Attorney for Defendants
*Rick Butler, Cheryl Butler, and*
*GLV, Inc. d/b/a Sports Performance Volleyball Club*

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES**......................................................................................iii

**PROCEDURAL BACKGROUND** ...........................................................................1

**ARGUMENT** ............................................................................................................2

**I.**     **PLAINTIFF AND HER ATTORNEYS FILED THIS LAWSUIT FOR AN IMPROPER PURPOSE**.......................................................................10

**II.**    **MULLEN'S PUBLIC HARASSMENT OF DEFENDANTS CONTINUED THROUGHOUT THIS LAWSUIT**...........................................................13

**III.**   **MULLEN ADMITS HER LAWSUIT WAS MERITLESS AND FILED FOR AN IMPROPER PURPOSE**.............................................................14

**IV.**   **PLAINTIFF AND HER ATTORNEYS ADVANCED FALSE AND IRRELEVANT FACTUAL ALLEGATIONS TO PUBLICLY DAMAGE DEFENDANTS' REPUTATIONS AND BUSINESS**...........................................15

      **A.**    **The Complaint's Core Allegations Are False**.................................16

      **B.**    **The Complaint Pleads Nearly 50 Pages of Irrelevant and Salacious Allegations**...........................................................................17

      **C.**    **Plaintiff Misrepresents and Improperly References the DCFS Proceedings**.................................................................................20

      **D.**    **Mullen's False Claims Related to Her Own Experience at Sports Performance**..................................................................................21

      **E.**    **Defendants Warned Plaintiff That They Would Seek Sanctions for Her False Claims and Assertions to the Court**...............................24

**V.**    **SANCTIONS ARE WARRANTED FOR PLAINTIFF'S BAD FAITH ASSERTIONS**.......................................................................................25

      **A.**    **Plaintiff's Meritless Claims on Summary Judgment Are Sanctionable**.......26

      **B.**    **Plaintiff's Version of "The Truth" is Asserted in Bad Faith**.........................28

      **C.**    **Plaintiff's Attorneys Employed Improper Litigation Tactics to Advance Bad Faith Accusations Against Defendants and Their Counsel**....................29

VI.    **PLAINTIFF AND HER ATTORNEYS SHOULD BE SANCTIONED FOR DISCOVERY MISCONDUCT**......................................................34

    A.    <u>**Plaintiff and Her Attorneys Relied Upon Fabricated Claims and Evidence to Obtain Discovery**</u> ....................37

    B.    <u>**Plaintiff and Her Attorneys Answered Discovery in Bad Faith**</u>.....................38

VII.    **THE COURT SHOULD SANCTION MULLEN AND HER ATTORNEYS AND AWARD DEFENDANTS ATTORNEYS FEES, COSTS AND EXPENSES**......................................................41

    A.    <u>**Edelson PC Orchestrated This Litigation in Bad Faith**</u>....................................42

    B.    <u>**Sanctions Are Warranted Under Rule 11**</u>....................................45

    C.    <u>**Sanctions Are Warranted Under 28 U.S.C. § 1927**</u>....................................46

    D.    <u>**Sanctions Should Be Entered Pursuant to the Court's Inherent Power**</u>........47

<u>**CONCLUSION**</u>....................................49

# <u>TABLE OF AUTHORITIES</u>

**United States Supreme Court Cases:**

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991) ............................................................................................9, 17, 47

*Cooter & Gell v. Hartmarx Corp.,*
    496 U.S. 384 (1990) ............................................................................................16, 47

*Goodyear Tire & Rubber Co. v. Haeger,*
    137 S. Ct. 1178 (2017) ............................................................................................47

*Hazel–Atlas Glass Co. v. Hartford–Empire Co.,*
    322 U.S. 238 (1944) ............................................................................................28

*Roadway Express, Inc. v. Piper,*
    447 U.S. 752 (1980) ............................................................................................29


**United States Court of Appeals Cases:**

*Alexander v. Caraustar Industries, Inc.,*
    930 F.Supp.2d 947 (7th Cir. 2013) ............................................................................16, 28

*Allen v. Chi. Transit Auth.,*
    317 F.3d 696 (7th Cir. 2003) ............................................................................38

*Barnes v. Dalton,*
    158 F.3d 1212 (11th Cir. 1998) ............................................................................45

*Carr v. Tillery,*
    591 F.3d 909 (7th Cir. 2010) ............................................................................47

*Fabriko Acquisition Corp. v. Prokos,*
    536 F.3d 605 (7th Cir. 2008) ............................................................................46

*Fednav Int'l Ltd. v. Cont'l Ins. Co.,*
    624 F.3d 834 (7th Cir. 2010) ............................................................................46

*First Bank of Marietta v. Hartford Underwriters Ins. Co.,*
    307 F.3d 501 (6th Cir. 2002) ............................................................................7

*Fries v. Helsper,*
    146 F.3d 452 (7th Cir.1998) ............................................................................45

*Fuery v. City of Chicago,*
    900 F.3d 450 (7th Cir. 2018) ......................................................................9, 25

*Golden v. Helen Sigman & Assocs.,*
    611 F.3d 356 (7th Cir. 2010) ...........................................................................46

*Holly v. Wexford Health Services, Inc.,*
    339 Fed.Appx. 633 (7th Cir.2009) ..................................................................22

*Jimenez v. Madison Area Tech. Coll.,*
    321 F.3d 652 (7th Cir. 2003) .............................................................12, 29, 47

*Jolly Grp. Ltd. v. Medline Indus. Inc.,*
    435 F.3d 717 (7th Cir. 2006) .....................................................................28, 46

*LHO Chicago River, L.L.C. v. Perillo,*
    942 F.3d 384 (7th Cir. 2019) ...........................................................................11

*Mach v. Will County Sheriff,*
    580 F.3d 495 (7th Cir. 2009) .............................................................................7

*Profile Gear Corp. v. Foundry Allied Indus,*
    937 F.2d 351 (7th Cir. 1991) ...........................................................................40

*Samuels v. Wilder,*
    906 F.2d 272 (7th Cir. 1990) ...........................................................................46

*Secrease v. Western & Southern Life Ins. Co.,*
    800 F.3d 397 (7th Cir. 2015) ...........................................................................16

*Tillman v. New Line Cinema,*
    374 Fed. Appx. 664 (7th Cir. 2010) ................................................................27

**United States District Court Cases:**

*In re Alberto,*
    119 B.R. 985 (Bankr. N.D. Ill. 1990) ..............................................................45

*Dotson v. Bravo,*
    202 F.R.D. 559 (N.D. Ill. 2001) ...............................................................38, 46

*Dupuy v. McDonald,*
    141 F. Supp. 2d 1090 (N.D. Ill. 2001) ............................................................21

iv

*Officer v. Duran*,
    No. 12-cv-10195, 2014 WL 51330 (N.D. Ill. Jan. 2, 2014) ..............................................41

*Rackemann v. LISNR, Inc.*,
    2018 WL 3328140, No. 1:17-cv-00624-MJD-TWP (N.D. Ill. July 6, 2018) ..................35

*Thompson v. Fajerstein*,
    No. 08-cv-3240, 2010 WL 4628515 (N.D. Ill. Nov. 8, 2010) ........................................35

**Rules and Statutory Authorities:**

28 U.S.C. § 1927 ..................................................................................................................46, 47

Fed. R. Civ. P. 11 .................................................................................................................*passim*

Fed. R. Civ. P. 37 .................................................................................................................*passim*

**Other Authorities:**

Christian Red, *Coach Rick Butler, already booted from USA Volleyball and AAU following sex abuse allegations, now banned from youth tournament at Disney*, NY Daily News, June 1, 2018, https://www.nydailynews.com/sports/more-sports/ny-sports-butler-volleyball-disney-20180601-story.html (last visited May 17, 2020) .....................................................41

Christian Red, *New Federal Class-Action Suit Against Rick Butler Seeks to Prevent Him from Interacting With Minors*, New York Daily News, March 1, 2018, http://www.nydailynews.com/sports/more-sports/new-suit-rick-butler-seeks-protect-minors-article-1.3850082 (last visited May 17, 2020) .......................................................................................................41

Conor Dougherty, *Jay Edelson, the Class-Action Lawyer Who May Be Tech's Least Friended Man*, The New York Times, April 4, 2015, https://www.nytimes.com/2015/04/05/technology/unpopular-in-silicon-valley.html (last visited May 17, 2020) ........................44

Hannah Leone, *Federal lawsuit accuses Aurora volleyball coach, club of covering up sex abuse*, Aurora Beacon-News, Chicago Tribune, February 28, 2018, https://www.chicagotribune.com/suburbs/aurora-beacon-news/ct-abn-class-action-butler-st-0228-20180228-story.html (last visited May 17, 2020) .......................................................................43

Illinois State Senate *Task Force Hearing*, May 15, 2018, http://www.ilga.gov/senate/committees/100Documents/SDHA/Hearing%20Packet%205.15.2018.pdf (last visited May 17, 2020) ................................................................................................................18, 43

Kenneth W. Starr, *Law and Lawyers: The Road to Reform*, 63 Fordham L. Rev. 959 (1995) ........................................................................................................................................34

Lauraann Wood, Less Talk, More Walk In Volleyball Sex Abuse Suit: Judge, Law 360, July 3, 2018, https://www.law360.com/articles/1059888/less-talk-more-walk-in-volley ball-sex-abuse-suit-judge   (last visited May 17, 2020) ................................................................34

Mary Ann Georgantopoulos, *A Top US Youth Volleyball Coach Is Accused Of Raping Teenage Girls Hundreds Of Times*, BuzzFeed News, February 28, 2018, https://www. buzzfeednews.com/article/maryanngeorgantopoulos/youth-volleyball-coach-lawsuit (last visited May 17, 2020) ................................................................34

Michael Tarm, *Coach's accusers: Schools should end relationships with him*, The Associated Press, April 25, 2018, https://apnews.com/871f109e9fe2433b8959a1d7898 ea517/Coach's-accusers:-Schools-should-end-relationships-with-him (last visited May 17, 2020) ................................................................33

Michael Tarm, *Michigan State kept ties to Aurora volleyball coach accused of sexual abuse*, The Associated Press, April 24, 2018 https://www.chicagotribune.com/news/ breaking/ct-michigan-state-kept-ties-to-coach-accused-of-sexual-abuse-20180423-story.html (last visited May 17, 2020) ................................................................18, 38

Defendants, GLV, Inc. d/b/a Sports Performance Volleyball Club and Great Lakes Center ("GLV"), Rick Butler ("Rick"), and Cheryl Butler ("Cheryl") respectfully submit this Motion and Memorandum requesting this Court impose sanctions against Plaintiff and her attorneys.

## PROCEDURAL BACKGROUND

Plaintiff filed this action pursuant to the Illinois Physical Fitness Services Act, 815 ILCS 645/1 *et seq.* (the "IPFSA"), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* (the "ICFA"), common law fraud, common law fraudulent concealment, and unjust enrichment for Defendants' alleged failure to disclose claims of sexual abuse made against Rick Butler which allegedly occurred in the 1980s. (Dkt. 1, ¶ 181) On May 28, 2019, Defendants filed their Motion for Summary Judgment on all claims arguing, *inter alia*, that Laura Mullen was not deceived by any act of the Defendants and that she did not suffer any injury caused by the Defendants. (Dkt. 144) On September 4, 2019, Plaintiff filed her Response, largely ignoring Defendants' arguments and instead focusing on the underlying allegations, relying on inadmissible evidence, and advancing a new theory of factual liability against Defendants. (Dkt. 171) On September 18, 2020, Defendants filed their Reply, objecting to the admissibility of Plaintiff's evidence and similarly objecting to Plaintiff's new theory. (Dkt. 172) On March 13, 2020, this Honorable Court entered a Memorandum Opinion and Order granting Defendants' Motion for Summary Judgment on all claims against Laura Mullen and allowing time for the Plaintiff Class to substitute a new class representative for her contract claim under the IPFSA, her deceptive practices claim under the ICFA, and for unjust enrichment.[1] (Dkt. 183, p. 26) On May 7, 2020, Edelson PC confirmed that "Plaintiff does not intend to substitute a class representative" and asking the Court to enter final judgment in favor of Defendants. (Dkt. 195, ¶ 1)

---

[1] On April 3, 2020, Defendants filed a Motion to Amend the Order to correct certain background facts and to clarify that the underlying allegations of abuse were not at issue in Defendants' motion. (Dkt. 188)

1

**ARGUMENT**

The Class Action Complaint in this case resembles a tabloid with lurid headlines and little substance. Laura Mullen, a mother of two daughters who played volleyball in Defendants' programs between 2012-2017, alleges that Defendants fraudulently concealed claims of sexual abuse made against Rick Butler from the 1980s. (Dkt. 1, ¶¶ 160, 166) Mullen claims that, had she and members of the class known about those allegations, they would "not have participated in any GLV associated volleyball programs." (Dkt. 1, ¶ 160) Mullen's claims are predicated on her assertion that she sent her child to the Defendants' organization without knowledge of Butler's history of sexual abuse. (Dkt. 1, ¶ 4) However, it is difficult to surmise these basic facts of Mullen's case, since they do not appear until page 49 of the 72-page Complaint.

Instead of framing issues for the Court and pleading facts within her personal knowledge, the Complaint is filled with unabashed, irrelevant, and knowingly false claims, and Plaintiff includes innumerable "exhibits" of which Mullen has zero personal knowledge. The Complaint begins with a patently false allegation that, "for over three decades, Rick [Butler] has used his position of power to sexually abuse no fewer than six underage teenage girls, and likely many more." (Dkt. 1, ¶ 1) This sensational claim was made to create the false perception that the allegations were recent, as opposed to taking place entirely in the 1980s. In reality, Plaintiff does not know of six accusers and she cannot point to a single allegation of abuse from the last three decades. (Dkt. 144-5, p. 17; Dkt. 144-4, pp. 15-18) The following 264 paragraphs reveal a pattern of gross mischaracterizations of fact and outright lies which continued throughout this litigation.

Plaintiff and her attorneys included claims which were intentionally inappropriate and crafted to guarantee media coverage and public outrage. In fact, Mullen has recognized this litigation was filed for the purpose of "itemizing all the allegations in great deal in one place for

news agencies to disseminate both local and national" and that she intended to "make it as public and embarrassing as possible for the Butlers." (Exhibit 2, pp. 44-46)

No more.

In the months leading up to this lawsuit, Mullen joined a campaign with a group of individuals, including those who have accused Butler of abuse, who have vowed to do whatever it takes to force the Defendants out of business. Mullen personally campaigned for college coaches to boycott recruitment from Defendants' program, she encouraged the stalking and harassment of the Defendants at their business, and she pressured and threatened businesses to cut all ties with the Defendants. (Exhibit 4, pp. 18, 23; Exhibit 31) Her conduct leading up to the filing of this litigation evidences her willingness to take extreme measures to put Defendants out of business. Mullen was actively engaged in discussions about how to inflict the most financial and reputational harm on the Defendants. (Exhibit 6) At the beginning of 2018, Mullen endorsed the idea that Rick "has dealt with the [public relations] scrutiny for decades now but where it will really start to bother him is when he is losing registrations in his club and camps." (Exhibit 3, p. 2) While Mullen acknowledged that "getting all the parents to pull their funding is next to impossible," she also supported the proposal that "[w]hen it hurts more than helps to be associated with SPVB…that's when you'll see change." (Exhibit 3, pp. 12, 40) Yet, those involved in these discussions eventually determined that, so long as the Defendants had customers, they could not be put out of business.

Realizing that families would not willingly withdraw their support of the Butlers and the Sports Performance program, the women who accused Butler of abusing them in the 1980s retained attorney Jay Edelson, who they claimed had "some good angles" to reach their "goals." (Exhibit 5) Then, they found Laura Mullen, who was posting on an anonymous message board about her daughters having played for Sports Performance and sent Mullen a private message

3

asking questions specific to the issues in this case, such as, "Do the Butlers inform [Sports Performance] parents about Rick's past?" *Id.* She explained that Mullen "may be able to help [the accusers] with the legal aspect" of removing the Butlers from the sport of volleyball. *Id*. It is clear that this lawsuit was created for Rick's accusers to evade the statute of limitations on their own claims, inflict financial and reputational harm on the Defendants, and abuse the judicial system in the process. The claims in this case are not the claims of Laura Mullen, who clearly knew about the allegations from the 1980s and actively discussed them on public forums. (Dkt. 183, p. 20) Nevertheless, Edelson PC moved forward with Mullen, knowing that her case was a sham.

Laura Mullen was an eager conduit for the accusers and their supporters to "achieve their goals" of destroying the Butlers in any way possible. (Exhibit 5) In Mullen's own words, she and the accusers "are trying to get him obviously monetarily but more importantly and hurtful to Rick Butler by going after his name." (Exhibit 7, p. 4) On March 7, 2018, Mullen liked a Facebook post from an attorney named Emily Swanson, discussing this lawsuit and explaining, "Rick and Cheryl Butler have been sued in a class action lawsuit (attached, for your viewing *pleasure*)…I'm proud to say I had a part, if only a minor one, in the ***justice being served on behalf of his survivors***." (Exhibit 30, p. 27) (emphasis added) This case was never about protecting players or recovering fees. It was about the financial and reputational destruction of Rick and Cheryl Butler.

This lawsuit was part of a deceitful, calculated plan to cut off Defendants from their supporters, punish customers for their association with Sports Performance, and destroy the Defendants' business. To carry out their plan, Mullen and her attorneys filed this case with knowledge that the core allegations of their Complaint were patently false. Therefore, Plaintiff invented the theory that it was "the truth" that was never revealed to her. (Dkt. 1, ¶ 221) To further obscure her baseless claims, Plaintiff's own evidence often conflicted with the stories in her

Complaint, leaving Defendants to guess which version Mullen has decided to believe. After two years of litigation, Mullen has never explained what "the truth" means to her, which allowed her to morph her claims to suit whatever argument was necessary to survive each stage in this case.

Even when Plaintiff turns to her own experience at Sports Performance, her claims are egregiously false. For example, Mullen claims that Butler "physically and emotionally" abused her daughter, that Rick caused her daughter to see a therapist, and that Mullen pulled her daughter from the program due to Rick's coaching. (Dkt. 1, ¶¶ 171, 175) In reality, Mullen admits that her daughter's illness was triggered before she was ever on Rick's team. (Exhibit 17) Furthermore, Mullen actively sought the assistance of Rick with her daughter's illness, Rick is the one who suggested her daughter see a therapist, and it was Rick who suggested that her daughter may need to leave the program to focus on her health. *Id.* Mullen's lies were quickly recognized by the class members who had children playing on the same team as Mullen's daughter in 2017, when Rick supposedly "verbally and emotionally abused Laura's daughter and other teammates." (Dkt. 1, ¶ 171; Dkt. 71, p. 14) One such parent offered to help in the defense of this lawsuit and said he was "beyond pissed after reading the crap in this BS lawsuit being filed by Laura…She was crazy." (Dkt. 71, p. 14) Another parent from that team offered to testify against Mullen and said the Defendants had "the truth" on their side. (Dkt. 71, p. 13) Similarly, a different parent from the team said, "I know for a fact [Mullen] is lying about certain points (we all do)." (Dkt. 87-6)

Most critically, however, is that Mullen's action was dependent on her allegation that she joined Defendants' program "without knowledge" of the claims of abuse dating back to the 1980s. (Dkt. 1, ¶ 4) Without this allegation, her Complaint falls apart. Despite facing ample evidence to the contrary, Mullen and her attorneys continued to pursue her claims. Mullen's claim that the Butlers fraudulently concealed the allegations is pure nonsense in light of the near-constant

5

publicity they have received since the mid-1990s. (Dkt. 183, pp. 18-20) On summary judgment, this Court held that, "[a]t all relevant times, there was enough information available to make it unjustifiable for any class member to rely on the defendants' omissions (or, for that matter, their denials) about Rick's history of sexual abuse." *Id.* Even more, Mullen sent her daughter to a GLV program during this litigation, showing an unabashed disregard for her claims during this judicial process. (Dkt. 183, p. 22) Therefore, the Court also found that "even after she had learned, in her words, the 'truth of the allegations against Rick,' Mullen chose to pay for GLV's services." *Id.*

Mullen has shown herself to be particularly cruel towards Defendants, which is evident in a series of disturbing, personal attacks on the Butlers' well-being and livelihood. Laura Mullen has publicly encouraged and participated in the harassment of Defendants at their place of business, such as by stalking, photographing, and posting pictures of the Butlers to Facebook where physical threats and death threats are often made and encouraged in the comments. (Exhibit 4, pp. 5, 12, 17-18; Exhibit 25; Exhibit 30) Mullen even encouraged the idea that, if Rick was spotted at a tournament, it would be a "figurative and possible literal death sentencing," and she endorsed a post "wish[ing] [Rick] the most painful remaining life and a miserable death." (Exhibit 6, pp. 14, 29) She supported the contention that Rick "is a despicable human being" who "deserves any terrible thing that will come his way now until he decides to go hide in the mountains." (Exhibit 3, p. 15) Furthermore, Mullen encouraged the repeated vandalism of Defendants' property, she openly mocked Rick, claiming "the guy now has a twitch" due to the stress of the near-constant harassment towards Defendants, and she has spread vicious, false rumors about the Butlers' relationship with their son. (Exhibit 2, p. 158; Exhibit 4, pp. 32, 17; Exhibit 33)

Laura Mullen's activity log on Volleytalk contains over 700 public entries—500 of which occurred in 2018—almost entirely taking place within threads or discussions related to the Butlers.

(Exhibit 8) Between 2016-2018, she was active in at least 17 different threads discussing the allegations of abuse and the various ways in which the Butlers could be attacked, both professionally and personally. (Exhibit 8; Exhibit 3) Laura Mullen's social media activity is critical evidence of her improper motives in filing this action. *See Mach v. Will County Sheriff*, 580 F.3d 495, 501 (7th Cir. 2009) (finding that bad faith may be found in the actions that led to the lawsuit). Even after this case was initiated, the comments and encouragement shown by Mullen paint a clear picture that this case had nothing to do with compensating class members for alleged fraud.

In the days after her filing her Complaint, Mullen all but confirmed that her "true intentions are to completely destroy everything he has built and absolutely demolish any reputation they will ever have again." (Exhibit 2, p. 106) Mullen and her attorneys improperly used the court system with a clear focus on harming the Defendants' reputations, inflicting enough financial harm to put Defendants out of business, and cutting Defendants off from their base of support—the class members. (Exhibit 6) Both Mullen and her attorneys should be sanctioned for their bad faith abuse of the judicial system. *See First Bank of Marietta v. Hartford Underwriters Ins. Co.*, 307 F.3d 501, 523-24 (6th Cir. 2002) (finding bad faith when plaintiff "improperly used the court system to try to force a result that it could not obtain under the applicable law").

The improper conduct of Plaintiff and her attorneys was not confined to their improper Complaint. Throughout this action, they repeatedly advanced unfounded, illogical arguments to gain additional publicity, needlessly increase the cost of litigation, and prejudice Defendants with baseless allegations which painted them in a negative light with this Court. (*See infra*, Part V-VI) Plaintiff's attorneys engaged in a pattern of abusive discovery tactics, demanding that Defense counsel immediately supplement answers, provide documents which were never requested and amend responses with more preferable language or information. *Id*. Plaintiff's attorneys would

often reference nonexistent "authority" and threaten Defense counsel with a motion for sanctions if she did not comply with their unreasonable demands. *Id.* Even after Defense counsel, attempting to avoid the waste of time and resources attendant to yet another motion with baseless accusations of misconduct, provided several versions of the same discovery responses, Plaintiff was never satisfied. *Id.* Plaintiff's attorneys were able to create the perception that Defendants and their counsel were acting in bad faith by employing this deceitful procedure and filing repeated motions and unsolicited "status reports" accusing the Defendants and their attorney of misconduct.

In the end, this Court saw through Mullen's lies and granted summary judgment in favor of Defendants on every claim she made. (Dkt. 183, p. 26) The Court's ruling confirmed facts which prove that Mullen and her attorneys intended to commit a fraud upon the Court by pleading false claims and advancing baseless arguments. For example, the Court's ruling states that "Mullen concedes that, between 2015 and 2017, she was generally aware of the allegations regarding sexual abuse by Rick and had reviewed news articles on the subject." (Dkt. 183, p. 4) Yet, in response to Defendants' Motion to Dismiss, Plaintiff argued that "[t]he Court should decline to take judicial notice of the news articles appended to [Defendants'] Motion, as none of the articles are referenced in the Complaint and they are inconsistent with her claims that ***she did not see any information online until June of 2017*** due to Defendants' concealment."[2] (Dkt. 57, p. 20 fn. 4) (emphasis added). Plaintiff and her attorneys lied to this Court, forcing Defendants to incur substantial legal fees until those lies ultimately defeated each of Laura Mullen's claims. (Dkt. 183, p. 26)

While Mullen's claims were fully disposed of on summary judgment, the Court gave the Plaintiff class time to find a new class representative who could maintain viable claims under three

---

[2] Furthermore, even if Mullen did learn of the allegations for the first time in June of 2017, her daughter attended a lesson at GLV on September 3, 2017 and a clinic on September 16, 2017. (Exhibit 20) Therefore, before she filed this lawsuit, her daughter returned to GLV programs at least twice after she "learned the truth" of the allegations.

of the six counts alleged. *Id.* On May 7, 2020, Edelson PC filed a Status Report with this Court admitting there is not one class member who can maintain viable claims under the facts alleged by the Complaint, therefore, those claims will be also dismissed. (Dkt. 195) Remarkably, Plaintiff filed this action claiming to represent the interests of *thousands* of individuals. (Dkt. 1, ¶ 178) Yet, after spending years in the Sports Performance program meeting dozens of parents, and after nearly two thousand class members were notified of her claims by this Court, Mullen and her attorneys could not identify a *single* person who supported her claims. (Dkt. 195) Plaintiff attempts to save face by inventing a theory that the Defendants and their attorney have intimidated these class members—most of which are no longer in the program—from coming forward. (Dkt. 195, ¶ 10) The notable lack of support for Plaintiff's claims cannot be attributed to anything besides the obviously false claims brought by the Plaintiff and her attorneys for the improper purpose of harming the Defendants' business and reputations and interfering with Defendants' relationships with those who continue to support them.

The lawsuit filed by Laura Mullen was a sham, and the bad faith acts by Plaintiff and her attorneys began before this lawsuit was filed and continued even after summary judgment. The misconduct of Mullen and Edelson PC justifies an award of attorney's fees, costs, and expenses required to defend against their baseless claims. The Court has inherent authority to enter sanctions when a litigant's course of conduct throughout the lawsuit evidenced bad faith. *See Chambers v. NASCO, Inc*., 501 U.S. 32, 44–45 (1991). Each lie, post, and "like" from Mullen added to the abuse of the judicial process. *See Fuery v. City of Chicago*, 900 F.3d 450, 455 (7th Cir. 2018) (noting that "the whole of abusive action is greater than the sum of the parts of which it is made"). "Were we to view judicial abuses piecemeal, each one might not be worthy of sanctions, or even comment. But these incremental abuses chip away at the fair administration of justice and frustrate

a trial judge's faith that she can rely upon the lawyers before her—officers of the court—to set forth a fair and accurate presentation of the facts and law." *Id*. Mullen's blatantly false claims and unabashed disparagement of Defendants demonstrates a brazen abuse of the judicial system, and her attorneys were aware of, and often complicit with, her actions every step of the way.

In this motion, the Defendants seek sanctions in the form of (a) an award of Defendants' reasonable attorneys' fees, costs, and expenses associated with defending this action; (b) monetary sanctions in the form of a fine payable to the Court; (c) a published, public reprimand of each of Plaintiff's attorneys, Jay Edelson, Alfred Kirkland Murray, Eve-Lynn J. Rapp, J. Eli Wade Scott, Ryan D. Andrews, Sydney M. Janzen, and Christopher Lillard Dore; (d) that each of Plaintiff's attorneys attend 20 hours of continuing legal education in professionalism and legal ethics; and (e) a referral of this matter and Plaintiff's attorneys' conduct to the Illinois Attorney Registration and Disciplinary Commission. Nothing less will deter future abuse of the judicial system by those involved in the prosecution of this action.

## I.   PLAINTIFF AND HER ATTORNEYS FILED THIS LAWSUIT FOR AN IMPROPER PURPOSE

Just one day after filing her Complaint, Mullen was involved in a conversation where she exposed that her lawsuit was not grounded in fact or law, and that it was filed for the improper purpose of damaging the Defendants' reputations and dismantling their business. Mullen endorsed a comment arguing that this lawsuit was, indeed, a new tactic to publicly damage the Butlers and their business, stating that "***a major law firm filing a suit demanding a jury trial and itemizing all the allegations in great deal in one place for news agencies to disseminate both local and national is 'a different angle.'***" (Exhibit 2, p. 46) (emphasis added) Mullen's own comments and endorsements repeatedly confirmed that she and her attorneys intended to make this litigation "as public and embarrassing as possible for the Butlers," and that this Complaint was filed in bad faith.

10

*Id.*; *See LHO Chicago River, L.L.C. v. Perillo*, 942 F.3d 384, 386 (7th Cir. 2019) (finding that an abuse of process occurs when a party brings a frivolous claim with the purpose of obtaining an advantage external to the litigation). Plaintiff and her attorneys should be sanctioned for their dishonesty and abuse of the judicial system.

Prior to this lawsuit, Mullen became involved in a campaign to destroy the Defendants' business, and she established a clear record of her efforts to diminish the willingness of third parties to associate with Defendants. (Exhibit 3; Exhibit 4) In her Response to Defendants' Motion for Summary Judgment, Plaintiff attempted to introduce a number of Facebook posts which evidence the ongoing campaign to destroy the Butlers' reputations and business. (Dkt. 171-18) Beginning in June of 2017 and leading up to the filing of this litigation, Mullen contributed to the campaign to push the Butlers out of the sport of Volleyball and concentrated her efforts on the promotion of negative press about the Defendants.[3] Mullen would often utilize negative publicity to pressure and shame individuals who continued to do business with Defendants. For example:

- In December of 2017, Mullen posted "Post about this bastard on social media. If any time was ripe for action, it is NOW!" Similarly, Mullen liked a post commenting on a call to "start putting our anger into action by calling and writing to AAU and USAV to protest Butler's membership! There is also a change.org page calling for Butler's ban that you should sign, showing your solidarity with these brave women." (Exhibit 3, pp. 31, 41)

- In January of 2018, Mullen posted that it was a "[m]ajor win!!" when two organizations pulled their contract to host a tournament at the Great Lakes Center. (Exhibit 4, p. 22)

- In February of 2018, just days before filing this lawsuit, Mullen posted "[t]o everyone seeing this news [of AAU banning Butler], please post on social media, inform your coaches, club directors, high school coaches, and parents. We need to keep the topic alive

---

[3] Plaintiff has argued to this Court that when someone "likes" a post on social media, the "message" they send is "clear" that they have "voiced their approval" of the post and shown "what was expected of" those who view the post. (Dkt. 143, pp. 13, 18) Her attorney, Jay Edelson, explained to this Court just weeks after this case was filed that Volleytalk "is something that the volleyball community and class members look at regularly" and that "they have been discussing this case" on the public forum. (Dkt. 141-1, p. 12; Dkt. 17, pp. 1-2; Exhibit 7, p. 2) Based on Plaintiff's strong belief that "liking" a post sends a clear message and even suggests to others what is expected of them, Laura Mullen's publicly-available Volleytalk activity is particularly relevant evidence of the message she intended to send to class members on the forum. In fact, Mullen was so active on the pages "discussing this case" that her anonymous username did not prevent her from being identified as the Plaintiff in this lawsuit. (Dkt. 141-1, p. 12; Exhibit 7, p. 2)

and **he really needs to feel the hit financially**, not just symbolically." (Exhibit 4, p. 18) Then, Mullen hinted at this lawsuit being filed after a user posted about the topic of Butler dying down "[i]n years past… until the following May/June when AAU would come around and **everyone fighting the good fight would use that time frame to get the most exposure**. This conversation is not going away any time soon this season." Mullen responded, "The conversation is not going away anytime soon. One could say that it is, in fact, gaining momentum." (Exhibit 4, p. 14)

Along with plans to incite public outcry against the Butlers, the campaign turned its attention to the Defendants' finances. In the months leading up to this litigation, they aimed to harm the Butlers by shifting their efforts to a new target: the parents who pay GLV for volleyball services. (Exhibit 6) Mullen engaged in a lengthy and detailed discussion of plans to interfere with the relationship between Defendants' and their customers:

- "Obviously the best way [to shut down the Butlers' business] is for parents to stop sending their children to a child rapist, but for some reason that has not happened. Social media has certainly helped push USAV to go back to a full ban…the only way, short of parents not sending their children to him, is to get any and all governing bodies of volleyball to ban him for life from attending their events." (Exhibit 6, p. 31)

- "The issue of real importance here is whether or not the abuse happened. All of this back and forth…is a sideshow and distraction that is typical and demonstrative of why this type of abuse has remained a persistent problem. The other important thing is finding a modicum of justice for the actual victims and perhaps an opportunity for some redemption for the circle of people around the abuser or the abused who might feel some guilt or remorse for wittingly or unwittingly having enabled the abuse. I don't have any hope that Rick Butler will feel that remorse or will ever do the right thing, but all of this back and forth is distracting from the final piece of this puzzle that needs to be put in place: ensuring that Butler's reach and influence and existence in the realm of club volleyball in particular ends as soon as possible. The battle isn't over." (Exhibit 3, p. 6)

This lawsuit is an abuse of justice and the culmination of a meritless and vindictive campaign that has unfairly tarnished the Defendants' reputations and inflicted irreparable harm on their business. *See Jimenez v. Madison Area Tech. Coll.*, 321 F.3d 652, 656-57 (7th Cir. 2003) (sanctions imposed for "false, fraudulent and salacious" accusations which "exploited the judicial process" and subjected opposing party to harassment, including "unnecessary embarrassment and mental anguish").

## II.    MULLEN'S PUBLIC HARASSMENT OF DEFENDANTS CONTINUED THROUGHOUT THIS LAWSUIT

While Plaintiff brought several baseless motions alleging that the Defendants were engaged in improper communications, including those supposedly made on Volleytalk, Laura Mullen was continuing her attack in the court of public opinion. Immediately after this lawsuit was filed, Mullen was engrossed in Volleytalk threads discussing this litigation and was publicly commenting and "liking" dozens of posts, including those in a thread titled "Class Action Lawsuit Filed Against Butlers, GLC." (Exhibit 2) There, users ridiculed and demeaned the Defendants in just about every way imaginable. Mullen continued to participate in public discussion of her case, while undermining the legitimacy of her claims and illustrating a disturbing culture of harassment with Defendants as the clear targets:

- "All is not well within [Sports Performance] 'Rick Butler is a RAPIST' was written all over a bathroom in sharpie and they closed it." (March 7, 2018) (Exhibit 2, p. 158)  "I would love to see the picture of ['Rick Butler is a RAPIST'] written on the bathroom, If everyone just keeps doing it in all the bathrooms they can not close them as they will be in a building code violation." (March 7, 2018) (Exhibit 2, p. 160)
- "I wouldn't just look at the money he has lost but probably the years off his life because of the immense stress and scrutiny he is under fire for…there is no way this is not taking an effect on him mentally and physically at his age." (April 24, 2018) (Exhibit 3, p. 27)

- "Butler was stupid to keep this going and not walk away especially after the metoo movement and the latest press he had been getting. I believe he will regret this for the rest of his life. He will spend his dying years fighting this lawsuit and if (when) he loses, he will retire broke." (May 17, 2018) (Exhibit 3, p. 30)

- "THIS is what is going to keep on happening to Butler, from now on. Both economic and public relations pressure on youth [volleyball]'s corporate sponsors is turning the tide. His ego must be hurting!" (May 30, 2018) (Exhibit 3, p. 33)

Mullen was so active in public social media threads related to this litigation that Mullen's disguised Volleytalk username was identified as the Plaintiff because it was "not hard to connect the dots." (Exhibit 7, p. 2) Mullen openly mocked the Defendants, their attorney, and their arguments in this litigation on June 2, 2018, stating that "the 'continuously evolving allegations'

are NOT 'evolving' in his favor. These deflection tactics aren't going to work anymore...green attorney." (Exhibit 4, p. 3) Mullen's flagrant disparagement of Defendants and their counsel, and her attempt to influence putative class members, was taking place at the same time her attorneys were asking this Court to punish Defendants for calling her lawsuit "frivolous" and for communicating about the lawsuit "in a non-neutral manner." (Dkt. 17) Plaintiff's hypocrisy demonstrates the disingenuous nature of her arguments to this Court.

### III. MULLEN ADMITS HER LAWSUIT WAS MERITLESS AND FILED FOR AN IMPROPER PURPOSE

This case was never about protecting class members. It was not about the players. It was not about the parents. It was about Plaintiff's aim to destroy the reputations and livelihoods of Rick and Cheryl Butler. In fact, in a private message about this lawsuit, Mullen explained her motives, as well as the motives of her attorneys, saying, "***we are trying to get him obviously monetarily but more importantly and hurtful to Rick Butler by going after his name*** (ego)." (Exhibit 7, p. 4) (emphasis added) Thus, the lawsuit was a harassment campaign brought for an improper purpose, which justifies the imposition of sanctions against Plaintiff's counsel. *See In Re Aircrash Disaster*, 909 F. Supp. 1083, 1124 (N.D. Ill. 1995).

Even worse, after this lawsuit was filed, Mullen harassed members of the class and their children during a tournament in April of 2018. During her daughter's match against a Sports Performance team of 15-year-olds, Mullen was "inappropriately loud and aggressive" and "taunting" Sports Performance parents, players, and coaches. (Exhibit 10, pp. 2-3; Exhibit 32) Sports Performance won the match, and, the next day, Mullen continued to lurk around the court where that 15-year-old Sports Performance team was playing. (Exhibit 10, pp. 4, 6; Exhibit 32) Then, as Mullen walked past their court, she turned back to the Sports Performance players and raised her middle finger towards them. (Exhibit 10, pp. 3-4) Hours after her daughter's team was

finished for the day, Mullen then attended the Sports Performance team's last match, where she again engaged in aggressive and intimidating behavior towards the team. (Exhibit 10, p. 4; Exhibit 32) Yet, Mullen and her attorneys argued to this Court that this litigation was "brought by a parent who is concerned about the welfare of the kids in Defendants' care." (Dkt. 54, p. 13)

Laura Mullen never cared about the parents or athletes in the program, and she campaigned for efforts which would inflict harm on the class members she claimed to represent. For example, numerous individuals on Volleytalk noted the potential harm this lawsuit would inflict on the athletes currently in the program, and, after a former Sports Performance parent argued that the families should be left out of the attacks on Rick Butler, Mullen liked a response stating:

> And for the hundreds of kids and parents there? That is really simple, they are collateral damage - you and every other parent that sends their kids there, and the kids themselves, know what they are going to be associated with whether they like it or not. If they do not want the criticism by association then it is really simple, go play somewhere else as we have very well documented there are lots of other options in the area.

(Exhibit 3, p. 13) It is clear that Mullen and her attorneys intended to weaponize the judicial system against the Defendants in bad faith. In fact, in a public discussion about the merits of this litigation, Mullen confirmed that her "***true intentions are to completely destroy everything [Rick] has built and absolutely demolish any reputation [the Butlers] will ever have again***." (Exhibit 2, p. 106) Plaintiff and her attorneys should be sanctioned for their abject abuse of the judicial system.

## IV. PLAINTIFF AND HER ATTORNEYS ADVANCED FALSE AND IRRELEVANT FACTUAL ALLEGATIONS TO PUBLICLY DAMAGE DEFENDANTS' REPUTATIONS AND BUSINESS

While the salacious allegations in the Complaint have made great headlines for Plaintiff's nefarious cause, they are false and inflammatory, legally baseless, and brought improperly in the form of a class action to gain as much publicity as possible. The pursuit of factually and legally baseless claims invites the inference that the Complaint was filed in bad faith and for improper

15

purposes. Mullen has publicly confirmed as much. Just one day after filing her Complaint, Mullen endorsed a post expressing "doubt [that] there is a viable theory of damages" and stating that "the merits of the case as a whole aren't necessarily what the lawyers are thinking about…The plaintiff's lawyers are thinking, if we can just hold on long enough to get to discovery, we can punish the defendant with the process." (Exhibit 2, p. 39) Plaintiff and her attorneys did just that.

### A.    The Complaint's Core Allegations Are False

To back her false claims, Mullen states under penalty of perjury that she "would not have paid for any volleyball training from Defendants if [she] had known that the sexual abuse allegations against Rick Butler were true." (Dkt. 171-19, ¶ 19) However, Mullen "enrolled one of her daughters in a GLV summer program in 2018" proving that "even after she had learned, in her words, the 'truth of the allegations against Rick,' Mullen chose to pay for GLV's services." (Dkt. 183, p. 22) Furthermore, Laura Mullen paid GLV for her daughter to participate in two programs, one in August of 2017 and another in September of 2017, after she claims to have learned "the truth" in June of 2017. (Exhibit 20; Dkt. 71-8) Falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. *Secrease v. Western & Southern Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) These falsehoods cannot be written off as innocent or *de minimis* overestimates about matters on the periphery of the case. *See Alexander v. Caraustar Industries, Inc.*, 930 F.Supp.2d 947, 961 (7th Cir. 2013). Rather, those falsehoods were pervasive, malicious, and constituted the core of her case, and Plaintiff and her attorneys should be sanctioned accordingly. Mullen and her attorneys prosecuted this action with the knowledge that the "essential characteristics of Mullen's claims" were being fabricated, and their continued pursuit of this litigation without the necessary factual allegations to state a claim merits sanctions. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990) (holding that one of the basic purposes of Rule 11 is to "deter baseless filings in the district court").

16

Plaintiff and her attorneys concocted this class action based upon false allegations and bad faith arguments to maximize the publicity of the Complaint, destroy Defendants' reputation, and obliterate their business relationships. Because Mullen's claims were doomed from the start, her headline-generating Complaint is riddled with prejudicial, false claims to inflict as much damage as possible, as quickly as possible. For example, the very first paragraph of her Complaint contains several inexcusably false claims, such as that Rick Butler has sexually abused athletes "for over three decades" (Dkt. 1, ¶ 1) At the time Plaintiff and her attorneys drafted her Complaint, they knew that *no allegations of abuse have been made against Butler in the last three decades*. (Dkt. 144-5, p. 17; Dkt. 144-4, pp. 15-18) Through their numerous false, fraudulent and salacious charges against Defendants, Plaintiff and her attorneys exploited the judicial process to inflict permanent reputational and financial harm on Defendants. *Chambers*, 501 U.S. at 50.

## B.   The Complaint Pleads Nearly 50 Pages of Irrelevant and Salacious Allegations

The allegations in the Complaint are not just false, they are outrageously and flagrantly so. Plaintiff managed to plead nearly 50 pages of slanderous, irrelevant, and unsubstantiated allegations wholly "on information and belief" and an "investigation conducted by her attorneys," further proving that Plaintiff and her counsel abused the judicial system and discovery process to maximize the publicity of this lawsuit and harm to Defendants' business and reputation. (Dkt. 1, Intro.) The Complaint makes it abundantly clear that Mullen and her attorneys intended to humiliate and degrade the Defendants both personally and professionally. For example, they included a fictional and reprehensible claim that, "in the late 1980s, Cheryl arrived at a friend's apartment crying and very upset because Butler had asked Cheryl if he could call her by one of those girl's names while they were having sex." (Dkt. 1, ¶ 137 fn. 6) This allegation serves absolutely no purpose but to publicly humiliate the Defendants with false and salacious claims.

It is clear that Plaintiff and her attorneys intentionally misrepresented facts when they filed the Complaint, such as: (1) that "Butler has a special relationship with Michigan State University"[4] (Exhibit 2, pp. 23, 49; Exhibit 3, pp. 5, 8, 12, 25, 46); (2) that when Rick went to California for Christine's abortion, which took place in January of 1987, it "was the last time she had any contact with Butler" (Dkt. 1, ¶ 82; Dkt. 171-18, pp. 20-21); (3) that Sarah "begged" Rick not to draft her to the Chicago Breeze and that she had "no choice" in the decision (Dkt. 1, ¶ 50; Dkt. 79-1, pp. 58-83; Exhibit 29); and (4) that Rick "mentally and emotionally abused" Julie, who is a client of Edelson PC,[5] during practice in the 1980s (Dkt. 1, ¶ 87; Exhibit 28). The Complaint's false portrayal of irrelevant allegations is direct evidence that this suit was brought in bad faith.

Furthermore, Plaintiff's lengthy, detailed stories of "abusive coaching" from the 1980s are irrelevant to the claims of the class over 30 years later, and they were only included in the Complaint to publicly harass the Defendants and harm their business. Similarly, (1) the allegations from Beth Rose and Jane Doe are irrelevant to the time period in which the class members joined the Defendants' program (Dkt. 1, ¶ 1; Dkt. 171, p. 32); (2) Plaintiff references "a sixth girl not described or identified in this Complaint" who is never discussed and does not exist (Dkt. 1, ¶¶ 1,

---

[4] This strategy of referencing MSU to generate negative publicity for the Butlers was not new to Mullen. Beginning in 2017, Mullen was pushing to take action against Butler, believing there would be an increased likelihood of success due to the "recent turn of events and the current climate regarding [sex] crimes" and urging others to take action against the Butlers, saying "[i]f any time was ripe for action, it is NOW!" (Exhibit 4, pp. 38, 31) Mullen's tactic worked. The Associated Press ran two stories which focused on the "connection" between Rick Butler and Michigan State University, while also reporting on the additional false claims in the Complaint. Soon, a new Volleytalk thread was created, titled, "Butler…AP chimes in" and Mullen was quickly engaged, tallying nearly two dozen comments or "likes" in just two days before Volleytalk locked the thread from new comments. (Exhibit 8, pp. 6-7) *See* Michael Tarm, *Michigan State kept ties to Aurora volleyball coach accused of sexual abuse*, The Associated Press, April 24, 2018 https://www.chicagotribune.com/news/breaking/ct-michigan-state-kept-ties-to-coach-accused-of-sexual-abuse-20180423-story.html (last visited May 17, 2020); *see also* Michael Tarm, *Coach's accusers: Schools should end relationships with him*, The Associated Press, April 25, 2018, https://apnews.com/871f109e9fe2433b8959a1d7898ea517 /Coach's-accusers:-Schools-should-end-relationships-with-him (last visited May 17, 2020).

[5] Julie is one of the accusers who retained Edelson PC before this lawsuit was filed to achieve the "goal" of removing the Butlers from volleyball. (Exhibit 5) *See* Illinois State Senate *Task Force Hearing*, May 15, 2018, http://www.ilga.gov/senate/committees/100Documents/SDHA/Hearing%20Packet%205.15.2018.pdf (last visited May 17, 2020). Therefore, Edelson PC knew or should have known that claims in the Complaint were undermined by Julie's public endorsement of Rick's coaching techniques. (Exhibit 28)

25; Dkt. 144-4, pp. 15-18); (3) the 2018 USAV, AAU, and JVA action against Rick Butler are irrelevant to the time period in which the class members joined the Defendants' program (Dkt. 1, ¶¶ 127-32); (4) the "Our Story" document, discussed for six pages in the Complaint, did not exist during the relevant time period[6] (Dkt. 1, ¶¶ 135-50); and (5) Cheryl's alleged social media activity is irrelevant to the claims of Mullen and the class, as Plaintiff never alleges that she or any members of the class viewed the posts or that the posts had any effect on her claims. (Dkt. 1, ¶¶ 133-49)

Furthermore, the Complaint intentionally combines allegations of "rape" with misleading headings such as "Rick Butler's Conduct Has Been Confirmed Through Multiple Official Proceedings" to give the false perception that the "stories" in the Complaint have been proven to be true. (Dkt. 1, ¶¶ 1, 118) In reality, the "official proceedings" resulted in findings that Rick had "sexual intercourse and a subsequent physical and emotional relationship" with Sarah, Julie, and Christine, two of whom were 16 at the time and the other 17. (Dkt. 1, ¶ 121) However, the age of consent in Illinois at all times between 1981 and 1987 was sixteen years old and, therefore, the relationships described in the findings of the "official proceedings" were not illegal under the Illinois law. *See* IL Rev Stat ch 38 section 11-4(a) (1983) and IL Rev Stat ch 38 section 12-15 (1985). Plaintiff's use of the word "rape" and "child abuse" is false and intentionally suggests that factual findings were made which would implicate criminal conduct, where the actual findings do not amount to any illegal conduct.

The evidence further shows that Mullen and her attorneys misrepresented the significance of the 2018 bans both in her Complaint and throughout her subsequent filings. In fact, Mullen has

---

[6] Plaintiff's twisted, selective presentation of the "Our Story" document confirms Mullen and her attorneys pursued this litigation with knowledge of the falsity of the claims. (Dkt. 1, ¶¶ 135-50; Dkt. 79-1) In reality, the document contains an abundance of evidence refuting Mullen's claims and demonstrates the absurdity of her contention that Defendants committed fraud when they referenced documentation supporting their defenses, such as a court ruling, copies of contracts, photographs, cancelled checks, receipts, emails, and letters. (Dkt. 171, pp. 26-27; Dkt. 79-1)

endorsed the belief that the 2018 USAV ban was a sham. (Exhibit 3, pp. 8, 13, 48-49, 51-52) Furthermore, Mullen and her attorneys are aware that the AAU only banned Butler after USAV threatened to decertify the AAU as an affiliated organization if it refused. The USAV even issued a public statement criticizing the JVA for suspending Butler "only a result of the recent decision made by the AAU to ban Rick Butler and ***not a result of their belief that Mr. Butler has done any wrong***." (Exhibit 3, p. 48) (emphasis added) USAV's statement about the JVA was referring to a public statement made by the executive director of the JVA, that "it's just curious" that decades-old allegations against Butler are surfacing now and that "it's much more than what's on the forefront." (Exhibit 3, p. 52) Thus, even the governing bodies of the sport have reason to disbelieve the "stories" in Plaintiff's Complaint. Therefore, Plaintiff's reliance on those bans as though they somehow add legitimacy to her claims is yet another misrepresentation to this Court.

### C.  Plaintiff Misrepresents and Improperly References the DCFS Proceedings

Plaintiff, in her Complaint and throughout this litigation, made several references to Illinois Department of Children and Family Services ("DCFS") proceedings. (Dkt. 1, ¶¶ 123-26; Dkt. 171) To start, Plaintiff's Complaint falsely alleges that the DCFS made findings of fact after "an extensive hearing" and based its decision upon "conclusive and credible evidence." (Dkt. 1, ¶ 164) Plaintiff continues, stating that the DCFS "concluded that Butler in fact engaged in inappropriate sexual contact with at least three teenage girls at the time he coached them." (Dkt. 57, p. 11) These claims are false, and Plaintiff and her attorneys knew or should have known they were false when they filed the Complaint. (Dkt. 1, ¶ 164) The DCFS hearing did not adjudicate alleged acts in the 1980s. (Dkt. 171-18, p. 36) In fact, the DCFS did not call any accuser from the 1980s to testify at the hearing. (Dkt. 171-18, p. 38) Furthermore, it is undisputed that all records of the 1994-1995 DCFS investigation were removed and destroyed by the Department over two decades ago. (Dkt.

1, ¶ 152) Yet, the Complaint contains the erroneous and irrelevant claim that, in June of 2017, after Mullen left the program, "Sports Performance coach Erik Vogt incorrectly assert[ed] that the findings of the Illinois DCFS are no longer applicable." (Dkt. 1, ¶ 152) In fact, not only are the findings inapplicable, but it is a crime to publish them.[7] *See* 325 ILCS 5/11.3 (West 2014).

As this Court has noted, those who have accused Butler of abuse have publicly discussed the DCFS proceedings for decades, and the findings of the DCFS have been widely reported in the media. (Dkt. 183, p. 2) However, any improper publicity of the DCFS decision in the past does not excuse the conduct of Plaintiff and her attorneys, who intentionally misrepresented the DCFS proceedings to give the false appearance that her allegations of "rape" were found to be true by a judge. Even after it became clear that Mullen's lies would ultimately end her case on summary judgment, Plaintiff's response included a document dump of irrelevant and inadmissible evidence related to the underlying claims of abuse, which did nothing to counter the arguments made by the Defendants. (Dkt. 171-9; Dkt. 171-12 – 18; Dkt. 171-25) Plaintiff was merely using the publicity of this case as a means to distribute information she deemed harmful to the Defendants.

### D.   Mullen's False Claims Related to Her Own Experience at Sports Performance

When Plaintiff finally pleads facts within her personal knowledge, she is no less dishonest. Mullen lies about when her daughters left the program, she lies about why her daughters left the program, and she lies about what happened while they were in the program. (Dkt. 1, ¶¶ 166-76; Exhibit 17; Exhibit 18; Exhibit 19) While Mullen's allegations of Rick's "abusive" coaching in 2017 are irrelevant to her cause of action, she chose to concoct a narrative that would publicly

---

[7] The Abused and Neglected Child Reporting Act establishes a unique privacy interest for individuals subject to DCFS indicated findings of abuse or neglect. (325 ILCS 5/11 (West 2014)). The DCFS privacy interest avoids the precise issue raised by Plaintiff's unauthorized disclosure of cherry-picked excerpts of the 1995 DCFS opinion and subsequent filing of the full document. (Dkt. 1, ¶ 126; Dkt. 171-18) It is clear that the harm caused by publicly releasing the findings of a DCFS report is severe and the risk that those findings will be misused is very high, especially in light of the particularized rules of the DCFS and low burden of proof needed to support a report of suspected abuse. *See Dupuy v. McDonald*, 141 F. Supp. 2d 1090 (N.D. Ill. 2001).

damage the Defendants' reputations and discourage families from participating in the Defendants' programs. However, these allegations were not innocent exaggerations or misstatements. *See Holly v. Wexford Health Services, Inc*., 339 Fed.Appx. 633 (7th Cir. 2009) (imposing severe sanctions for dishonesty to the court "even though that lie does not bear upon the truthfulness of the allegations in the underlying lawsuit"). They were intentional lies meant to further harm the Defendants' business. Therefore, severe sanctions are warranted against Mullen and her attorneys for their intentional misrepresentations in the Complaint and throughout this litigation.

Under penalty of perjury, Plaintiff repeats the false claims alleged in her Complaint, stating that "Rick Butler verbally and emotionally abused my eldest daughter, A.M., by regularly making comments about her weight and appearance. This caused my daughter to lose weight and to develop self-esteem issues, ultimately causing her to see a therapist as a result." (Dkt. 171-19, ¶ 6; Dkt. 1, ¶ 171) Yet, an email exchange between Rick and Mullen leaves no question that Rick had serious concerns for her daughter's well-being and was actively working with Mullen to provide her daughter the resources and support needed to overcome her condition. (Exhibit 17) Therefore, Mullen's false testimony amounts to perjury. (Dkt. 171-19, ¶ 6; Exhibit 17, p. 6)

On March 28, 2017, while her daughter was in China[8] on a team trip, Rick emailed Mullen about her daughter, A.M. because he believed her daughter was having "serious eating issues," and he stressed that her daughter was "going to need lots of help and support." (Exhibit 17, p. 5) Therefore, Rick asked Mullen to "start working on finding a counselor" for her daughter, and

---

[8] Plaintiff additionally lied about her husband passing away while her daughter was on a trip to China. After receiving Defendants' first warning that they would be seeking sanctions for her false claims, Plaintiff included a footnote in her Response to Defendants' Motion to Dismiss claiming that "[t]he Complaint mistakenly states that Plaintiff's husband passed away while her daughter was at a volleyball tournament with Butler in China, when in fact he passed away during the following tournament." (Dkt. 57, p. 13 fn 1) Furthermore, because Mullen's daughter wanted to go on the trip to China, Rick met with Mullen and her daughter and coordinated travel insurance, which GLV paid for, so that her daughter's ticket could be easily refunded or rescheduled in case of an emergency related to her father's health. (Exhibit 18)

Mullen responded that she was "to blame for letting it get out of hand," and she confirmed that "something was triggered" with her daughter before she was ever placed on Rick's team. (Exhibit 17, pp. 5-6) Just days before her daughter left the program, Mullen specifically requested Rick's continued encouragement. (Exhibit 17, p. 7) Rick again expressed his concern for A.M.'s wellbeing, when he sent, "I think the best thing to do is for us all to sit down together next week and try to decide what the best path forward is based on what her therapist and her Dr. are recommending. I'm not sure this is something she can beat while maintaining the schedule and physical demands of an elite level athlete." (Exhibit 17, p. 9)  Shortly after Rick sent this email, Mullen's husband passed away, and it was decided that it was in A.M.'s best interest to leave the program and focus on her mental and physical well-being.[9] (Exhibit 17, pp. 10-12) However, after her daughter left the program, Mullen again emailed Rick saying, "Thank you very much for the outpouring of love and support shown to our family from Sports Performance." (Exhibit 17, p. 12)

While Mullen would have this Court believe that she pulled her daughters as a result of "physical and emotional abuse," the evidence demonstrates nothing of the sort. There is not one objective piece of evidence that supports Mullen's contention that there was any "physical and emotional abuse" towards her daughter. (Dkt. 1, ¶ 175) In fact, the emails exchanged between Mullen and Rick throughout 2017 show the opposite. (Exhibit 17) Yet, Mullen brazenly argued that "Defendants' physically and emotionally abusive behavior towards her daughter, combined with her discovery of the details of Butler's history of sexual abuse, caused her to withdraw her daughter from the program prior to the end of the season she had paid for." (Dkt. 1, ¶ 175) This is

---

[9] On April 15, 2017, the Butlers organized for Sports Performance teams to support Mullen's daughters after the passing of their father by attending the "Celebration of Life" held by Mullen. (Exhibit 17, pp. 11-12) Mullen emailed Rick, "Thank you very much for the outpouring of love and support shown to our family from Sports Performance over the past week. Numerous people came up to me Saturday, totally impressed with the fact that so many of the girls and coaches were there! As you can imagine, it is difficult for [A.M.] to separate herself from volleyball, yet she knows it is the right thing to do for herself at the moment…Again, thank you for all of the support!" *Id.*

patently false. Mullen pulled her older daughter in April of 2017 and her younger daughter in May of 2017, and she alleges that "she did not see any information online until June of 2017." (Dkt. 144-5, pp. 5-6; Dkt. 57, p. 20 fn. 4; Dkt. 1, ¶ 175) Furthermore, Mullen's younger daughter was pulled immediately prior to the final trip of the season due to Mullen's concerns over playing time and because, according to Mullen, her daughter did "not get set by the current setter." (Exhibit 19)

Mullen continued her pattern of false claims when she argued that Defendants "failed to provide Plaintiff with a copy of her contract." (Dkt. 57, pp. 27-28; Dkt. 1, ¶ 199) Mullen produced a copy of the contract in discovery and has since admitted that she received a copy of the contract for each year her daughters were in the Sports Performance program. (Dkt. 144-7; Dkt. 144-5, pp. 5-6) However, the Court relied upon Mullen's false claims in denying Defendants' Motion to Dismiss. (Dkt. 68, p. 8) Mullen and her attorneys exploited the judicial process, unnecessarily delayed the resolution of this matter, and needlessly increased in the cost of litigation for the Defendants. As such, the Court should impose sanctions for their gross misconduct.

### E. Defendants Warned Plaintiff That They Would Seek Sanctions for Her False Claims and Assertions to the Court

In nearly every brief filed with this Court, Defendants have stressed that this action was filed for improper purposes by Plaintiff and her counsel and identified various misrepresentations. Yet, the Seventh Circuit has held that no warning is required for sanctions where the conduct is severe and the party represented, such as the case here. *Matter of Bluestein & Co.*, 68 F.3d 1022, 1026 (7th Cir. 1995). But even if warnings were required, Mullen and her attorneys had plenty. Defendants sent two letters to Plaintiff in compliance with the Rule 11, one in June of 2018 and another in August of 2018. Defendants' June 18, 2018 letter explained that "[d]espite the requirements of Federal Rule of Civil Procedure 11, it is clear that Plaintiff's Complaint, and the allegations contained therein, were presented to the Court for an improper purpose, namely, to

24

harass the Defendants, cause damage to Defendants' business and reputation, and to gain publicity…it has become increasingly more obvious that Plaintiff is merely being used as a conduit to smear my clients' reputations and cause permanent and irreparable harm to their business." (Exhibit 20) Defendants attached sixty pages of documents in support of their contentions and outlined nearly every issue raised in this Motion for Sanctions against Plaintiff and her attorneys. (Exhibit 20; Dkt. 71, pp. 16-20; Dkt. 59, ¶ 8; Dkt. 59-1, ¶ 11)

Then, after learning that Mullen's daughter participated in GLV's summer league in the summer of 2018, Defense counsel sent a second warning to Edelson PC in August of 2018, stressing that Mullen's decision to allow her daughter to play in the Defendant's summer league, hosted in the Great Lakes Center – which is named in the caption of the Complaint – invalidated her claims that she would "not have participated in any GLV associated volleyball programs" had she known of the allegations in her Complaint. (Exhibit 21; Dkt. 1, ¶ 160) In response, Mullen's attorneys dismissed Defendants' warnings, each sent pursuant to Rule 11, and simply stated that each "letter does not comply with the Federal Rules." (Exhibit 22)

## V.    SANCTIONS ARE WARRANTED FOR PLAINTIFF'S BAD FAITH ASSERTIONS

Plaintiff's allegations intentionally distort reality, and this Court should impose sanctions in the form of Defendants' attorneys' fees that resulted from the bad faith conduct of Laura Mullen and Edelson PC. *See Fuery*, 900 F.3d at 475-78 (affirming sanctions based on "the total effect of the misconduct on the integrity of the proceedings" and the need to "maintain the integrity of the trial process"). In this case, severe sanctions are warranted, because Plaintiff and her attorneys took steps to vexatiously and unreasonably increase the attorneys' fees throughout this litigation. Plaintiff improperly brought her claims as a class action lawsuit to maximize publicity and force Defendants to incur substantial legal fees they would not have incurred otherwise. Mullen's lies

allowed her to survive an early dismissal of her claims, forcing Defendants to participate in extensive written discovery and a demanding, time-consuming class notice process to foreclose the class claims on summary judgment along with claims from Mullen.

The crux of Mullen's claims rests upon her assertion that "Butler's scandalous past was covered up by GLV" and that the Butlers "shamed and intimidated victims into silence." (Dkt. 83-1, p. 9) Yet, while Mullen argued to this Court that the Defendants somehow kept the "stories of abuse buried" from the public, she was aware that one of the accusers publicly declared in 2016 that "[n]one of these facts were buried but rather broadly publicized in 1995 and again in 2015." (Dkt. 83-1, pp. 9; Exhibit 13; Exhibit 14; Exhibit 15; Exhibit 16, p. 2) A simple Google search disproves her claim, and this Court ruled against Plaintiff, in part, based on "the amount of publicly available information" related to the claims of abuse. (Dkt. 183, p. 19) Here, the sanctionable conduct was not simply the pursuit of a baseless claim without an appropriate inquiry into the facts, it was the initiation and pursuit of claims that the Plaintiff and her attorneys, themselves, knew were false and which they sought to further through knowingly false sworn statements.

### A.  Plaintiff's Meritless Claims on Summary Judgment are Sanctionable

While acknowledging that Defendants' Motion for Summary Judgment turned on Mullen's personal knowledge of the allegations (as opposed to whether those allegations were true), the Plaintiff chose to spend nearly 11 pages of her response brief discussing details of the underlying allegations, some of which were being introduced for the first time. (Dkt. 171, pp. 7-17) Remarkably, Plaintiff did not attempt to overcome or even address the abundance of evidence showing that she had actual knowledge of the information she claims was concealed from her. (Dkt. 171, p. 18 fn. 1) Instead, Plaintiff attempted to submitted irrelevant transcripts, court documents, letters, and eight affidavits containing substantial discrepancies with Mullen's version of "the truth" and further prove that Mullen and her attorneys had knowledge of their false claims.

(Dkt. 171-6 – Dkt. 171-18; Dkt. 171-25) None of the discrepancies are addressed by Mullen, who simply claimed that she "believes the women, and further contends that Butler's refusal to acknowledge the truth of his past abusive behavior is fraudulent." (Dkt. 171, p. 1)

In a bad faith attempt to survive summary judgment, Plaintiff, for the first time, complained that she, "of course," knew about the allegations, but that "[c]ertain key facts regarding Butler's conduct were never part of the public record." (Dkt. 171, p. 11, 27) Mullen's new theory focused heavily on the false premise that she was defrauded by the Defendants because she "was unaware of the findings of both USAV and DCFS" and states that those findings "were non-public." (Dkt. 171, p. 32) This is unquestionably false, and Plaintiff should be sanctioned for continuing to pursue her false claims. (Exhibit 13, Exhibit 16); *See Tillman v. New Line Cinema*, 374 Fed. Appx. 664, 666 (7th Cir. 2010) (discussing the duty on attorneys to abandon proceedings when they are "fac[ed] with evidence showing [they] had no chance to prevail"). The USAV and DCFS proceedings received substantial press coverage beginning in 1995 and continuing through the present day. (Dkt. 183, p. 2) In July of 2016, before Mullen returned to Sports Performance in the fall for the 2016-2017 season, she liked a post which said that Rick was "banned by the governing body of his sport" and stated that, "[a]ccording to the women involved and according to the findings of the USAV ethics panel, he was a serial rapist." (Exhibit 3, p. 36)

Plaintiff's claim on summary judgment that the findings of USAV were non-public flies in the face of all evidence and common sense. To advance her argument, contends that a letter from 1995 evidences her claim that the USAV findings were non-public because, according to Mullen, "USAV's attorney even wrote that 'the Committee is doing its best to keep this matter confidential.'" (Dkt. 171, p. 12) However, Plaintiff attempts to mislead the Court by quoting only half of the sentence which, in full, states that "[t]he Committee is doing its best to keep this matter

confidential *despite the unfortunate publicity that has already occurred*." *Id.* (emphasis added) Plaintiff's "evidence" was a brazen attempt to mislead the Court with a document that clearly contradicted her position. Rather than acknowledging the overwhelming evidence against her false claims and dismissing Plaintiff's bogus lawsuit, her attorneys invented a new theory and attempted to mislead the Court with inadmissible and intentionally deceptive evidence. Their unreasonable conduct was a fraud on this Court and should be sanctioned as such. *See Alexander,* 930 F.Supp.2d at 961 (citing *Hazel–Atlas Glass Co. v. Hartford–Empire Co.*, 322 U.S. 238, 251 (1944) ("No fraud is more odious than an attempt to subvert the administration of justice.").

In the end, this Court saw through Mullen's false claims that held that "[i]t is undisputed that even at the beginning of the class period, information about Rick's history of sexual abuse of female youth athletes was available in the public domain" and that those online articles "featured highly detailed descriptions of the allegations against Rick and mentioned the USAV coaching ban and the DCFS finding." (Dkt. 183, p. 18) Mullen's claim that she "was unaware of the findings of both USAV and DCFS" and that those findings were unavailable to the public is a sanctionable fabrication that should not be tolerated by this Court. (Dkt. 171, p. 31) *See Jolly Grp. Ltd. v. Medline Indus. Inc.*, 435 F.3d 717, 720 (7th Cir. 2006).

**B.** <u>**Plaintiff's Version of "The Truth" is Asserted in Bad Faith**</u>

Plaintiff claims that, "[h]ad parents and players been aware of the true state of the facts regarding Butler's sexual abuse…they would not have participated in any GLV associated volleyball programs and would not have paid substantial money to Defendants." (Dkt. 1, ¶ 160) Yet, Mullen has never identified which factual allegations she believes represent "the truth." Her version of "the truth" is simply whatever version she subjectively decides to believe, which has allowed her to morph her claims to suit whatever argument was necessary to survive different phases of this litigation. Prior to initiating this action, Mullen and her attorneys had access to an

28

abundance of evidence showing that her allegations and arguments are not true. (Dkt. 1, ¶ 135; Dkt. 79-1; Dkt. 183, p. 2) Even more, they were aware that Plaintiff's version of "the truth" has been rejected by officers of the court, and judicial decisions.[10] (Dkt. 79-1; Exhibit 20) Given the egregious nature of their conduct, sanctions should be imposed and Mullen and her attorneys should be responsible for the attorneys' fees and expenses related to the defense of Plaintiff's frivolous and improper actions. *See Jimenez*, 321 F.3d at 656-57. Edelson PC investigated the accusations for months before bringing this lawsuit, and they contend that the Complaint represents the "truthful" stories of abuse against Rick Butler. Yet, the record clearly establishes that this simply is not true. The truth is that Mullen has mislead this Court from the beginning.

## C. Plaintiff's Attorneys Employed Improper Litigation Tactics to Advance Bad Faith Accusations Against Defendants and Their Counsel

Plaintiff and her attorneys engaged in an abusive litigation tactic called "litigation by sanction." This "sanctions tort" has been described as discovery gamesmanship in which one party will "exploit or abuse judicial procedures" to generate sanctions against an opposing party. *See Roadway Express, Inc. v. Piper*, 447 U.S. 752, 757 n.4 (1980). The lawyer attempts to stoke a judge's anger at the opposing party, accusing it of intentionally obstructing justice, and seeks broad sanctions. Here, Plaintiff's counsel used this playbook to repeatedly attack the Defendants and their attorney with false, misleading, and baseless claims to cast them in a false and negative light. Shortly after filling her Complaint, which was chockfull of falsehoods, Plaintiff filed a Motion for Leave to Propound Limited Expedited Discovery, alleging—with no facts to support the allegations—that the Defendants and their counsel were improperly communicating with class

---

[10] For example, the 1995 Decree of Adoption was part of the "Our Story" document, so Mullen and her attorneys undoubtedly knew that a judge had deemed the Butlers' home to be safe for children prior to arguing in this case that "[a]s an objective matter, Butler is not qualified to be alone in a room with children, let alone coach them." (Dkt. 57, p. 24; Dkt. 79-1) Plaintiff's contention is clearly not fact-based in light of the 1995 court approving the Butlers' petition to adopt a child and finding Rick and Cheryl to be "reputable persons with character" after reviewing substantial evidence, including the DCFS and USAV investigation and findings. (Exhibit 20; Dkt. 71-13; Dkt. 87-13)

members. (Dkt. 17, p. 5) Then, Plaintiff continued their "litigation by sanction" scheme with a Motion to Compel and for Entry of Protective Order asking the Court for an Order finding, *inter alia*, that Defendants and their counsel engaged in improper communications with putative class members and requiring Defendants to issue corrective notice to putative class members. (Dkt. 48, p. 1) Plaintiff's motion presented one strange argument after another, including, *inter alia*, (1) asking this Court to sanction Defendants because Cheryl Butler, a non-attorney, was not aware of the procedural distinctions between a Motion to Dismiss and a Motion for Summary Judgment, (2) arguing that Defendants lied when they said they had evidence to counter Mullen's claims, because they did not attach such evidence to their 12(b)(6) Motion to Dismiss, when doing so would clearly violate the Rule, and (3) asserting that Defendants "misrepresent the fundamental nature of the lawsuit, stating that the misconduct at issue stems from fraud," when Plaintiff was, in fact, suing them for fraud under five different legal theories.[11] (Dkt. 48, pp. 4-10) The Court declined Plaintiff's request for corrective notice, pointing out that the statements to class members explained the lawsuit by referencing some of the same issues the Court "relied on in denying the motion to dismiss." (Dkt. 141-2, pp. 11-12)

Plaintiff's deceitful litigation tactics continued in a March 27, 2019, "Notice Regarding Class Notice," which was a blatant attempt to influence the Court early on that Defendants were responsible for actions which were initiated by members of the class. (Dkt. 116) Plaintiff's false accusations prompted the Court to enter an Order requiring the parties to appear the following day. (Dkt. 118) There, the Court explained that the Plaintiff's previous complaints about the

---

[11] Plaintiff's claim is particularly bold in light of statements made to the press by Jay Edelson, stating that Defendants' argument "that parents might have sent their kids to a different club and paid money to that other club seems to be a bit of a red herring." (Exhibit 2, p 27) (comment posted by John Tawa, founder of PrepVolleyball.com) Mr. Edelson's statement is false, as this Court that "Mullen could—and did—purchase volleyball training services from other sports clubs, and she therefore does not have a viable ICFA claim under an unfair practices theory." (Dkt. 183, p. 24)

Defendants' communications with class members raised the suspicion that the Defendants were responsible for the communications between members of the class related to the Class Notice. (Dkt. 141-6, pp. 4-5) However, Defense counsel explained that this "spontaneous effort…on the part of potential class members" in the face of the allegations of abuse against Butler was nothing new to Defendants. (Dkt. 141-6, pp. 9-10) In fact, based on Mullen's Volleytalk activity and the "investigation" conducted by her attorneys, the actions taken by the class should have been of no surprise to any party to this case. (Dkt. 89-1; Dkt. 89-3) Nevertheless, the allegations in Plaintiff's Notice became the basis for additional expedited discovery regarding Defendants' communications with class members regarding the Notice and opt outs. (Dkt. 141-6, p. 14)

On April 15, 2019, Plaintiff again filed a "Status Report Regarding Class Notice" which was not requested by the Court. (Dkt. 123) The Report was filed the day before the Parties previously-scheduled status hearing, which all but ensured that Defendants would not have time to file a substantive response to its misleading claims. (Dkt. 124) Much like in Plaintiff's Motion for Sanctions, Mullen provided the Court with select excerpts of emails without proper context in a clear attempt to construe those statements as improper. *Id.* The timing of the report ensured that Defendants were stripped of an opportunity to review, investigate, and/or prepare a substantive, written response to the accusations and, instead, forced Defense counsel to defend against the misleading claims, without proper notice, in open court.

Continuing their scheme, on May 7, 2019, again just one day prior to a previously-scheduled status hearing set for May 8, 2019, Plaintiff filed an 89-page "Status Report Regarding Class Notice" at 7:07 p.m., again ensuring that Defendants would not have any opportunity to respond. (Dkt. 139) The Report followed Plaintiff's pattern of misconstruing communications in an attempt to mislead the Court and prejudice Defendants by falsely casting them in a negative

31

light immediately prior to each Court hearing. *Id.* Notably, Plaintiff made the baseless accusation that "Defendants and their counsel have engaged in misleading and improper communications with class members since the beginning of this case." (Dkt. 143, p. 1) Clearly, Plaintiff was hoping that if she repeated the accusation enough times, the Court would eventually be convinced it was true.

Furthermore, Plaintiff's counsel had a particular focus on disparaging Defense counsel with false and baseless claims, beginning with the first motion filed in this matter and continuing even after summary judgment. On April 3, 2018, Plaintiff sought production of Defense counsel's communications with class members and baselessly accused Defense counsel of communicating with class members "for the purposes of misleading them about the nature of Plaintiff's lawsuit" (Dkt. 17, p. 1) Throughout this case, Plaintiff has failed to present evidence to substantiate the two-year-long contention that Defense counsel communicated with class members "for the purposes of misleading them about the nature of Plaintiff's lawsuit." (Dkt. 17, p. 1)

Plaintiff's counsel apparently believed they could create such evidence on a telephonic meet and confer regarding discovery issues. (Dkt. 48-2) There, Jay Edelson interrogated Defense counsel about whether she had "spoken to anyone who's part of the class or who's on the teams or anything like that." (Dkt. 48-4, p. 12) Just days later, Plaintiff filed a motion arguing that Defense counsel improperly communicated with putative class members when she issued a statement to the press "falsely claiming" that "[t]he recent lawsuit against Rick Butler, filed by a disgruntled parent, concerns alleged misrepresentations related to contracts and business practices." (Dkt. 48, pp. 1, 4-10) The Court flat-out rejected Plaintiff's position. At a hearing on July 3, 2018, the Court confirmed that Defense counsel's statement "kind of seems like it's right on the money" about the claims at issue in this case. (Dkt. 141-2, pp. 10-11) The Court continued, "The statement is absolutely true…It's not false at all. It's not misleading at all. It is. I mean, each

one of [Plaintiff's] claims is a claim for deception. You have a claim for deception under the IPFSA. You have a claim for deception under the ICFA. You have a common law misrepresentation claim. You have an unfair practices claim under the ICFA. You have a contract deficiency claim under the IPFSA, and you've got an unjust enrichment claim. All of those concern misrepresentations related to contracts and business practices. So that statement is true." *Id.*

Plaintiff's bizarre, unsubstantiated attacks on Defense counsel continued even after summary judgment. On May 7, 2020, Plaintiff filed with this Court a Status Report which was not requested by this Court and contains improper and misleading information. (Dkt. 195) The latest filing by Edelson PC contains a screenshot of a Facebook post from Defense counsel's private Facebook page. (Dkt. 195) Edelson PC contends Defense counsel "use[d] her personal connection to the Class members to communicate with them" and that she made "threats" to the Class. (Dkt. 195, ¶ 10) Like those before it, the "Report" is loaded with false, uninformed accusations. In reality, Defense counsel is not friends with class members on Facebook, Defense counsel does not communicate with class members on Facebook, and, most importantly, Defense counsel does not even use her own name on Facebook. (Dkt. 195, ¶ 6; Exhibit 34, ¶¶ 32-34) Edelson PC's attempt to police what Defense counsel can say to her friends and family is profoundly inappropriate, and it appears the firm conducted a considerable investigation into Defense counsel's personal life, which is the only way the firm could discover her private Facebook page under a different name. *Id.* Edelson PC's fixation on disparaging Defense counsel with baseless accusations has been inappropriate throughout this entire litigation, and, at this point, has become downright creepy.

Laura Mullen and her attorneys lied to get this case into this Court and continued to lie for over two years, until her claims were ultimately disposed of on summary judgment. (Dkt. 183, p. 22) Plaintiff's attorneys seem to believe that they can manufacture a cause of action, falsify

evidence, and abuse the judicial system with impunity. It speaks volumes about the legitimacy of Plaintiff's claims that even the "hint" of accountability for their misconduct sends them running back to this Court with more false claims.[12] (Dkt. 195) For two years, Mullen and her attorneys claimed to represent the interests of *thousands* of class members, yet they still have not identified a single class member who supports this lawsuit.[13] It is abundantly clear that it is Laura Mullen and her attorneys who have intentionally mislead this Court and the public from the moment this lawsuit was filed.[14]

## VI.    PLAINTIFF AND HER ATTORNEYS SHOULD BE SANCTIONED FOR DISCOVERY MISCONDUCT

The case was assigned to this Court on April 13, 2018. By June 20, 2018—just over two months later—Plaintiff had already presented this Court with four discovery-related motions, all of which sought sanctions or attorneys' fees. Plaintiff's "litigation by sanction" tactic culminated in an unending stream of discovery demands. Lawyers engaged in this type of procedural abuse have developed techniques for setting "traps" to trigger sanctions. *See, e.g.,* Kenneth W. Starr, *Law and Lawyers: The Road to Reform*, 63 Fordham L. Rev. 959, 965 (1995) (instigating sanctions "is now a standard part of the modern litigation's play book"). They intentionally provoke disputes to create the perception of bad faith, for example, by inundating courts with "motions for sanctions

---

[12] Plaintiff's argument is particularly curious in light of Mullen "liking" a Volleytalk post that challenged the Butlers to take action, saying, "[Butler's] attorney needs to quit saying everything is false, unsubstantiated, and without merit. If your client feels wrongfully accused, he should sue. If not, shut up and go away." (Exhibit 3, p. 34)

[13] Mary Ann Georgantopoulos, *A Top US Youth Volleyball Coach Is Accused Of Raping Teenage Girls Hundreds Of Times*, BuzzFeed News, February 28, 2018, https://www.buzzfeednews.com/article/maryanngeorgantopoulos/youth-volleyball-coach-lawsuit (last visited May 17, 2020).

[14] Even after summary judgment, Jay Edelson has continued to advance dubious arguments and false narratives in the media, such as that Plaintiff has "never gotten discovery into the extent to which [Butler] abused his position of power to sexually harass and assault teenage girls on his team." Plaintiff admits to receiving discovery from Rick Butler in Defendants' Supplemental Answers to Plaintiff's First Set of Interrogatories. (Dkt. 119) While Plaintiff filed a baseless Motion to Compel Rick Butler's Answer to Interrogatory No. 1, which omitted Rick's 5-page substantive response to the Interrogatory, the motion was based upon Edelson PC's apparent dissatisfaction that there were not more accusations of sexual abuse made against Rick. *See* Lauraann Wood, *Coach Says Edelson Should Be Sanctioned Over Abuse Suit*, Law360, May 18, 2020, https://www.law360.com/legalethics/articles/1274602/coach-says-edelson-should-be-sanctioned-over-abuse-suit (last visited May 24, 2020).

based upon speculation that responsive material is being withheld with nefarious intent." *Id*. The timeline of Defendants' production exemplifies the "traps" created by Plaintiff's devious tactic, and it illustrates Defendants' attempts to comply with Plaintiff's unmanageable and unreasonable demands. (Exhibit 34, ¶¶ 28-29)

On April 12, 2019, Defendants explained to this Court that "[t]he unreasonable manner in which Plaintiff continuously issues sets of discovery requests and, almost immediately, demands supplemental responses has created an unmanageable state of outstanding written discovery…Defendants have been in a near-constant state of answering discovery and producing documents. The supplemental discovery and the answers to Plaintiff's recently-issued discovery overlap in the types of information and documents requested or relied upon." (Dkt. 132, p. 1) Defendants explained, for example, that "[o]n March 14, 2019, approximately 5 hours after Defendants produced their supplemental discovery responses, Plaintiff requested a meet and confer claiming that portions of Defendants' discovery responses and production were deficient." *Id.* Throughout this case, Defendants made repeated efforts to avoid discovery disputes and comply even with Plaintiff's unreasonable requests, all the while, Plaintiff's counsel was simply intending to create a state of chaos likely to result in an error, setting a "trap" to trigger another motion.

In the end, it is clear that Plaintiff counsel militarized the requirement for attorneys to make good faith efforts to settle discovery disputes in order to manufacture discord. "When a party's attorney is at fault for a discovery violation, the appropriate remedy is to shift costs to the party's counsel." *Rackemann v. LISNR, Inc.*, 2018 WL 3328140, No. 1:17-cv-00624-MJD-TWP, at *7 (N.D. Ill. July 6, 2018) (holding Plaintiff's counsel, Edelson PC, responsible for the payment of attorneys' fees to Defendants)*; Thompson v. Fajerstein*, No. 08-cv-3240, 2010 WL 4628515, at *1 (N.D. Ill. Nov. 8, 2010). In a good faith effort to resolve differences without court intervention,

Defendants often produced supplemental responses (and even second supplemental responses) only to end up on yet another meet and confer with counsel for Plaintiff dictating the exact information he desired in each answer, which was often not requested in, or made clear by, the original request. (Exhibit 34, ¶ 29) If Defendants refused, Plaintiff would accuse counsel of ethical misconduct, distort the parties' prior discovery agreements, and threaten to—and often did—file yet another sanctions-related motion with this Court. (Dkt. 48-4; Dkt. 48)

Within the first months of proceedings, it became clear to Defense counsel that she could not have a productive, good-faith conversation with Plaintiff's attorneys due to their abusive, inappropriate conduct and gross misrepresentations of the parties' telephonic meet and confer conferences.[15] In a June 15, 2018 email from Defense counsel to Plaintiff's attorneys, she expressed her frustrations with their abusive tactics:

> The transcript from our phone call is clear. Read it. You repeatedly mischaracterized what I had previously said, and, at least three times, I explicitly had to correct you, saying "that's not what I said/admitted." I shouldn't have to explain to you how you are mischaracterizing my words, because you clearly know what you're doing and when you're doing it – each self-serving mischaracterization is an attempt to construe my words into an admission. Local Rule 37.2 requires a good faith effort to resolve discovery disputes. It is clear that you are unable to have a productive, good faith conversation on the phone regarding discovery disputes.

(Dkt. 59-2, p. 8) The phone call Defense counsel referenced above took place on May 24, 2018, to discuss discovery disputes with Plaintiff's attorney, Jay Edelson. (Dkt. 48-4) However, it is clear from the transcript of that phone call that the attorneys for the Parties had two very different agendas when discussing the discovery at issue. (Dkt. 48-4) Defense counsel attempted in good faith to resolve a discovery dispute, while Jay Edelson attempted to extract evidence, misstate the law, and intimidate Defense counsel into complying with his unreasonable demands. *Id.* Mr.

---

[15] After the first phone call between the attorneys, Mr. Edelson sent an email which was, in his words, "memorializing the brief phone call." (Dkt. 17-1, p. 2) In response, Defense counsel stated that Mr. Edelson's "self-serving statement does not memorialize our call in any way." (Dkt. 17-1, p. 3)

Edelson used the phone call to interrogate Defense counsel which, unbeknownst to her at the time, was an attempt to manufacture evidence to be used against her clients in a motion seeking sanctions against Defendants. (Dkt. 48-4, pp. 6-12) There, Plaintiff alleged that Cheryl Butler was "falsely" claiming to have evidence which showed that Mullen was lying, and that Cheryl "falsely" stated that Defendants would be filing a counterclaim against Mullen. (Dkt. 48-4, pp. 1-2) Therefore, Plaintiff's counsel apparently believed he could bully Defense counsel into making statements favorable to his position by repeatedly misconstruing her words, and the transcript of that phone call exemplifies Mr. Edelson's proclivity for violating Local Rule 37.2 requiring attorneys to act in good faith in resolving discovery disputes. (Dkt. 48-4)

Plaintiff's tactics concerning Defendants' potential filing of a counterclaim continued into the Parties' court appearance on July 3, 2018. There, the Court noted that it was "sort of mystified" by Plaintiff's contention that Defendants were required to anticipate and include a potential counterclaim in their Rule 26(a) disclosure. (Dkt. 141-2, p. 7) After Mr. Edelson intentionally distorted the Court's analysis of Plaintiff's contentions, the Court stated, "That's not what I said. And that's the kind of thing I'm talking about. You take something somebody says and then you just sort of flip it on its head…don't clutter this stuff up with bogus arguments. That was a bogus argument." (Dkt. 141-2, pp. 7-9)

A.  **Plaintiff and Her Attorneys Relied Upon Fabricated Claims and Evidence to Obtain Discovery**

Beginning with her first motion and continuing through summary judgment, Plaintiff advanced bizarre and unsubstantiated accusations against Defendants. For example, Plaintiff claimed that the Defendants were illegally transferring assets to Brazil and traveling overseas to set up a new volleyball business. (Dkt. 17, p. 2; Dkt. 17-1, p. 4) Plaintiff's only evidence of the alleged "misconduct" was in the form of a declaration submitted by her attorney, Jay Edelson,

which conspicuously failed to identify the source of the information. (Dkt. 17-3, ¶¶ 5-6) In the end, it was Laura Mullen, posting anonymously on Volleytalk, who was repeatedly circulating the rumors that Defendants were hiding assets and planning to leave the country. (Exhibit 4, pp. 4, 6, 11, 13) That it was Mr. Edelson who advanced the false claims under oath is further evidence of his complicity in bringing Mullen's bad faith Complaint before this Court. (Dkt. 17-3, ¶¶ 2-7) "Perjury committed in the course of legal proceedings is a fraud on the court" which justifies sanctions against Mr. Edelson.[16] *Allen v. Chi. Transit Auth*., 317 F.3d 696, 703 (7th Cir. 2003).

Plaintiff's attorneys advanced these sensational, false claims to generate additional publicity and create a false air of legitimacy to her claims with a fabricated narrative that the Butlers were so concerned with her lawsuit that they began transferring assets and traveling overseas "to avoid the potential judgment."[17] From the start, Mullen and her attorneys resorted to "extreme measures" to ensure this case would play out like a courtroom drama for the public, all the while intentionally increasing the costs of litigation for the Defendants. (Exhibit 2, p. 111)

### B. Plaintiff and Her Attorneys Answered Discovery in Bad Faith

Rule 37 provides for the imposition of sanctions against a party that fails to make disclosure or cooperate in discovery. *See Dotson v. Bravo*, 202 F.R.D. 559, 570 (N.D. Ill. 2001) ("The federal discovery rules give ample notice to litigants regarding how to properly conduct themselves. In a discovery disclosure system, designed to operate insofar as possible without judicial intervention, issuance of a court order in the first instance is unnecessary before a violation of the rule can be found."). Here, Edelson PC should be sanctioned for its inexcusable discovery gamesmanship.

---

[16] This filing commenced Plaintiff's scheme to cast Defendants and their counsel in a negative light with this Court with baseless accusations of misconduct which were often abandoned shortly thereafter. (Dkt. 17) Foe example, when the parties appeared in Court on April 17, 2018, Mr. Edelson explained, "we had two requests, but we're foregoing the other one which had to do with concerns about transferring their assets, so forget about that." (Dkt. 141-1, p. 9)

[17] Jon Seidel and Michael O'Brien, *Rick Butler lawsuit gets contentious with claims he might move overseas*, Chicago Sun-Times, April 3, 2018, https://chicago.suntimes.com/2018/4/3/18316254/rick-butler-lawsuit-gets-contentious-with-claims-he-might-move-overseas (last accessed May 6, 2020).

On April 15, 2019, Plaintiff provided Defendants with grossly inadequate responses to discovery propounded by the Defendants. (Dkt. 144-3) Rather than answering the Interrogatories as requested, Plaintiff's counsel made the unreasonable decision to treat each subpart of Interrogatory No. 1 and Interrogatory No. 5 as separate Interrogatories, which was clearly unreasonable and done in bad faith. (Dkt. 144-3, pp. 3-6; 9-18) Then, Plaintiff refused to provide answers to the remaining Interrogatories after reaching her self-imposed limit. (Dkt. 144-3) Defendants sent a letter to Plaintiff's counsel requesting supplemental responses within 7 days. (Exhibit 23) However, when the Parties spoke on the phone, Plaintiff requested an extension of over 30 days, and promised Defense counsel that, if she agreed to the much-extended deadline, they would provide substantive responses to every Interrogatory over any objections. (Exhibit 34, ¶ 29) Based on this promise (and considering Plaintiff's "litigation by sanction" ploy, which had already frustrated the Court with discovery disputes), Defense counsel agreed to the extension. *Id*.

Yet, Plaintiff's supplemental responses were again inadequate and largely failed to provide substantive responses. (Dkt. 144-4) For example, when Plaintiff was asked to state the facts upon which she based her allegation that "Defendants have a 'special relationship' with Michigan State University," Plaintiff merely provided Defendants with the title—not even a link—to a Chicago Tribune article which was published ***after this litigation*** was filed. (Dkt. 144-4, pp. 29-30) Plaintiff's remaining responses were similarly evasive, with many of her answers (1) merely referencing the Complaint or another document, (2) stating, in lieu of an answer, that the Plaintiff would produce responsive documents which were not produced, or (3) providing nonsensical answers in a clear effort to avoid the question. (Dkt. 144-4) To illustrate, when Defendants propounded discovery requesting that Mullen itemize and/or explain her damages, she simply referred to her Rule 26 disclosures. (Dkt. 144-4, pp. 8-9; Dkt. 144-6, pp. 3-4) Similarly, in response

to Defendants' request that Plaintiff "[i]dentify the owners and/or users of every VolleyTalk username of which You have knowledge…" (Dkt. 144-4, pp. 18-19) Plaintiff ignored the actual request and responded that "she used the VolleyTalk username swimrowvball. Plaintiff has not owned and/or used any other VolleyTalk usernames." *Id.* Plaintiff's answer is either intentionally nonsensical or outright false, because Defendants were clearly requesting Mullen's knowledge of other users. *Id.* It is without question that Mullen did not provide an accurate response, because she communicated on Volleytalk with the accuser who contacted her about this lawsuit and would, at the very least, know that user's identity. (Exhibit 5) Likewise, Plaintiff ignores all requests that she identify Jane Doe and the "sixth woman" referenced in the Complaint (Dkt. 144-4, pp. 15-17)

Furthermore, the day after this lawsuit was filed, Plaintiff's attorney told a news publication that his firm received "many calls and emails from people offering to provide further evidence in support of our lawsuit." (*supra*, fn. 14) However, in response to interrogatories which would elicit such information, Plaintiff did not disclose any of the communications her attorney discussed with the media, and instead stated that she would provide responsive documents (which were never provided) or that the information would be produced in "accordance with the trial plan and schedule ultimately entered by the Court." (Dkt. 144-4, pp. 15-16, 19) Plaintiff's intentionally evasive discovery responses are sanctionable. *See Profile Gear Corp. v. Foundry Allied Indus*, 937 F.2d 351 (7th Cir. 1991) (sanctioning a party for "evasive conduct" when, instead of answering interrogatories, the party responded "See Complaint and "See Documents Produced."). Plaintiff's evasive responses sought to prevent Defendants from discovering communications between those in the scheme against Defendants which would explicitly confirm that Mullen and her attorneys brought this case for an improper purpose. Therefore, the Court should exercise its discretion to order sanctions under Rule 37(b) by finding that Plaintiff's unproduced answers and documents

are presumed to contain communications which evidence Mullen and her attorneys' participation in a scheme to commit a fraud upon this Court. *See Officer v. Duran*, 2014 WL 51330, at *3 (N.D. Ill. Jan. 2, 2014) (presuming certain facts as a sanction for violation of discovery order).

## VII. THE COURT SHOULD SANCTION MULLEN AND HER ATTORNEYS AND AWARD DEFENDANTS ATTORNEYS FEES, COSTS AND EXPENSES

The campaign to harm Defendants' business with this litigation was, ultimately, successful. The organized threats to publicly shame those who associate with the Butlers began prior to this litigation, however, those threats became significantly more effective after the Complaint publicly listed several of those organizations and Edelson PC sent misleading "document preservation letters" to intimidate the rest. (Exhibit 11, ¶¶ 23-30; Exhibit 12, ¶¶ 18-24; Exhibit 25; Dkt. 71-2) Furthermore, Edelson PC engaged in a media campaign discussing the salacious details of the Complaint and campaigning to remove the Butlers from the sport.[18]

Immediately following the filing of the Complaint and related publicity, organizations that had known about the allegations for decades were cutting ties with Defendants – not because they wanted to end the relationship – but because they were afraid they would be dragged into this lawsuit or otherwise lose their businesses. *Id.* Schools which held GLV camps year after year suddenly pulled their contracts with the Defendants after being included in Plaintiff's Complaint. (Dkt. 1, ¶ 20) Teams were being pressured to withdraw from GLV's events, and Laura Mullen extended personal thanks to those organizing alternative events. (Exhibit 24) Certain colleges refused to recruit from Sports Performance, which Laura Mullen repeatedly encouraged (only after her own daughter was recruited). It is no coincidence that the Butlers were financially harmed in

---

[18] Christian Red, *New federal class-action suit against Rick Butler seeks to prevent him from interacting with minors*, New York Daily News, March 1, 2018, https://www.nydailynews.com/sports/more-sports/new-suit-rick-butler-seeks-protect-minors-article-1.3850082 (last visited May 17, 2020) (stating that the main objective behind the lawsuit is to prevent the Butlers from ever interacting with minors, and quoting Edelson: "a large number of adults in organizations have supported Butler and his club, either implicitly or explicitly… we're in a different era than we were even last year…that's why there was so much pressure on these three organizations to finally step up and do the right thing.").

ways that Laura Mullen has specifically encouraged. (Exhibit 4, p. 18; Exhibit 25; Exhibit 30; Exhibit 31) The Butlers certainly felt "the hit financially" from Mullen's false claims, as GLV suffered extensive losses, and the Butlers were forced to sell their home to pay for legal fees and prevent harassment caused by this suit. (Exhibit 11, ¶ 15; Exhibit 12, ¶, 10)

In deciding the appropriate sanctions, courts consider "the nature and extent of the prejudice suffered or likely to be suffered by the parties in the future as a result of the violation." *In re Air Crash Disaster*, 909 F.Supp. at 1124. Following the publicity of her explicit, detailed allegations of sexual abuse, Mullen encouraged the public to harass the Butlers, and the public listened. Their business was vandalized, they were followed and photographed at events, Rick received death threats on his voicemail, GLV email accounts and Facebook pages were hit abusive comments, their customers were publicly harassed, their former players were shamed on social media, and even the Butlers' attorney was threatened. (Exhibit 25; Exhibit 11, ¶¶ 9, 14-19; Exhibit 12, ¶¶ 8-14; Exhibit 27) Mullen has even supported the idea that spectators should forcibly remove Rick Butler from any volleyball event he attends, even if they resort to illegal acts to do so. (Exhibit 3, p. 9) It would not take long for this idea to become a reality. In January of 2020, when Rick was attending an out-of-town scrimmage, another coach aggressively approached him in front of players, parents, and event staff and made a threat to his life. (Exhibit 11, ¶ 17) This is all a direct result of the culture that Mullen, her attorneys, and the accusers have created towards the Butlers, which was substantially advanced by this improper, baseless lawsuit. Laura Mullen has explicitly directed and encouraged this harassment, and her behavior is clearly sanctionable, if not criminal.

### A. Edelson PC Orchestrated This Litigation in Bad Faith

Plaintiff's counsel orchestrated this duplicitous litigation in conjunction with the alleged victims to advance their goals of removing the Butlers from the sport of volleyball. Jay Edelson claims to have "started investigating for the litigation well before USA Volleyball banned Butler

for life in December" of 2017.[19] In January of 2018, one of Rick's accusers posted on Volleytalk that the alleged "victims of Butler just acquired representation from a very caring and very powerful lawyer" who "has some good angles for us to reach our goals." (Exhibit 5) Of course, this lawyer was Jay Edelson.[20] On May 15, 2018, Jay Edelson, Sarah Powers-Barnhard, Julie Romias, and Kay Rogness appeared before an Illinois State Senate Task Force to testify about this lawsuit.[21] With knowledge of the intentional, pervasive lies in the Complaint, these individuals brazenly argued that state legislatures must strengthen existing perjury laws "specifically to protect survivors of child sexual abuse." The hypocrisy is astounding.

This litigation was part of a calculated plan to abuse the judicial process. The accuser said it best when she told Mullen, "you may be able to help us with the legal aspect to get [Rick] away" from those who continue to attend GLV for volleyball training. (Exhibit 5) This case was never about recovering fees. It was never about fraud. It was always about finding a way to destroy the Defendants' business; if people would not leave the program on their own, the accusers were going to make them. Plaintiff's attorneys manufactured a cause of action to create a barrier between the Defendants and their customers. From start to finish, Jay Edelson, along with numerous attorneys at Edelson PC acting under his direction, undoubtedly orchestrated this fraud on the Court. Defendants suspect that Plaintiff's attorneys have been involved in the campaign to remove the Butlers from volleyball long before this lawsuit was filed, that they took an active role in pressuring

---

[19] Hannah Leone, *Federal lawsuit accuses Aurora volleyball coach, club of covering up sex abuse*, Aurora Beacon-News, Chicago Tribune, February 28, 2018, https://www.chicagotribune.com/suburbs/aurora-beacon-news/ct-abn-class-action-butler-st-0228-20180228-story.html (last visited May 17, 2020).

[20] While it remains unclear when Edelson PC began preparing for this case, on April 3, 2017, an employee of Edelson PC contacted Rick Butler's personal email address and specifically requested that Rick coach the firm twice per week in group lessons. (Exhibit 26) Rick referred the firm to a former SPVB player who confirmed that he did several lessons with Edelson in Chicago. *Id.* If Edelson PC was, in fact, contacting Rick Butler and/or seeking lessons from him as part of their "investigation," it is clear that Mr. Edelson's interest in this matter is personal in nature.

[21] Illinois State Senate, *Task Force Hearing*, May 15, 2018, http://www.ilga.gov/senate/committees/100Documents/SDHA/Hearing%20Packet%205.15.2018.pdf (last visited May 17, 2020) (meeting agenda listing this case as a discussion topic, with the full Complaint being publicly-accessible as an attachment to the Task Force agenda).

43

the sport's governing bodies to ban Butler, and that they have been active in discussions about the Defendants on Volleytalk prior to this litigation.[22] However, as mentioned above, Plaintiff's evasive discovery responses have prohibited Defendants from confirming as much. Obviously, Mr. Edelson and the accusers have known Mullen's Volleytalk username since they first made contact with her prior to the filing of the Complaint. (Exhibit 5) Mullen's attorneys had access to her entire Volleytalk history prior to bringing this suit, including her comments discussing the allegations which were posted as early as 2015. (Exhibit 3; Exhibit 4; Exhibit 8; Exhibit 9)

Although Mullen was most certain a willing accomplice, it was Plaintiff's attorneys who were responsible for filing a frivolous claim with an extraordinarily improper Complaint. It was Plaintiff's attorneys who filed baseless motions used to further harass and prejudice the Defendants, increase their legal fees, and create additional negative publicity. It was the Plaintiff's attorneys who abused the discovery process and proceeded to summary judgment with inadmissible and irrelevant evidence. Edelson PC utilized its abusive litigation tactics in full force against the Defendants.[23] While Defendants warned Plaintiff—twice—that they would seek sanctions pursuant to Rule 11, the misconduct in this litigation is far beyond "the pursuit of a claim

---

[22] There are several Volleytalk users who appear to have legal knowledge and a particular interest in issues presented in this litigation, even before it was filed. For example, on February 14, 2018, less than two weeks before filing her Complaint, Mullen liked a post which stressed the campaign's goal of "ensuring that Butler's reach and influence and existence in the realm of club volleyball in particular ends as soon as possible." (Exhibit 3, p. 6) Plaintiff's Complaint mirrors this language, referencing Butler's "far-reaching sphere of influence" in club volleyball. (Dkt. 1, ¶ 19)

[23] Edelson PC and, specifically, Jay Edelson is no stranger to engaging in improper litigation tactics. According to a 2017 lawsuit against Edelson PC and Jay Edelson, the firm's practice "largely consists of nothing more than preying upon unsuspecting businesses, conjuring up nonexistent issues and then attempting to extort settlements that benefit no one but themselves through payments for their nuisance lawsuits." *See Johnson & Bell, Ltd. v. Edelson PC*, 2017 L 003169 (March 28, 2017) The lawsuit also accused Edelson PC of using abusive litigation tactics similar to those committed in Mullen's case, explaining that the firm "illegally abused the process of the courts to further their own self-aggrandizement and have engaged in a self-serving publicity tour spreading their lies and defamatory statements." *Id.; see also* Conor Dougherty, *Jay Edelson, the Class-Action Lawyer Who May Be Tech's Least Friended Man*, The New York Times, April 4, 2015, https://www.nytimes.com/2015/04/05/technology/unpopular-in-silicon-valley.html (last visited May 17, 2020) (where attorney Jay Edelson was described as "a leech tarted up as a freedom fighter," and an attorney explained that "[Edelson] tries to convince you that because there's a legal gotcha with a big number [in a class action], you should pay him instead of litigating. That's his business model.").

44

without reasonable inquiry into the underlying facts." *See, e.g., Barnes v. Dalton*, 158 F.3d 1212 (11th Cir. 1998). In fact, the Plaintiff's pattern of false claims and perjury played a role in this Court's decisions regarding dismissal and class certification. (Dkt. 68, p. 5; Dkt. 101, pp. 14-15) In short, the misconduct was not harmless. Therefore, in addition to imposing monetary sanctions, the Court should refer this matter to disciplinary authorities. The Court "has available a variety of possible sanctions," including "referring the matter to disciplinary authorities." *See* Fed. R. Civ. P. 11(c) (advisory committee notes to 1993 Amendments). To the extent that Plaintiff's attorneys knowingly advanced a claim "that is unwarranted under existing law," or "asserted material factual statements that are false," or that the Complaint "serves merely to harass or injure another," they have also violated their ethical duties under Rule 3.1 of the Illinois Rules of Professional Conduct.

### B. <u>Sanctions Are Warranted Under Rule 11</u>

Rule 11 requires that an attorney certify to the best of his "knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," that any pleading is not presented to a court for an improper purpose, that the claims therein have a legally sufficient basis, and that the allegations and other factual contentions have evidentiary support. Fed.R.Civ.P. 11(b). Under Rule 11(c), a district court may impose sanctions on a party or her counsel (or both), for failing to comply with Rule 11(b). *Fries v. Helsper*, 146 F.3d 452, 458 (7th Cir.1998); *see also In re Alberto*, 119 B.R. at 993 ("[w]hen an attorney and client share responsibility for litigation strategy and such strategy violates Rule 11, courts can impose joint and several liability.").

Before filing this lawsuit, Mullen and her attorneys knew they had no case against the Defendants, but they nonetheless required Defendants to spend the time, effort, and money moving to dismiss, participating in discovery, briefing class certification issues, participating in class notification, and moving for summary judgment. After two letters sent in compliance with the Seventh Circuit's interpretation of Rule 11's safe harbor provision, Edelson PC continued to

advance Mullen's baseless claims. *See Fabriko Acquisition Corp. v. Prokos*, 536 F.3d 605, 610 (7th Cir. 2008) (affirming sanctions against an attorney who "continued to advocate a claim that had no legal basis and refused to alter or withdraw it when that deficiency was pointed out"). The appropriate sanction here is the amount Defendants expended to defend the suit because at all times Plaintiff and her attorneys had knowledge of the falsity of her claims. *See* Fed. R. Civ. P. 11(c)(4); *Golden v. Helen Sigman & Assocs.*, 611 F.3d 356, 365 (7th Cir. 2010). Plaintiff's carefully contrived, pervasive, perjurious statements created a factual dispute where there was none, costing the Defendants time and resources, and the imposition of severe sanctions is entirely warranted. *See Dotson*, 321 F.3d at 668; *Salmeron*, 579 F.3d at 797.

### C.   Sanctions Are Warranted Under 28 U.S.C. § 1927

The Seventh Circuit has explained that Section 1927 addresses prolonging litigation whereas Rule 11 addresses particular filings and therefore, unlike Rule 11, Section 1927 does not require reasonable investigation. *Samuels v. Wilder*, 906 F.2d 272, 275 (7th Cir. 1990). Pursuant to 28 U.S.C. § 1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 838 n.1 (7th Cir. 2010). A district court "has discretion to impose § 1927 sanctions when an attorney has acted in an objectively unreasonable manner by engaging in a serious and studied disregard for the orderly process of justice, pursued a claim that is without plausible legal or factual basis and lacking in justification or pursued a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound." *Jolly Grp. Ltd.*, 435 F.3d at 720. This standard does not require subjective bad faith as long as the "attorney's actions otherwise meet the standard of objective unreasonableness." *Id.* Here, a simple Google search would have alerted Plaintiff's counsel of Mullen's baseless claims of concealment, and Defendants' Rule 11

46

letters surely provided sufficient notice that Mullen's claims were meritless. However, Plaintiff's counsel persisted, increasing the Defendants' costs of litigation in an attempt to put them out of business. Therefore, sanctions are warranted under § 1927 for the unreasonable and vexatious conduct multiplying the proceedings, resulting in substantial and unnecessary litigation costs.

### D. **Sanctions Should Be Entered Pursuant to the Court's Inherent Power**

In addition to the rule and statutory bases discussed above (including sanctions pursuant to Rule 37 discussed in Part VI), the Court has inherent authority to enter sanctions. "[I]f a court finds that fraud has been practiced upon it…it may assess attorney's fees against the responsible party." *Chambers*, 501 U.S. at 46; *Carr v. Tillery*, 591 F.3d 909, 919 (7th Cir. 2010). An "all-fees award" is justified upon a showing the misconduct "so permeated the suit as to make that misconduct a but-for cause of every subsequent legal expense" incurred. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1183 (2017). Mullen's claims were so meritless and her behavior so unethical that the filing of her baseless Complaint amounts to a veritable attack on the judicial system, and sanctions should be imposed on Laura Mullen and her attorneys for their flagrant abuse of the judicial system. *See Jimenez*, 321 F.3d at 656-57. The substantial fees, costs, and expenses related to the defense of Mullen's claims were caused "solely by the relentless, repeated fraudulent and brazenly unethical efforts" of Mullen and her attorneys from the moment she filed her deceitful Complaint and continuing thereafter. *Chambers*, 501 U.S. at 57. Here, the record clearly demonstrates that Plaintiff's attorneys intended to abuse the judicial system as a means to dismantle a business and destroy the reputations of others.

This Court should impose sanctions in an amount which would deter future abuse of the judicial system. One of the basic purposes of Rule 11 is to "deter baseless filings in the district court." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990); *see also Chambers*, 501 U.S. at 49 ("[T]he inherent power of a court can be invoked even if procedural rules exist which sanction

47

the same conduct.") Mr. Edelson has used this case to promote his firm in the media, which alone serves as motive for other attorneys to similarly abuse the judicial system, harm the Defendants, and receive public praise for doing so. In fact, many have already done just that. (Exhibit 25; Exhibit 33) The scheme against the Butlers is led by Sarah Powers-Barnhard, along with Kay Rogness, an attorney, Emily Swanson, an attorney, Nancy Hogshead-Makar, an attorney, Marci Hamilton, an attorney, Jay Edelson, an attorney, and many others. Those attorneys and others who have participated in the scheme have certainly benefitted from the publicity, notoriety, and opportunities they have received as a result of their involvement, even if their lawsuit was ultimately unsuccessful.[24] (Exhibit 30; Exhibit 25; Exhibit 24; Exhibit 6, Exhibit 4; Exhibit 3; Exhibit 2) The attorneys involved in the scheme against the Butlers have already shown that they are willing to abuse the judicial system in furtherance of their goal, and the campaign against the Butlers remains steadfast in its desire to harm the Defendants:

> ***Of course people are looking to take down SPRI otherwise there wouldn't [be] a lawsuit against the butlers*** [sic]… as long as you are a paying, supporting member of spvb and the butlers [sic] you are subject to collateral damage…***Even if [the Butlers] get this lawsuit thrown out, or it is diminished beyond the initial intent, there will be people who will come and find other ways to get him away from the game.*** So instead of blowing all that money and time in the courts, exposing the athletes they supposedly care so much about, and their coaching staff who some use as their means of income, just pack it up sell the business and go away ***before some angry parent finds a way to ruin their lives beyond volleyball.***

(Exhibit 3, p. 56) (emphasis added).

One poster mentioned a 2019 lawsuit filed by Powers-Barnhard against the Butlers and GLV in New York, stating that "[i]n this current environment, Rick Butler is TOAST…he will be

---

[24] The Defendants have consistently been the subject of public attacks in the media since the allegations were first made. (Dkt. 183, p. 18) However, in recent years, the campaign against the Butlers has exploited the judicial system and the publicity related to the #MeToo movement, such as threatening action under Title IX, broadcasting petitions to harm the Butlers and anyone doing business with them, suing the Butlers and GLV in 2019 in New York pursuant to the Child Victim's Act, and filing lawsuits to force Butler out of the sport. (Exhibit 30) *See Sarah Powers-Barnhard v. Rick Butler, et al*, Case No.: 5:19-cv-1208 (N.D.N.Y. 2019) (awaiting decision on Defendants' Motion to Dismiss).

sued for every penny he owns." (Exhibit 3, p. 57) Similarly, another posted that the Defendants' legal fees "won't be ending anytime soon as the new lawsuit[s] are being filed." *Id.* The evidence is clear that this case was brought as part of a bigger scheme to shut down the Defendants' business through any means necessary, and the actions of those in that scheme leading up to, and throughout, this litigation show that their threats against Defendants should be taken seriously. The need "to deter future parties from trampling upon the integrity of the court" is extremely high in this case. (Exhibit 3, p. 56; Exhibit 25, pp. 24-27)

Mullen and her attorneys ensured that the Defendants would suffer permanent and irreparable harm upon filing her Complaint. If substantial sanctions are not imposed for the egregious misconduct in this litigation, the illicit scheme against the Butlers will continue to abuse the judicial system in furtherance of its "goals." (Exhibit 5; Exhibit 3, p. 56-57) Those involved in the scheme have shamelessly confirmed as much, as they have publicly boasted about their continued efforts to harass and harm the Defendants and they have already made a public vow that this is not the end.

## **CONCLUSION**

For all of the foregoing reasons, Defendants respectfully request that this Court enter an Order granting the following relief:

A.  Awarding Defendants reasonable attorneys' fees, costs, and expenses associated with defending this action;

B.  Monetary sanctions in the form of a fine payable to the Court (in an amount to be determined by the Court);

C.  A published, public reprimand of Jay Edelson, Alfred Kirkland Murray, Eve-Lynn J. Rapp, J. Eli Wade Scott, Ryan D. Andrews, Sydney M. Janzen, and Christopher Lillard Dore;

D. That Jay Edelson, Alfred Kirkland Murray, Eve-Lynn J. Rapp, J. Eli Wade Scott, Ryan D. Andrews, Sydney M. Janzen, and Christopher Lillard Dore attend 20 hours of continuing legal education in professionalism and legal ethics;

E. Referring this matter and Plaintiff's attorneys' conduct to the Illinois Attorney Registration and Disciplinary Commission; and

F. Any other relief that this Court deems just and proper.

Date: May 26, 2020

<div style="margin-left:40%">

Respectfully Submitted,
GLV, INC., RICK BUTLER, and
CHERYL BUTLER

By: */s/ Danielle D'Ambrose*
One of Their Attorneys

</div>

Danielle D'Ambrose
D'AMBROSE P.C.
500 North Michigan Avenue, Suite 600
Chicago, IL 60611
P: (312) 396-4121 | F: (312) 574-0924
Danielle@DambrosePC.com
ARDC No. 6323782

*Attorney for Defendants*

## **CERTIFICATE OF DELIVERY**

The undersigned, an attorney, certifies that pursuant to Section X (E) of the General Order on Electronic Case Filing for the Northern District of Illinois, service of the above and foregoing document on all attorneys of record was accomplished through the Court's Electronic Notice for Registrants on May 26, 2020.


*/s/ Danielle D'Ambrose*